# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Robert W. Gettleman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | **00 C 4729** | **DATE** | Sept. 10, 2002 |
| **CASE TITLE** | In re: Trans Union Corp. Privacy Litigation | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due _____. Reply to answer brief due _____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ■ Status hearing set for 9/27/02, at 9:00 a.m.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]

## Memorandum opinion and order entered.
## Accordingly, defendants' motions are granted in part and denied in part.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | **Document Number** |
| | No notices required. | | number of notices | |
| X | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | SEP 13 2002 | |
| | Docketing to mail notices. | | date docketed | 95 |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| GDS | courtroom deputy's initials | | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN RE TRANS UNION CORP. PRIVACY ) 
LITIGATION, )
)
)    No.    00 C 4729

## MEMORANDUM OPINION AND ORDER

In this multi-district action, plaintiffs,[1] individually and on behalf of all persons similarly

situated, have brought a consolidated eleven count amended putative class action complaint

against defendant Trans Union LLC ("Trans Union"), Acxiom Corp. and MCI WorldCom

Communications, Inc., and MCI WorldCom, Inc., (together, "MCI"), alleging various violations

of the Fair Credit Reporting Act (FCRA") 15 U.S.C. §1681 et seq. (Counts I, II, III, VI, VII, IX

and X), and state law claims for invasion of privacy and misappropriation (Count IV), unjust

enrichment (Count V), violation of the California Business and Professional Code §17200

(Count VIII), and violation of the Arizona Deceptive Trade Practices Act, ("CPA") A.R.S. §44-

1521 et seq. (Count XI). Trans Union is named as a defendant in each count. Acxiom is named

in Counts I through III and VIII. MCI is named in Counts IX-XI.[2]

The consolidated complaint seeks certification of seven separate classes, which plaintiffs

identify as: 1) FCRA Class (Counts I, II, III); 2) Common Law Class (Counts IV, V); 3) Firm

---

[1]The named plaintiffs in the underlying constituent actions are: Cynthia Albert, Jeffrey
Beadle, Cecilia Comstock, Dawn DeRonde, David Feige, Megan Gogerty, Victoria Scott
Kearley, Geri Mann, Marci Martinelli, Lawrence and Joan Palazzolo, Heather Payne, Boris and
Alla Rozenblitt, Randall J. Stein, Elizabeth H. Turner, Alan Wayne, Nancy M. Winkelmann and
Nancy M. Woods.

[2] MCI has filed a "Notice of Bankruptcy and Suggestion of Automatic Stay."
Nonetheless, some of the claims against MCI require discussion because of their relation to the
claims against the other defendants.



Offer I Class (Counts I, VI, VII); 4) 17200 Class (Count VIII); 5) MCI Class (Counts I, II, III); 6) Firm Offer II Class (Counts IX, X, XI); and 7) Arizona CPA Class (Count XI). The complaint, which contains a single joint prayer for relief for all counts, seeks: 1) an injunction preventing defendants from disclosing consumer reports in the form of target marketing lists, misappropriating and invading the common law plaintiffs' privacy rights, and requiring defendants to notify all plaintiffs of their right to be excluded from defendants' target marketing lists; 2) a declaration that defendants' sale and/or disclosure to target marketing lists and other products violate the FCRA; 3) statutory damages pursuant to 15 U.S.C. §1681n of not less than $100 and not more than $1,000 for each instance of defendants' willful failure to comply with the FCRA; 4) punitive damages; 5) nominal damages under §1681n or o; 6) disgorgement of profits; and 7) pre-and post-judgment interest and attorneys' fees.

Pending before the court are myriad defense motions: 1) Trans Union's motion to dismiss, joined by Acxiom as to Counts I, II and III; 2) Trans Union's motion to strike plaintiffs' prayers for certain relief; 3) Trans Union's motion for a determination that a claim for statutory damages under the FCRA cannot be maintained as a class action; and 4) MCI's motion to dismiss.[3] For the reasons set forth below the motions are granted in part and denied in part.

### Background

Defendant Trans Union is one of three major consumer reporting agencies in the United States. Its core business is assembling and evaluating consumer credit information, including credit and payment patterns on consumers for the purpose of selling consumer reports to third

---

[3]Because the action against MCI has been automatically stayed pursuant to 11 U.S.C. § 362, this opinion will not address MCI's motion.

parties. Typical buyers of such information are firms considering extending credit to a particular consumer. The information provided by Trans Union is used to determine if the consumer is a good credit risk.

Trans Union maintains a computer data base called "CRONUS," that contains consumer credit information it uses to generate credit reports. The data base includes the credit activity of every credit-active individual in the United States. Trans Union receives the information from credit grantors such as banks, mortgage companies, credit unions, auto dealers and collection agencies. Trans Union also receives information on student loans and child support.

Every credit-active person has a "record" in CRONUS, which includes the consumer's name and address. Additional consumer credit information is listed in a "tradeline." A tradeline is a segment of a credit report reflecting a credit relationship between the consumer and a creditor. Tradeline information includes customer account numbers, telephone numbers, social security numbers, open dates, credit grantors' names, types of loans, credit limits, payment history, and dates the accounts are closed. Each consumer's file includes all tradelines for that consumer.

In addition to selling "credit reports" used by customers to help determine whether a consumer is eligible for personal, family or household credit or insurance, Trans Union also has a division that distributes, sells, leases and/or rents "target marketing" lists to third parties. This division, first called TransMark, then Trans Union Lists, and now Performance Data, uses data from Trans Union's CRONUS to create mailing lists. Trans Union then sells these lists to its target marketing customers, which include catalog companies, newspaper and magazine subscription vendors, firms using mail solicitation or telemarketing, and target marketing list

3

brokers, managers, and wholesalers. The target marketers sell or advertise goods and services directly to consumers by mail or telephone. The consumers are picked by criteria including financial or credit related criteria.

From its CRONUS data base, Trans Union creates a master file which includes a Base List. Since January 1998, to be included within the master file, a consumer CRONUS file must include two tradelines active within the last six months. The tradeline must not be a collection or public record. Any consumer with no activity in a twelve month period is dropped. Trans Union's promotions state that the master file contains a list of 135 million individuals.

There at least two ways for Trans Union customers to utilize the master file information. Some customers provide a list of consumers to Trans Union and purchase the master file credit or financial information regarding those customers. Other customers get a list from Trans Union of the names and addresses of consumers who satisfy pre-selected criteria chosen by the customer. Some of the criteria or indicators available are: 1) open automobile loans; 2) open bank cards; 3) open department store cards; 4) open mortgages; 5) open student loans; and 6) mail order buyers.

The mailing list purchased by Trans Union customers are simply collections of names and addresses. Because, however, Trans Union has culled out names that did not satisfy the specified criteria, the customer knows additional information about each consumer on the list, including that each person on the list has at least two active credit accounts.

The complaint contains little information about Acxiom. According to plaintiffs, Trans Union is or has been the single largest shareholder of Acxiom and is or has been Acxiom's second largest customer. According to plaintiffs, during the 1990s, Acxiom was "intricately involved in the operation of Trans Union's target marketing business, and has substantially

4

profited from the sale and disclosure of consumer's private credit and other financial information.

Defendant MCI provides cellular communications services and equipment to consumers. MCI purchased a mailing list from Trans Union for purposes of soliciting consumers, including plaintiff Comstock, to purchase wireless service. On or about March 13, 2000, MCI sent Comstock "an exclusive offer for pre-approved wireless service." Plaintiffs allege that the offer violates § 1681m(d) of the FCRA.

Based on the information implicitly contained in the mailing lists, the Federal Trade Commission ("FTC") in an enforcement action determined that the sale of the list is a communication of "consumer reports" for a purpose that is not permissible under the FCRA. See final order, In the Matter of Trans Union Corp., No. 9255 (Sept. 28, 1994). The District of Columbia Circuit reversed and remanded that decision, see Trans Union Corp. v. F.T.C., 81 F.3d 228 (D.C. Cir. 1996), for submission of further evidence. The FTC again held that the mailing lists are "consumer reports" under the FCRA and cannot be sold for target marketing purposes. Trans Union has been permanently enjoined from further sale of target marketing lists. This decision was affirmed on appeal. Trans Union Corp. v. F.T.C., 245 F.3d 809 (D.C. Cir. 2001). After denial of rehearing, Trans Union's petition for a writ of certiorari was recently denied by the Supreme Court. Trans Union LLC v. F.T.C., ___ U.S. ___, 122 Sct. 2386 (June 10, 2002). The FTC's decision that Trans Union's target marketing lists constitute "consumer reports" under the FCRA led to a rash of consumer class actions, many of which have been consolidated in the instant multi-district action.

**Discussion**

I.      Trans Union's Motion to Dismiss

Trans Union's motion to dismiss is broken into five separate submotions: a) motion to dismiss Counts VI, VII, IX, and X (the firm offer counts); b) motion to dismiss Counts I, II, III, VI, VII, IX and X for failure to state a claim; c) motion to dismiss the common law counts (Counts IV and V) for failure to state a claim; d) motion to dismiss Count VIII under the California Unfair Competition Act §17200; and e) motion to dismiss Count IX under the Arizona Consumer Fraud Act for failure to state a claim.

A.      Motion to Dismiss Count VI, VII, IX and X

In Count VI and VII, plaintiffs allege that Trans Union, either willfully or negligently violated the FCRA by selling target marketing lists used for firm offers of credit or insurance that included information beyond that which is permitted by the act.

The FCRA was passed in 1968 as Title VI of the Consumer Credit Protection Act. Kodrick v. Ferguson, 54 F. Supp. 2d 788, 789 (N.D. Ill. 1999). It was designed to "ensure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy." 15 U.S.C. §1681a. Section 1681b(c)(1)(B)(i) allows a consumer reporting agency to issue a consumer report relating to any consumer in connection with any credit or insurance transaction that is not initiated by the consumer if the transaction consists of a firm offer of credit or insurance. In essence, this section allows the sale of target marketing lists provided the lists are used for making firm offers of credit or insurance to the consumers on the list. This practice is known as prescreening.[4]

---

[4] The FTC action did not address Trans Union's prescreening business.

6

The information that a person may receive through prescreening is limited to: a) the name and address of a consumer; b) an identifier that is not unique to the consumer and that is used by the person solely for the purpose of verifying the identity of the consumer; and c) other information pertaining to a consumer that does not identify the relationship or experience of the consumer with respect to a particular creditor or entity. 15 U.S.C. § 1681b(c)(2). In Counts VI and VII, plaintiffs allege that Trans Union violated §1681b(c) by including telephone numbers and/or private financial credit or other confidential information in its mailing list. In Counts IX and X, which are based on plaintiff Comstock's receipt of an offer from MCI, plaintiffs allege that Trans Union violated the FCRA by failing to ensure that MCI:1) was not going to engage in target advertising; 2) was in fact extending credit to consumers: and 3) was making clear and conspicuous disclosures as required by 15 U.S.C. §1681m.

Trans Union raises three challenges to these counts. First, Trans Union argues that the claims are not properly before this court because the issues raised in the consolidated complaint are not common to issues raised in any of the constituent complaints transferred to this court by the Mult-District Litigation Panel. See Fed. R. Civ. P. 42(a); 28 U.S.C. §1407(a). According to Trans Union, all of the constituent complaints, with the exception of the Comstock complaint, are directed at Trans Union's target marketing business which was the subject of the FTC enforcement action. Count VI, VII, IX and X, however, attack Trans Union practices with respect to its prescreening business, which is a separate division.

The problem with this argument is twofold. First, as Trans Union recognizes, the Comstock case (C.A. No. 2:00-518) raises this issue, at least with respect to Comstock's receipt of a (disputed) firm offer of credit from MCI. Second, the Gogerty case, C.A. No. 1:00CV1665,

7

raises the exact issues found in Counts VI and VII of the consolidated complaint. Paragraph 45 of the Gogerty first amended complaint specifically alleges that "[i]n addition to its target marketing products, Trans Union also discloses and sells private financial, credit and other confidential information to third parties pursuant to so-called 'firm offers of credit' under the FCRA." Paragraph 46 then alleges that Trans Union violates §1681b(c) by disclosing telephone numbers and other information linking a particular consumer's relationship with a particular creditor. Thus, the issues raised in Counts VI, VII, IX and X, are raised in the constituent complaints.

The MDL Panel consolidated and transferred both Comstock and Gogerty to this court finding, without objection (indeed with agreement by Trans Union), that the cases involve common questions of fact relating to whether Trans Union's sale of target marketing lists through its performance data division violates the FCRA. The transfer order excluded certain unrelated claims, but elected to include all the claims in both Comstock and Gogerty. This court sees no reason to alter that decision. Accordingly, Trans Union's motion to dismiss Count VI, VII, IX and X based on unrelatedness is denied.

Next, Trans Union challenges plaintiffs' standing to bring Counts VI and VII, arguing that there is no case or controversy because plaintiffs have not alleged that any of them has actually received a firm offer of credit or insurance from a third party based on information furnished by Trans Union beyond that which is permitted by the FCRA. Trans Union acknowledges that Comstock has raised a firm offer claim, but argues that she does not allege that Trans Union furnished information to MCI beyond that which the Act allows.

This argument fails because plaintiffs have alleged that their own personal information was in fact disclosed by Trans Union to third parties for use by the third party to determine whether to make an offer, and that in so doing, Trans Union disclosed too much information. The FCRA limits the information that a consumer reporting agency may disclose, and it is the disclosure of information beyond that which is allowed which creates the violation. Plaintiffs have alleged that their own personal information has been disclosed and thus have alleged an injury in fact, sufficient to establish standing. See Doe v. County of Montgomery, 41 F.3d 1156, 1159 (7th Cir. 1994). Accordingly, the court concludes that plaintiffs have standing to bring the claims alleged in Counts VI and VII.

Trans Union also argues that Comstock does not have standing to represent the Firm Offer II Class for the claims alleged in Counts IX and X, because she received an offer from MCI only, but the counts allege that Trans Union failed to maintain proper controls generally, not just with respect to MCI. Count IX is titled "Willful Non-Compliance With the FCRA, 15 U.S.C. §1681e, 1681m, 1681n by Comstock Against Trans Union and MCI." It alleges that Trans Union violates §1681b by furnishing to third parties consumers reports for the purposes of engaging in target advertising that did not comply with §1681m. It also alleges that Trans Union was required, "before providing any such reports to MCI, to verify that MCI was not going to engage in targeted advertising, was extending credit to consumers and was making the clear and conspicuous disclosures required by 15 U.S.C. §1681m." The count further alleges that Trans Union breached §1681e by failing to maintain procedures to avoid violating §1681b and §1681m by furnishing consumer reports to MCI and other third party vendors when Trans Union knew or had reasonable grounds to believe that the customers would engage in target advertising in

9

violation of §1681m. Count X makes the same allegations based on negligence. With respect to MCI, the counts allege that MCI makes offers such as the one received by Comstock, that do not contain the conspicuous disclosures required by §1681m.

Trans Union correctly notes that Comstock alleges only that she received a solicitation from MCI based on a consumer report furnished to MCI by Trans Union. She does not allege that she received a firm offer (or solicitation) from any other third party based on information received by that third party from Trans Union. Thus, according to Trans Union, Comstock does not have standing to represent a Firm Offer II Class which is alleged to include "[a]ll persons in the United States who, at any time between March 12, 1998 and the present, have a tradeline . . . in CRONUS and whose private financial credit or other confidential information has been disclosed by Trans Union to a third party for purposes of the third party making a firm offer of credit or insurance, and to whom said offer was made but without the disclosures required by the FCRA." Trans Union argues that at best, Comstock has standing to represent a class of persons who received the same solicitations from MCI that she received.

In response, plaintiffs argue that §1681e (failure to maintain reasonable procedures) is violated upon disclosure of their names to third parties who do not have a permissible purpose. Thus, according to plaintiff, it is irrelevant that Comstock received her solicitation from MCI, because Trans Union's violation is complete upon disclosure.

Both parties are correct. It is true, as plaintiffs assert, that disclosure by Trans Union of plaintiffs' confidential information to a third party customer that does not have a proper purpose for the information, without reasonable procedures maintained by Trans Union to ensure that the customer has a proper purpose, constitutes a violation of the Act whether or not plaintiffs

10

received the solicitation from the third party. It is the improper disclosure that violates the Act. See Washington v. CSC Credit Services Inc., 199 F.3d 263, 266 (5th Cir. 2000). Plaintiffs, however, purport to represent a class of persons "whose . . . confidential information has been disclosed by Trans Union to a third party for purpose of the third party making a firm offer of credit or insurance, and to whom said offer was made, but without the disclosures required by the FCRA." (Emphasis added.) Defendants are correct that apart from Comstock's claim relating to MCI, plaintiffs do not allege that a firm offer of credit "was made" to any of them. Thus, plaintiffs do not have standing to represent the Firm Offer II Class as defined with respect to the claims in Counts IX and X. Accordingly, the court grants Trans Union's motion to dismiss for lack of standing with respect to the Firm Offer II Class, but denies the motion with respect to the claims based on the MCI solicitation.

Finally, Trans Union argues that Counts IX and X fail to state a claim because the complaint does not and cannot allege that Trans Union failed to obtain certification from its customers that the information provided would be used solely for permissible purposes, and second because the counts seek to impose upon Trans Union an obligation not required by the FCRA.

As noted, the counts allege that Trans Union violated the FCRA by, 1) failing to maintain reasonable procedures designed to avoid violations of §1681b and §1681m by ensuring consumer reports are furnished only to customers that certify that they have a permissible purpose, and 2) furnishing reports to MCI and other customers when Trans Union knew or had reasonable grounds to believe that the customers would engage in target advertising that did not meet the requirements of §1681m. With respect to the first claim, Trans Union argues that under

11

§1681e(a), all it is required to do is obtain a certification from its customer of the purposes for which the information is sought. Because the complaint does not allege that Trans Union has no procedure in place to obtain such certificates (or that Trans Union in fact does not obtain such certificates), Trans Union argues that no claim can be stated. In essence, Trans Union argues that receipt of the certification means its procedures are reasonable as a matter of law.

Under §1681e(a) even when a consumer reporting agency makes an improper disclosure, liability attaches only upon a showing that the reporting agency willfully or negligently failed to maintain reasonable procedures designed to limit disclosures to those made for permissible purposes. 15 U.S.C. §1681e(a); Andrews v. Trans Union Corp. Inc., 7 F. Supp. 2d 1056, 1069 (C.D. Cal. 1998). The statute sets out several requirements for the procedures, including requiring prospective users of the information to identify themselves, certify the purposes for which the information is sought, and certify that the information will be used for no other purpose. Id. In addition, every consumer reporting agency shall make reasonable efforts to verify the identity of a new prospective user and the uses certified by such prospective user prior to furnishing such user a consumer report. Id. Finally, "no consumer reporting agency may furnish a consumer report to any person if it has reasonable grounds for believing that the consumer report will not be used for a purpose listed in § 1681b of this Title." Id.

As is evident from the statute itself, receipt of the certification alone is not sufficient to establish that Trans Union has "maintained reasonable procedures." Some reasonable investigation is also required. Moreover, even if Trans Union is correct that certification is sufficient, paragraph 122 of the consolidated complaint clearly alleges that Trans Union failed to maintain reasonable procedures designed to avoid violation of §1681b and §1681m of the FCRA

12

such that consumer reports are furnished only to prospective users who certify that the purpose for which the information is sought is permissible and will be used for no other purpose. Although not stated in specific terms, the court reads this allegation as alleging that Trans Union furnishes consumer reports to customers without first receiving the proper certification. Thus, to the extent that the counts allege that Trans Union failed to maintain proper procedures to ensure that its customers have a permissible purpose as defined in §1681b, the counts state a claim, at least as to Comstock. Again, the counts purport to be brought on behalf of the asserted Firm Offer II Class, which is defined as persons who actually received a firm offer a credit for a proper purpose, but lacked the required disclosures under §1681m. Because none of the plaintiffs aside from Comstock have alleged that they received such an offer, the counts fail to state a claim as to the Firm Offer II Class.

The "second" claim raised in Counts IX and X alleges that Trans Union violated the FCRA "by furnishing consumer reports to MCI and other third party vendors when Trans Union knew or had reasonable grounds for believing that those customers would engage in targeted advertising that did not meet the requirements of §1681m." Section 1681m requires the lawful users of consumer reports (i.e., Trans Union's customers) to include certain disclosures in their solicitations. 15 U.S.C. §1681m(d)(1), (2). Thus, the complaint alleges that Trans Union is required to maintain reasonable procedures to ensure that its lawful customers include the required disclosures in their solicitations.

Trans Union argues that its requirement to maintain reasonable procedures applies only to ensuring that its customers have a permissible purpose. Section 1681e(a) provides that "each consumer reporting agency shall maintain reasonable procedures designed to avoid violations of

13

§ 1681c of this Title [unrelated to the instant litigation] and to limit the furnishing of consumer reports to the purposes listed under §1681b of this Title." Under subsection (d)(1)(B), consumer reporting agencies are required to provide to any person to whom a consumer report is provided, a notice of that person's responsibilities under the subsection. Subsection (d)(2) provides that the FTC shall prescribe the content of the notice and that a consumer reporting agency "shall be in compliance with this subsection if it provides a notice under paragraph (1) that is substantially similar to the FTC prescription under this paragraph." Thus, Trans Union argues that its obligations are complete upon provision of the notice and, because the complaint does not allege that Trans Union fails to provide such notice, Counts IX and X fail to state a claim.

Plaintiffs' only response is to quote from one of the congressional findings and statements of purposes set forth in §1681(a)(4), which states that there "is a need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy." This is, of course, no response at all. Plaintiffs have presented no authority to support their position that a consumer reporting agency has an obligation to "police" each permissible solicitation sent by its customers to ensure that the customer has complied with its obligations. Given that the statutory scheme provides just the opposite, the portions of Counts IX and X so alleging fail to state a claim and are dismissed.

    B.    <u>Trans Union's Motion to Dismiss FCRA Counts (I, II, III, VI, VII, IX, X)</u>

        1.    <u>Equitable Relief</u>

In Count I, brought by all plaintiffs on behalf of the asserted Firm Offer I Class against Trans Union and Acxiom, and by Comstock against MCI and Trans Union, plaintiffs seek a declaration that defendants have violated the FCRA. The remaining FCRA counts all allege

either willful or negligent noncompliance with the FCRA. Each count requests "all appropriate relief as set forth in the Prayer for Relief." The Prayer for Relief requests both declaratory and injunctive relief enjoining defendants from disclosing consumer reports in the form of target marketing lists unless defendants have reason to believe such a person intends to use such list for permissible purposes, and requiring defendants to notify all members of all classes of their right to be excluded from defendants' target marketing lists and how to effect that exclusion.

Defendants argue that neither provision of the FCRA which creates a private right of action under the Act permits individual plaintiffs to obtain declaratory or injunctive relief.[5] See 15 U.S.C. §§1681n, 1681o. These provisions give private individuals the right to sue for noncompliance with the FCRA. They provide for actual or statutory damages, punitive damages, costs and attorney's fees. Neither section provides for any form of injunctive, declaratory, or other form of equitable relief. In contrast, §1681s(a), provides that compliance with the FCRA shall be enforced by the FTC, under the FTC Act, which expressly provides that the FTC can issue cease and desist orders. 15 U.S.C. § 45(b). Of course, such an order has been issued by the FTC and is being enforced against Trans Union. Thus, Trans Union argues that the statutory scheme demonstrates that Congress intended to limit the remedies available in consumer actions to damages.

"Absent the clearest command to the contrary from Congress, federal courts retain their equitable powers to issue injunctions in suits over which they have jurisdiction." Califano v. Yamaski, 442 U.S. 682, 705 (1979). "Unless a statute in so many words, or by a necessary and

---

[5]Defendants' motion to dismiss is directed to Count I for declaratory relief. Defendants have challenged plaintiffs' right to injunctive relief in Trans Union's motion to strike prayers for certain relief. Because the issues are so related, the court addresses them together.

inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied." Amoco Production Co. v. Village of Gambell, 480 U.S. 531, 542 (1987). Thus, this court must determine if Congress has clearly and unambiguously limited the court's equity jurisdiction.

Washington, 199 F.3d 263, is the only circuit court decision to address this issue directly. After recognizing the requirements as set forth by the Supreme Court, and reviewing what it considered to be a split among the lower courts,[6] the Washington the court specifically held (at 268):

> The affirmative grant of power to the FTC to pursue injunctive relief, coupled with the absence of a similar grant to private litigants when they are expressly granted the right to obtain damages and other relief, persuasively demonstrates that Congress vested the power to obtain injunctive relief solely with the FTC.

In addition to the relief dichotomy in the statutory scheme, the Washington court noted that the later added §1681u, requiring reporting agencies to disclose consumer information to the FBI for counterintelligence purposes, provides consumers with a damage remedy against the government for improperly obtaining information, and also specifies that injunctive relief shall be available to require compliance. 15 U.S.C. §1681u(m). "Thus, where Congress intended to

---

[6]A close review of the lower court cases cited by the Washington court does not really reveal a true split. None of the cases cited by the Washington court actually hold that injunctive relief is available on a class-wide bases. In Greenway v. Information Dynamics, Ltd., 399 F. Supp. 1092, 1096-97 (D. Ariz. 1974), the court certified a class on a claim for injunctive relief, but no challenge to the plaintiffs' right to such relief was raised. In Andrews, 7 F. Supp.2d at 1083-84, the court allowed injunctive relief based on state law, and refused to reach the question of whether the FCRA allowed class-wide injunctive relief. To this court's knowledge, every court that has actually addressed the issue has held that such injunctive relief is limited to the FTC.

allow private injunctive relief under the FCRA, it expressly stated that this relief was available." Washington, 199 F.3d at 269.

Finally, the Washington court also noted that its conclusion is consistent with various courts' holding that similar provisions of the Fair Debt Collection Practices Act, 15 U.S.C. §1692k, l preclude private actions for injunctive relief. Id. at 268 n.4.

Plaintiffs argue that Washington is not binding on this court and was incorrectly decided. Washington is based on §1681p, which gives the court jurisdiction over "[a]n action to enforce any liability created under this subchapter." As Washington noted, the private right of action sections, 1681 n and 1681o, create liability for damages (actual or statutory), punitive damages, and attorney's fees, but do not include injunctive or other equitable relief. In light of the affirmative grant of such power to the FTC, this court agrees with Washington that Congress vested the power to obtain injunctive relief solely with the FTC.

With respect to the declaratory relief sought in Count I, plaintiffs argue such relief is available under the Declaratory Judgment Act, 28 U.S.C. §§2201, 2202, even if unavailable under the FCRA. The court disagrees. First, as defendants argue, the relief requested by plaintiffs – a declaration that Trans Union has violated the FCRA – is not the type of action contemplated by the Declaratory Judgment Act. The primary purpose of that Act is to avoid accrual of avoidable damages to one not certain of his rights and to afford him early adjudication without waiting until his adversary should see fit to begin suit, after damage has accrued. Cunningham Bros., Inc. v. Bail, 407 F.2d 1165, 1167-68 (7th Cir. 1969).

Additionally, the Declaratory Judgment Act is procedural only; it does not expand the court's subject matter jurisdiction. Skelly Oil Co. v. Phillips Petro. Co., 339 U.S. 667, 671-72

17

(1950).  Again, this court's jurisdiction is limited to enforcing the liability created by the statute, and the sections of the FCRA granting a private right of action limit liability to damages.  15 U.S.C.§1681n, o.

Finally, it is within the court's discretion to deny declaratory relief when a more complete remedy is available.  City of Highland Park v. Train, 519 F.2d 681, 693 (7th Cir. 1975) ("While the availability of another remedy does not preclude declaratory relief, a court may properly decline to assume jurisdiction in a declaratory action when the other remedy would be more effective or appropriate.").  In the instant case, Count I, seeking a declaration that defendants violate the FCRA, adds nothing to plaintiffs' claims for monetary damages for the same violations.  Therefore, the court declines to exercise its jurisdiction over Count I.  Accordingly, defendants' motion to dismiss Count I is granted, and Trans Union's motion to strike certain prayers from relief is granted as to plaintiffs' prayer for injunctive and declaratory relief based on the FCRA.

### 2.  Counts III, VII and X

Counts III, VII and X, brought pursuant to 15 U.S.C. §1681o, each allege that Trans Union negligently failed to Comply with the FCRA.  Each count asks for a litany of relief, as set forth in the joint prayer for relief, including: declaratory and injunctive relief, statutory, punitive and nominal damages, disgorgement of profits, and interest and attorney's fees.  Not included in the litany, however, is a request for actual damages.  Section 1681o, which creates a private right of action for negligent failure to comply with the FCRA, provides that a person who is negligent in failing to comply is liable for, 1) actual damages sustained as a result of the failure, and 2) costs of any successful action including reasonable attorney's fees.  Because plaintiffs have failed

18

to request actual damages, and the statute does not provide for the relief requested, Trans Union argues that the counts fail to state a claim.

The court agrees with Trans Union that the statute does not provide for the requested relief. The Prayer for Relief, however, includes a request for "[s]uch further legal and equitable relief as the court deems just." In addition, Fed. R. Civ. P. 54(c) provides that ". . . every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in the party's pleading." The court construes plaintiffs' request for all legal relief to include a claim for actual damages. Accordingly, the motion to dismiss Counts III, VII and X for failure to request actual damages is denied.

### 3.   Counts II, VI and IX

Counts II, VI and IX, each allege claims for willful violations of the FCRA. Liability for willful violations is set forth in §1681n, which provides in pertinent part:

(a) In general

> Any person who willfully fails to comply with any requirement imposed under this subchapter with respect to any consumer is liable to that consumer an amount equal to the sum of –
>
>> (1)(A) any actual damages sustained by the consumer as a result of the failure or damages of not less than $100 and not more than $1,000;
>>
>> (2) such amount of punitive damages as the court may allow; and
>>
>> (3) in the case of any successful action to enforce any liability under this section, the costs of the action together with reasonable attorney's fees as determined by the court.

19

In its motion to dismiss and its motion to strike prayers for certain relief, Trans Union argues that the statutory and punitive damages provisions of §1681n are unconstitutionally vague and together violate due process because they impermissibly impose a double penalty. Accordingly to Trans Union, under §1681n, a consumer who has suffered no actual damage may still recover both statutory and punitive damages for a willful violation. This, according to defendant, amounts to a double penalty for the same act.

Plaintiffs do not contest the basic notion that a double penalty for the same act violates due process. Instead, they dispute Trans Union's underlying assumption that §1681n(a)(1)(A), which authorizes an award of actual damages or damages of not less than $100 or not more than $1,000, is punitive and, thus, duplicative of §1681n(a)(2), which allows an award of punitive damages apart from the actual or statutory damages.

To support its argument that the statutory damage provision is punitive, Trans Union relies on the civil liability provisions of other subchapters of the Consumer Credit Protection Act, 15 U.S.C. §1601 et. seq. Unfortunately for Trans Union, such comparisons dispel, rather than prove, Trans Unions' argument. For example, as noted by Trans Union, §130 of the Truth in Lending Act ("TILA") , 15 U.S.C. §1640, which authorizes the recovery of statutory damages, has been called a "civil penalty." See Mourning v. Family Publication Service, Inc., 411 U.S. 356, 376 (1973). A simple examination of the statutory provision reveals why. TILA §1640 provides:

> (a) individual or class action for damages; amount of award; factors determining amount of award
>
> except as provided in this section, any creditor who fails to comply with any requirement imposed under this part, including any requirement under §1635 of

this Title, or part d or e of this subchapter with respect to any person is liable to such person in an amount equal to the sum of –

1) any actual damage sustained by such person as a result of the failure;

2) (A)(i) in the case of an individual action twice the amount of any finance charge in connection with the transaction, (ii) in the case of an individual action relating to a consumer lease under part e of this subchapter, 25 percent um of the total amount of monthly payments under the lease, except that the liability under this subchapter shall not be less than $100 nor greater than $1,000 or (iii) in the case of an individual action related to credit transaction not under an open end credit plan that is secured by real property or a dwelling, not less than $200 or greater than $2,000; or . . .

Thus, the plain wording of §1640 allows recovery of actual damages plus statutory damages as additional damages. It is because the statutory damages are allowed in addition to compensatory (actual) damages that they are considered a penalty. The same is true under the Fair Debt Collection Practices Act ("FDCPA") 15 U.S.C. §1692k(i)(2)(A), which allows for recovery of actual damages plus such additional damages as the Court may allow, but not exceeding $1,000.00. "The language of the statute is plain and unambiguous. The statutory scheme clearly contemplates that actual damages are recoverable and that 'additional damages' may not exceed $1,000.00. 15 U.S.C. §1692k(a)(2)(A). The only reasonable reading of 'additional,' considering the ordinary meaning of the term, is that 'additional damages' includes punitive damages and that discretionary statutory award is meant to preclude a separate award of punitive damages." Thomas v. Pierce, Hamilton, and Stern, Inc., 967 F.Supp. 507, 509 (N.D. GA 1997).

When determining the scope of available remedies, courts rely on the plain language of the statute. The starting point for interpreting a statute is the language of the statute itself.

Consumer Product Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 108 (1980). It is also the stopping point "if a statutory language is unambiguous and the statutory scheme is coherent and consistent." Barnhart v. Sigmon Coal Co., Inc., 534 U.S. 438, 122 S.Ct. 941, 950 (2002)(quoting Robinson v. Shell Oil Co., 519 U.S. 337, 350 (1997)).

In the instant case, the language of §1681n(a)(1)(A) clearly and unambiguously allows for actual or statutory damages as the measure of compensatory damages, but not both. Statutory damages are allowed in lieu of, not in addition to, actual damages. Punitive damages are then allowed in addition to whatever measure of compensatory damages the plaintiff elects. Contrary to Trans Union's assertions, the statute does not allow recovery of actual plus statutory plus punitive damages, which would amount to a double penalty.[7]

Despite the lack of ambiguity in the wording of the statute, Trans Union argues that § 1681n(a) is a penalty because when Congress amended the section in 1996 to allow statutory damages (as a measure of actual damages) for willful violations, it did not similarly amend § 1681o for negligent violations. Thus, Trans Union argues that Congress clearly intended to impose a penalty for willful violations.

This argument invites the Court to speculate on Congress' intent in deciding to allow statutory damages in lieu of actual damages as a measure of compensation for a willful violation, but not for a negligent violation. Whatever its reason, the statute unambiguously indicates that statutory damages can be awarded in lieu of, but not in addition to, actual damages. Therefore,

---

[7]The Credit Repair Organization's Act ("CROA"), 15 U.S.C. §1679g(a), and Equal Credit Opportunity Act ("ECOA") 15 U.S.C. §1691a(b), also cited by Trans Union, each provide for actual damages plus punative damages, but not statutory damages. Thus neither statute provides for a double penalty and neither statute supports Trans Union's argument.

the statutory damage provision acts as compensation, and is not punitive. "We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'" Barnhart, 122 S.Ct. at 956. Accordingly, the court concludes that §1681n(a) does not impermissibly impose a double penalty.

Trans Union Next argues that 1681n(a) is unconstitutional on its face, because it is vague and lacks meaningful standards for the application of an award of punitive damages. It is true that unlike the CROA §1679g(a) and ECOA, §1691e(b), the FCRA provides no guidance as to what the court or a jury should consider when awarding punitive damages. This does not, however, render the section unconstitutionally fatal.

In Pacific Mutual Life Insurance Co. v. Haslip, 499 U.S. 1 (1991), the Supreme Court reiterated its long standing opinion that the common law method of assessing punitive damages, which is essentially what §1681n(a) effects, is constitutional. This court, as it does in common law cases, can cure any problem of unfettered discretion by providing the jury with an instruction setting forth factors that it should consider in assessing punitive damages. Accordingly, the court denies Trans Union's motion to dismiss and Trans Union's motion to strike certain prayers for relief based on its argument that §1681n(a) is unconstitutionally vague.

C.    Common Law Claims. (Counts IV and V)

Counts IV and V, brought by all plaintiffs on behalf of the asserted Common Law Class, charge Trans Union with invasion of privacy and misappropriation, and unjust enrichment. According to plaintiffs' briefs, they assert a claim under the privacy sub-tort of intrusion into seclusion. Relying on Illinois common law, Trans Union argues that the counts fail to state a

23

claim upon which relief may be granted. Also relying on Illinois law, plaintiffs argue that the counts meet the liberal pleading standards of Fed. R. Civ. P. 12b(6). Neither party has explained their reliance on Illinois law.

Just recently, the Seventh Circuit has stated that "no class action is proper unless all litigants are governed by the same legal rules. Otherwise the class cannot satisfy the commonality and superiority requirements of Fed. R. Civ. P. 23(a)(b)(3)." In re Bridgestone/Firestone, Inc., 288 F.3rd 1012, 1015 (7th Cir. 2002). Differences in state law on theories presented in a putative class action have led the Seventh Circuit to hold that the actions may not proceed as a nationwide class. Id. Therefore, uniform law on invasion of privacy, intrusion into seclusion, and unjust enrichment is essential for certification of a requested nationwide class.

Because the common law claims are pendant state law claims, this court applies the choice of law rules of the state in which it sits. Id.; Baltimore Orioles, Inc. v. Major League Baseball Players Ass'n., 805 F.2d 663, 681 (7th Cir. 1986). For tort claims, Illinois follows the most significant relationship test of the Restatement (Second) of Conflicts of Law. Ingersoll v. Klein, 46 Ill.2d 42 (1970). "Under this test, the law of the place of injury controls unless Illinois has a more significant relationship with the occurrence and with the parties." Id. at 45. When applying this test the court considers: (1) where the injury occurred; (2) where the injury- causing conduct occurred; (3) the domicile of the party; and (4) where the relationship of the parties is centered. Id. at 47. The court must look at the contacts of the jurisdictions under these four factors and then evaluate those contacts in light of the policies underlying the laws of those jurisdictions. Esser v. McIntyre, 169 Ill.2d 292, 298 (1996).

In the instant case, the alleged injury occurred in all fifty states. Although it is unclear from the pleadings, the court will assume, for purposes of this motion, that the injury causing conduct occurred at Trans Union's headquarters in Illinois. Plaintiffs are domiciled in all fifty states, Trans Union is domiciled in Illinois. To the extent there exists a relationship between Trans Union and plaintiffs, that relationship would be centered where plaintiffs are domiciled, which would be in all fifty states.

To determine which jurisdiction has the most significant relationship, the court looks at the contacts in light of the relevant general principles governing all choice of law decisions: (a) the needs of the interstate and international systems; (b) the relevant policies of the forum; (c) the relevant policies of other interested states and the relative interests of those states in the particular issue; (d) the protection of justified expectations; (e) the basic policies underlying the particular field of law; (f) certainty, predictability and uniformity of result; and (g) ease in the determination and application of the law to be applied.

Under these standards, the law of state where the injury occurred would apply. Illinois has no greater interest in the action than any other state, because each state has an interest in defining and protecting the privacy interests of its citizens. Nor can it be said that a citizen of Alaska, for example, would expect that his right to protect his confidential information would be governed by anything but Alaskan law.

Although most states provide a cause of action for intrusion into seclusion based on the standards set forth in the Restatement (Second) of Torts §652B, it is not clear that all states apply the standards in the same manner and measure damages equally. As Justice (then Judge) Ginsberg has stated in a similar context, even "the Uniform Commercial Code is not uniform."

25

Walsh v. Ford Motor Company, 807 F.2d 1000, 1016 (D.C. Cir. 1986). For example, in McGuire v. Shubert, 722 A.2d 1087, 1091 (P.A. Super. Court 1998), the court held that to plead a claim for intrusion into seclusion, a plaintiff must have "sufficient facts which could establish that the information disclosed would have caused mental suffering, shame, or humiliation to a person of ordinary sensibilities." Plaintiffs in the instant case have not even made such allegations generally. Indeed, plaintiffs allege only that "disclosure and sale of such private facts and information is one that is offensive and objectionable to a reasonable person of ordinary sensibilities." This general allegation is insufficient under the Restatement, which requires the disclosure to be "highly offensive." Restatement (Second) Torts §652B. Accordingly, Trans Union's motion to dismiss Counts IV and V is granted.

> D.     Count VIII

In Count VIII, plaintiffs Martinelli, Stein and Wayne, on behalf of the "17200 Class," assert a claim for unfair competition under §17200 of the California Business and Professional Code. Cal. Bus. & Prof. Code §17200. The count seeks (on behalf of the 17200 Class and the California general public) an order enjoining Trans Union and Acxiom from violating §17200, and requiring defendants to provide restitution and disgorge all unjust gains derived from their acts of unfair competition. Trans Union and Acxiom argue that the count fails to state a claim because disgorgement of profits is not an available remedy.

Section 17203 of the act provides:

> Any person who engages, has engaged, or proposes to engage in unfair
> competition may be enjoined in any court of competent jurisdiction. The court
> may make such orders or judgments including appointment of a receiver, as may
> be necessary to prevent the use or employment by any person of any practice
> which constitutes unfair competition as defined in this chapter, or as may be

> necessary to restore to any person in interest any money or property, real or
> personal, which may have been acquired by means of such unfair competition.

Cal. Bus. & Prof. Code §17203. Based on this section, Trans Union and Acxiom argue that

"restitution is the only monetary relief expressly authorized by the statute." See, Kraus v. Trinity

Management Services, Inc., 999 P.2d 718, 726 (2000). Because plaintiffs have not been deprived

of any money or property defendants argue there is nothing to be restored, and the statute does

not provide for disgorgement.

Under the wording of the statute, there are two potential pathways for an order of

disgorgement. First, disgorgement could be considered restitutionary. This is the argument

advanced by plaintiffs, citing a recent order by the California Superior Court in Fey v. Trans

Union Corp., No. 79893 (March 28, 2002), a class action related to the instant case raising the

same §17200 claims. In Fey, the court concluded that because the California Supreme Court has

held that the recovery of wrongfully withheld overtime wages as restitutionary, "it seems as

likely that the Supreme Court would find that recovery of some measure of money for the

wrongful use of one's private information for profit is also restitutionary." Id. at 2. (Citing

Cortez v. Purolator Air Filtration Products Co., 999 P.2d 706 (Cal. 2000).

This court does not read Cortez so broadly as to support the Fey court's conclusion that

the California Supreme Court would allow monetary recovery for the wrongful use of one's

private information as a form of restitution. In Cortez, although the court stated that restitution

pursuant to §17200 "is not limited only to the return of money or property that was once in the

possession of [the person to whom it is returned]," 999 P.2d at 715, it did so in the context of its

holding that "an order that earned wages be paid is therefore a restitutionary remedy authorized

by the UCL[17200]." Id. The basis of that holding was that earned wages are due and payable pursuant to §200 of the Labor Code. Id. Thus, as explained in Watson Labs, Inc. v. Rhone-Poulenc Rorer, Inc., 178 F.Supp. 2nd 1099, 1121 (C.D. Cal. 2001), the employee-plaintiff in Cortez, whose work had already been performed, had conferred an affirmative benefit that was concrete and there was no other way to make him whole but to require payment. "[E]arned wages that are due and payable . . . are as much the property of the employee who has given his or her labor to the employer in exchange for that property as is the property a person surrenders through an unfair business practice." Cortez, 999 P. 2d at 715. In contrast, in the instant case plaintiffs have conferred no benefit on Trans Union and Acxiom, and Trans Union and Acxiom have withheld no property from plaintiffs. Accordingly, the court concludes that the "disgorgement of profits" that plaintiffs seek does not constitute a restitutionary remedy available under §17203.

There is, however, a second avenue by which plaintiffs may recover under a disgorgement theory. Section 17203 authorizes the court to enter such orders or judgments as may be necessary to prevent the use of employment by any person of any practice that constitutes unfair competition. "Such orders may encompass broader restitutionary relief, including disgorgement of all monies so obtained even when it may not be possible to restore all of that money to direct victims of the practice." Kraus v. Trinity Management Services, Inc., 999 P.2d at 718, 726 (Cal. 2001). In Kraus, the companion case to Cortez, the California Supreme Court stated that "orders for disgorgement may have deterrent force beyond that of injunctions coupled with restitutionary orders and in some cases might therefore be deemed necessary to prevent the use or employment . . . of any practice which constitutes an unfair competition." Id., at 732.

Recovery was denied in <u>Kraus</u> because it was a representative action, and the California legislature had authorized disgorgement into a fluid recovery fund in class actions only. "Therefore, we decline to read the grant of equitable power in §17203 as encompassing the authority to fashion a fluid recovery remedy when the action has not been certified as class action." <u>Id</u>. Clearly, however, disgorgement is available in class cases. Accordingly, Trans Union's and Acxiom's motion to dismiss Count VIII is denied.

      E.     <u>Count XI</u>

Count XI, brought by Comstock on behalf of the "Arizona CPA Class" against Trans Union and MCI, alleges that Trans Union violated the Arizona Consumer Protection Act, A.R.S. §44-1521 et. seq. , by violating the FCRA. With respect to Trans Union, the FCRA violation alleged selling, leasing or distributing consumer reports to businesses, including MCI, which failed to provide required disclosures within their solicitations. In part IA above, the court has dismissed the FCRA claims against Trans Union based on the allegation that Trans Union failed to ensure that its customers had provided the required disclosures under §1681m. Because Count XI is based on that claim, it is also dismissed.

II.     <u>Trans Union's and Acxiom's Motion To Strike Prayers For Certain Relief</u>.

      A.     <u>Statutory and Punitive Damages Under §1681n(a)</u>.

Trans Union and Acxiom move to strike plaintiffs' claims for statutory and punitive damages under §1681n(a) as imposing a double penalty and as unconstitutionally vague. This motion is denied for the reasons set forth in part IB3 above.

B.    Declaratory and Injunctive Relief.

Trans Union and Acxiom move to strike plaintiffs' prayer for declaratory and injunctive relief under the FCRA. This motion is granted for the reason set forth in part IB1 above.

C.    Nominal Damages.

Trans Union and Acxiom move to strike plaintiffs' prayer for an award of nominal damages under §§1681n and 1681o, arguing that neither provision supports such an award. In response to this argument, plaintiff cites some older FCRA cases (pre-1996 Amendment) awarding nominal damages (none of which actually address the issue), and some cases supporting the unremarkable position that "nominal damages are an appropriate means of vindicating rights whose deprivation has not caused actual provable injury." Kyle v. Patterson, 196 F.3d 695, 697 (7th Cir. 1999).

With respect to §1681n(a), the analysis is simple. As held above, the section provides for statutory damages in lieu of actual damages. Thus, if plaintiff proves a §1681n violation, an award of statutory damages is appropriate and there is no need for an award of nominal damages.

With respect to negligent violations of the FCRA under §1681o, however, the analysis is somewhat more complicated. Nominal damages are "a trivial sum of money awarded to a litigant who has established a cause of action but has not established that he is entitled to compensatory damages." Restatement (Second) of Torts §907. "When a cause of action for a tort exists but no harm has been caused by the tort or the amount of harm is not significant or is not so established that compensatory damages can be given, judgment will be given for nominal damages, consisting of a trivial award against a wrongdoer who has caused no harm or an insignificant harm." Id. cmt.a. Thus, in Carey v. Piphus, 435 U.S. 247, 264 (1978), the Court,

30

despite holding that no compensatory damages could be awarded for violation of a constitutional right absent proof of actual injury, approved an award of nominal damages as "the appropriate means of vindicating rights whose deprivation has not caused actual provable injury." Memphis Community School Dist. v. Stachura, 477 U.S. 299, 307 n. 11 (1986).

> Common-law courts traditionally have vindicated deprivations of certain absolute rights that are not shown to have caused actual injury through the award of a nominal sum of money. By making the deprivation of such rights actionable for nominal damages without proof of actual injury, the law recognizes the importance to organized society that those rights be scrupulously observed; but at the same time, it remains true to the principle that substantial damages should be awarded only to compensate actual injury or, in the case of exemplary or punitive damages, to deter or punish malicious deprivation of rights.

Carey, 435 U.S. at 266.

Carey and the §1983 cases cited by plaintiffs, however, are obviously based on intentional violations or torts, because negligence cannot support a §1983 claim. Pena v. Leombruni, 200 F.3d 1031, 1033 (7th Cir. 1999). Nominal damages are not awarded in negligence actions because "actual damages are necessary to the cause of action." Restatement (Second) Torts §907 cmt.a. Because proof of damages is an element of recovery for a claim under the FCRA, see, Hyde v. Hibernia Nat'l Bank, 861 F.2d 446, 448 (5th Cir. 1988), and because nominal damages are by definition awarded irrespective of harm to the complainant, nominal damages are unavailable under §1681o. Accordingly, Trans Union's motion to strike plaintiffs' prayer for relief for nominal damages based on the FCRA is granted.

III.    Trans Union's Motion for Determination that Action to Recover Statutory Damages
        under the FCRA Cannot be Maintained as a Class Action

In its final motion, Trans Union argues that an action for statutory damages under § 1681n cannot be maintained as a class action because: 1) a class action is not the superior

31

method for the fair and efficient adjudication of the controversy; and 2) allowing a class action would violate Trans Union's due process rights. Both arguments are based, in large part, on the enormity of the putative FCRA Class which, according to Trans Union, would consist of approximately 190 million persons.[8]

To maintain their claim for statutory damages as a class action, plaintiffs must demonstrate compliance with Fed. R. Civ. P. 23. First, plaintiffs must satisfy all requirements of Rule 23(a): numerosity, commonality, typicality, and adequacy of representation. These elements are a prerequisite to certification, and failure to meet any one of them precludes certification of the class. Second, the action must also satisfy one of the conditions of Rule 23(b). Joncek v. Local 714 International of Teamsters Health and Welfare Fund, 1999 WL 755051 at *2 (N.D. Ill. 1999) (and cases cited therein). For purposes of the instant motion, Trans Union has not challenged plaintiffs' ability to establish the requirements of Rule 23(a), leaving only the issue of whether plaintiffs can satisfy one of the conditions of Rule 23(b).[9]

Plaintiffs assert that maintenance of a class is appropriate under Rule 23(b)(1), (2) and (3). Because the court has held that injunctive and declaratory relief is unavailable to plaintiffs as a class, certification under Rule 23(b)(2), which provides for class actions when "the party

---

[8]Plaintiffs suggest that this figure is inflated, but do not dispute that in 1997 the Trans Union Master List File contained 190 million names and that the List Master File was sold to wholesalers. Under the FTC order, any such sale was a communication of a consumer report without a proper purpose.

[9]Plaintiffs argue that Trans Union's motion is premature, but even before a plaintiff moves for class certification "a defendant may test the propriety of the action by a motion for denial of class certification." Parker v. Time Warner Entertainment Co., L.P., 198 F.R.D. 374, 376 (E.D. N.Y. 2001) (quoting Brown v. Milwaukee Spring Co., 82 F.R.D. 103, 104 (E.D. Wis. 1979). The burden of establishing the propriety of a class action remains with the plaintiff. Id.

32

opposing the classes acted or refused to act on grounds generally applicable to the class, thereby making appropriate" final injunctive or declaratory relief, is also unavailable.

Rule 23(b)(1)(B) provides for maintenance of a class when prosecution by individual members would create a risk of:

> Adjudication with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudication or substantially impair or impede their ability to protect their interests.

Plaintiffs assert that because Trans Union has argued that statutory damage to a nationwide class would subject it to liability in an amount exceeding Trans Union's net worth, certification under Rule 23(b)(1)(B) is proper under a "limited fund" theory. As noted by the Supreme Court in Ortiz v. Fireboard Corp., 527 U.S. 815, 833 (1999), "[a]mong the traditional varieties of representative suit encompassed by Rule 23(b)(1)(B) were those involving 'the presence of property which called for distribution or management.' One recurring type of such suit was the limited fund class action, aggregating claims . . . made by numerous persons against a fund insufficient to satisfy all claims." (Citations omitted). "Classic limited funds actions include claimants to trust assets, a bank account, insurance proceeds, company assets in a liquidation sale, proceeds of a ship sale in a maritime accident suit and others." Id. (quoting H. Newberg & A. Conta, Class Actions Section 409 at 4-33 (3d Edit. 1992). Obviously, the instant case does not resemble one of the "classic" limited fund examples mentioned by the Court.

In Ortiz, the Court specifically cautioned that Rule 23(b)(1)(B) should be narrowly interpreted and not expanded to include claims that attempt to "aggregate unliquidated tort claims on a limited fund rationale." Id. at 842. The reasons are obvious. Rule 23(b)(1)(B)

provides for mandatory classes. Class members are not given notice and an opportunity to opt out, because the notice provisions in Rule 23(c)(2) apply only to classes certified under Rule 23(b)(3). Id. at 833 n.13. Accepting plaintiffs' theory, any putative class action where the potential damages were greater than the defendant's net worth should be certified as a Rule 23(b)(1)(B) limited fund class. This is precisely what the Supreme Court rejected in Ortiz. Accordingly, the court concludes that plaintiffs' claim for statutory damages cannot be maintained as a Rule 23(b)(1)(B) limited fund class.

That leaves Rule 23(b)(3) as the only viable option for plaintiffs' maintenance of a class action. Rule 23(b)(3) requires plaintiffs to demonstrate "that questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Fed. R. Civ. P. 23(b)(3). Trans Union argues that a class action is not the superior method for the fair and efficient adjudication of the controversy before the court.

As noted, the FCRA is one of seven subchapters of the Consumer Credit Protection Act, 15 U.S.C. §1601 et seq. Each of the other subchapters specifically provides a cap on class action damages.[10] The FCRA does not. Neither the parties nor the court have found a case addressing the issue of class certification for statutory damages under the FCRA pursuant to Rule 23(b)(3). Trans Union argues that plaintiffs' putative class action is "strikingly similar to actions brought under TILA shortly after its enactment," prior to being amended to provide for the class action

---

[10]See TILA 15 U.S.C. §1640(a)(2)(B); CROA, 15 U.S.C. §1679g(a)(2)(B); ECOA, 15 U.S.C. §1691e(b); the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692k(a)(2)(B); and the Electronic Funds Transfer Act, 15 U.S.C. §1693m(a)(2)(B); and the Consumer Leasing Act, 15 U.S.C. §1667l.

damage cap. As enacted, TILA provided for recovery of statutory damages of twice the amount of the finance charge imposed in the transaction, but not less than $100 or more than $1,000 plus fees and costs. As enacted, the statute was silent as to the availability of class actions. 15 U.S.C. §1604(a)(1), (2) (1968). Thus, as in the instant case, the potential class recovery consisted of the sum of all individual statutory damages, with each class member entitled to at least $100, making the potential liability enormous. This potential for catastrophic liability led a number of courts to question whether a class action was the proper vehicle by which to bring a claim for statutory damages. See e.g., Berkman v. Sinclair Oil Corp., 59 F.R.D. 602, 611 (N.D. Ill. 1973).

The leading case dealing with class certification under TILA as originally enacted is Ratner v. Chemical Bank New Trust Co., 54 F.R.D. 412 (E.D. N.Y. 1972), in which a credit card holder sued a bank under TILA for failing to show a nominal annual percentage rate on a periodic statement reporting an outstanding balance with no interest yet accrued. There were an estimated 130,000 class members, each of which would have been entitled to the $100 statutory minimum damage. In concluding that a class action was not a superior method of adjudication of a TILA action for statutory damages, Judge Frankel, one of the architects of Rule 23, stated (Id. at 416):

> ... defendant points out that (1) the incentive of class-action benefits is unnecessary in view of the Act's provision for a $100 minimum recovery and payment of costs and a reasonable fee for counsel; and (2) the proposed recovery of $100 each for some 130,000 class members would be a horrendous, possibly annihilating punishment, unrelated to any damage to the purported class or to any benefit to defendant, for what is at most a technical and debatable violation of the Truth in Lending Act. These points are cogent and persuasive.

Following Ratner, district courts routinely denied class action status in TILA cases. See S. Rep. No. 278, 93rd Congress First Session at 14 (1973). Recognizing the problems, Congress

35

amended TILA in 1974, eliminating the minimum statutory recovery and placing a limit of the

lesser of $100,000 or 1 percent of the net worth of the creditor, on the total recovery in class

actions. Pub. L. No. 93-495, §408(a), 88 Stat. 518 (1974). As noted by the Senate Committee on

Banking, Housing and Urban Affairs, S. Rep. No. 93-278, at 14-15:

> A problem has arisen in applying these minimum liability provisions in class
> action suits involving millions of consumers. If each member of the class is
> entitled to a minimum award of $100, a creditor's liability can be enormous. For
> example, if a large national department store chain with 10 million customers fails
> to include a required item of information on its monthly billing statement, it can
> be subject to a minimum liability of $1 billion in a class action suit.
>
> . . .
>
> The purpose of the civil penalty section under Truth in Lending was to provide
> creditors with a meaningful incentive to comply with the law without relying on
> an extensive new bureaucracy. However, the Committee feels this objective can
> be achieved without subjecting creditors to enormous penalties for violations
> which do not involve actual damages and may be of a technical nature. Putting a
> reasonable limit on a creditor's maximum class action liability would seem to be
> in the best interest of both creditors and consumers.
>
> . . .
>
> The Committee believes the present ambiguities and uncertainties with respect to
> class action suits under Truth in Lending should be clarified. Moreover, the
> Committee agrees with the Federal Reserve Board that potential class action
> liability is an important encouragement to the voluntary compliance which is so
> necessary to ensure nationwide adherence to uniform disclosure and that such
> remedies should not be restricted to actual damages. As the Committee pointed
> out in its report on similar legislation last year, 'Most Truth in Lending violations
> do not involve actual damages and . . . some meaningful penalty provisions are
> therefore needed to ensure compliance.' Accordingly, the Committee again
> decided to place an aggregate limitation on creditor's class action liability for
> violations not involving actual damages.

It is evident from the legislative history of TILA that the 1974 amendment providing a

cap on class action damages did not and was not intended to "provide for" or create a right to

36

proceed as a class action. A class action is a procedural right created under statute and the Federal Rules of Civil Procedure. See Lopez v. Plaza Finance Co., 1996 WL 210073 at *3 (N.D. Ill. 1996). TILA was amended because the availability of classwide relief could lead to catastrophic damages. Thus, any argument that a class action is unavailable or prohibited under the FCRA simply because the statute does not so specifically provide is without merit.

Nonetheless, the fact that a class action is not prohibited does not mean that it is the superior method to resolve the dispute. Trans Union is correct that the current version of the FCRA is very similar to the pre-amended version of TILA, and certification of a class action could lead to the kind of disastrous results rejected by Ratner and recognized by Congress in its decision to adopt the 1974 amendment. Recently, both the Western District of Missouri and the Eastern District of New York have relied on the reasoning of Ratner and its progeny to reject class actions under the Cable Communications Act of 1984 ("Cable Act"), 47 U.S.C. §551(f) which, like the FCRA and pre-amendment TILA, provides for actual damages but not less than minimal statutory recovery, with no cap on class action damages. Wilson v. American Cablevision of Kansas City Inc., 133 F.R.D. 573 (W.D. Mo. 1990); Parker v. Time Warner Entertainment Co., LP., 198 F.R.D. 374 (E.D. N.Y. 2001).

In Parker, cable subscribers alleged that the defendant violated the Cable Act by disclosing and selling personal identifiable information about its subscribers to third parties and by failing to provide subscribers with clear and conspicuous notice of its disclosure of such information. The plaintiffs attempted to distinguish Wilson and its reliance on Ratner by arguing, as do plaintiffs in the instant case, that those cases involved pure technical violations,

37

while the Parker defendants took the additional step of actually marketing subscribers' personal information. In rejecting this argument, the Parker court stated ( id. at 383-84):

> . . . this distinction does not disturb the fundamental principle articulated in Wilson that a class action is not the superior manner of proceeding where the liability defendant stands to incur is grossly disproportionate to any actual harm sustained by an aggrieved individual. For reasons already mentioned this principle is of particular relevance where, as here, plaintiffs essentially have conceded that no actual harm was suffered by individual subscribers.

Plaintiff's are correct, however, that the Seventh Circuit has never expressly adopted Ratner's result or reasoning. Indeed, in Haynes v. Logan Furniture Mart, Inc., 503 F.2d 1161 (7th Cir. 1974), a pre-1974 TILA class action for statutory damages, the court expressly rejected any notion that class action treatment was absolutely precluded. "To find any congressional intent to preclude . . . treatment of such cases under Rule 23 would be a work of clairvoyance and not of construction or interpretation." Id. at 1164 (quoting Wilcox v. Commerce Bank of Kansas City, 474 F.2d 336, 343-44 (10th Cir. 1973). In so holding, the Haynes court also rejected Ratner's conclusion that the incentive for individual litigation (statutory damages and reasonable attorney's fees) precludes class action litigation as "assum[ing] that the incentive solely relates to consumer motivation to sue rather than to creditor's compliance with the Act. To the contrary, the purpose of enacting the statutory minimum damage provision was as much to induce creditor compliance with the Act as to provide incentives for private litigants." Id. Finally, the Haynes court also noted that "while procedural fairness with respect to protecting defendants from crushing damages predicated on the statutory minimum recovery is an important consideration in determining the superiority of the class action mode of adjudication, it is at least equally

important to prevent violators of the Act from limiting recovery to a few individuals where actual, wide-spread noncompliance is found to exist." Id.

The Haynes court did not, however, hold that a class action was in all cases the superior method of adjudicating the controversy, but simply that a class action device is not always incompatible with TILA case. "Where overriding reasons for preclusion are not present, there seems no reason why the use of this procedural device may not be appropriate and desirable." Id. at 1164 (quoting Wilcox, 474 F.2d at 347-48).

In reaching its conclusion that a class action was appropriate, the Haynes court distinguished Ratner and Wilcox on certain key points. First, the court "deem[ed] it highly significant that here, unlike Ratner and Wilcox, actual damages were alleged." Id. Indeed, in Haynes the defendant had imposed finance charges and applied interest rates, such that it was highly likely that the statutory penalty of twice the improper finance charge "would approximate or exceed the statutory minimum recovery in a predominate number of transactions." Id.

Second, the Haynes court also noted that the potential class size of only 2,500 purchasers, would be "inherently more manageable than the class of 180,000 members proposed in Wilcox or the class of 130,000 members suggested in Ratner. Id. Finally, the court noted that notice would present little difficulty because consumers were identifiable from the company's installment sales contracts. Id. Thus, the court concluded that "under these circumstances, . . . the class action is the superior means of adjudicating the present total controversy . . .." Id.

Applying the factors that the Haynes court deemed important in evaluating the appropriateness and desirability of class actions, the court concludes that a class action is not the superior method of adjudicating the instant controversy. First, the most important factor in

39

Haynes was the allegation of actual damages. A finance charge was imposed and an interest rate applied. In the instant case, no actual damages are alleged.

Second, in Haynes the individual recovery of twice the finance charge generally exceeded the statutory minimum recovery as provided in the Act. This point was particularly important to the Haynes court's assessment of the unfairness that would result to the defendant by allowing a class action where there was no waiver of the statutory minimum for the members of the class. As the Seventh Circuit stated in a later case interpreting Haynes, "[i]f their individual recoveries in most cases would have exceeded the minimum amount, it was not unfair to the defendant to allow the suit to proceed as a class action." Goldman v. First Nat'l Bank of Chicago, 532 F.2d 10, 15 (7th Cir. 1976). In the instant case, even the minimum statutory recovery of $100 far exceeds any actual damages suffered by plaintiffs.

Next, Haynes was predicated in large part on the small number of prospective class members (2,500) compared to the classes in Ratner (130,000) and Wilcox (180,000). In the instant case the prospective class is enormous (approximately 190 million members), over 100 times that in Ratner. The size of the class alone makes notice a problem, even if all class members are identifiable from Trans Union's data base. Finally, as Goldman makes clear, the prime concern in Haynes was that the hardship faced by the defendant if a class was certified was minimal because of the existence of actual damages that approximated or were greater than the statutory minimum. Id. at 16. In the instant case, approval of a class action could result in statutory minimum damages of over $19 billion, which is grossly disproportionate to any actual damage.

Although certification should not be denied solely because of the possible financial impact it would have on a defendant, consideration of the financial impact is proper when based on the disproportionality of a damage award that has little relation to the harm actually suffered by the class, and on the due process concerns attended upon such an impact. Parker, 198 F.R.D. at 383-84 (citing Wilson, 133 F.R.D. at 573). Thus, given the particular circumstances of the instant case, the court concludes that a class action is not the superior method for adjudicating the present controversy.

The court is mindful that this is a somewhat anomalous result. Congress has created a statutory scheme that provides for a minimum recovery of $100 for each willful violation of the Act, yet it is that very $100 minimum, combined with the enormous size of the putative class, that leads in this case to the potential for catastrophic damages and, as a result, the denial of class status. The net result is that absent class notification, it is likely that the vast majority of potential class members will not even become aware that their privacy rights might have been violated. At first glance, this result appears to encourage widespread rather than narrow abuse, for if the putative class was smaller, certification might be proper under Haynes. The harshness of this anomalous result is tempered, however, by the same statutory scheme that also provides for regulation and enforcement by the FTC , which has resulted in a cease and desist order against Trans Union halting much of the practices attacked by plaintiffs. Thus, any "uninformed victims" who have suffered no actual economic damage, have been and continue to be protected by the FTC's enforcement of the statute and regulations. In light of this balanced statutory scheme enacted by Congress, the court concludes that regulation by the FTC, coupled with individual actions for damages (and attorney fees), is superior to a class action for statutory

41

damages by tens of millions of consumers who claim no actual economic loss. See In re Bridgestone/Firestone, Inc., 288 F.3d at 1019.

For the reasons stated above, Trans Union's motion for determination that plaintiffs' claim for statutory damages cannot be maintained as a class is granted.

## CONCLUSION

For the reasons set forth above, defendants' motions are granted in part and denied in part as follows:

A.  Trans Union's (and Acxiom's) motion to dismiss the consolidated amended complaint:

    a.  Count VI, VII, IX and X, is granted as to the Firm Offer II Class and as to those portions of Counts IX and X alleging that Trans Union failed to maintain reasonable procedures to ensure that its lawful customers include all required disclosures in their solicitations, and is denied in all other respects.

    b.  The FCRA Counts is granted as to Count I and denied in all other respects.

    c.  Common law Counts, IV and V, is granted.

    d.  Count VIII is denied.

    e.  Count XI is granted.

B.  Trans Union's motion to strike prayers for certain relief:

    a.  As to statutory and punitive damages is denied.

    b.  As to declaratory and injunctive relief is granted.

    c.  As to nominal damages is granted.

C.     Trans Union's motion to determine that an action to recover statutory damages

       cannot be brought as a class is granted.

This matter is set for a report on status September 27, 2002, at 9:00 a.m.

**ENTER:**     **September 10, 2002**

                              Robert W. Gettleman
                              **Robert W. Gettleman**
                              **United States District Judge**