

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| In Re TRANS UNION CORP.<br>PRIVACY LITIGATION ) ) ) | |
| ——————————————————— ) | |
| ) | Lead Case No. 00 cv 4729 |
| THIS DOCUMENT RELATES TO: ) | MDL Docket No. 1350 |
| ) | Judge Robert W. Gettleman |
| ALL ACTIONS ) | |
| ——————————————————— ) | |

**TRANS UNION LLC'S REPLY IN SUPPORT OF MOTION TO DISMISS**

126

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iii

INTRODUCTION ................................................................................................. 1

ARGUMENT ......................................................................................................... 2

I.      PLAINTIFFS' CLAIMS FOR INJUNCTIVE RELIEF MUST
        BE DISMISSED AS MOOT. ................................................................... 2

II.     THE LACK OF LEGAL GUIDANCE BEFORE FEBRUARY 2000
        CONCERNING THE FCRA'S APPLICATION TO TARGET
        MARKETING PRECLUDES LIABILITY FOR "WILLFUL"
        VIOLATIONS AS A MATTER OF LAW ................................................ 3

        A.      TARGET MARKETING LISTS WERE NOT DEFINED AS CONSUMER
                REPORTS BEFORE FEBRUARY 2000. ............................................... 5

        B.      CONTRARY TO PLAINTIFFS' SUGGESTION, NEITHER THE FTC NOR
                THE D.C. CIRCUIT FOUND THE FCRA SUFFICIENTLY SPECIFIC TO
                BE APPLIED RETROACTIVELY TO TRANS UNION'S TARGET
                MARKETING PRACTICES…….. ........................................................ 7

III.    PLAINTIFFS FAIL TO STATE A CLAIM FOR UNLAWFUL
        DISCLOSURES IN FIRM OFFER PRESCREENING. ............................ 8

IV.     PLAINTIFFS FAIL TO STATE CLAIMS FOR INVASION OF
        PRIVACY AND UNJUST ENRICHMENT. ............................................ 8

        A.      NO CLAIM FOR INTRUSION INTO SECLUSION EXISTS FOR DEFENDANTS
                ACCESSING THEIR OWN RECORDS LAWFULLY OBTAINED. ................. 8

        B.      PLAINTIFFS FAIL TO ALLEGE AN INJURY CAUSED BY THE
                ALLEGED INTRUSION. ................................................................... 10

        C       PLAINTIFFS FAIL TO ALLEGE FACTS DEMONSTRATING THAT
                TRANS UNION'S INTRUSION WAS HIGHLY OFFENSIVE. .................. 10

        D.      INDIVIDUAL STATE LAWS REQUIRE DISMISSAL OF CLAIMS FOR
                INTRUSION INTO SECLUSION.. ...................................................... 11

        E.      PLAINTIFFS FAIL TO STATE A CLAIM FOR MISAPPROPRIATION
                OF NAME OR LIKENESS. ............................................................... 12

F        PLAINTIFFS FAIL TO STATE A CLAIM FOR UNJUST ENRICHMENT. .............14

CONCLUSION...............................................................................................................................15

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Alabama Hosp. Ass'n v. Beasley,*
  702 F.2d 955 (11th Cir. 1983) ............................................................................3

*Berkos v. Nat'l Broad. Co.,*
  515 N.E.2d 668 (Ill. App. 1987) ........................................................................13

*BMW of North America, Inc. v. Gore,*
  517 U.S. 559 (1996).........................................................................................3-4

*Bouie v. City of Columbia,*
  378 U.S. 347 (1964)............................................................................................7

*C.H. Sanders Co., Inc. v. Bristol Constr. Corp.,*
  903 F.2d 114 (2nd Cir. 1990) .............................................................................14

*Cuccioli v. Jekyll & Hyde Neue Metropol Cremen Theater Produktion Gmbh & Co.,*
  150 F. Supp. 2d 566 (S.D.N.Y. 2001)................................................................14

*Davis v. Asset Services,*
  46 F. Supp. 2d 503 (M.D. La. 1998)...................................................................4

*Davis v. Duryea,*
  417 N.Y.S.2d 624 (N.Y. Sup. Ct. 1979) ...........................................................14

*Doe v. High-Tech Inst. Inc.,*
  972 P.2d 1060 (Colo. App. 1998) ..................................................................9, 10

*Dwyer v. American Express Co.,*
  652 N.E.2d 1351 (Ill. App. 1st Dist. 1995)....................................................9-14

*Fleischer v. W.P.I.X., Inc.,*
  213 N.Y.S.2d 632 (N.Y. Sup. Ct. 1961) ...........................................................14

*Goodrich v. Waterbury Republican-Am., Inc.,*
  448 A.2d 1317 (Conn. 1982) .........................................................................11-12

*Holman v. Gillen,*
  2002 U.S. Dist. LEXIS 24271 (N.D. Ill. Dec. 16, 2002) ...................................2

*Holmes v. Fisher,*
    854 F.2d 229 (7th Cir. 1988) .................................................................2

*In re Trans Union Corp.,*
    No. 9255, 118 F.T.C. 821, 1994 FTC LEXIS 202 (Sept. 28, 1994) .............................6

*In re Trans Union Corp.,*
    No. 9255, 1999 FTC LEXIS 210 (March 29, 1999) ....................................6

*In re Trans Union Corp.,*
    Docket No. 9255, 2000 FTC LEXIS 23 (Feb. 10, 2000) ........................................ 6-7

*In re Trans Union Corp. Privacy Litig.,*
    211 F.R.D. 328 (N.D. Ill. 2002) ..................................................... 2-3, 8, 15

*James v. United States,*
    366 U.S. 213 (1961) .........................................................................4

*Johnson v. K Mart Corp.,*
    723 N.E.2d 1192 (Ill. App. 2000) ...............................................................9

*Jordan v. Federal Express Corp.,*
    116 F.3d 1005 (3d Cir. 1997) .................................................................14

*Molina v. Phoenix Sound, Inc.,*
    747 N.Y.S.2d 227 (App. Div. 1st Dept. 2002) .........................................14

*Montville v. City of DeKalb,*
    No. 93 C 20247, 1994 U.S. Dist. LEXIS 11632 (N.D. Ill. Aug. 12, 1994) .................10

*Natural Resources Defense Council v. Nuclear Regulatory Comm'n,*
    680 F.2d 810 (D.C. Cir. 1982) .................................................................3

*Nova Records, Inc. v. Sendak,*
    706 F.2d 782 (7th Cir. 1983) .................................................................4

*Richmond Medical Center for Women v. Gilmore,*
    55 F. Supp. 2d 441 (E.D. Va. 1999) ...........................................................4

*Samayoa v. Chicago Bd. Of Education,*
    783 F.2d 102 (7th Cir. 1986) .................................................................2

*Sannon v. United States,*
    631 F.2d 1247 (5th Cir. 1980) .................................................................3

*Schwartz v. Royal,*
    1996 Conn. Super. LEXIS 1316 (May 20, 1996) ......................................................12

*Shariff v. Coombe,*
    2002 U.S. Dist. LEXIS 11422 (S.D.N.Y. June 26, 2002)............................................2

*Shibley v. Time, Inc.,*
    341 N.E.2d 337 (Ohio App. 1975).......................................................................11, 15

*Trans Union Corp. v. FTC,*
    81 F.3d 228 (D.C. Cir. 1996) ......................................................................................6

*Trans Union Corp. v. FTC,*
    245 F.3d 809 (D.C. Cir. 2001) ....................................................................................7

*United States v. Critzer,*
    498 F.2d 1160 (4th Cir. 1974) ....................................................................................4

*Village of Hoffman Estates v. Flipside, Hoffman Estates,*
    455 U.S. 489 (1982).....................................................................................................4

**Statutes, Rules and Regulations**

Federal Rule Of Civil Procedure 12.........................................................................................1

16 C.F.R. § 600.5(d) (1974).....................................................................................................6

16 C.F.R. § 600.5(d) (1990).....................................................................................................6

Fair Credit Reporting  Act ............................................................................................... *passim*
    15 U.S.C. § 1681n.............................................................................................4, 14
    15 U.S.C. § 1681(d)(1) ...........................................................................................5

New York Civ. Rights Law, §§ 50, 51 ...........................................................................11, 14

**Other Materials**

Restatement (Second) Torts, § 652B (1977)..........................................................................11

Restatement (Second) Torts, § 652C (1977)..........................................................................13

### INTRODUCTION

Plaintiffs' memorandum in opposition to Trans Union's motion to dismiss ("Pl. Mem.") is remarkable for its focus on pleading standards and other technical issues, to the near-complete exclusion of substantive issues relating to the actual facts they have alleged. Plaintiffs do not deny, for example, that the Federal Trade Commission ("FTC") has entered an order, now approved by a federal appellate court, precluding Trans Union from engaging in the very conduct plaintiffs seek to enjoin through this litigation. Instead, plaintiffs merely argue that they have recited enough magic words to entitle them to proceed with *some* claim for relief, even if their injunctive claims are otherwise moot. (*See* Pl. Mem. at 3-4.) Nor do plaintiffs deny that, until February 2000 at the earliest, there was no valid legal authority holding that target marketing lists like Trans Union's were "consumer reports" under the Fair Credit Reporting Act ("FCRA"). Instead, plaintiffs assert that, because of their naked assertion that Trans Union's conduct somehow constituted a "willful" FCRA violation despite the lack of any legal authority subjecting it to regulation under the statute, this Court may not resolve the issue at the Rule 12 stage without discovery about Trans Union's subjective mental state. (*See id.* at 6-8.) Plaintiffs' sclerotic reading of Rule 12 is unjustified under well-established law, and in any event the substance of their own allegations demonstrates that their complaint is now ripe for dismissal.

For these and other reasons explained below, the combination of plaintiffs' own allegations and the extant legal authorities at the time the challenged conduct allegedly occurred demonstrate that plaintiffs' latest complaint must be dismissed. Trans Union therefore respectfully requests that the Court grant its motion to dismiss pursuant to Rule 12.

<u>ARGUMENT</u>

I.     **PLAINTIFFS' CLAIMS FOR INJUNCTIVE RELIEF MUST BE DISMISSED AS MOOT.**

Plaintiffs' primary argument against dismissal of their injunctive claims is that, regardless of whether those claims have been mooted by the FTC's cease-and-desist order, they "cannot be dismissed based on a lack of injunctive relief when other forms of relief are clearly available to plaintiffs on each of their claims." (Pl. Mem. at 3.)  To the contrary, the Seventh Circuit has repeatedly recognized the authority of district courts to dismiss claims for injunctive relief, even if such a dismissal would leave other theories of relief intact.  *See, e.g., Holmes v. Fisher*, 854 F.2d 229, 230 (7th Cir. 1988); *Samayoa v. Chicago Bd. of Education*, 783 F.2d 102 (7th Cir. 1986). The dismissal of claims for injunctive relief on mootness grounds is routine, regardless of whether the plaintiff has asserted other theories of relief.  *See, e.g., Holman v. Gillen*, 2002 U.S. Dist. LEXIS 24271, at *1 n.1 (N.D. Ill. Dec. 16, 2002) (noting earlier opinion in which court "dismissed as moot any request for declaratory or injunctive relief in light of the permanent closing of the Joliet Correctional Center"); *Shariff v. Coombe*, 2002 U.S. Dist. LEXIS 11422, at *3 (S.D.N.Y. June 26, 2002) ("The court dismisses with prejudice all claims for injunctive relief brought by these six Plaintiffs" because the claims "have been addressed by prison officials").[1]

Given that the Court has the authority to dismiss plaintiffs' claims for injunctive relief on mootness or any other ground, the only question is whether those claims are subject to dismissal on their merits.  As explained in Trans Union's opening brief, they plainly are.  Plaintiffs have not identified any distinction between the conduct covered by the FTC's cease-and-desist order

---

[1]      Indeed, in its September 10, 2002 dismissal order, this Court dismissed plaintiffs' claims for injunctive relief, wholly apart from its disposition of the other claims asserted in the complaint. *See In re*

2

and the conduct they seek to enjoin through this litigation, and there is none. Since "[c]orrective

action by an agency is one type of subsequent development that can moot a previously justiciable

issue" in civil litigation, *Natural Resources Defense Council v. Nuclear Regulatory Comm'n*,

680 F.2d 810, 814 (D.C. Cir. 1982), plaintiffs' claims should be dismissed to the extent they seek

injunctive relief.[2]

## II.    THE LACK OF LEGAL GUIDANCE BEFORE FEBRUARY 2000 CONCERNING THE FCRA'S APPLICATION TO TARGET MARKETING PRECLUDES LIABILITY FOR "WILLFUL" VIOLATIONS AS A MATTER OF LAW.

Rather than actually addressing the utter lack of legal authority prior to February 2000

concerning whether target marketing lists constitute "consumer reports" under FCRA, plaintiffs

attempt to evade the issue by recharacterizing Trans Union's argument about legal ambiguity

into an argument about the company's subjective state of mind.   (*See* Pl. Mem. at 7-14.)

Plaintiffs' analysis entirely misses the point.  Trans Union is exempt from liability for "willful"

FCRA violations not because of its subjective beliefs, but because, given the objective state of

the law, Trans Union's conduct before February 2000 could not have been willful as a purely

legal matter.  Time and again, the federal courts have refused to impose liability for "willful"

misconduct when an objective legal analysis reveals a lack of authority on the relevant issue at

the relevant time.  In *BMW of North Am., Inc. v. Gore*, for example, the Supreme Court reversed

a punitive damages award, holding that the defendant could not have acted in willful disregard of

its legal duties precisely because "at the time th[e] action was commenced, no state court had

---

*Trans Union Corp. Privacy Litig.*, 211 F.R.D. 328, 339 (N.D. Ill. 2002).

[2]    *See also Alabama Hosp. Ass'n v. Beasley*, 702 F.2d 955, 961 (11th Cir. 1983) ("Newly promulgated administrative regulations can have the effect of mooting a previously viable case."); *Sannon v. United States*, 631 F.2d 1247, 1250-51 (5th Cir. 1980) ("That newly promulgated regulations immediately applicable to litigants in a given case can have the effect of mooting what once was a viable

3

explicitly addressed whether its State's disclosure statute provides a safe harbor for nondisclosure of presumptively minor repairs or should be construed instead as supplementing common-law duties." 517 U.S. 559, 577 (1996).[3]  In *United States v. Critzer*, the Fourth Circuit reversed a defendant's conviction for willful tax evasion, holding that "*[a]s a matter of law, defendant cannot be guilty of willfully*" violating the law due to the uncertain state of the relevant tax law at the time of the challenged conduct, and that the "*defendant's actual intent is irrelevant*" to the determination of willfulness.  498 F.2d 1160, 1162 (4th Cir. 1974) (emphasis added).[4]  As one district court recently reemphasized, "[w]hen the law is vague or highly debatable, a defendant – actually or impliedly – lacks the requisite intent to violate it." *Richmond Medical Center for Women v. Gilmore*, 55 F. Supp. 2d 441, 499 (E.D. Va. 1999) (quoting *Critzer*, 498 F.2d at 1162).  The same is true when the government advances "pioneering interpretations" of the law.  498 F.2d at 1163.[5]

As explained below, an objective analysis of the law prior to February 2000 demonstrates that Trans Union's conduct during that period cannot have constituted a "willful" violation of

---

case is without doubt.").

[3]       Willfulness under § 1681n of the FCRA is even stricter than the willfulness required to justify a punitive damages award, being "synonymous with the requirement of intent in criminal statutes." *Davis v. Asset Services*, 46 F. Supp. 2d 503, 510 (M.D. La. 1998).

[4]       Plaintiffs' related effort to recharacterize Trans Union's position as asserting a "good faith defense" (*see* Pl. Mem. at 12-13) ignores this rule that where a law is vague, evidence of good faith reliance is irrelevant to the question of willfulness. *See, e.g., Critzer*, 498 F.2d at 1162; *James v. United States*, 366 U.S. 213 (1961).

[5]       Citing *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489 (1982) and *Nova Records, Inc. v. Sendak*, 706 F.2d 782 (7th Cir. 1983), plaintiffs claim that Trans Union must establish that the definition of consumer report in the FCRA must be impermissibly vague in all of its applications. (Pl. Mem. at 10)  This argument confuses the pre-enforcement *facial* challenges made in these cases with the *as applied* challenge here. *See Hoffman Estates*, 455 U.S. at 490; *Nova Records*, 706 F.2d at 786.  Moreover, given the protected speech issues existing here and the FCRA's definition of consumer reports by reference to the use of reports by third parties, it is doubtful that the FCRA would pass muster on even a facial challenge. *See e.g., Nova Records*, 782 F.2d at 789.

4

FCRA. For this reason, plaintiffs' claims seeking redress for willful FCRA violations must be dismissed.

### A.   TARGET MARKETING LISTS WERE NOT DEFINED AS CONSUMER REPORTS BEFORE FEBRUARY 2000.

Plaintiffs assert that the "FTC did not articulate a new standard in its February 2000 opinion, but applied the same plain and unambiguous statutory provisions that had been in effect for years." (Pl. Mem. at 6.) Yet plaintiffs offer no substantive response to Trans Union's demonstration of the vagueness of the FCRA with respect to target marketing, and how the interpretation of the FCRA has changed over time. (*See* Trans Union Mem. at 6-12.)

A consumer report under the FCRA is defined more by third party conduct than the substance of the information in the report as follows:

> The term "consumer report" means any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing a consumer's eligibility for * * * [credit, insurance, or employment.]

15 U.S.C. § 1681a(d)(1). Trans Union could not have concluded based on this bare language that target marketing lists are "consumer reports." Indeed, the inherent vagueness of this definition has been recognized by both Congress and the courts. (*See* Trans Union Mem. at 7-8.)

The FTC's own evolving view of the FCRA's application to target marketing demonstrates the absence of any concrete meaning of the term "consumer report" before February 2000 that could support a willfulness finding here. Before the FCRA was amended in 1996, the FTC allowed consumer reporting agencies to engage in target marketing as a "business transaction" with a consumer and required certification that every person on the list ". . . will be

5

the subject of an offer to enter into the particular business relationship involved." 16 C.F.R. § 600.5(d) (1974 and 1990) (attached at Tabs A and B). In 1992 it entered into a consent decree with Trans Union's competitor, TRW, allowing the disclosure in target marketing of information collected for a credit reporting database.

On December 15, 1992, the FTC brought the enforcement action against Trans Union out of which this litigation arose. While the FTC took the position in that proceeding that the term "consumer report" includes any information collected by a credit reporting agency, *see In re Trans Union Corp.*, No. 9255, 118 FTC 821, 1994 FTC LEXIS 202, * 42 (Sept. 28, 1994), that view was rejected by the D.C. Circuit as inconsistent and illogical given both the prior TRW consent decree and the structure of the statute itself. *See Trans Union Corp. v. FTC*, 81 F.3d 228, 232 (D.C. Cir. 1996) ("*Trans Union I*"). Plaintiffs' suggestion that Trans Union should have abided by the FTC's interpretation notwithstanding its reversal on appeal (*see* Pl. Mem. at 9 n.12) ignores the fact that the D.C. Circuit's reversal in *Trans Union I*, and the FTC's stay of its own later order (*see In re Trans Union Corp.*, No. 9255, 1999 FTC LEXIS 210 (March 29, 1999)), demonstrate that at all relevant times during the FTC proceeding Trans Union had a likelihood of success on the merits. For this reason alone, Trans Union's conduct during this period cannot have constituted a "willful" FCRA violation as a matter of law.

After the D.C. Circuit's decision in *Trans Union I*, Congress amended the FCRA to specifically include target marketing for credit and insurance as a permissible purpose. Given this wholesale change in the scope of FCRA, the FTC on rehearing abandoned its previous analytic approach and focused instead on how Trans Union's customers determined credit eligibility through prescreening criteria. *See In re Trans Union Corp.*, No. 9255, 2000 FTC

6

LEXIS 23, *36-38 and n.19 (Feb. 10, 2000).  More importantly, the FTC used individual elements in these complex criteria as the touchstone for applying FCRA to target marketing activities, whether or not these elements were used to determine credit eligibility.  This entirely new approach – never before adopted by the FTC or any court – was upheld by the D.C. Circuit under administrative deference principles.  *See Trans Union Corp. v. FTC*, 245 F.3d 809, 815 (D.C. Cir. 2001) ("*Trans Union II*").  Yet even the D.C. Circuit recognized that the FTC's new approach was a departure from past practice, and specifically was inconsistent with the TRW consent decree.  *Id.* at 816.  In short, an objective legal analysis reveals no authority prior to February 2000 (at the earliest) from which Trans Union could have concluded that the alleged target marketing activity was unlawful.[6]

**B.**    **CONTRARY TO PLAINTIFFS' SUGGESTION, NEITHER THE FTC NOR THE D.C. CIRCUIT FOUND THE FCRA SUFFICIENTLY SPECIFIC TO BE APPLIED RETROACTIVELY TO TRANS UNION'S TARGET MARKETING PRACTICES.**

Plaintiffs wrongly assert that Trans Union's vagueness argument was rejected by the FTC and the D. C. Circuit.  In the FTC proceeding, the FTC telling sought only prospective remedies, and did not seek to sanction Trans Union for past conduct (as it had the power to do).  The statutory vagueness that precludes a finding of pre-February 2000 "willful" misconduct thus was simply not at issue in the FTC proceeding.  *Cf. Trans Union II*, 245 F.3d at 818  (focusing on availability of FTC's advisory opinion procedures as means for curing vagueness issues associated with prospective remedy).  Far from finding that the statutory definition of "consumer report" was not vague, the D.C. Circuit specifically recognized the vagueness problem (though it

---

[6]    Plaintiffs' argument about retroactivity (*see* Pl. Mem. at 11-12) misses the point.  As was the case in *Bouie v. City of Columbia*, 378 U.S. 347, 351 (1964), the *Trans Union II* decision marked an authoritative expansion of the FCRA's reach which cannot be retroactively applied to impose penalties.

7

found it curable through the administrative process with respect to the prospective remedies at issue). Plaintiffs' argument to the contrary is thus simply unsupportable.

## III.    PLAINTIFFS FAIL TO STATE A CLAIM FOR UNLAWFUL DISCLOSURES IN FIRM OFFER PRESCREENING.

Plaintiffs attempt to find support for their firm offer claim by citing paragraphs 60-64 of the SACC. These paragraphs, however, refer only to target marketing lists, and make no reference to disclosures made in connection with prescreening for firm offers of credit or insurance. Indeed, these allegations appear under the subheading "Trans Union's Target Marketing Lists, Products And Services," (SACC, p. 18), while allegations relating to firm offer prescreening claims appear in Paragraphs 77-80 under the subheading "Trans Union's 'Firm Offers Of Credit.'" (*Id.* at p. 25). Notably, plaintiffs were careful to define "target marketing lists" to specifically *exclude* "firm offers of credit or insurance" in the SACC. (*Id.* at ¶ 31). Accordingly, allegations that Trans Union disclosed plaintiffs' tradelines in target marketing lists have nothing to do with their attempt to state a claim for disclosing information in connection with firm offers.[7]

## IV.    PLAINTIFFS FAIL TO STATE CLAIMS FOR INVASION OF PRIVACY AND UNJUST ENRICHMENT.

### A.    NO CLAIM FOR INTRUSION INTO SECLUSION EXISTS FOR DEFENDANTS ACCESSING THEIR OWN RECORDS LAWFULLY OBTAINED.

Plaintiffs argue that, contrary to case law and the RESTATEMENT (SECOND) OF TORTS, all

---

[7]    Citing this Court's September 10th Order, plaintiffs suggest that the Court determined that their firm offer claims were adequately alleged in the Consolidated Amended Complaint. (*See* Pl. Mem. at 15). Trans Union's earlier motion to dismiss, however, did not address the sufficiency of plaintiffs' firm offer allegations; it merely argued that plaintiffs lacked standing to bring such a claim. *In re Trans Union Corp. Privacy Litigation*, 211 F.R.D. 328, 336 (N.D. Ill. 2002).

8

that matters in determining the sufficiency of a claim for intrusion into seclusion is whether the defendants obtained unwanted access to information that plaintiffs regard as private. (Pl. Mem. at 17). By doing so, plaintiffs ignore the law, *i.e.*, that intrusion claims must be based upon the unlawful conduct in *collecting or gathering* the plaintiffs' information. *See* Trans Union Mem. at 16-17. Plaintiffs' claims fail because they do not and cannot claim that Trans Union obtained plaintiffs' information through deception or other unlawful means. *Id.* at 17-18.[8]

Because plaintiffs make no claim that Trans Union used unlawful or deceptive means to gather the subject information, their effort to distinguish *Dwyer v. American Express*, 652 N.E.2d 1351 (Ill. App. 1st Dist. 1995) is unpersuasive. The key to the court's decision in *Dwyer*, was whether the defendant obtained the information lawfully:

> Plaintiffs' allegations fail to satisfy the first element [of the tort of intrusion], an unauthorized intrusion or prying into the plaintiffs' seclusion. The alleged wrongful actions involve the defendants' practice of renting lists that they have compiled from information *contained in their own records*. . . . We cannot hold that a defendant has committed an unauthorized intrusion by compiling the information voluntarily given to it and then renting its compilation.

652 N.E.2d at 1354 (emphasis added). The fact that plaintiffs are not the source of the information at issue here (*see* Pl. Mem. at 18)[9] does not change the fact that the information was

---

[8]     Plaintiffs' assertion that the information Trans Union gathers from third parties is held "in trust" and cannot be used for target marketing is without factual or legal support. (Pl. Mem. at 12). Trans Union does not obtain information from plaintiffs; moreover, the FTC and the amended FCRA have always allowed the use of consumer information in target marketing, subject to consumers' rights to opt out.

[9]     The cases cited by plaintiffs are inapposite because they involve intrusion claims against defendants who, through deception or similar means obtained the information "voluntarily" from the plaintiffs. *See Doe v. High-Tech Inst. Inc.*, 972 P.2d 1060, 1069 (Colo. App. 1998) (school obtained student's consent to test his blood for rubella, but performed additional HIV test as well); *Johnson v. K Mart Corp.*, 723 N.E.2d 1192, 1196 (Ill. App. 2000) (claim was stated because the means defendant used to obtain plaintiffs' information -- through use of investigators posing as co-workers – were deceptive). The *Doe* court noted that intrusion into seclusion "focuses on the manner in which the information that a

9

voluntarily provided to Trans Union by credit grantors.  Consequently, the claim of intrusion into seclusion must be dismissed.[10]

**B.    PLAINTIFFS FAIL TO ALLEGE AN INJURY CAUSED BY THE ALLEGED INTRUSION.**

Any harm plaintiffs claim to have suffered arose not from the intrusion, but from the subsequent disclosure of plaintiffs' information.  Therefore, the alleged harm is not compensable by the intrusion claim they assert.  *See* Trans Union Mem. at 18-19.  Plaintiffs concede this point, but suggest that damages can be presumed, and that their claim for nominal damages is a substitute for injury.  Plaintiffs are mistaken.  Consistent with the Restatement, the court in *Dwyer* recognized that four elements must be alleged in order to state a claim for intrusion into seclusion, the fourth of which is that the intrusion causes anguish and suffering.  *Dwyer,* 652 N.E.2d at 1354 (citing *Melvin v. Burling,* 490 N.E.2d 1011, 1013-14 (Ill. 1986)).  *See also Montville v. City of DeKalb,* No. 93 C 20247, 1994 U.S. Dist. LEXIS 11632 (N.D. Ill. Aug 12, 1994) (dismissing claim for intrusion because plaintiff failed to allege that she suffered anguish as a result of the intrusion).  Accordingly, in the absence of allegations of harm resulting from the act of intrusion, rather than the disclosure of plaintiffs' information, plaintiffs fail to state a claim for intrusion.

**C.    PLAINTIFFS FAIL TO ALLEGE FACTS DEMONSTRATING THAT TRANS UNION'S INTRUSION WAS HIGHLY OFFENSIVE.**

Plaintiffs claim that "the issue of whether or not a particular ***disclosure*** would be 'highly offensive to a reasonable person' is generally reserved for the jury."  (Pl. Mem. at 18) (emphasis

---

person has kept private has been obtained."  972 P.2d at 1065.
[10]     Plaintiffs make no effort to distinguish the other cases cited by Trans Union which hold that intrusion claims based upon accessing information in defendant's own records fail to state a claim.  *See*

10

added).  This claim illustrates the problem – plaintiffs' allegations of highly offensive conduct refer not to the intrusion, as the cause of action requires, but instead to the subsequent disclosure of information.  *See* RESTATEMENT, 652B; Pl. Mem. at 16 (quoting RESTATEMENT).  However, it is the *intrusion* that must be highly offensive, and the SACC makes no allegation of a highly offensive intrusion.  *See, e.g.,* SACC ¶ 98 (alleging that the disclosure and sale of plaintiffs' information is highly offensive).

Moreover, Trans Union's disclosure of information was not highly offensive as a matter of law.  In *Dwyer*, the court held that the disclosure of lists containing names and addresses for target marketing, arguably constituting "personality profiles," was not highly offensive as a matter of law because they were used only to determine what type of advertising should be sent. 652 N.E.2d at 1355.  The allegations of the SACC ¶¶ 22(iv), 53-59 are indistinguishable in this regard.  Thus, the compilation of target marketing lists from Trans Union's own files, used for the purpose of identifying individuals who may be responsive to certain solicitations, is not highly offensive as a matter of law.  "The right of privacy does not extend to the mailbox . . . ." *Id.* (quoting *Shibley v. Time, Inc.*, 341 N.E.2d 337, 339-40 (Ohio App. 1975)).

### D.   INDIVIDUAL STATE LAWS REQUIRE DISMISSAL OF CLAIMS FOR INTRUSION INTO SECLUSION.

By their silence, plaintiffs apparently concede that there is no claim under New York law for intrusion into seclusion.  *See* N.Y. Civ. Rights Law, §§ 50, 51.  *See also* Pl. Mem. at 16 n.17 (suggesting that New York's statutory right to privacy encompasses only the misappropriation claim).  The New York plaintiff's claim for intrusion into seclusion must be dismissed.

In an effort to save the Connecticut claim, plaintiffs cite *Goodrich v. Waterbury*

---

Trans Union Mem. at 17).

~CHGO1:30259701.v1  |2/28/03

11

*Republican-Am., Inc.*, 448 A.2d 1317, 1328-29 (Conn. 1982) and suggest that the general adoption of the Restatement's four categories of the invasion of privacy torts therein precludes Connecticut from limiting the scope of the intrusion into seclusion tort. *See* Pl. Mem. at 19. In making this argument, plaintiffs fail to address *Schwartz v. Royal*, 1996 Conn. Super. LEXIS 1316 \*10 (Conn. Super. May 20, 1996), a more recent case cited in Trans Union's opening brief.[11] As the *Schwartz* court stated, "the *Goodrich* court adopted the invasion of privacy definitions and categories set forth in the RESTATEMENT (SECOND) OF TORTS." 1996 Conn. Super. LEXIS 1316 \*8 (citing *Goodrich*, 448 A.2d 1317). However, the state's general adoption of the tort's elements as outlined in the Restatement does not mean that it adopts the manner in which the Restatement comments upon or interprets those elements. *Schwartz* specifically states that Connecticut courts "have concluded that 'in order to establish a claim for unreasonable intrusion upon the seclusion of another, the plaintiffs must prove an intentional ***physical*** intrusion by the defendant . . .'" *Id.* (citations omitted). Accordingly, the mere adoption of the Restatement does not change the fact that Connecticut claims for intrusion into seclusion are limited to physical intrusions.

### E.   PLAINTIFFS FAIL TO STATE A CLAIM FOR MISAPPROPRIATION OF NAME OR LIKENESS.

Notwithstanding plaintiffs' effort to distinguish the facts here, their claim for misappropriation of name or likeness is clearly governed by *Dwyer*. Plaintiffs argue that, unlike *Dwyer*, they allege that each plaintiff's name and information have value. (Pl. Mem. at 20 (citing SACC ¶¶ 21, 99)). But the only basis in the SACC for valuing plaintiffs' information is

---

[11]   Notably, *Goodrich* was not an intrusion into seclusion case.

~CHGO1:30259701.v1 |2/28/03

the same method rejected in *Dwyer*[12] -- by reference to the number of names **on a list**.  *See*

SACC ¶ 21 (the value of plaintiffs' information "was determined by defendants when they sold

the information at a certain price per thousand names or at a certain price per name, depending

on the amount of private information that was sold with the name").  The price per thousand

referenced by plaintiffs is the value identified in *Dwyer*.  Moreover, it is a value associated with

sending a group a ***marketing offer***.  This value has nothing to do with the use of a name in, for

example, the marketing of a product.

While plaintiffs baldly allege that their names have value (SACC ¶ 99), there is no

allegation that such value has been impaired by Trans Union's use or disclosure of the

information.  Plaintiffs do not allege that their names have been used to take advantage of their

reputations or prestige for the purposes of publicity.  *See Berkos v. Nat'l Broad. Co.*, 515 N.E.2d

668, 679 (Ill. App. 1987) (quoting RESTATEMENT (SECOND) OF TORTS § 652C, cmt. d)).  The

value of a plaintiff's likeness is not appropriated "when it is published for purposes other than

taking advantage of his reputation, prestige, or other value associated with him for purposes of

publicity."  RESTATEMENT, § 652C, cmt. d.  The SACC alleges that the purpose of using names

is not to appropriate the plaintiffs' publicity value of these names, but to use the names to

compile target marketing lists.  (SACC ¶¶ 52-53).  Placing plaintiffs' names in a target marketing

list does not reduce the value of the name, and therefore any value that may exist was not

---

[12]       In *Dwyer*, the court held that:

>       Undeniably, each cardholder's name is valuable to defendants.  The more names
> included on a list, the more the list will be worth.  However, a single, random
> cardholder's name has little or no value to defendants (or a merchant).  Rather, an
> individual name has value only when it is associated with one of defendant's
> lists.  Defendants create value by categorizing and aggregating these names.

652 N.E.2d at 1356.

13

"appropriated." *See Dwyer*, 652 N.E.2d at 1356 ("defendants' practices do not deprive any of the cardholders [on the list] of any value their individual names may possess.").[13]

### F.   PLAINTIFFS FAIL TO STATE A CLAIM FOR UNJUST ENRICHMENT.

Plaintiffs argue that their unjust enrichment claim does not "rise or fall" with their common law privacy claims, suggesting that alleged violations of the FCRA provide a basis for unjust enrichment. (Pl. Mem. at 24). The SACC, however, specifically states that the unjust enrichment claim "is being asserted by Plaintiffs under the laws of the states in which Plaintiffs reside," not under the FCRA or any concept of federal common law. (SACC, ¶ 102).

Moreover, no such cause of action exists under the FCRA or federal common law. *See* 15 U.S.C. §§ 1681n, 1681o (prescribing limited remedies for FCRA violations). *See also C.H. Sanders Co., Inc. v. Bristol Constr. Corp.*, 903 F.2d 114, 118 (2nd Cir. 1990) ("Restitution for unjust enrichment is not provided by federal statute. Its availability is part of the federal common law relating to statutory violations."); *Jordan v. Federal Express Corp.*, 116 F.3d 1005, 1017-18 (3rd Cir. 1997) (federal common law causes of action are appropriate only when

---

[13]     Plaintiffs' claim under N.Y. Civ. Rights Law § 51, authorizing claims for use of one's name or picture for advertising, also fails. As the basis for plaintiffs' claim, the SACC alleges only a "misappropriation of plaintiffs' financial, credit and other personal information." SACC, ¶ 22(iii). Moreover, under New York law, such a claim is limited to the unauthorized use of a name or picture "to sell a collateral commodity," "where blatant commercial exploitation is found to exist," "or for solicitation of patronage for a particular service or product." *Davis v. Duryea*, 417 N.Y.S.2d 624, 626-27 (N.Y. Sup. Ct. 1979). Thus, the claim is properly limited to disclosures that suggest the person named in the advertisement endorses or otherwise sponsors the product with which his name is being associated. *See Fleischer v. W.P.I.X., Inc.*, 213 N.Y.S. 2d 632, 649 (N.Y. Sup. Ct. 1961) (to constitute misappropriation, "there must be an exploitation of the name in the commercial announcement or in direct connection with the product itself"). No such claim is made here and cannot be made when names are simply used to identify recipients for marketing solicitations. In addition, plaintiffs omit required allegations that the use of plaintiffs' names occurred within the State of New York. *See* N.Y. Civ. Rights Law, § 51; *Molina v. Phoenix Sound, Inc.*, 747 N.Y.S.2d 227, 230 (App. Div. 1st Dept. 2002); *Cuccioli v. Jekyll & Hyde Neue Metropol Cremen Theater Produktion Gmbh & Co.*, 150 F. Supp. 2d 566, 575 (S.D.N.Y. 2001).

14

"necessary to fill in interstitially or otherwise effectuate the statutory pattern enacted in the large by Congress") (citation omitted).   To allow the claim here would override Congress and the limited remedies it authorized under the FCRA.   As this Court recognized in its September 10 Order, the FCRA provides specific equitable remedies in enforcement proceedings, not in private consumer actions.   *In re Trans Union Corp. Privacy Litigation*, 211 F.R.D. at 338-40, 345. Accordingly, because plaintiffs' claims for invasion of privacy fail, so too does their claim for unjust enrichment.   *Id.* at 342-44 (treating unjust enrichment claim as derivative of privacy claim).   *See also, Shibley v. Time, Inc.*, 341 N.E.2d at 340 ("Since appellants base their claim of unjust enrichment upon the assumption that defendants have wrongfully appropriated their personalities, that claim has no merit there being no such wrongful appropriation.").

### CONCLUSION

For the foregoing reasons, Trans Union LLC respectfully requests that plaintiffs' Second Amended Consolidated Complaint be dismissed in its entirety, with prejudice.

February 28, 2003

TRANS UNION LLC

By: _____
One of its attorneys

Roger L. Longtin (ARDC No. 01689185)
Michael O'Neil (ARDC No. 06201736)
PIPER RUDNICK
203 N. LaSalle Street ,Suite 1800
Chicago, IL  60601-1293
(312) 368-4000

15

John H. Beisner
Brian P. Brooks
O'MELVENY & MYERS LLP
555 13th Street, N.W.
Washington, D.C.  20004-1109
Tel: (202) 383-5300
Fax: (202) 383-5414

16

## CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of the foregoing *Trans Union LLC's Reply In Support Of Motion To Dismiss* has been served on this 28th day of February, 2003, upon All Counsel of Record via First Class U.S. Mail, postage prepaid, as indicated below.

Mr. Jon W. Borderud
PRONGAY & BORDERUD
12121 Wilshire Blvd.
Suite 400
Los Angeles, California  90025

Mr. Matthew Righetti
RIGHETTI & WYNNE
456 Montgomery Street
Suite 1400
San Francisco, California  94104

Mr. Frank Janecek, Jr.
MILBERG, WEISS, BERSHAD, HYNES
 & LERACH, LLP
401 B Street, Suite 1700
San Diego, California  92101

Ms. Amy Stewart
ROSE LAW FIRM
120 East Fourth Street
Little Rock, Arkansas  72201

Ms. Terry Rose Saunders
Law Offices of Terry Rose Saunders
33 N. Dearborn Street
Suite 1302
Chicago, Illinois  60602

Mr. Ross B. Bricker
JENNER & BLOCK
One IBM Plaza
47th Floor
Chicago, Illinois  60611


Roger L. Longtin

17

# SEE CASE FILE FOR EXHIBITS