## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Robert W. Gettleman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 00 C 4729 MDL1350 | DATE | July 6, 2004 |
| CASE TITLE | In re: Trans Union Corp. Privacy Litigation | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Hearing
(5) ■ Status hearing set for 7/29/04, at 9:00 a.m.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
 ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Memorandum opinion and order entered. Trans Union's motion to dismiss is granted as to counts III and IV and is denied in all other respects. Trans Union and Acxiom are directed to answer counts I, II, V, VI and VII on or before 7/27/04.
(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. | | number of notices | Document Number |
| X | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | JUL 0 8 2004 date docketed | 150 |
| | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | U.S. DISTRICT COURT CLERK 2004 JUL -7 PM 4:35 | date mailed notice | |
| GS courtroom deputy's initials | | Date/Time received in Central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IN RE TRANS UNION CORP. PRIVACY LITIGATION, | )<br>)<br>)<br>) No. 00 C 4729<br>) MDL Docket No. 1350<br>) Judge Robert W. Gettleman |

DOCKETED JUL 08 2004

## MEMORANDUM OPINION AND ORDER

In their seven count second amended consolidated putative class action complaint in this multi-district action, plaintiffs[1] on behalf of themselves and all others similarly situated, charge defendants Trans Union LLC, Acxiom Corp., and MCI WorldCom Communications, Inc. and MCI WorldCom, Inc.,[2] with various violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 et seq. (Counts I, II, V, VI), state law claims for invasion of privacy and misappropriation (Count III), unjust enrichment (Count IV) and violation of the California Business and Professional Code § 17200 (Count VII).

The consolidated complaint seeks certification of five separate named classes, some with subclasses: (1) an FCRA class, including four subclasses; (2) an FCRA firm offer class; (3) state law privacy classes, including nine separate subclasses; (4) state law unjust enrichment classes; and (5) a California unfair competition class. The complaint's single joint prayer for relief seeks: (1) an order enjoining defendants from disclosing consumer reports in the form of target

---

[1] The named plaintiffs in the underlying constituent actions are: Cynthia Albert, Jeffrey Beadle, Cecilia Comstock, Dawn DeRonde, David Feige, Megan Gogerty, Victoria Scott Kearley, Geri Mann, Marci Martinelli, Lawrence and Joan Palazzolo, Heather Payne, Boris and Alla Rozenblitt, Randall J. Stein, Elizabeth H. Turner, Alan Wayne, Nancy M. Winkelmann and Nancy M. Woods.

[2] The MCI entities filed a notice of bankruptcy and automatic stay in 2002, and the case has been stayed as to them pursuant to 11 U.S.C. § 362.

marketing lists unless defendants have reason to believe that such person intends to use such list for a permissible purpose, misappropriating or invading plaintiffs' privacy rights, and requiring defendants to notify all plaintiffs of their right to be excluded from defendants' target marketing lists; (2) statutory damages under 15 U.S.C. § 1681n of not less than $100 and not greater than $1,000 for each instance of defendants' wilful failure to comply with the FCRA; (3) punitive damages; (4) nominal damages under 15 U.S.C. § 1681n for the members of the FCRA class whose consumer reports were disclosed between January 28, 1997, and October 1, 1977; and (5) disgorgement of profits. Trans Union has moved to dismiss all counts.[3] For the reasons set forth below, the motion is granted in part and denied in part.

## BACKGROUND/FACTS[4]

Defendant Trans Union is one of three major credit reporting agencies in the United States. Its core business is assembling and evaluating consumer credit information, including credit and payment patterns on consumers for the purpose of selling consumer reports to third parties. Typical buyers of such information are companies considering extending credit to particular consumers. The information provided by Trans Union is used to determine if the consumer is a good credit risk.

---

[3] Acxiom has joined Trans Union's motion. For purposes of clarity, the court will refer to both defendants as Trans Union.

[4] A detailed description of plaintiffs' allegations and the history of the Federal Trade Commission ("FTC") enforcement proceeding against Trans Union upon which plaintiffs' claims are based, can be found in this court's previous opinion disposing of defendants' initial motion to dismiss, see In Re Trans Union Corp. Privacy Litigation, 211 F.R.D. 226 (N.D. Ill. 2000) ("Trans Union I"), and two District of Columbia Circuit Court opinions reviewing the FTC enforcement decisions. Trans Union Corp. v. FTC, 81 F.3d 228 (D.C. Cir. 1996) ("FTC I") and Trans Union Corp. v. FTC, 245 F.3d 809 (D.C. Cir. 2001) ("FTC II").

Trans Union maintains a computer data base called "CRONUS" that contains consumer credit information that it uses to generate consumer reports. The data base includes the credit activity of every credit-active individual in the United States. Trans Union receives the information from credit grantors such as banks, mortgage companies, credit unions, automobile dealers, and collection agencies.

Every credit-active person has a "record" in CRONUS, which includes the consumer's name and address. Additional consumer credit information is listed as a "tradeline." A tradeline is a segment of a credit report reflecting the credit relationship between a consumer and a creditor. Tradeline information includes the customer account number, telephone number, social security number, open date, the credit grantor's name, types of loans, credit limits, payment history, and dates the accounts are closed. Each consumer's file includes all tradelines for that consumer.

In addition to selling consumer reports used by customers to help determine whether a consumer is eligible for personal, family or household credit or insurance, Trans Union has a division that distributes, sells, leases, and rents "target marketing" lists to third parties. This division uses data from CRONUS to compile these lists, which it then sells to its target marketing customers, including catalog companies, newspapers and magazines subscription vendors, firms using mail solicitation or telemarketing, as well as, target marketing brokers, managers, and wholesalers. The target marketers sell or advertise goods and services directed to consumers by mail or telephone. The consumers are picked by criteria including financial or credit related criteria.

From its CRONUS data base, Trans Union creates a master file that includes a base list. Since December 1998, to be included within the master file, a consumer's CRONUS file must include two tradelines active within the last six months. The tradeline must not be a collection or public record, and any consumer with no activity in a 12 month period is dropped.

There are two ways in which Trans Union's customers utilize the master file information. Some customers provide a list of consumers to Trans Union and purchase the master file credit or financial information regarding those consumers. Other customers get a list from Trans Union of the names and addresses of consumers who satisfy pre-selected criteria or indicators chosen by the customer. Some criteria or indicators available are: open automobile loans; open bank accounts; open department store cards; open mortgages; open student loans; and mail order buyers.

The lists purchased by Trans Union's customers are simply collections of names and addresses. Because Trans Union has culled out names that do not satisfy the specified criteria, however, the customer knows additional information about each consumer on the list, including that each person on the list has at least two active credit accounts.

Based on the information implicitly contained in the mailing list, the FTC in an enforcement action determined that the sale of the lists is a communication of "consumer reports" for a purpose that is not permissible under the FCRA. See final order In re Trans Union Corp., No. 9255 (Sept. 28, 1994). The District of Columbia Circuit reversed that decision, questioning the soundness of the FTC's position, but remanding for submission of further evidence. See FTC I, 81 F.3d 228. After the submission of further evidence, the FTC again held that the mailing lists are "consumer reports" under the FCRA and that the lists cannot be sold for

4

target marketing purposes. Trans Union has been permanently enjoined from further sale of target marketing lists. That decision was affirmed on appeal. FTC II, 245 F.3d 809. After denial of rehearing, Trans Union's petition for writ of certiorari was denied. Trans Union, LLC v. FTC, 122 S. Ct. 2386 (June 10, 2002).[5]

## DISCUSSION

### I. THE FEDERAL COUNTS

Trans Union has moved to dismiss all counts of the second amended complaint.[6] With respect to the counts based on the FCRA (Counts I, II, V, VI) (the "federal counts"), Trans Union argues that the FTC proceedings require dismissal of all those counts for two reasons. First, until February 2000, when the FTC held for the second time that Trans Union's lists were credit reports, there had been no authoritative ruling from which Trans Union could have ascertained that its activities were unlawful. Next, Trans Union presents the related argument that the FTC proceedings demonstrate that the challenged conduct was not actually unlawful until February 2000 at the earliest, requiring dismissal of all claims predicated on conduct prior to that date. Finally, with respect to plaintiffs' claims that Trans Union willfully or negligently furnished information to unaffiliated third party vendors beyond that which is permitted by the FCRA in

---

[5] On September 27, 2002, this court granted in part and denied in part Trans Union's motion to dismiss the amended complaint. Trans Union I. Trans Union appealed the court''s decision that injunctive relief is unavailable under the FCRA. The Seventh Circuit dismissed the appeal for lack of jurisdiction.

[6] Although the motion indicates that it is attacking all counts of the Second Amended Complaint, neither it nor the briefs specifically mention Count VII, which purports to state a claim under § 1700 of the California Business and Professional Code. Accordingly, the court concludes that no attack on the sufficiency of Count VII is pending.

5

products used for firm offers of credit or insurance in violation of 15 U.S.C. § 1681b(e) (firm offer Counts V, VI), Trans Union argues the counts simply fail to allege that it disclosed unique identifiers or other information that identifies plaintiffs' relationships or experiences with respect to particular creditors. For the reasons set forth below, Trans Union's arguments for dismissal of the federal counts are rejected in their entirety.

As noted, Trans Union's argument for dismissal of the federal counts is based predominately on the history of the FTC enforcement action against it. Specifically, Trans Union argues that it could not have "willfully" violated the FCRA because until at least February 2000 there was no "authoritative" ruling from which it could have determined that its activities were unlawful. Trans Union's argument relies, in large part, on the D.C. Circuit's opinion in <u>FTC I</u>, reversing the FTC's grant of summary judgment against Trans Union. According to Trans Union, the <u>FTC I</u> court's "outright reversal" of the FTC's interpretation of the FCRA "clearly demonstrates, that, as of that date, Trans Union had no reason to believe that its conduct was unlawful."

A brief review of the procedural history reveals that Trans Union takes a myopic view of the FTC proceeding generally and the 1996 D.C. Circuit Court opinion in particular. The FCRA regulates credit reporting agencies, like Trans Union, imposing certain obligations to protect consumers. The FTC first challenged Trans Union's target marketing and pre-screening activities as unlawful in December 1992. In 1994 the FTC summarily held that Trans Union's lists were consumer reports. The FCRA defines a consumer report as (15 U.S.C. § 1681a(d)(1):

> any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living

6

which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for --

A    credit or insurance to be used primarily for personal, family or household purposes;

B    employment purposes; or

C    any other purpose authorized under §1681b of this title.

Finding that the information embodied in Trans Union's lists was used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing "the credit eligibility of the persons listed, and that target marketing is not an authorized use of a credit report under § 1681b, the FTC ordered Trans Union to stop selling the lists. In that initial proceeding, the FTC heard no evidence, instead relying solely on the undisputed fact that the information in those lists had been included as one section in credit reports that are routinely sent to credit grantors for purposes of establishing credit eligibility. FTC I, 81 F.3d 228 (citing final order, In re matter of Trans Union Corp. slip copy, Dkt. No. 9255 at 23 (Sept. 28, 1994).

Contrary to Trans Union's assertion, FTC I did not reverse the decision "outright," but simply held that on summary disposition the FTC had not established factually that Trans Union intended that the information contained in the lists to serve as a factor in credit-granting decisions, or that someone used or expected that information to be used for that purpose. Id. at 138. Thus, the court rejected the FTC's interpretation that the mere fact that information included on the list was also included as one section in a credit report sent to credit grantors for purposes of establishing credit eligibility was alone sufficient to establish that that information was used for that purpose. Id. FTC I did not hold that the information included on the list could not or was not ever used for that purpose, only that the FTC had not presented evidence sufficient

7

to reach that conclusion. Id. It thus remanded the cause the to the FTC for presentation of further evidence. The court did reject the FTC's conclusion that <u>any</u> information included in a credit report sent to credit grantors is automatically used or expected to be used to establish credit eligibility, but did not hold that the information in the Trans Union lists were not so used. It held simply that the record, as it existed, could not support that conclusion. Id. at 232-33. The court agreed with the FTC, however, that selling credit reports for target marketing violates the FCRA. Id. at 233-34. Thus, Trans Union was on notice that if its lists constituted credit reports under the Act, its sale of those lists was unlawful. It was also on notice, of course, that the FTC believed the lists constituted credit reports as defined in the Act.

On remand, following extensive discovery and an over a month long trial, the FTC again determined that Trans Union's target marketing lists contained information that credit grantors use as factors in granting credit. Thus, the FTC concluded that the lists are consumer reports under the FCRA and that their sale by Trans Union was unlawful. In this proceeding the FTC took the position that "a factor in establishing the consumer's eligibility for credit" includes any type of information credit grantors use in their criteria for pre-screening or in credit scoring models. "Pre-screening" involves selecting individuals for guaranteed offers of credit or insurance, and "credit scoring models" are statistical models for predicting credit performance that are developed by observing the historical credit performance of a number of consumers and identifying the consumer characteristics that correlate with good and bad credit performance. FTC II, 245 F.3d at 814. The FTC also rejected Trans Union's position that any restriction on the sale of its lists would violate its First Amendment rights and ordered Trans Union to cease and desist from distributing or selling credit reports, including those in the form of target

marketing lists, to any person unless Trans Union had reason to believe such person intends to use the lists for a purpose permissible under the Act.

Once again Trans Union appealed to the D.C. Circuit.[7] Tellingly, however, Trans Union did not challenge the FTC's interpretation that the definitional requirement in § 1681a(d)(1) "factor in establishing the consumer's eligibility for credit" includes any information considered by lenders in pre-screening, which can involve consideration of criteria other than credit-worthiness, such as whether a certain consumer is likely to respond to an offer of credit. FTC II, 245 F.3d at 815. The FTC II court reviewed the entire record and held that there was ample evidence to support a finding that Trans Union's lists contain information that lenders take into account in creating credit models and pre-screening. Id. at 815-16. The court also held that the record contained sufficient evidence to support the FTC's conclusion that the mere existence of a tradeline is "a factor in credit-granting decisions," the precise issue remanded in FTC I. Id. at 816 (citing FTC I, 81 F.3d at 233).

This history demonstrates the lack of merit in Trans Union's argument that it could not have willfully violated the FCRA because there was no authoritative ruling that its activities were unlawful. Trans Union's argument is based predominately on a statement in FTC I that the court was reluctant to reach Trans Union's First Amendment argument "because of the very serious doubts whether Trans Union's lists are covered by the Act at all." FTC I 81 F.3d at 235. Based on this statement, Trans Union argues that it could not have the "scienter" required to violate the FCRA willfully. Scienter, according to Trans Union, "envision[s] not only a knowing of what is

---

[7]During each of its appeals, Trans Union requested and received a stay from the FTC of enforcement of the cease and desist orders, and continued to market its lists until FTC II was decided.

done but a knowing that what is done is unlawful, or at least so wrong that it is probably unlawful." Levas v. Village of Antioch, 684 F.2d 446, 453 (7th Cir. 1982). Because FTC I expressed such concern, Trans Union argues that it could not have willfully or knowingly violated a vague or unknowable legal standard.

As the procedural history demonstrates, however, the concern expressed by the FTC I court was not the result of a vague standard, but of a poorly developed record. Neither in FTC I nor FTC II did the court adopt a new legal standard for what constitutes a credit report under the Act. Indeed, FTC II ultimately affirmed the FTC's original position that the mere presence of a single tradeline is a factor in credit-granting decisions. Both FTC I and FTC II involved the application of the statutory definition. Trans Union was in a better position than most to determine the "factors" creditors rely on in making credit eligibility decisions. Thus, there is and was nothing vague about the standard that would prevent plaintiffs' claims.

Moreover, Trans Union raised and lost this same argument in FTC II. After recognizing that the Act contains a scienter requirement and authorizes criminal penalties, the court rejected Trans Union's vagueness argument because the statute contains "'extremely clear process for clarifying the meaning of the regulation.'" Id. at 818 (quoting Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 498 (1982)). Nothing raised in Trans Union's brief suggests that a different result is compelled in the instant case. Accordingly, the court rejects in its entirety Trans Union's argument that the FCRA counts should be dismissed based on the FTC proceedings or vagueness.[8]

---

[8]Trans Union's argument that it could not have willfully violated the statute until there was an authoritative ruling that its lists are consumer reports seems to suggest that it possessed a sort of "qualified immunity" to take a position counter to that of the agency empowered to

10

Finally, Trans Union has moved to dismiss the firm offer counts (V and VI) for failure to state a claim. Those counts allege that Trans Union has violated § 1681b(c), by selling target marketing lists used by the purchaser for making firm offers of credit, that contain information beyond which is permitted by the FCRA. Specifically, the counts allege that Trans Union's lists include telephone numbers and are private financial, credit and/or confidential information of plaintiffs.

Section 1681b(c)(1)(B)(i) provides that a consumer reporting agency may provide a consumer report relating to a consumer in connection with any credit or insurance transaction not initiated by the consumer if the transaction consists of a firm offer of credit or insurance. Under subsection (c)(2), the information a Trans Union customer can receive in that credit report is limited to the name and address of the consumer, an identifier not unique to the consumer that is used by the consumer reporting agency's customer solely for verifying the identity of the consumer, and other information pertaining to the consumer that does not identify the relationship or experience of that consumer with respect to a particular creditor or other entity.

Trans Union argues that the second amended complaint fails to allege that it disclosed a unique identifier or other information that identifies plaintiffs' relationship with respect to a particular creditor. The complaint, however, charges generally that Trans Union's lists used for firm offers contain information beyond which is allowed, and specifies "telephone numbers and/or private financial, credit and/or confidential information." Trans Union has presented no authority to suggest that FCRA violations must be pled with the particularity required by Fed. R.

---

enforce the Act, until such time as a court upholds the agency's position. Of course, no authority supports this position.

Civ. P. 9(b). Under the liberal federal notice pleading standards of Fed. R. Civ. P. 8, the allegations are sufficient. Accordingly, Trans Union's motion to dismiss Counts V and VI is denied.

## II. THE STATE LAW COUNTS

In Counts III and IV, plaintiffs bring state law claims against Trans Union for invasion of privacy and misappropriation, and unjust enrichment. In Trans Union I, 211 F.R.D. at 343, this court held that the law of the states in which plaintiffs reside would apply to the privacy claims. Because the count failed to plead the basic requirement under the Restatement (Second) Torts § 652B, that the alleged intrusion was highly offensive, the court dismissed the state law counts. Id. at 344. As a result, Count III of the second amended complaint purports to be asserted under the laws of nine states: Alabama; Arizona; California; Connecticut; Illinois; Nebraska; New Jersey; New York; and Pennsylvania. The count attempts to allege claims under the privacy sub-torts of intrusion into seclusion and misappropriation and contains a general allegation that the "unauthorized disclosure and sale of such private facts and information is one that is highly offensive or objectionable to a reasonable person of ordinary sensibilities and has caused mental anguish and suffering . . . ." Trans Union has moved to dismiss, arguing that the count fails to state a claim under either theory in any of the nine states.

Despite the court's admonition in Trans Union I, neither Trans Union nor plaintiffs have separately analyzed Count III under each of the nine states' privacy laws. Trans Union acknowledges that the states' privacy laws "vary significantly," but then attempts to argue

generally that Count III fails under either theory.[9] The plaintiffs respond in kind. Accordingly, unless otherwise noted, the court will assume that the laws of the states involved are similar enough that a general discussion is sufficient.

A. <u>Intrusion into Seclusion</u>

Both plaintiffs and Trans Union agree that intrusion into seclusion is a recognized claim, either in tort or by statute, in all of the relevant states except New York. The parties also agree that the claim is generally defined by the Restatement (Second) of Torts § 652B as:

> one who intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person.

As the comments to this section make clear, this form of invasion of privacy does not depend upon any publicity given to the person whose interest is invaded or to his affairs. Rather, it consists of an intentional interference with the interest in solitude or seclusion. The invasion may be by physical intrusion into a place in which the plaintiff has secluded himself. It may also be by use of the defendant's senses, with or without mechanical aids, to oversee or overhear the plaintiff's private affairs, as by looking into a window with binoculars or by tapping telephone wires. More importantly for the instant case, it may be by some other form of investigation or examination into the plaintiff's private concerns, such as by opening private and personal mail, searching a safe or wallet, or examining a private bank account. It is the intrusion itself that creates liability, even without publication or other use of the information. <u>Id.</u>, cmts. a, b.

---

[9] Trans Union does reference differences among specific state laws in its brief, noting, for example, that New York's privacy law, which is statutory, does not recognize a claim under the "intrusion" sub-tort.

13

Plaintiffs' intrusion theory is that Trans Union accessed, disclosed and sold the private financial, credit and other confidential information of plaintiffs without their knowledge, authority, or consent. As is clear from the Restatement comments, however, it is the intrusion itself that creates liability, not any subsequent publication or disclosure. Thus, Trans Union argues correctly that the only alleged "intrusion" is the access by Trans Union of plaintiffs' information from Trans Union's own files. Most states, however, require, as an element of the tort, that there be an "unauthorized" intrusion. See Miller v. Motorola, Inc., 202 Ill. App.3d at 976, 981 (1st Dist. 1990). Relying predominately on Dwyer v. American Express Co., 273 Ill. App.3d 742 (1st Dist. 1995), Trans Union argues that there can be no unlawful intrusion when a company accesses its own lawfully obtained files. In Dwyer, much like the instant case, the plaintiffs brought privacy and state law consumer protection claims against a charge card company for renting lists of cardholder names, categorized by purchasing patterns for advertising purposes. In analyzing the plaintiffs' intrusion claim, the court concluded that when accessing its own files the defendant had not unlawfully intruded upon the plaintiffs' seclusion. The plaintiffs had used the charge card voluntarily and had voluntarily given the defendant the information. Id. at 746.

Plaintiffs attempt to distinguish Dwyer by pointing out that in that case the plaintiffs made voluntary disclosures directly to the defendant, while in the instant case plaintiffs disclosed nothing directly to Trans Union. There is little to this argument, however, because plaintiffs voluntarily disclosed the information to third party creditors who subsequently and lawfully transmitted the information to Trans Union. Plaintiffs do not and cannot allege that they were unaware that their creditors would pass this information on to Trans Union in the normal course

14

of business. Thus, Trans Union's accessing its own lawfully obtained files cannot be considered an unlawful intrusion. See Miller, 202 Ill. App.3d at 981 (accessing information voluntarily provided does not amount to unauthorized intrusion); Tureen v. Equifax, Inc., 571 F.2d 411, 416 (8th Cir. 1978) (defendant's search of its own files not objectionable).

Plaintiffs argue that Trans Union "holds plaintiff's private and detailed financial information in trust, and is prohibited from using it for target marketing purposes." Trans Union is correct, however, that this amounts to a claim that Trans Union lawfully accessed information from its files, but then wrongfully distributed the information to third parties. Although this allegation might possibly support a claim for improper disclosure, Trans Union is correct that it does not support a claim for unauthorized intrusion. Accordingly, Trans Union's motion to dismiss plaintiff's claim in Count III for intrusion into seclusion is granted.

B. Misappropriation

Both plaintiffs and Trans Union agree that the laws of the states involved all provide some sort of privacy claim for misappropriation. The parties also agree that any such claim is defined generally by § 652C of the Restatement:

> one who appropriates to his own use or benefit the name or likeness of another is subject to liability to the other for invasion of his privacy.

Again, the comments to this section help understand the scope of the claim. The interest protected is the interest of the individual in the exclusive use of his own identity, as it is represented by his name or likeness, and insofar as the use may be of benefit to him or to others. Id., cmt. a. Although not limited to commercial appropriation, the common form of misappropriation is the appropriation and use of the plaintiff's name or likeness to advertise the

15

defendant's business or product, or for some similar commercial purpose. Id., cmt. b. To be liable, the defendant must have appropriated to his own use or benefit the reputation, prestige, social or economic standing, public interest or other values of the plaintiff's name or likeness. Id. Cmt. c. "It is only when the publicity is given for the purpose of appropriating to the defendant's benefit the commercial or other values associated with the name or likeness that the right of privacy is invaded." Id., Cmt. d.

Based on the Restatement comments, it is easy to understand Trans Union's objection to plaintiffs' claim. Plaintiffs have not alleged that their names have been publicized to enhance Trans Union's reputation. Nor do plaintiffs' allege that Trans Union has appropriated to its benefit their reputation, prestige, social, economic standing, or public interest in their names. Instead, what plaintiffs argue is that each plaintiff has some intrinsic value in their name, as demonstrated by the fact that Trans Union charges different prices depending upon the number of names on the list; each plaintiffs' name on the list adds incremental value thereto. The court rejects this theory for the reasons stated in Dwyer, 273 Ill. App.3d at 749:

> Understandably, each cardholder's name is valuable to defendants. The more names included on the list, the more the list will be worth. However, a single, random cardholder's name has little or no intrinsic value to defendants (or a merchant). Rather, an individual name has value only when it is associated with one of defendants' lists. Defendants create value by categorizing and aggregating these names. Furthermore, defendants' practices do not deprive any of the cardholders of any value their individual names possess.

This statement in Dwyer is equally applicable to the instant case. Plaintiffs do not allege that any of them have a specific reputation, prestige or social standing that Trans Union sought to appropriate for purposes of publicity. Thus, the allegedly appropriated value of each plaintiffs' name is actually created by its placement on the list. Absent the list, there is no value to

16

appropriate. Accordingly, the court grants Trans Union's motion to dismiss the misappropriation claims in Count III. Additionally, because the unjust enrichment claims are predicated on plaintiffs' state law claims in Count III, Count IV is also dismissed.

## CONCLUSION

For the reasons set forth above, Trans Union's motion to dismiss is granted as to Counts III and IV and denied in all other respects. Trans Union and Acxiom are directed to answer Counts I, II, V, VI, and VII on or before July 27, 2004. A report on status is set for July 29, 2004, at 9:00 a.m.

**ENTER:** **July 6, 2004**

_____
**Robert W. Gettleman**
**United States District Judge**

17