FILED

FEB 1 8 2005

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT



UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | |
|---|---|
| In re TRANS UNION CORP. PRIVACY LITIGATION | ) ) ) |
| | ) |
| This Document Relates To: | ) ) |
| ALL ACTIONS. | ) ) ) |

Lead Case No. 00CV4729

MDL Docket No. 1350

Judge Robert W. Gettleman

## PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

## TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................................................................ 1

II.   ARGUMENT ...................................................................................................... 3

    A.    Plaintiffs' Proposed Classes Do Not Render Them Inadequate Class
        Representatives ..................................................................................................... 3

    B.    Issues of Fact and Law Common to Plaintiffs and Class Members
        Predominate Over Any Specific Individual Issues ............................................. 5

        1.    Variations in Defendants' Target Marketing Products Do Not
               Preclude a Finding of Predominance ....................................................... 5

        2.    The Source of Data Used to Create Target Marketing Lists Is
               Common to All Plaintiffs and Class Members ........................................ 10

        3.    Common Issues of Law Predominate Over Plaintiffs' and Class
               Members' FCRA Claims .......................................................................... 12

        4.    Punitive Damages Under the FCRA Do Not Require a Showing  of
               Individualized Proof ................................................................................ 15

        5.    Plaintiffs' Illinois-Only Firm Offer Class Is Appropriate  for Class
               Treatment ................................................................................................ 17

        6.    Trans Union's Defenses Are Speculative and Cannot Be Decided
               at Class Certification ............................................................................... 17

    C.    Plaintiffs' Proposed California UCL Class Is Proper ......................................... 20

        1.    A Pending Appeal of the *Frey* Order Prevents Collateral Estoppel
               Effect ...................................................................................................... 20

        2.    Proposition 64 Does Not Bar Plaintiffs' UCL Claims ............................. 21

        3.    Certification of the California UCL Class Is Warranted Under Rule
               23(b)(2) .................................................................................................. 24

    D.    Plaintiffs and Their Counsel Will Fairly and Adequately Protect the
        Interests of Class Members ................................................................................. 26

    E.    Certification Is Not Only Superior, but the Only Method of Adjudication .......... 29

III.  CONCLUSION .................................................................................................. 30

# TABLE OF AUTHORITIES

Page

## CASES

*Allapattah Servs. v. Exxon Corp.*,
    188 F.R.D. 667 (S.D. Fla. 1999) ...................................................................................... 19

*Allen v. Leis*,
    204 F.R.D. 401 (S.D. Ohio 2001) .................................................................................. 24

*Amchem Prods. v. Windsor*,
    521 U.S. 591 (1997) .................................................................................................... 7, 8

*Ashby v. Farmers Ins. Co.*,
    No. CV 01-1446-BR, 2004 U.S. Dist. LEXIS 21053
    (D. Or. Oct. 18, 2004) .................................................................................................. 16

*Benson v. Kwikset Corp.*,
    No. G030956, 2005 WL 327472 (Cal. Ct. App. Feb. 10, 2005) ...................................... 22

*Blonder-Tongue Labs., v. Univ. of Ill. Foundry*,
    402 US 313 *aff'd*, 402 U.S. 313 (1971) ............................................................................ 20

*Branick v. Downey Sav. & Loan Ass'n*,
    No. B172981, 2005 WL 299926 (Cal. Ct. App. Feb. 9, 2005) ........................................ 22

*Californians for Disability Rights v. Mervyn's, LLC*,
    No. A106199, 2005 WL 230019 (Cal. Ct. App. Feb. 1, 2005) ...................... 21, 22, 23, 24

*Carbajal v. Capital One, F.S.B.*,
    219 F.R.D. 437 (N.D. Ill. 2004) .............................................................................. *passim*

*Carlough v. Amchem Products, Inc.*,
    158 F.R.D. 314 (E.D. Pa. 1993) .................................................................................... 30

*Clay v. Am. Tobacco Co.*,
    188 F.R.D. 483 (S.D. Ill. 1999) .................................................................................... 24

*Cousin v. Trans Union Corp.*,
    246 F.3d 359 (5th Cir. 2001) ........................................................................................ 15

*Danis v. USN Communs., Inc.*,
    189 F.R.D. 391 (N.D. Ill. 1999) ........................................................................ 10, 17, 18

*Eisen v. Carlisle & Jacquelin*,
    417 U.S. 156 (1974) ................................................................................................ 18, 29

Page

*Gates v. Towery,*
  No. 04 C 2155, 2004 U.S. Dist. LEXIS 22876 (N.D. Ill. Nov. 9, 2004) ........................... 12

*Heastie v. Cmty. Bank of Greater Peoria,*
  125 F.R.D. 669 (N.D. Ill. 1989)....................................................................................... 26

*Hickey v. Great W. Mortgage Corp.,*
  158 F.R.D. 603 (N.D. Ill. 1994)....................................................................................... 17

*In re Am. Med. Sys., Inc.,*
  75 F.3d 1069 (6th Cir. 1996) ............................................................................................ 8

*In re Bridgestone/Firestone, Inc., Tires Prods. Liab. Litig.,*
  333 F.3d 763 (7th Cir. 2003) .................................................................................... 20, 21

*In re Rhone-Poulenc Rorer Inc.,*
  51 F.3d 1293 (7th Cir. 1995) ........................................................................................... 13

*In re Terazosin Hydrochloride Antitrust Litig.,*
  220 F.R.D. 672 (S.D. Fla. 2004)...................................................................................... 12

*In re Trans Union Corp. Privacy Litig.,*
  326 F. Supp. 2d 893 (N.D. Ill. 2004) .................................................................. 13, 14, 16

*In re United Energy Corp. Solar Power Modules Tax Shelter Invs. Sec. Litig.,*
  122 F.R.D. 251 (C.D. Cal. 1988) ..................................................................................... 27

*In re Universal Serv. Fund Tel. Billing Practices Litig.,*
  219 F.R.D. 661 (D. Kan. 2004).............................................................................. 4, 5, 27

*Ippolito v. WNS, Inc.,*
  864 F.2d 440 (7th Cir. 1988) ........................................................................................... 13

*Jefferson v. Ingersoll Int'l Inc.,*
  195 F.3d 894 (7th Cir. 1999) .................................................................................... 24, 25

*Keele v. Wexler,*
  149 F.3d 589 (7th Cir. 1998) ........................................................................................... 28

*Kifafi v. Hilton Hotels Ret. Plan,*
  189 F.R.D. 174 (D.D.C. 1999).................................................................................. 18, 20

*Lemon v. Int'l Union of Operating Eng'rs, Local No. 139,*

Page

216 F.3d 577 (7th Cir. 2000) ............................................................................................. 25

*Lewis v. Nat'l Football League,*
146 F.R.D. 5 (D.D.C. 1992) ............................................................................................. 29

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach,*
523 U.S. 26 (1998) ............................................................................................................. 3

*Migra v. Warren City School Dist. Bd. of Educ.,*
465 U.S. 75 (1984) ........................................................................................................... 20

*Morris v. Risk Mgmt. Alternatives, Inc.,*
203 F.R.D. 336 (N.D. Ill. 2001) ........................................................................................ 7

*Palmer v. Combined Ins. Co. of Am.,*
217 F.R.D. 430 (N.D. Ill. 2003) ...................................................................................... 18

*Parker v. Risk Mgmt. Alternatives, Inc.,*
206 F.R.D. 211 (N.D. Ill. 2002) ........................................................................................ 7

*Payton v. County of Kane,*
308 F.3d 673 (7th Cir. 2002) *cert. denied,* 540 U.S. 812 (2003) ...................................... 18

*People ex. rel. Gow v. Mitchell Bros'. Santa Ana Theater,*
101 Cal. App. 3d 296 (1980) ............................................................................................ 20

*Phillips Petroleum Co. v. Shutts,*
472 U.S. 797 (1985) ......................................................................................................... 13

*Retired Chicago Police Ass'n v. City of Chicago,*
7 F.3d 584 (7th Cir. 1993) ............................................................................................... 28

*Sapia v. Regency Motors of Metairie, Inc.,*
276 F.3d 747 (5th Cir. 2002) ..................................................................................... 15, 16

*Simmons v. Kansas City,*
129 F.R.D. 178 (D. Kan. 1989) ........................................................................................ 29

*State Farm Mut. Ins. Co. v. Campbell,*
538 U.S. 408 (2003), *cert. denied,* No. 04-116,
2004 U.S. LEXIS 6620 (2004) ......................................................................................... 16

*Trans Union Corp. v. FTC,*
245 F.3d 809 (D.C. Cir. 2001) ................................................................................ 6, 7, 9, 19

Page

*Wash. Mut. Bank v. Superior Court,*
    24 Cal. 4th 906 (2001) .................................................................................................... 13

*Weathers v. Peters Realty Corp.,*
    499 F.2d 1197 (6th Cir. 1974) ....................................................................................... 18

*White v. Imperial Adjustment Corp.,*
    No. 99-3804, 2002 U.S. Dist. LEXIS 26610
    (E.D. La. Aug. 6, 2002) .............................................................................. 13, 15, 16, 17

## STATUTES, RULES AND REGULATIONS

15 U.S.C. §1681 ................................................................................................................. 1, 13

15 U.S.C. §1681n(a) ............................................................................................................ 15

15 U.S.C. §6806 .................................................................................................................. 14

Fed. R. Civ. P. 8(c) ............................................................................................................. 20

Fed. R. Civ. P. 23(a) ........................................................................................................... 18

Fed. R. Civ. P. 23(a)(4) ....................................................................................................... 26

Fed. R. Civ. P. 23(b)(3) ................................................................................................. *passim*

## SECONDARY AUTHORITIES

Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* (4th ed. 2002)
    §3:26 ......................................................................................................................... 28
    §4:14 ......................................................................................................................... 24

## I.    INTRODUCTION

Reading defendants' oppositions to plaintiffs' motion for class certification, one is reminded of the story of Goldilocks and the Three Bears – the porridge is either too hot or too cold, but *in this case*, never just right.    This is understandable.    Defendants were caught intentionally selling the credit and other private information of millions of Americans in violation of established federal law.    These were transgressions of enormous proportions which affected most adults in America with some credit history.    Defendants illegally sold this confidential and personal credit information for as long as they possibly could, before they were *forced* by the Federal Trade Commission ("FTC"), through protracted litigation and appeals, to stop.    Defendants reaped hundreds of millions of dollars in illegal revenue by selling this confidential information.    Defendants now seek to avoid giving up their ill-gotten gains.

The *only* way defendants will *ever* be held accountable is by means of the class action procedural device.    Most Class Members do not even know defendants have violated their rights by selling their private credit information.    Even if a substantial number of class members actually highly knew about defendants' unlawful conduct, as well as their legal rights under the FCRA, it is unlikely they could find an attorney willing to take the risk and spend the enormous amounts of time and money required to litigate against a company like Trans Union, all with a very uncertain result.    Therefore, defendants know that if they raise enough issues they might convince this court *not* to certify a class and thereby avoid any accountability for their illegal acts.    This motivation is evident from defendants' self-serving and distorted legal arguments.

Defendants argued in their initial motion to preclude plaintiffs from certifying a nationwide statutory damage class under the Fair Credit Reporting Act ("FCRA" or the "ACT"), 15 U.S.C. §1681 *et seq*, that even if we assume Trans Union is guilty of the unlawful conduct alleged (as already established by the FTC), the statutory damages would be *too* big to certify, while the actual damages for each class member would be *too* small.    In opposition to plaintiffs' current motion to certify a class, defendants once again make the same argument – that an Illinois statutory damage class, although a fraction of the size of a nationwide class and where the actual class size has yet to be determined, would be too big, particularly in relation to any actual individual damages, which would again be too small.

At the same time, defendants argue that some of the proposed classes plaintiffs seek to certify are too small, because they don't include all potential class members and all potential claims.    As a result, defendants argue, plaintiffs are inadequate class representatives because they

- 1 -

have effectively "abandoned" claims of the class, or "split" these claims. This is pure nonsense. Plaintiffs have not abandoned any claims or class members, or split any claims, but rather have been *precluded* by the Court from trying to certify a class that is *too* big. Notwithstanding defendants' self-serving arguments, all class certification requirements are met: numerosity, commonality, typicality, adequacy, predominance and superiority.

Defendants try to manufacture numerous individual issues to confuse and mislead the Court. But these "issues" have absolutely nothing to do with the specific and narrow classes proposed by plaintiffs for certification. These proposed classes do not contain *any* individual issues necessary to determine defendants' liability under the FCRA as to each class member. In fact, the primary issue of liability has already been fully litigated and decided by the FTC and the federal courts.

The primary issue of defendants' liability is *whether or not the inclusion of an individual's name and other information on Trans Union's List Master File constitutes a "Consumer Report" under the FCRA.* The FTC and the U.S. Court of Appeals, D.C. have already answered this question *in the affirmative*. The inclusion of a consumer's name and other information in defendants' List Master File now constitutes a Consumer Report as a matter of fact and law. Because it is equally undisputed and admitted by defendants that they repeatedly disclosed and sold their List Master File numerous times to third parties (and therefore the Consumer Report of every person in the List Master File), such disclosures and sales were, *a fortiori*, unlawful disclosures under the FCRA. Thus, the issue of defendants' liability under the FCRA can be easily decided on a common basis for every single member of the proposed classes, perhaps by a single motion. There are simply no predominant individual issues. Accordingly, the issue of defendants' liability under the FCRA is ideal for class treatment.

Similarly, the issue of defendants' willful noncompliance under the FCRA can also be established without looking at *any* individual issues. This inquiry simply looks at the conduct of the defendants and the circumstances surrounding defendants' repeated and continual disclosure and sale of these Consumer Reports in the List Master File in violation of the Act. The trier of fact can decide this issue on a common basis for every single member of the proposed classes, making this issue ideal for class treatment as well.

Finally, there are no individual issues associated with the punitive damage class proposed by plaintiffs. Indeed, this may be one of the only mechanisms available to the Court to ensure that defendants do not retain any of their ill-gotten gains and are punished in proportion to the

- 2 -

scope of their willful misconduct.

It is clear that without certification of a class, there will have been a complete failure of justice in this case. Defendants simply cannot be allowed to retain all of their ill-gotten gains, because their unlawful conduct violated the rights of too many consumers.

## II.    ARGUMENT

### A.    Plaintiffs' Proposed Classes Do Not Render Them Inadequate Class Representatives

Defendants argue that representative plaintiffs are inadequate because they "allege that Trans Union willfully violated FCRA by disclosing certain consumer information in its target marketing lists. Yet, they elect to pursue statutory damages only on behalf of Illinois residents, and not on behalf of any other 178 million people they purport to represent." TU Brf. at 7. In other words, defendants argue that plaintiffs have abandoned claims of the class.

Defendants must have forgotten that they moved to preclude plaintiffs from certifying a nationwide statutory damage class, and that the Court granted their motion. As a result, plaintiffs have not abandoned a nationwide statutory damage class – they were *precluded* from bringing a motion to certify such a class. This distinguishes plaintiffs and their motion from every case cited by defendants.

With respect to plaintiffs' proposed Illinois class, a case was initially filed by an Illinois resident against an Illinois defendant, and that case is pending in a federal district court in Illinois. It is not unreasonable for the Illinois plaintiffs to move to certify a statutory damage class for Illinois residents and to try to protect the rights of those Illinois residents they seek to represent. The same is true of the California plaintiffs and the class they seek to certify and represent.

With respect to plaintiffs' proposed punitive damage class, defendants argue that if "a class is certified and this action is tried, individuals who reside outside Illinois and California will not have a second-chance to seek statutory damages under FCRA or whatever remedies their state laws may provide – the prohibition of claim-splitting ensures as much." TU Brf. at 7. This argument is simply not true and contains a number of false assumptions.

First, this is a *coordinated* proceeding. The various cases against defendants have been consolidated and coordinated by the MDL Panel for pretrial purposes only. Each of the separate cases will be sent back to the district courts in which they were originally filed for trial. *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 36-37 (1998). Plaintiffs Gogerty

- 3 -

and Beadle are not inadequate representatives because they seek to certify a class of Illinois residents in the state and court in which they originally filed their complaint, against a defendant who has its principle place of business in Illinois. The same is true of the California plaintiffs and the claims they have asserted in the State of California against defendants.

Defendants' argument that residents outside of Illinois and California will not have a second chance to seek statutory damages under FCRA is pure speculation at this point and contrary to relevant authority. In *In re Universal Serv. Fund Tel. Billing Practices Litig.*, 219 F.R.D. 661 (D. Kan. 2004), the court analyzed a similar claim-splitting argument by a defendant in response to a motion for class certification by the plaintiffs. In reviewing the applicable law, the court noted:

> Claim splitting is generally prohibited by the doctrine of res judicata, which bars parties to a prior action or those in privity with them from raising in a subsequent proceeding any claim they could have raised in the prior action where all of the claims arise from the same set of operative facts.... "Usual principles of both claim and issue preclusion apply in class actions" but *"the court ... cannot predetermine the res judicata effect of the judgment; this can be tested only in a subsequent action."*

*Id.* at 668.[1] Here, the court simply cannot predetermine the potential *res judicata* effect of a possible or hypothetical judgment in this case, which can only be tested in a subsequent action. Furthermore, there are a number of potential outcomes, none of which would preclude class members from pursuing their own statutory damage claims.

The court in *Universal Serv.* analyzed each of the cases cited by defendants in support of their clam-splitting argument and noted:

> [T]hose cases "are all distinguishable from the case at bar, in that they involved actions where the class representatives had left aside the far stronger claims for monetary damages and sought to have the weaker claims certified, for dubious strategic purposes....
>
> In contrast, in this case the court is satisfied that the interests of the named plaintiffs are aligned with the interests of the absent class members... This is not a case where the class representatives are pursuing relatively insignificant claims while jeopardizing the ability of class members to pursue far more substantial,

---

[1]     All emphasis is added and citations are omitted unless otherwise noted.

> meaningful claims. Rather, here the named plaintiffs simply decided to pursue
> certain claims while abandoning a fraud claim that probably was not certifiable.

*Id.* at 669.

Finally, the court pointed out at least one means of insuring that class members are not unfairly barred from pursuing claims and remedies that a defendant might later try to argue have been precluded by a prior judgment:

> Nevertheless, with that being said, it would certainly be prudent to include
> language in the class notice advising potential class members that this lawsuit
> does not involve any fraud or FCA claims, and further that class members may
> risk being barred from pursuing any such potential claims in the future if they do
> not opt out of the class.

*Id.* at 670.  The same is true here.  The court cannot predetermine the possible effect of a hypothetical judgment in this case.  The plaintiffs have not abandoned any claims or classes, but were precluded from certifying a nationwide class for statutory damages.  Plaintiffs' efforts to certify a nationwide punitive damage class does ***not*** create a conflict between plaintiffs and Class Members because it does not necessarily preclude class members from seeking statutory damages, and it may be the only nationwide class capable of being certified given the Court's prior rulings.  As a result, defendants' arguments of inadequacy and claim-splitting simply do not hold water.

**B.  Issues of Fact and Law Common to Plaintiffs and Class Members Predominate Over Any Specific Individual Issues**

**1.  Variations in Defendants' Target Marketing Products Do Not Preclude a Finding of Predominance**

Trans Union would like this Court to believe that because it disclosed plaintiffs' and class members' consumer information through different types of target marketing lists, and that the information contained in each list differed based on the needs of its customers, a jury will have to consider *every* disclosure for every consumer to find a violation of the FCRA.  This argument, however, is nothing more than a red herring since it completely ignores the FTC's findings of fact and conclusions of law set forth in its Final Order dated February 10, 2000 ("Final Order").  The FTC's Final Order held that Trans Union's disclosure of minimum credit information about every consumer reported in its target marketing databases and lists sold to third parties for target marketing purposes violated the FCRA.  This common fact and the legal issues related to plaintiffs' and class members' claims against Trans Union, all of which arise out of Trans

Union's standard pattern of unlawful conduct, provide a classic case for which the courts have routinely granted class certification. Accordingly, common adjudication of plaintiffs' and class members' claims against Trans Union is not only appropriate, but the *only* realistic remedy for plaintiffs and class members to challenge Trans Union's unlawful acts.

The FTC held in relevant part that virtually all of Trans Union's target marketing products were created based on minimum credit (or "tradeline") criteria employed by Trans Union to extract consumer information from its CRONUS database. *See In the Matter of Trans Union Corp.*, No. 9255, 2000 FTC LEXIS 23, at *15 (Feb. 10, 2000). Specifically, the FTC found that Trans Union extracted personal consumer information from its CRONUS database to create secondary databases, such as the List Master File and Standard Characteristics database, from which its direct marketing products were created. *Id.* at *4. The FTC found that only consumers who met the minimum credit or tradeline criteria were included in the target marketing databases and lists. *Id.* at *4-*5. Trans Union's customers knew that every consumer included in the copy of the database or report they purchased from Trans Union had met the minimum credit criteria, such as the presence of one or more active tradelines (charge accounts, etc.) during the past 12 months. *Trans Union Corp. v. FTC*, 245 F.3d 809, 812 (D.C. Cir. 2001) ("Purchasers also know that every individual on a target marketing list satisfies the criteria for inclusion in MasterFile."). In fact, Trans Union confirmed as much in its bold advertisements about the credit-active consumers included in its target marketing products. *See Trans Union*, 2000 FTC LEXIS 23, at *14 ("Trans Union's promotions boasted that the Master File is a list of '135 million financially active individuals'").

The FTC concluded that Trans Union's target marketing databases and lists constituted "consumer reports" as that term is defined in the FCRA since, at a minimum, Trans Union confirmed minimum credit information about every consumer listed in the report. *Trans Union*, 245 F.3d at 812. If those "consumer reports" were sold to unrelated third parties for target marketing purposes, the FTC held that such disclosures violated the FCRA. *See Trans Union*, 2000 FTC LEXIS, at *16, *19. The FTC's findings of fact and conclusions of law apply equally to plaintiffs and class members. Accordingly, the focus of this litigation is not on the different target marketing products offered by Trans Union, or the specific information contained in each such product, but rather, Trans Union's common disclosure of the same minimum credit information about every consumer identified in its target marketing databases and lists and sold to its customers for target marketing purposes.

Trans Union is well aware that its List Master File, the Standard Characteristics database, and the target marketing lists and related products derived therefrom, were declared "consumer reports" by the FTC since all such products confirmed minimum credit activity about every consumer reported therein. *Trans Union*, 245 F.3d at 812. If plaintiffs and class members were identified in copies of the List Master File, Standard Characteristics databases, or the target marketing reports derived therefrom and sold by Trans Union to its customers for target marketing purposes (or any other purpose not authorized by the FCRA), plaintiffs and class members have an actionable claim against Trans Union.

Commonality is met as long as one issue is common to all class members, and that issue's determination will advance the litigation.[2]  *Carbajal v. Capital One, F.S.B.*, 219 F.R.D. 437, 440 (N.D. Ill. 2004). Trans Union attempts to draw the Court's attention away from the FTC's findings of fact and conclusions of law common to plaintiffs and class members by focusing on its different target marketing products sold to its customers. Trans Union claims that because it used various products and disclosed different information in each product, common adjudication is not appropriate. To support its argument Trans Union cites *Amchem Prods. v. Windsor*, 521 U.S. 591 (1997), where the Supreme Court stated in relevant part, "that Rule 23(a)(2)'s 'commonality' requirement is subsumed under, or superseded by, the more stringent Rule 23(b)(3) requirement that questions common to the class 'predominate over' other questions." *Id.* at 609.

*Amchem* involved a products liability lawsuit against the defendant manufacturers of certain asbestos products. A global settlement had previously been reached and the defendants moved to dismiss the claims by plaintiffs who had not timely opted out of the class. The Supreme Court, addressing the Rule 23(b)(3) issue of whether questions common to the class were predominant over questions related to individual class members, noted that meeting the predominance requirement in products liability cases is difficult, especially in asbestos exposure claims where "class members in this case were exposed to different asbestos-containing

---

[2]      For class certification, plaintiffs need only show the existence of questions of law and fact that are common to the class. *Morris v. Risk Mgmt. Alternatives, Inc.*, 203 F.R.D. 336, 343 (N.D. Ill. 2001). "The Rule does not mandate absolute commonality; a common nucleus of operative fact is usually enough to satisfy the requirement." *Parker v. Risk Mgmt. Alternatives, Inc.*, 206 F.R.D. 211, 213 (N.D. Ill. 2002). "A common nucleus of operative fact exists where 'defendants have engaged in standardized conduct towards members of the proposed class.'" *Morris*, 203 F.R.D. at 343.

products, in different ways, over different periods, and for different amounts of time." *Id.* The Supreme Court explained that in personal injury cases, where some claimants have disproportionately larger and different types of damage claims, they have a "'significant interest in individually controlling the prosecution of [their case].'" *Id.* at 616. The Supreme Court also recognized that when class members' claims are uniform and damages are relatively small, such claimants have a greater interest in joining their claims in a class action. *Id.* at 617 (citing *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344 (7th Cir. 1997)).[3]

This case does not involve the complex defect, use and damages issues common in products liability and personal injury cases like *Amchem*. Rather, this case involves common issues similar to the fact and circumstances in *Carbajal*. In *Carbajal*, plaintiffs received similar solicitation letters from the defendant offering to accept credit balance transfers from their existing credit card accounts. Plaintiffs asserted that such offers were regulated by the Fair Debt Collection Practices Act ("FDCPA"). Plaintiffs further asserted that the form of the solicitations used by defendant violated the FDCPA by suggesting that the plaintiffs would maintain their right to challenge the individual debts being transferred to the new account. *Carbajal*, 219 F.R.D. at 440. Plaintiffs moved for class certification for all persons residing in either Indiana or Illinois "to whom defendants sent similar solicitations on or after February 13, 2002." *Id.* at 439. The court, assessing the Rule 23(b) requirement that common questions of law and fact predominate over individual issues, concluded as follows:

> The primary focus of the litigation will be the indisputably common issue of whether the forms of solicitation used by defendants violate the FDCPA. This plainly can be determined on a class-wide basis....
>
> The Court is also convinced that a class action is a superior means of adjudicating the parties' dispute. A class action will allow for a single adjudication of whether defendants' practices comport with the FDCPA. This is the most efficient means of determining the legality of mass solicitations to consumers who are all similarly situated.

---

[3]     *In re Am. Med. Sys., Inc.*, 75 F.3d 1069 (6th Cir. 1996), another products liability case cited by Trans Union, involved the sale, use and alleged defects in ten different models of a penile implant that had been first introduced in 1973 and modified many times thereafter. *Id.* at 1081. The court denied class certification primarily because proving "strict liability, negligence, failure to warn, breach of express and implied warranties" would be different for each plaintiff due to uncommon factors such as "surgical error, improper use of the device, anatomical incompatibility, infection, device malfunction, or psychological problems." *Id.* Such facts are not presented here.

*Id.* at 442-43.

Similar to the facts and circumstances of *Carbajal,* common adjudication of plaintiffs' and class members' claims regarding Trans Union's practice of reporting their active credit or tradeline information to customers for target marketing purposes is the most efficient means of addressing Trans Union's conduct as regulated by the FCRA. The FTC has already held that the mere identification of plaintiffs or class members in the List Master File and target marketing lists constitutes an actionable claim if such disclosure was made for unauthorized target marketing purposes. Trans Union's customers obtained valuable information about plaintiffs' and class members' credit history from the mere inclusion of their name in the reports. *Trans Union,* 245 F.3d 812. Therefore, in contrast to Trans Union's arguments, the content of each such disclosure is not a critical issue in this case. [4]

Trans Union also argues that because the FTC's February 10, 2000, ruling did not specifically address all of Trans Union's target marketing products, this Court will have to examine the other products and the disclosures referenced therein to determine whether they violate the FCRA. This argument again ignores that the instant litigation will focus on the creation of Trans Union's target marketing lists and their sale or disclosure to Trans Union's customers. Even if every single target marketing product sold by Trans Union was not addressed in the FTC's Final Order, the FTC did find that "the Minimum Criteria apply to *virtually all* of Trans Union target marketing lists." *See Trans Union,* 2000 FTC LEXIS 23, at *58. By extrapolation, therefore, "virtually all" of Trans Union's databases and lists sold to target marketers violated the FCRA if the reports were sold for target marketing purposes. Trans Union's argument also ignores the fact that plaintiffs' and class members' data records were available for disclosure in *any* copies of databases and target marketing lists sold by Trans Union. Trans Union has already confirmed that the named plaintiffs were included in a copy of the List Master File sold by Trans Union to unrelated non-agent entities. Thus, to argue that the Court will have to examine the marketing lists not specifically addressed in the FTC's Final

---

[4] Trans Union has already admitted in response to plaintiffs' written discovery that it had disclosed to third parties the fact that, *inter alia,* each of the Plaintiffs met the minimum criteria and/or "existence of tradeline" information necessary for inclusion in the List Master file or other relevant databases. *See* Declaration of William J. Doyle II In Support of Plaintiffs' Motion for Class Certification ("Doyle Decl.").

Order is, at best, speculative, and not a sufficient reason to deny class certification. *Danis v. USN Communs., Inc.*, 189 F.R.D. 391, 395 (N.D. Ill. 1999) ("[T]he Court is not required to deny certification for speculative reasons; the certification decision always remains within the sound discretion of the court.").

The focus of this litigation is on Trans Union's standard practice employed to create "virtually all" of its target marketing databases and lists sold to its customers for target marketing purposes. Only those consumers who met the minimum tradeline requirements were included in such lists. Class certification is the most efficient means to address Trans Union's violations of the FCRA. Any differences that may exist amongst plaintiffs' and class members' claims are not of the type or variety addressed in *Amchem* and *Am. Med. Sys.* Moreover, the law does not require *the absence* of any differences in the claims, only that "individual questions" do not predominate over "common" issues. Fed. R. Civ. P. 23(b)(3). Similar to the facts and circumstances in *Carbajal*, plaintiffs' and class members' claims will not be large, and "no individual plaintiff would have a significant incentive to sue on his or her own." 219 F.R.D. at 443 (citing *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985)).

## 2. The Source of Data Used to Create Target Marketing Lists Is Common to All Plaintiffs and Class Members

Trans Union also argues that because its target marketing products were derived from different sources, the need to identify the source of each disclosure will render the case unsuitable for class certification. This argument, too, is a red herring and completely ignores the fact that plaintiffs have already established that their names and records were contained in copies of the List Master File sold to unrelated non-agent entities. As set forth herein, the mere inclusion of plaintiffs' and class members' names and records in the List Master File, and any and all reports generated thereby, sold to a non-agent party confirms that plaintiffs and class members meet the minimum tradeline requirements. That finding, therefore, covers all sales of Trans Union's Master File and all target marketing reports derived therefrom. Furthermore, the other major databases used by Trans Union to create target marketing products, the "Standard Characteristics" or "Attribute File," likewise only contain records of those consumers who also meet the "Master File Minimum Criteria." *See Trans Union*, 2000 FTC LEXIS 23, at *20. Thus, Trans Union's sale or disclosure of those files, and any target marketing lists or similar products derived therefrom, constitute "consumer reports" since they also communicate minimum credit information about each consumer identified therein.

Trans Union is also misguided in its claim that the Court will have to review each disclosure since the databases and products changed content from time to time. TU Brf. at 16. It is not the content, but the minimum requirements employed by Trans Union for inclusion in the target marketing databases and lists, that caused the FTC to determine such databases and lists qualified as "consumer reports." Plaintiffs and class members need only show that their records were included in any sale or disclosure deemed to be in violation the FCRA. The content of the disclosures is not a material issue in this case.

Likewise, changes to the minimum tradeline requirements for inclusion in the List Master File during the relevant time periods is not a significant issue in this case. As long as plaintiffs' and class members' records were maintained in the List Master File, Standard Characteristics database, or corresponding target marketing lists, Trans Union's customers knew they had met the minimum tradeline requirements. Furthermore, the minimum criteria for inclusion in Trans Union's target marketing databases (and the lists derived therefrom) only changed once in January, 1998.[5]  Regardless of the post-1997 changes to the minimum criteria used by Trans Union, copies of the List Master File and the target marketing lists derived therefrom confirmed the same information was sent to Trans Union's target marketing customers about the consumers included in the databases and reports. Thus, neither the changes to the content nor the changes to the minimum criteria for inclusion in the report changes the focus of the litigation in this case.

Trans Union concludes its argument by asserting that individual fact finding will be required because databases other than the List Master File were used to create target marketing lists. The FTC addressed this fact issue in its Final Report wherein it found that the consumer information used to create its various target marketing lists came from "two primary databases called the Master File and the Standard Characteristics database." *Trans Union*, 2000 FTC

---

[5]     In its Final Order, the FTC held in relevant part: "Prior to January 1998, each CRONUS consumer file had to show at least two open tradelines with one of the tradelines verified – *i.e.*, that some reported activity took place – during the preceding 12 months. In addition, a qualifying tradeline could not be closed or an account about which there was a consumer dispute, and could not be a collection record or public record. These criteria are hereinafter referred to as the 'pre-1998 Minimum Criteria.'" It further held: "In January 1998, in order to be included in the Master File, Trans Union began to require CRONUS consumer files to contain two tradelines active within the last six months or one tradeline active in the last six months with an address confirmed by an outside source. We refer to these later criteria as the 'post-1997 Minimum Criteria' and both sets jointly as the 'Minimum Criteria.'" *Trans Union*, 2000 FTC LEXIS 23, at *12-*13.

LEXIS 23, at *11.  However, the FTC specifically found that the consumers listed in the Standard Characteristics database also must meet the Master File minimum criteria.  *Id.* at *7. Additionally, addressing all of the target marketing lists offered by Trans Union, the FTC concluded in relevant part as follows:

> Nonetheless, because ***the Minimum Criteria apply to virtually all of Trans Union target marketing lists***, we make the following determinations based on our review of the record.  First, the Minimum Criteria for appearing on Trans Union's base marketing lists are not the "mere existence of tradeline."  Rather, the Minimum Criteria also reveal, among other things, the existence of a recently active and current credit relationship.  Specifically, the prerequisite for appearing on a list is:  (1) the existence of either two tradelines active within the last six months or one tradeline active within the last six months with an address matched to an outside vendor file, and (2) that the tradeline must have no closed date, must not be disputed, and cannot be a collection tradeline or public record tradeline.

*Id.* at *58-*59.

"[V]irtually all of Trans Union['s] target marketing lists" contained only consumers who had met the minimum tradeline requirements.  *Id.*  Accordingly, Trans Union's focus on the source of the information contained in its target marketing lists is yet another red herring.  The common nucleus of legal and fact issues is whether plaintiffs' and class members' records were disclosed in copies of the List Master File, Standard Characteristics database, or target marketing products derived therefrom for target marketing purposes in violation of the FCRA.

### 3.    Common Issues of Law Predominate Over Plaintiffs' and Class Members' FCRA Claims

Trans Union's lengthy "30-year history of [the] FCRA" detailing the evolution of the term "consumer report" is not only monotonous and over inclusive, but fails to raise a legitimate argument not already litigated.  TU Brf. at 18-22.  The vagueness and ambiguity in the legal standard Trans Union speaks of is nothing but a self-serving interpretation previously found invalid by the FTC and numerous courts.  Defendant Trans Union, not the FCRA, falsely defined the term "consumer report" and applied it unlawfully.

Rule 23(b)(3) permits class certification where "'the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members.'"  *See Gates v. Towery*, No. 04 C 2155, 2004 U.S. Dist. LEXIS 22876, at *25-*26 (N.D. Ill. Nov. 9, 2004).  "[C]lass certification pursuant to Rule 23(b)(3) is nonetheless appropriate where there is a commonality of substantive law applicable to all class members."  *In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672, 695 (S.D. Fla. 2004); *see also*

*Phillips Petroleum*, 472 U.S. 797. The FCRA is a uniform federal legal standard that governs all consumer reporting agencies and their disclosure of consumer reports to third parties. 15 U.S.C. §1681. Thus, there is no legal variation in the substantive law applicable to this case. "The duties owed the consumer under FCRA are uniform in every respect." *White v. Imperial Adjustment Corp.*, No. 99-3804, 2002 U.S. Dist. LEXIS 26610, at *54 (E.D. La. Aug. 6, 2002).

This case is clearly distinguishable from the cases Trans Union relies on to support its lack of predominance claim. Trans Union cites to *In re Rhone-Poulenc Rorer Inc.*, 51 F.3d 1293, 1300 (7th Cir. 1995), and *Wash. Mut. Bank v. Superior Court*, 24 Cal. 4th 906, 924 (2001), to argue a predominance issue that is irrelevant to this proceeding. Both the Seventh Circuit case of *Rhone-Poulenc* and the California state case of *Washington Mutual Bank* involved proposed nationwide classes of state law claims where multi-state variations in the underlying law prevented certification. *See Rhone-Poulenc*, 51 F.3d at 1302 (Judge Posner reversed the Rule 23(c)(4)(A) certification of a mass tort action because of the "nonidentical negligence laws of 51 jurisdictions."); *Wash. Mut. Bank*, 24 Cal. 4th at 927 ("nationwide class was premised upon the faulty legal assumption that choice-of-law issues need to be resolved"). The predominance issue identified by these courts (varying state laws) is not present in the instant case where the governing legal standard is a federal Act applied uniformly across the country.

Trans Union cites *Ippolito v. WNS, Inc.*, 864 F.2d 440 (7th Cir. 1988), as Seventh Circuit authority that validates Trans Union's alleged misconduct "in many instances" through its definition of a consumer report under the FCRA. TU Brf. at 19. While defendant's interpretation of *Ippolito* is irrelevant to the Court's determination of class certification, it is emblematic of Trans Union's inconsistent and contradictory arguments made in opposition to class certification. For instance, Trans Union argues *ad nauseam* that the courts have interpreted the term consumer report as "vague and undetermined" for most of the FCRA's 30-year history. Yet, Trans Union is able to identify a 1988 case it proclaims is the "prevailing analysis in this Circuit" on the term "consumer reports," which purportedly excuses *some* of its misconduct. TU Brf. at 19. Without a doubt, Trans Union has proven through this litigation and the FTC action, that it is determined to rewrite the history of FCRA for its own purposes.

Trans Union bases the crux of its predominance argument on the procedural history of the FTC enforcement action. As previously noted by this Court, "[t]he FTC first challenged Trans Union's target marketing and pre-screening activities as unlawful in December 1992. In 1994 the FTC summarily held that Trans Union's lists were consumer reports." *In re Trans Union*

*Corp. Privacy Litig.*, 326 F. Supp. 2d 893, 897 (N.D. Ill. 2004). This determination was made far before the start of either the proposed punitive damages class period or firm offer class period (1997 – present). These decisions also preceded the proposed class period for the UCL class (1995 – present). When an agency empowered to enforce an Act speaks with such certainty, it is extremely difficult, if not impossible, to argue any kind of vagueness or ambiguity in the legal standard.

Trans Union also repeatedly references its own conduct in prolonging the FTC's enforcement action against it to support its claim of vagueness in the FCRA's legal standard. However, the Court has already rejected this very argument in defendants' motion to dismiss:

> As the procedural history demonstrates, however, the concern expressed by the ***FTC I court was not the result of a vague standard, but of a poorly developed record***. Neither in FTC I nor FTC II did the court adopt a new legal standard for what constitutes a credit report under the Act. Indeed, FTC II ultimately affirmed the FTC's original position that the mere presence of a single tradeline is a factor in credit-granting decisions. Both FTC I and FTC II involved the application of the statutory definition. Trans Union was in a better position than most to determine the "factors" creditors rely on in making credit eligibility decisions. Thus, ***there is and was nothing vague about the standard that would prevent plaintiffs' claims***.

*Trans Union*, 326 F. Supp. 2d at 899.

Trans Union also tries to cloud the issue with references to the Gramm-Leach-Bliley Act ("GLBA") and the Fair and Accurate Credit Transaction Act of 2003 ("FACT Act"), which impose additional restrictions on defendant's activities. TU Brf. at 22. Although these Acts supplement the existing regulatory infrastructure that governs Consumer Reporting Agencies, their implementation in no way affects the commonality of substantive law (the FCRA) applicable to plaintiffs and all class members. Plaintiffs bring their claims under the FCRA, not the GBLA or FACT Act. Moreover, as Trans Union readily admits, neither the GLBA nor the FACT Act substantially alters the governing provisions of the FCRA. *See id.* at 21-22 ("the FACT Act imposed ***new*** rights and obligations on Consumer Reporting Agencies"; "GLBA does not alter operation of FCRA"); 15 U.S.C. §6806.

As discussed above, the central theory of liability under FCRA is common and predominates among the claims of all plaintiffs and class members. As the Court has previously ruled, there is "***nothing vague***" about the FCRA's legal standard. *Trans Union*, 326 F. Supp. 2d at 899. The FCRA is applied uniformly in governing the conduct of all Consumer Reporting Agencies. Thus, there are no significant, let alone predominant variations in the FCRA's legal

- 14 -

standard. Accordingly, common issues of law predominate plaintiffs' and Class Members' FCRA claims.

### 4. Punitive Damages Under the FCRA Do Not Require a Showing of Individualized Proof

Contrary to Trans Union's assertions, plaintiffs are not required to show injury through individualized proof when seeking punitive damages for defendants' willful violations of the FCRA. Trans Union falsely contends that plaintiffs have no intention of establishing defendants' unlawful conduct to substantiate their claims. Whether defendants *willfully* sold or otherwise unlawfully disclosed personal or credit information is uniformly established for all plaintiffs and class members through the prior FTC action, defendants' admissions and minimal additional discovery. Once this evidence is obtained, defendants' intent can be established quite efficiently and without the need for the "millions of mini-trials" Trans Union alludes to. *See* TU Brf. at 25. There are no individual issues of proof when the relevant inquiry is on defendants' intent behind its uniform misconduct.

The FCRA provides that "[a]ny person who willfully fails to comply with any requirement imposed under this title with respect to any consumer is liable to that consumer in an amount equal to the sum of ... such amount of punitive damages as the court may allow." 15 U.S.C. §1681n(a). "For the violation to be 'willful,' thereby justifying an award of punitive damages under the Fair Credit Reporting Act, a *defendant's course of conduct* must exhibit a 'conscious disregard' for or entail 'deliberate and purposeful' actions taken against a plaintiff's rights." *Sapia v. Regency Motors of Metairie, Inc.*, 276 F.3d 747, 753 (5th Cir. 2002); *see also Cousin v. Trans Union Corp.*, 246 F.3d 359, 372 (5th Cir. 2001). "Even with no actual damages, courts have allowed recovery for humiliation and mental distress and for injury to one's reputation and creditworthiness." *White*, 2002 U.S. Dist. LEXIS 26610, at *22; *see also Sapia*, 276 F.3d at 753 (citing *Fischl v. Gen. Motors Acceptance Corp.*, 708 F.2d 143, 151 (5th Cir. 1983)).

Defendant's argument that punitive damage claims under the FCRA raise individualized issues of proof has already been considered and dismissed by other courts. In *White*, the court certified a punitive damages class for willful violations of the FCRA. 2002 U.S. Dist. LEXIS 26610. The court noted, "[c]ontrary to defendants' assertion, there is *no necessity of showing any injury through individualized proof* or otherwise." *Id.* at *54-*55. Similarly, in *Sapia*, the court acknowledged that actual damages need not be established before punitive damages could

- 15 -

be awarded under the FCRA. 276 F.3d at 753. Finally, in *Ashby v. Farmers Ins. Co.*, No. CV 01-1446-BR, 2004 U.S. Dist. LEXIS 21053 (D. Or. Oct. 18, 2004), the court did not indulge defendants "individualized" concerns of whether proposed class members suffered "'actual damages at all'" *Id.* at *15. The court reasoned, "[defendant's] concerns are premature for purposes of the Motion to Certify and do not provide a sufficient basis for this Court to exercise its discretion to disallow class certification." *Id.* at *15-*16.

Trans Union repeatedly warns the Court that "millions of mini-trials" will be necessary to determine individualized proof of a particular FCRA violation. *See* TU Brf. at 23-25. This is just plain nonsense. As held in *White*, "[t]he identification of the affected consumers is a matter capable of ministerial determination from the defendants' files." 2002 U.S. Dist. LEXIS 26610, at *57. Generalized evidence exists that will "prove[] or disprove[] an element of the class member's claim on a simultaneous, class-wide basis." *Id.* at *58. The same is true here. Whether defendants willfully sold or otherwise disclosed personal or credit information in violation of the FCRA is easily established on a class-wide basis through the prior FTC action, defendants' admissions and some further testimony and records discovery.

With regard to establishing Trans Union's intent or willfulness, the Court has already noted, "[t]he FTC first challenged Trans Union's target marketing and pre-screening activities as unlawful in December 1992. In 1994 the FTC summarily held that Trans Union's lists were consumer reports." *Trans Union*, 326 F. Supp. 2d at 897. These prior proceedings, along with expected testimony from key Trans Union officials, will uniformly establish Trans Union's intent and knowledge prior to the start of the proposed class periods in this matter. As this Court stated:

> Trans Union's argument that it could not have willfully violated the statute until there was an authoritative ruling that its lists are consumer reports seems to suggest that it possessed a sort of 'qualified immunity' to take a position counter to that of the agency empowered to enforce the Act, until such time as a court upholds the agency's position. ***Of course, no authority supports this position.***

*Id.* at 899 n.8.

Trans Union's only authority cited in support of its individualized proof argument is the Supreme Court case *State Farm Mut. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003), *cert. denied*, No. 04-116, 2004 U.S. LEXIS 6620 (2004). Unlike this case, *Campbell* involved common law claims of bad faith, fraud, and intentional infliction of emotional distress. In *Campbell*, the Supreme Court battled with the highly-litigated issues of excessive punitive

- 16 -

damage awards and the Due Process Clause of the Fourteenth Amendment.  The $145 million punitive damages award to Curtis Campbell, in his individual capacity, is completely inapposite to a class of plaintiffs seeking no compensatory damages, but a single, uniform punitive damage award as provided for under the FCRA.  Thus, the due process concerns of the Supreme Court in *Campbell* are not only premature, but have nothing in common with plaintiffs' punitive damage claims under the FCRA.

As shown above, plaintiffs are not required to show injury through individualized proof when seeking punitive damages for defendants' willful violations of the FCRA.  Whether defendants willfully sold or otherwise disclosed personal or credit information is uniformly established for all plaintiffs and class members through defendants' uniform misconduct and knowledge.  Moreover, the Court has already acknowledged this fact in its previous orders.

### 5.    Plaintiffs' Illinois-Only Firm Offer Class Is Appropriate for Class Treatment

Trans Union's element by element breakdown of how plaintiffs must prove their FCRA Firm Offer claim appears to take more time and energy to draft than actually substantiate at trial. Defendants argue that plaintiffs' Firm Offer class "raises unique issues that are too inherently individualized." *See* TU Brf. at 25.  Defendants fail to recognize that generalized evidence exists that will "prove or disprove an element of the class member's [FCRA] claim on a simultaneous, class wide basis." *White*, 2002 U.S. Dist. LEXIS 26610, at *58.  As discussed above, whether defendants willfully sold or otherwise disclosed plaintiffs' and class members' personal or credit information is uniformly established by defendants' conduct as proven through prior litigation, testimony, and records.

### 6.    Trans Union's Defenses Are Speculative and Cannot Be Decided at Class Certification

In §II(F) of Trans Union's opposition brief, it argues that the Court will have to engage in "painstaking claimant-by-claimant investigations" (TU Brf. at 29) to determine which claims are barred by the defenses asserted in its Answer.  Trans Union fails, however, to identify any plaintiffs whose claims are affected by its defenses, and specifically, its statute of limitations, waiver and consent, or First Amendment defenses.  Trans Union's arguments, therefore, are purely speculative.  "[T]he court is not required to deny certification for speculative reasons; the certification decision always remains within the sound discretion of the court." *Danis*, 189 F.R.D. at 395; *Hickey v. Great W. Mortgage Corp.*, 158 F.R.D. 603, 609 (N.D. Ill. 1994).  "Pure

speculation will not defeat a finding of typicality." *Danis*, 189 F.R.D. at 398.

The defenses raised by Trans Union are not only speculative at this juncture of the lawsuit, they go to the merits of the action and cannot be considered on a motion for class certification. *Payton v. County of Kane*, 308 F.3d 673, 677 (7th Cir. 2002) (determination of a party's request for class certification should not rely on the likelihood of success on the merits) *cert. denied*, 540 U.S. 812 (2003). For example, asking the Court to resolve the statute of limitations issue in a motion for class certification "would impermissibly intrude upon the merits" of the plaintiffs' claims. *Kifafi v. Hilton Hotels Ret. Plan*, 189 F.R.D. 174, 178 (D.D.C. 1999) (citing *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177 (1974) ("[N]othing in either the language or history of Rule 23 that gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action.")). The court in *Kifafi* held that statute of limitations defenses would be considered "in the context of dispositive motions, at which time the court could issue an order limiting the class to exclude any members whose claims were time-barred." *Id.*

Factual variations amongst plaintiffs' and class members' claims do not destroy commonality required for class certification. *Palmer v. Combined Ins. Co. of Am.*, 217 F.R.D. 430, 437 (N.D. Ill. 2003). "The existence of factual differences will not preclude certification, and the '[s]imilarity of legal theory is more important than factual similarity, so the presence of factual differences between the claims of the members of the proposed class is not fatal to finding of typicality.'" *Id.* (citing *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983)). In addressing the propriety of certification, "'the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits but rather whether the requirements of Rule 23 are met.'" *Weathers v. Peters Realty Corp.*, 499 F.2d 1197, 1201 (6th Cir. 1974).

First, and most importantly, any unique affirmative defenses which may apply to absent class members are completely ***irrelevant*** to this motion. Fed. R. Civ. P. 23(a). Moreover, as set forth herein, Trans Union's assertions are based on nothing more than pure speculation about whether some class members' claims may be barred by its defenses. Such purported defenses are nothing more than premature guess-work by the defendants and do not defeat class certification. Courts routinely reject the claim of "unique defenses" as a basis for denying class certification. "Courts have ... found that where there is a 'common legal grievance,' shared by the members of the class, 'the benefit from the determination in a class action of the existence of

a ... common pattern of fraud *outweighs the problems of individual actions involving such other issues as causation, reliance, and damages*.'" *Allapattah Servs. v. Exxon Corp.*, 188 F.R.D. 667, 674 (S.D. Fla. 1999).

Trans Union further argues that plaintiffs' "invocation of equitable tolling principals ... only complicates the inquiry." TU Brf. at 29. Trans Union again ignores that the inquiry is whether plaintiffs have met the requirements of Rule 23, not whether they will prevail on the merits of their claims. Trans Union also ignores the underlying fact that plaintiffs' and class members' information is alleged to have been available for inclusion in Trans Union's target marketing databases and lists up to and including the present time. The plaintiffs' and class members' records remained available for disclosure in Trans Union's target marketing lists up to and including the present date. Thus, Trans Union's arguments are based on the assumption that some plaintiffs' and class members' information was only disclosed during a period that may be barred by its statute of limitations defense.    Such arguments based on pure surmise and conjecture cannot defeat plaintiffs' motion for class certification.

Trans Union's additional defenses of waiver and consent or First Amendment defenses likewise go to the merits of plaintiffs' claims against Trans Union and should not be addressed as part of plaintiffs' request for class certification. Furthermore, both defenses focus on the different categories of information disclosed by Trans Union and whether Trans Union has a defense to the disclosure of that information.    TU Brf. at 30.    Trans Union's argument completely ignores the main focus of this class action lawsuit. Pursuant to the FTC's Final Order, Trans Union's common pattern of pulling consumer information from its CRONUS database using minimum tradeline activity criteria, storing that data in a target marketing database such as the List Master File, and selling copies of the List Master File or target marketing lists to its customers, violated the FCRA since such disclosures in and of themselves confirmed minimum credit activity about each consumer included therein. *Trans Union*, 245 F.3d at 806.    The content of the disclosures, the alleged basis for Trans Union's First Amendment and waiver and consent defenses, are not critical issues in this case. Accordingly, Trans Union's arguments that the content of its disclosures will require individualized fact finding with respect to its defenses is groundless and, at best, speculative.

Issues related to Trans Union's defenses should be considered "in the context of dispositive motions, at which time the court could issue an order limiting the class to exclude any members whose claims were time-barred." *Kifafi*, 189 F.R.D. at 178. To rule on such defenses

now would impermissibly rule on the merits of the claims or defenses in this case, especially considering the speculative nature of the defenses.

### C.    Plaintiffs' Proposed California UCL Class Is Proper

#### 1.    A Pending Appeal of the *Frey* Order Prevents Collateral Estoppel Effect

Relying on *In re Bridgestone/Firestone, Inc., Tires Prods. Liab. Litig.*, 333 F.3d 763 (7th Cir. 2003), defendants argue that this Court should give the *Frey* trial court decision collateral estoppel to bar certification of plaintiffs' UCL[6] class. Defendants' argument is wanting because the *Frey* trial court order is presently on appeal and cannot be afforded collateral estoppel effect. Moreover, defendants' application of *Bridgestone/Firestone* is inapposite.[7]

Defendants neglect to inform the Court that the certification order in *Frey* is now on appeal in Division Three of California's Fourth District Court of Appeal. Where, as here, the party asserting collateral estoppel seeks to rely upon a **state court** judgment, federal courts must apply the *res judicata* and collateral estoppel rules of the state that rendered the underlying judgment. *Migra v. Warren City School Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984). California state court judgments are not final until the time for appeal has expired; or if an appeal is filed, **until the judgment is affirmed** and the case remitted to the trial court. Until then, no *res judicata* or collateral estoppel attaches. *People ex. rel. Gow v. Mitchell Bros'. Santa Ana Theater*, 101 Cal. App. 3d 296 (1980). Thus, defendant is not entitled to rely upon the *Frey* trial court order to support its collateral estoppel theory.

Second, under *Bridgestone/Firestone* the *Frey* trial court order does not support a finding that absent class members are collaterally estopped from seeking certification here. The *Bridgestone/Firestone* court made it clear that an order denying class certification would only be binding on absent class members if there were **findings** that the absent class members were adequately represented, "[a] decision with respect to the class is conclusive **only** if the absent

---

[6]    California Business and Professions Code §17200, *et. seq.*, is also commonly referred to as the Unfair Competition Law, or "UCL."

[7]    Additionally, *res judicata* (claim preclusion) and collateral estoppel (issue preclusion) are *affirmative defenses* that must be pleaded or are waived (*see* Fed. R. Civ. P. 8(c)); *Blonder-Tongue Labs., v. Univ. of Ill. Foundry*, 402 US 313, 350, *aff'd*, 402 U.S. 313 (1971). Here, Trans Union attempts to argue a point that it failed to plea in its affirmative defense.

members were adequately represented by the named litigants and class counsel." 333 F.3d at 768-69. It is clear that the *Frey* trial court order did not make any such findings. Per *Bridgestone/Firestone*, absent a finding by the *Frey* court concerning adequacy of representation, the *Frey* trial court order cannot bar absent class members from seeking certification of a UCL class here.

### 2.    Proposition 64 Does Not Bar Plaintiffs' UCL Claims

Trans Union claims that newly-enacted Proposition 64 serves as the "death knell" for plaintiffs' UCL claims. Proposition 64 narrowed the broad standing requirements of the UCL, yet it has no impact on the claims asserted here because plaintiffs have standing to assert their claims for injunctive relief. Indeed, defendants do not dispute the central facts that each proposed class representative (and their private credit information) is in the List Master File, and that defendants sold or disclosed that database to third parties during the relevant class periods. Additionally, it is now well established that defendants' disclosures were in violation of the FCRA (as established by the FTC). Nothing more could reasonably be required for plaintiffs to establish standing under the revised UCL.

### a.    Proposition 64 Does Not Apply Retroactively

Additionally, defendants' argument concerning recent amendments to the UCL is irrelevant because the amendments are not retroactive. Plaintiffs' motion for class certification correctly states that under the UCL, plaintiffs need not prove that they or any class member were actually deceived or injured by defendants' conduct to demonstrate standing and proceed in a representative capacity. Defendants do not challenge, as a general principle, the accuracy of plaintiffs recitation of the UCL. Instead, defendants argue that with the passing of Proposition 64 on November 2, 2004, the standing requirements under the UCL have changed (*i.e.*, according to defendants, plaintiffs must now make a showing of actual injury to bring claims under the UCL). Thus defendants' attack on plaintiffs' UCL claim hinges entirely on whether Proposition 64 applies *retroactively* to actions filed prior to November 3, 2004.

The California Court of Appeal squarely decided this issue in *Californians for Disability Rights v. Mervyn's, LLC*, No. A106199, 2005 WL 230019 (Cal. Ct. App. Feb. 1, 2005). The Court held that Proposition 64 has no application to pending cases because it is *not retroactive*. Thus, Proposition 64 does not apply to cases filed prior to November 3, 2004. Since this case was filed prior to November 3, 2004, defendants' argument that Proposition 64 applies to this case necessarily fails. As a consequence, plaintiffs are not required to make a showing of injury

- 21 -

to proceed under the UCL on a representative basis. In addition, Proposition 64's requirement that plaintiffs meet the criteria for class certification under California Code of Civil Procedure §382 in order to proceed on a representative basis is also inapplicable.[8]

Californians for Disability Rights ("CDR") is a non-profit corporation organized to protect the interests of persons with disabilities. CDR filed a lawsuit against retailer, Mervyn's, LLC pleading a single cause of action alleging unlawful business practices under Business & Professions Code §17200, *et. seq.* CDR contended that Mervyn's denied store access to persons with mobility disabilities by failing to provide adequate pathway space between merchandise displays. *See Mervyn's*, 2005 WL 230019, at *1. After a bench trial, the court denied relief to CDR and entered judgment in favor of Mervyn's. While the case was pending on appeal, California voters approved Proposition 64 on November 2, 2004, amending the UCL. Proposition 64 limits private enforcement of unfair business competition laws by providing that a private person may not bring a lawsuit unless he or she has suffered some injury and lost money or property as a result of the challenged business practices, and meets the requirements for a class representative in a class action. *Id.* Mervyn's immediately moved to dismiss CDR's appeal. Similar to defendants' arguments here, Mervyn's argued that Proposition 64 applied retroactively to pending actions. *Id.*

### b. The Court of Appeal's Basis for Rejecting the Argument that Proposition 64 Applies Retroactively

In rejecting Mervyn's claim of retroactivity, the Court of Appeal explained: "It is well settled that a new statute is presumed to operate prospectively absent an express declaration of retrospectivity or a clear indication that the electorate, or the Legislature, intended otherwise." *Id.* at *2. In that regard, the Court of Appeal found that "Proposition 64 contains no express declaration of retrospectivity" and is in fact "silent on the matter" – a point which Mervyn's rightly conceded. *Id.*

Further, the Court of Appeal found that the terms of the statutory amendments, the legislative analysis, and the ballot arguments made, (1) no mention as to whether Proposition 64

---

[8] After *Mervyn's* was decided, two other California courts of appeal held that Proposition 64 applies to actions on file before its enactment. *See Branick v. Downey Sav. & Loan Ass'n*, No. B172981, 2005 WL 299926 (Cal. Ct. App. Feb. 9, 2005); *Benson v. Kwikset Corp.*, No. G030956, 2005 WL 327472 (Cal. Ct. App. Feb. 10, 2005). The issue is likely headed to the California Supreme Court.

was meant to apply retroactively to preexisting lawsuits; (2) failed to provide any implicit indication that the electorate intended the law to be retroactive; and (3) if anything, suggested an intention that the law only apply ***prospectively*** to future lawsuits. *Id.* The Court of Appeal went on to say, "the presumption against retroactive legislation is deeply rooted in our jurisprudence ... fairness dictate[s] that individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted." *Id.* at *3.

The Court of Appeal further explained that, "[h]ere, Proposition 64 imposes limits on private enforcement of the UCL by precluding the filing of a complaint by a private party who has not suffered injury in fact and lost money or property as a result of the challenged business conduct." *Id.* at *5. If the law were applied retroactively, it "would sweep up all pending complaints by uninjured plaintiffs. The application of a new law restricting the filing of complaints to previously filed complaints would plainly constitute a retroactive application of the law." *Id.* "While the filing of a complaint may be characterized as 'procedural,' a 'new rule concerning the filing of complaints would not govern an action in which the complaint had already been properly filed under the old regime....'" *Id.* at *5.

The Court of Appeal noted that in determining whether a new law is to be applied retroactively, "we must consider 'the nature and extent of the change in the law and the degree of connection between the operation of the new rule and a relevant past event.' In making that determination, we are guided by 'familiar considerations of fair notice, reasonable reliance, and settled expectations.'" *Id.* at *4. In applying these criteria, the Court of Appeal summed up the basis for finding that Proposition 64 is ***not*** retroactive as follows:

> The disruption that would result from application of Proposition 64 to preexisting lawsuits should not be minimized. Plaintiffs who filed and prosecuted cases for years, like CDR, could suffer dismissal of their lawsuit at all stages of litigation. The prospect of such dismissals raises a host of difficult questions, including whether a plaintiff who did not allege actual injury is entitled to amend his or her complaint to make the allegation or substitute another party who was injured; whether a plaintiff may amend his or her complaint to add class action allegations; and whether any amended standing allegations relate back to the filing of the complaint so as to toll the statute of limitations. Retroactive application of a statute often entails difficulties in enforcement and unanticipated consequences, and should not be embarked upon where, as here, there is no indication that retroactivity was ever considered or intended by the voters.

*Id.* at *6.

Thus, defendants' Proposition 64 arguments should be rejected because they are contrary to existing legal authority and the California Plaintiffs already have adequate standing.

### 3. Certification of the California UCL Class Is Warranted Under Rule 23(b)(2)

Trans Union and Acxiom do not dispute (1) that injunctive and other equitable relief are available under the California UCL; (2) that the California plaintiffs seek injunctive and equitable relief not obtained by the FTC; and (3) that the fundamental requirements of Rule 23(b)(2) (*i.e.*, that the defendant "has acted or refused to act on grounds generally applicable to the class ... making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole") are met here. Instead, they claim that Rule 23(b)(2) certification is unwarranted because the "primary relief" sought is monetary damages, the sum of money potentially subject to equitable disgorgement is large, and that any request for injunctive relief is "largely moot." These arguments are devoid of merit.

The Seventh Circuit distinguishes between "money damages" and "equitable monetary relief." *See Jefferson v. Ingersoll Int'l Inc.*, 195 F.3d 894, 899 (7th Cir. 1999) (noting that "equitable monetary *relief* such as back pay" does not implicate the propriety of 23(b)(2) certification). Thus, where plaintiffs and class members seek injunctive relief and equitable monetary relief, the question of whether the claim for money damages predominates is irrelevant.[9] Here, no money damages are sought under the UCL by the California plaintiffs – the relief sought is strictly equitable. Trans Union cites no California authority establishing that such relief is not equitable, and the authorities it does cite are inapplicable.[10] While Trans Union argues that it could be ordered to disgorge $100 million, the amount of disgorgement does not

---

[9]     *See id.*; *see also Allen v. Leis*, 204 F.R.D. 401, 409 (S.D. Ohio 2001) (acknowledging "numerous ... cases indicating the propriety of classifying restitution as equitable relief such that it would not interfere with the purposes of a Rule 23(b)(2) certification"); 2 *Newberg on Class Actions*, §4:14, at 89 (4th ed. 2002) ("When monetary relief is properly sought as equitable restitution, such cases qualify as Rule 23(b)(2) classes, though such monetary relief is often as predominant as the injunctive and other equitable relief sough in such cases").

[10]     *Clay v. Am. Tobacco Co.*, 188 F.R.D. 483 (S.D. Ill. 1999), cited by Trans Union, predates *Jefferson v. Ingersoll*, and is contrary thereto to the extent it purports to disregard any distinction between money damages and equitable monetary relief. Additionally, the plaintiffs in *Clay* sought no particularized injunctive relief in their complaint or elsewhere. 188 F.R.D. at 494-95. Here, plaintiffs have sought specified injunctive relief since the outset of these cases, and have identified injunctive relief beyond that obtained by the FTC.

change the nature of the relief sought. Given the size of the California class, the amount disgorged would likely amount to less than $10 per class member, a sum that would never be recovered absent class treatment.

Trans Union's argument that any injunctive relief is "largely moot" is also unavailing. First, the FTC did not order that Trans Union disgorge monies it obtained in violation of the FCRA. Second, Trans Union sold copies of the List Master File to third parties during the relevant time period, and also engaged in a last-ditch effort to sell licenses to third parties granting them "unlimited lifetime use" of its List Master File database. *See* Doyle Decl., ¶7. Injunctive relief ordering the revocation of such licenses and the recovery of List Master Files supplied to third parties is but one of many types of injunctive relief the California UCL class may seek at the time of trial, and is far from moot. Third, plaintiffs seek an order requiring defendants to notify the public of target marketing opt-out rights and methods – additional relief not ordered by the FTC. Finally, no injunctive relief has ever been entered against Acxiom. Thus, the equitable relief sought by the California class under the UCL is clearly significant and merits Rule 23(b)(2) certification.

Assuming *arguendo* that the monetary relief sought here is not equitable, Rule 23(b)(2) certification is still warranted where the monetary damages are "incidental" to the injunctive or declaratory relief, *i.e.*, where they "'flow directly from liability to the class as a whole on the claims forming the basis of the injunctive or declaratory relief.'" *Lemon v. Int'l Union of Operating Eng'rs, Local No. 139*, 216 F.3d 577, 581 (7th Cir. 2000). Trans Union's violations of California consumers' rights under the FCRA form the predicate unlawful business acts under Bus. & Prof. Code §17200, and the disgorgement flows directly from those violations. Upon a finding that Trans Union violated the FCRA (a small step considering the FTC's Final Order), plaintiffs will be entitled to injunctive relief and disgorgement under the UCL. No individual calculations will be needed, and Trans Union will simply be required to disgorge all monies wrongfully obtained. Accordingly, this case is a prime candidate for Rule 23(b)(2) certification.[11]

---

[11] To the extent that the Court finds that the California UCL class members are seeking money damages and that those damages are not merely "incidental" to their equitable claims, this Court may properly order "[d]ivided certification," and "certify the injunctive aspects of the suit under Rule 23(b)(2) and the damages aspects under Rule 23(b)(3)." *Jefferson*, 195 F.3d at 898.

### D.   Plaintiffs and Their Counsel Will Fairly and Adequately Protect the Interests of Class Members

The proposed class representatives[12] and their counsel have vigorously pursued these cases for well-over four years. Since at least late 2000, the proposed class representatives and their counsel have vigorously opposed Trans Union's successive motions to dismiss their claims; its motion to strike plaintiffs' prayers for certain relief; and its motion for a determination that a nationwide claim for statutory damages under the FCRA cannot be maintained as a class action. The proposed class representatives and their counsel vigorously pursued multiple avenues of appellate review of decisions adverse to the putative classes in these cases in an effort to maximize the relief available on a class-wide basis. They have pursued class certification-related and merits discovery from defendants, produced documents, answered interrogatories, appeared for depositions and otherwise sought to protect the interests of the classes they endeavor to represent. The sheer weight of the long and arduous substantive and procedural history of this complex litigation by itself dispels any notion that the proposed class representatives and their counsel have failed to "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).

Both Trans Union and Acxiom claim that the proposed class representatives cannot adequately represent the classes because they are insufficiently familiar with the factual and legal aspects of their claims. This is not true. First, it is well-recognized that class representatives need not possess encyclopedic knowledge of the claims at issue, and may properly rely on knowledgeable and experienced class action counsel to know the factual details of the case as well as the law, and to provide guidance on litigation strategies.[13]  *See Carbajal*, 219 F.R.D. at 442 (plaintiffs claimed lack of knowledge "'entitled to little weight'" when assessing adequacy); *Heastie v. Cmty. Bank of Greater Peoria*, 125 F.R.D. 669, 676 (N.D. Ill. 1989) (class representative's knowledge is not the focus; instead the courts focus "on the competency of the named plaintiff's counsel and the existence of any conflicts of interest between the named class

---

[12]    Plaintiffs Randall Stein, and Alla and Boris Rozenblitt do not seek to represent any of the classes.

[13]    Defendants do not dispute that co-lead counsel and other counsel representing these classes are knowledgeable and experienced class action litigators.

representative and other class members").[14]  Here, the class representative plaintiffs displayed more than adequate knowledge of the facts and claims.  The testimony of Nancy Winkelmann regarding the facts and claims against Trans Union is illustrative:

> Trans Union, the way I understand it, has a CRONUS file with my name and address, and in that database they also have a master list file, and to get in the master list file, you need two tradelines.  So I meet the criteria to get into the master trade file....  And in the ... master list are target marketing criteria or underneath saying what credit cards I have, what bank cards I have, how much I owe, how I paid it off, my mortgage, if I have an auto loan, if I'm head of the household.

> And then there's also another Standard Characteristic list that's in the database, and under that, there's more criteria that's, I think, more specific.  It has to do more with finances, like E-VAL and SOLO and PIC and P$YCLE and TIE.

> So what they do, Trans Union sells my name to third parties that I'm a target for, to companies such as Acxiom, Donnelly, and Locus Marketing, and they sell it for a price and they're making money off my name and I think that's wrong.  They don't have my permission to do it.  It's unfair, it's unlawful and it's creepy because who knows who gets that information.

Winkelmann at 49:18-50:18.

Other proposed class representatives were similarly able to articulate the facts and claims against both Trans Union and Acxiom, as well as the goals of or remedies sought by this lawsuit.[15]  With regard to their roles as class representatives, the proposed class representatives also displayed sufficient knowledge of the classes they represent and/or of their obligations as

---

[14]    *See also Universal Serv.*, 219 F.R.D. at 671 (adequacy requirement met even though all of class representative's information regarding defendants' wrongful conduct "has been provided by his attorney"); *In re United Energy Corp. Solar Power Modules Tax Shelter Invs. Sec. Litig.*, 122 F.R.D. 251, 258 (C.D. Cal. 1988) (adequacy requirement met where "at least some of the named Plaintiffs have expressed an understanding and interest in the proceedings," others "have produced numerous documents, participated in many depositions, and evinced an understanding that recovery is for the class as a whole").

[15]    *See, e.g.*, Alberts at 16-22, 30-31, 68-69; Beadle at 21-23, 28-30, 60-63, 79-83, 86-89, 95-96, 220-24, 226-27; Comstock at 24, 60, 65, 88; Feige at 52, 120-27, 150-53; Gogerty at 41-45, 52-54, 62-64, 67-68, 75-76, 165-66; Kearly at 39-40, 45, 63-64, 77-80, 106, 127-28, 158; Mann at 13-14, 16, 40-45, 47, 69, 108, 110-11, 115, 149-50; Martinelli at 68-69, 71, 93; J. Palazzolo at 32-34, 52, 83, 90, 112-14; L. Palazzolo at 45-47, 49-51, 61-64, 80-82, 88-93, 95-96, 157-58; Turner at 33-34, 59-61, 80, 133, 137-38; Wayne 30, 32-33, 36, 58; Winkelmann at 49-51, 59-60, 79-80, 151-64, 188, 272-76; Woods at 21-23, 29-31, 60, 63-64, 66-67, 70-72, 145-46.

class representatives.[16]  Finally, Trans Union's and Acxiom's attempts to show some potential

conflict among counsel or purported close relationships between counsel and class

representatives are unsupported by the record.[17]

Trans Union's further claim that the proposed class representatives' alleged

idiosyncrasies make them all atypical plaintiffs is specious.  The typicality requirement is met if

the plaintiff's claim "'arises from the same event or practice or course of conduct that gives rise

to the claims of other class members and his or her claims are based on the same legal theory.'"

*Keele v. Wexler*, 149 F.3d 589, 595 (7th Cir. 1998).  Typicality may be found even where "'there

are factual distinctions between the claims of the named plaintiffs and those of other class

members.'" *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 597 (7th Cir. 1993).

Here, Trans Union does not dispute that each proposed class representative (and their credit

information) is in Trans Union's List Master File, and that Trans Union sold or disclosed that

database to a third party during the relevant class periods.

Indeed, while Trans Union attempts to recite purported differences among the class

members, it fails to explain how the alleged differences will undermine their representation of

the classes at issue with regard to the claims at issue.  It is well-settled that to preclude

certification, any claimed conflict "must be fundamental" and "must go to the specific issues in

controversy."  1 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* §3:26, at 435

(4th ed. 2002); *see also id.* §3:25, at 422 ("speculative conflict[s] should be disregarded at the

class certification stage").  "At most, defendants have highlighted the inevitable factual

---

[16]     *See, e.g.*, Alberts at 29-31, 33-34, 88-89; Beadle at 24-27, 112-14, 158-60, 168-74; Comstock at
66-67, 71-72, 77; Feige at 56-57, 181-82; Gogerty at 66, 108-09; Kearly at 46-47, 84; Mann at 104-08;
Martinelli at 91-92; J. Palazzolo at 53-55, 126-29; L. Palazzolo at 64-65, 97-98; Wayne at 38, 41;
Winkelmann at 83-84, 172; Woods at 36-38, 97, 100.

[17]     Trans Union's claim that Ms. Martinelli was not aware that her counsel had filed a suit against
Locus is inaccurate. Ms. Martinelli testified that the suit was five years ago, that she did not recall it, and
that around that time period, she was distracted by her father's impending death. Martinelli at 162-63.
Furthermore, Locus filed for bankruptcy just prior to the filing of Ms. Martinelli's case. The case was
stayed from the outset and has been inactive ever since. *See* Appendix, Tab 16. Additionally, lead
counsel here are not attorneys of record in *Frey v. Trans Union.* Trans Union's assertion to the contrary
is false. Acxiom, similarly, asserts that John Turner (son of Ms. Turner) serves as class counsel in this
case when, in fact, he is not. *See* Turner at 5-7. With regard to Mr. Wayne, the fact that he has served as
a class representative in other matters is irrelevant in the absence of a demonstrated conflict, which
Acxiom fails to establish here.

variations among named plaintiffs and potential class members ... [which] are insufficient to undermine the adequacy of the named plaintiffs' representation." *Simmons v. Kansas City*, 129 F.R.D. 178, 180 (D. Kan. 1989).

In addition to being immaterial, the purported differences among the class representatives cited by Trans Union and Acxiom are also overstated. As the testimony cited above shows, the class representatives in these cases uniformly are opposed to defendants unlawful use and distribution of their personal private financial information. *See* fn.14, above. They recognize that Trans Union profited immensely from this unlawful conduct and that the company should not be permitted to do so. Many also articulated similar forms of harm they have endured,[18] and even assuming some variations in this regard, it would be insufficient to preclude typicality. *See Lewis v. Nat'l Football League*, 146 F.R.D. 5, 9 (D.D.C. 1992) ("[a]lthough [class members] may not have suffered identical damages, that is of little consequence to the typicality determination when the common issue of liability is shared"). Moreover, plaintiffs are not seeking to certify claims for actual damages. For all of the foregoing reasons, defendants' typicality challenges should be rejected.

### E.    Certification Is Not Only Superior, but the Only Method of Adjudication

Defendants argue that class certification is not a *superior* method of adjudication. Defendants raise a valid point; here it is the *only* method of adjudication. While defendants speculate about manageability concern, (an issue only raised by the massive scope of their misconduct), they ignore the most critical issue: without certification, neither plaintiffs nor class members can seek recourse for defendants' willful violations of the FCRA. Courts do not hesitate to right such wrongs, even when faced with certifying large classes. *See Eisen*, 417 U.S. at 162 ("A critical fact in this litigation is that petitioner's individual stake in the damages award he seeks is only $70. No competent attorney would undertake this complex antitrust action to recover so inconsequential an amount. Economic reality dictates that petitioner's suit proceed as

---

[18]    *See, e.g.*, Alberts at 28, 46-47, 55-61; Beadle at 70-72, 89-93, 107-11; Comstock at 24, 58-60, 65-67, 71-72, 77, 88; Feige at 61-62, 130-38, 145-46; Gogerty at 34, 47, 55-56, 168, 169-70; Kearly at 42-43, 67-71; Mann at 81-82, 129-30; Martinelli at 78-82, 87, 167; J. Palazzolo at 48-49, 92-93, 97-100; L. Palazzolo at 58-60, 96-97, 101-02, 105-07; Turner at 52-54, 47-49; Winkelmann at 118-20, 126-28, 141; Wayne at 58; Woods at 74, 76-78.

a class action or not at all."); 2 *Newberg on Class Actions, supra*, §4:33, at 291 ("Courts ... have demonstrated that management of an action involving a large class, both in numbers and geographic scope, is indeed possible.").

Here, denial of the class would inevitably result in no litigation at all, an economic reality defendants counted on when they ignored the FTC's demands. Furthermore, manageability is only one of the factors in determining superiority. Other factors the Court must consider include: conserving time, effort, and expense; providing a forum for small claimants; and deterring illegal activities. 2 *Newberg on Class Actions, supra*, §§4:38, 4:39, 4:40, 4:41. These factors clearly weigh in favor of certification.[19]

## III.   CONCLUSION

For the above reasons and those set forth in plaintiffs' moving papers, plaintiffs' motion for class certification should be granted.

DATED:  February 18, 2005                Respectfully submitted,

                                          SAUNDERS & DOYLE
                                          TERRY ROSE SAUNDERS
                                          THOMAS A. DOYLE

                                          33 North Dearborn Street, Suite 1302
                                          Chicago, IL  60602
                                          Telephone:  312/551-0051

                                          Liaison Counsel for Plaintiffs

---

[19]     Contrary to Acxiom's arguments, Plaintiffs are not required to mail notice to all class members. Notice is not required under Rule 23(b)(2), and Rule 23(b)(3) requires individual notice only to class members "who can be identified through reasonable effort." *See Carlough v. Amchem Products, Inc.*, 158 F.R.D. 314, 325 (E.D. Pa. 1993) (what constitutes a "reasonable effort" is a function of "the anticipated results, costs and amount involved"). Here, the issue of whether mailed notice to all class members is reasonable is premature. If the Court is inclined to certify one or more of the classes under Rule 23(b)(3), Plaintiffs request an opportunity to submit a notice plan detailing proper notice and any cost shifting permitted by law.

LERACH COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
FRANK J. JANECEK, JR.
WILLIAM J. DOYLE II


_____
WILLIAM J. DOYLE II

401 B Street, Suite 1600
San Diego, CA 92101
Telephone: 619/231-1058

PRONGAY & BORDERUD
KEVIN M. PRONGAY
JON W. BORDERUD
11755 Wilshire Blvd., Suite 2140
Los Angeles, CA  90025
Telephone: 310/207-2848

RIGHETTI WYNNE, P.C.
MATTHEW RIGHETTI
456 Montgomery Street, Suite 1400
San Francisco, CA  94104
Telephone: 415/983-0900

Co-Lead Counsel for Plaintiffs

S:\CasesSD\Trans Union\BRF00018383.doc

## CERTIFICATE OF SERVICE

I, Thomas A. Doyle, certify that I caused a copy of the foregoing document to be served before 5 p.m. on February 18, 2005, on counsel listed below, in the manner indicated below.

Roger Longtin
Michael O'Neil
Peter Donoghue
Paula Friedman
DLA Piper Rudnick Gray Cary
203 North LaSalle Street, Suite 1900
Chicago, IL 60601-1293
*(Via Messenger Delivery)*

Amy Lee Stewart
Rose Law Firm
120 East Fourth Street
Little Rock, AR 72201
*(Via UPS Overnight Delivery)*

Elayna T. Pham
Holland & Knight
131 S. Dearborn Street, 30th Floor
Chicago, IL 60603
*(Via Messenger Delivery)*

Thomas A. Doyle