# TRANS UNION LLC

# PROFESSIONAL LIABILITY INSURANCE

## 1999 – 2002



*Aon Group Limited*

Financial Institutions and Professional Risks

# TRANS UNION LLC

# PROFESSIONAL LIABILITY INSURANCE

## 1999 – 2002



*Aon Group Limited*

Financial Institutions and Professional Risks

## DECLARATIONS

Attaching to and forming part of
PROFESSIONAL LIABILITY INSURANCE POLICY NUMBER: 823/QA9900096

This Insurance is effected with certain
Underwriters at Lloyd's of London (not incorporated)

**THIS IS A CLAIMS-MADE PROFESSIONAL LIABILITY
INSURANCE POLICY. PLEASE READ CAREFULLY.**

1. **Named Assured:**

   TRANS UNION LLC and/or associated and/or subsidiary companies.

   **Address:**

   555 W. Adams Street
   Chicago
   Illinois 60661
   United States of America and elsewhere.

2. **Period of Insurance:**

   **From:**  16th June 1999

   **To:**  16th June 2002

   Both days at 12.01 a.m. Local Standard Time

3. **Limit of Liability:**

   (a)  USD 75,000,000      each Claim

   (b)  USD 75,000,000      Aggregate for the Period of Insurance

4. **Self-Insured Retention:**

   USD 2,500,000      each Claim, subject to:

   USD 5,000,000      in the annual aggregate, thereafter:

   USD 100,000      each Claim.

5. **Premium for the Period of Insurance:**

   USD 1,220,625.00

   For the purpose of this Policy, the annual premium is deemed to be USD542,500.00

6. **Retroactive Date:**

   None

7. **Notice of Claim to:**

   Aon Risk Services, Inc. of Illinois
   123 North Wacker Drive
   Chicago
   Illinois 60606
   United States of America.

8. **Notice of Election:**

   Aon Risk Services, Inc. of Illinois
   123 North Wacker Drive
   Chicago
   Illinois 60606
   United States of America.

9. **Service of Suit:**

   John C. Gurley
   Attorney-in-fact for Underwriters at Lloyd's, London
   115 South LaSalle Street
   Chicago
   Illinois 60603
   United States of America.

10. **Agent of the Assured:**

    The Marmon Group Inc.
    225 West Washington Street
    Chicago
    Illinois 60606
    United States of America.

## PROFESSIONAL LIABILITY INSURANCE

NOTICE: This is a Claims made form. Except to such extent as may otherwise be provided herein, the coverage afforded under this Insurance Policy is limited to liability for only those Claims that are first made against the Assured and reported to the Underwriters either while the Insurance is in force or within sixty (60) days after expiration of the Period of Insurance. The Limit of Liability available to pay Damages shall be reduced and may be completely exhausted by payment of Claims Expenses. Damages and Claims Expenses shall be applied against the Self-Insured Retention. Please review the coverage afforded under this Insurance Policy carefully and discuss the coverage hereunder with your insurance agent or broker.

The Underwriters agree with the Named Assured, set forth at Item 1 of the Declarations made a part hereof, in consideration of the payment of the premium and reliance upon the statements in the application which is made a part of this Insurance Policy (hereinafter referred to as the "Policy" or "Insurance") and subject to the Limit of Liability, exclusions, conditions and other terms of this Insurance:

I.      **INSURING AGREEMENTS**

   A.   Coverage

        To pay on behalf of the Assured Damages and Claims Expenses which the Assured shall become legally obligated to pay because of any Claim or Claims, including any Claim or Claims for Personal Injury, first made against any Assured during the Period of Insurance or Extended Reporting Period and reported to the Underwriters either while the Insurance is in force or within sixty (60) days after expiration of the Period of Insurance, arising out of any act, error, violation or omission of the Assured or of any person for whose act, error, violation or omission the Assured is legally responsible (including but not limited to any violation of the Fair Debt Collection Practices Act 15 U.S.C. Section 1692 (FDCPA) or the Fair Credit Reporting Act 15 U.S.C. Section 1681 (FCRA) or any similar laws of any state of the United States of America or any amendments to such Acts or any code changes, or any similar laws of any other country) in rendering or failing to render Professional Services, for others on behalf of the Named Assured designated in Item 1 of the Declarations except as excluded or limited by the terms, conditions and exclusions of this Policy.

   B.   Defense and Settlement (Included in the Limit of Liability)

        1.   The Underwriters shall have the right and duty to defend, subject to the Limit of Liability, any Claim against the Assured seeking payment under the terms of this Insurance, even if any of the allegations of the Claim are groundless, false or fraudulent. The Named Assured shall have the right to select counsel to defend or investigate any Claim or circumstance which might lead to a Claim and to control the defence or investigation of such Claim or circumstance which might lead to a Claim.

However, Underwriters have the right to consent to any counsel selected by the Named Assured with respect to any Claim for which the Claims Expenses exceed USD 500,000, such consent not to be unreasonably withheld. The Named Assured shall notify Underwriters in writing of their selection of counsel within sixty (60) days after the time the Claims Expenses exceed such amount. Once, Underwriters have provided their consent to a particular counsel, the Named Assured may select that particular counsel to defend any future Claim or circumstance which might lead to a Claim without the requirement of notification to Underwriters, provided, however that Underwriters retain the right to withdraw their consent to a particular counsel in the event they become unsatisfied with such counsel's previous service.

2. It is agreed that the Limit of Liability available to pay Damages shall first be reduced and may be completely exhausted by payment of Claims Expenses. Damages and Claims Expenses shall be applied against the Self-Insured Retention.

3. The Underwriters shall have the right to make any investigation they deem necessary, including, without limitation, any investigation with respect to the application and statements made in the application and with respect to coverage.

4. If the Assured shall refuse to consent to any settlement or compromise recommended by the Underwriters and acceptable to the Claimant and elects to contest the Claim, Underwriters' liability for any Damages and Claims Expenses shall not exceed:

   (i) the amount for which the Claim could have been settled, less the remaining Self-Insured Retention (including the Claims Expenses incurred up to the time of such refusal), and

   (ii) 25% of the difference between the amount for which the Claim is settled (including the Claims Expenses) and the amount for which the Claim could have been settled (including the Claims Expenses incurred up to the time of such refusal)

   or the applicable Limit of Liability, whichever is less, and the Underwriters shall have the right to withdraw from the further defense thereof by tendering control of said defense to the Assured.

5. It is further provided that the Underwriters shall not be obligated to pay any Damages or Claims Expenses, or to undertake or continue defense of any suit or proceeding after the applicable limit of the Underwriters' liability has been exhausted by payment of Damages or Claims Expenses or after deposit of the applicable policy limit in a court of competent jurisdiction, and that upon such payment, the Underwriters shall have the right to withdraw from the further defense thereof by tendering control of said defense to the Assured.

II. **PERSONS INSURED**

Each of the following is an Assured under this Insurance to the extent set forth below:

(a) if the Named Assured designated in Item 1 of the Declarations is an individual, the person so designated but only with respect to Professional Services;

(b) if the Named Assured designated in Item 1 of the Declarations is a firm or association, the firm or association so designated and any partners, directors, officers, shareholders or any other employee but solely with respect to Professional Services, on behalf of the Named Assured designated in Item 1 of the Declarations;

(c) any person who previously qualified as an Assured under (b) above prior to the termination of the required relationship with the Named Assured, but solely with respect to Professional Services, on behalf of the Named Assured designated in Item 1 of the Declarations;

(d) the estate, heirs, executors, administrators, assigns and legal representatives of any Assured in the event of such Assured's death, incapacity, insolvency or bankruptcy, but only to the extent that such Assured would otherwise be provided coverage under this Insurance;

(e) any company, firm, association, partnership or individual by whom the Named Assured has been appointed, retained or contracted to render Professional Services shall be included as an additional Assured, but only with respect to any Claims arising out of the rendering, or failure to render, Professional Services by the Named Assured.

III. **TERRITORY**

This Insurance applies to acts, errors, violations or omissions which take place anywhere in the world provided the Claim is first made against the Assured during the Period of Insurance or Extended Reporting Period purchased in accordance with Clause IX.

IV. **EXCLUSIONS**

The coverage under this Insurance does not apply to Damages or Claims Expenses incurred with respect:

(a) to any Claim arising out of any criminal, dishonest, fraudulent or malicious act, error, violation or omission of any person who is or was a member of the Board of Directors of Trans Union LLC, committed with actual, criminal, dishonest, fraudulent or malicious purpose or intent.

However, notwithstanding the foregoing, the insurance afforded by this Policy shall apply to:

(i) Any Claim arising out of a violation of the Fair Debt Collection Practices Act 15 U.S.C. Section 1692 (FDCPA) or the Fair Credit Reporting Act 15 U.S.C. Section 1681 (FCRA) or any similar laws of any state of the United States of America or any amendments to such Acts or any code changes, or any similar laws of any other country, unless there is a judgment or final adjudication of actual criminal, dishonest, fraudulent or malicious acts, errors, violations or omissions of any person who is or was a member of the Board of Directors of Trans Union LLC, or

(ii) Claims Expenses incurred in defending any such Claim or circumstance which might lead to a Claim, but shall not apply to any Damages which the Assured might become legally obligated to pay;

(b) to any Claim by one Assured under this Insurance against another Assured under this Insurance, unless such Claim:

(i) emanates originally from a party who is not an Assured as defined in this Policy, or

(ii) is made by any company, firm, association, partnership or individual included as an additional Assured by viture of paragraph (e) of Clause II - Persons Insured;

(c) to any Claim for bodily injury, sickness, disease or death of any person, unless arising out of an act, error, violation or omission of the Assured or of any person for whose act, error, violation or omission the Assured is legally responsible, or to injury to or destruction of any tangible property, including the loss of use thereof;

(d) to any claim arising out of the insolvency or bankruptcy of any Assured or of any other entity including but not limited to the failure, inability, or unwillingness to pay Claims, losses, or benefits due to the insolvency, liquidation or bankruptcy of any such individual or entity;

(e) to any Claim arising out of any Assured's activities as a trustee, partner, officer, director or employee of any employee trust, charitable organization, corporation, company or business other than that of the Named Assured;

(f) to any Claim made by or against or in connection with any business enterprise (including the ownership, maintenance or care of any property in connection therewith), which does not fall within the definition of the Assured as contained in Clause II - Persons Insured, which is owned by any Assured or in which any Assured is a trustee, partner, officer, director or employee;

(g) to any Claim arising out of acts, errors, violations or omissions that took place prior to the effective date of this Insurance, if the Chief Financial Officer of the Named Assured on the effective date knew that such acts, errors, violations or omissions might be expected to be the basis of a Claim;

(h) to any Claim arising out of or relating to any liability assumed by any Assured under any contract or agreement, whether written or oral, including but not limited to any express warranties or guarantees, or estimates of cost, unless such liability would have attached to the Assured in the absence of such agreement when arising out of an act, error, violation or omission of the Assured or of any person for whose act, error, violation or omission the Assured is legally responsible;

(i) to any Claim arising out of the Employee Retirement Income Security Act of 1974 and its amendments or any regulation or order issued pursuant thereto;

(j) to any damages which are a multiple of compensatory damages, fines, sanctions or penalties, or the return of or reimbursement for fees, costs or expenses charged by any Assured, except for statutory damages as used in the definition of Damages contained in this Policy;

(k) to any Claim or circumstance which might lead to a Claim in respect of which any Assured has given notice to the insurer of any other policy in force prior to the effective date of this Policy;

(l) to any Claim arising out of employment practices;

(m) to any Claim arising from the failure to buy or maintain any form of insurance, suretyship or bond;

(n) to any Claim directly or indirectly arising out of:

(i) the actual alleged or threatened discharge, dispersal, release or escape or failure to detect the presence of "pollutants", including but not limited to solid, liquid, gaseous or thermal irritants or contaminants, including asbestos, smoke, vapour, soot, fumes, acids, alkalis, chemicals and waste (waste includes materials to be recycled, reconditioned or reclaimed).

(ii) Any governmental or regulatory directive or request that the Assured or anyone acting under its direction or control test for, monitor, clean up, remove, contain, treat, detoxify or neutralize said "pollutants".

(o) to any Claim arising out of failure to pay any bond, interest on any bond, financial guarantee or debenture;

(p) to any Claim arising out of any actual or alleged commingling of or inability or failure to pay, collect or safeguard funds;

(q) to any Claim arising out of or based upon a loss alleged to have been sustained through fluctuation in the market value of any security or property including real property;

(r) to any Claim arising out of any actual or alleged violation of the Racketeer Influenced and Corrupt Organizations Act, 18 USC Sections 1961 Et. seq., and any amendments thereto, or any rules or regulations promulgated thereunder;

If a retroactive date is applicable to this coverage it will appear at Item 6 of the Declarations and the following exclusion shall apply:

(s) to any Claim or circumstance that might lead to a Claim arising out of any act, error, violation or omission which took place, or is alleged to have taken place, prior to the retroactive date as set forth in Item 6 of the Declarations.

V.   **DEFINITIONS**

Wherever used in this Policy:

A.   "Claims Expenses" means:

1.   fees, costs and expenses incurred by or on behalf of any Assured resulting from the investigation, adjustment, defense and appeal of a Claim, suit or proceeding arising in connection therewith.

2.   Claims Expenses does not include any salary, overhead or other charges by the Assured for any time spent in co-operating in the defense and investigation of any Claim or circumstance which might lead to a Claim notified under this Insurance.

B.   "Period of Insurance" means the period of time between the inception date shown in the Declarations and the effective date of termination, expiration or cancellation of this Insurance and specifically excludes any Extended Reporting Period hereunder.

C.   "Extended Reporting Period", if applicable, means the 12-month, 24-month or 36-month period of time after the end of the Period of Insurance for reporting Claims, arising out of acts, errors, violations or omissions which take place prior to the end of the Period of Insurance and otherwise covered by this Insurance.

D.   "Claim" means a demand received by any Assured for money or services including injunctive relief, subpoenas, service of suit or institution of arbitration, administrative, disciplinary, judicial, regulatory or other proceedings against the Assured.

E.   "Damages" means a monetary judgment, award or settlement including an award of punitive or exemplary damages (where such damages are insurable by law) or an award of attorney fees or statutory damages under the Fair Debt Collection Practices Act 15 U.S.C. Section 1692 (FDCPA) or the Fair Credit Reporting Act 15 U.S.C. Section 1681 (FCRA) or any similar laws of any state of the United States of America or any amendments to such Acts, or any similar laws of any other country.

With respect to the coverage for punitive or exemplary damages, where the Assured is able to demonstrate in good faith that punitive or exemplary damages are insurable under any applicable law, Underwriters shall not challenge that interpretation of insurability.

F. "Professional Services" means the conduct of the Named Assured's business in providing credit information, identifying information, consumer reports and other information on consumers, business reports and other information on businesses, mortgage reports, insurance reports, modelling solutions, list services and other information on real estate, account management, health care reports, computer services and databases and information development and as otherwise described in the submission provided to Underwriters.

G. "Personal Injury" means:

1. false arrest, humiliation, detention or imprisonment, wrongful entry or eviction or other invasion of the right of private occupance, or malicious prosecution;

2. libel or slander or other defamatory or disparaging material, or a publication or an utterance in violation of an individual's right of privacy.

## VI.    LIMIT OF LIABILITY

A. The Limit of Liability stated in the Declarations as "each Claim" is the limit of the Underwriters' liability for all Damages and Claims Expenses arising out of the same, related or continuing Professional Services without regard to the number of Assureds, Claims or claimants.

B. The Limit of Liability stated in the Declaration as "Aggregate for the Period of Insurance" is the total limit of the Underwriters' liability for all Damages and Claims Expenses arising out of all Claims or circumstances which might lead to a Claim which are covered under the terms and conditions of this Policy.

C. In the event the Limit of Liability stated in the Declarations as "Aggregate for the Period of Insurance" is exhausted by payments of Damages and Claims Expenses, then the Named Assured must reinstate this Limit of Liability a single time, by payment of an additional premium of USD 949,375 within thirty (30) days.

It is specifically agreed that nothing contained in the above paragraph shall be deemed to override the provisions contained in Clause A above, and the Reinstated Limit of Liability shall only apply to subsequent Claims which are totally unrelated to the Claims that gave rise to such exhaustion.

## VII.    SELF-INSURED RETENTION

The Self-Insured Retention amount stated in Item 4 of the Declarations, shall be satisfied by payments by the Assured of Damages and Claims Expenses resulting from all Claims first made and reported to the Underwriters during the Period of Insurance and the Extended Reporting Period as a condition precedent to the payment by the Underwriters of any amounts hereunder and the Underwriters shall be liable only for the amounts in excess of such Self-Insured Retention subject to Underwriters' total liability not exceeding the limit stated in Item 3(a) of the Declarations. The Assured shall make direct payments within the Self-Insured Retention to appropriate parties.

Underwriters agree that all sums paid by the Assured below the Self-Insured Retention amount stated in Item 4 of the Declarations, will contribute towards the exhaustion of the annual aggregate Self-Insured Retention.

## VIII. INNOCENT ASSURED

Whenever coverage under this Insurance would be excluded, suspended or lost;

1. because of any exclusion relating to criminal, dishonest, fraudulent or malicious acts, errors, violations or omissions by any person who is or was a member of the Board of Directors of Trans Union LLC, and with respect to which any other Assured did not personally participate or personally acquiesce or remain passive after having personal knowledge thereof, or

2. because of non-compliance with any condition relating to the giving of notice to the Underwriters with respect to which any other Assured shall be in default solely because of the failure to give such notice or concealment of such failure by one or more Assureds responsible for the loss or damage otherwise insured hereunder:

the Underwriters agree that such insurance as would otherwise be afforded under this Policy shall cover and be paid with respect to those Assureds who did not personally commit or personally participate in committing or personally acquiesce in or remain passive after having personal knowledge of (a) one or more of the acts, errors, violations or omissions described in any such exclusion; or (b) such failure to give notice, provided that if the condition be one with which such Assured can comply, after receiving knowledge thereof, the Assured entitled to the benefit of Clause VIII shall comply with such condition promptly after obtaining knowledge of the failure of any other Assured to comply therewith.

## IX. EXTENDED REPORTING ENDORSEMENT

A. In the event of cancellation or non-renewal of this Insurance by the Named Assured or by the Underwriters, the Named Assured designated in Item 1 of the Declarations shall have the right, upon payment of the premium set forth below in full and not proportionally or otherwise in part, to have issued an endorsement providing an Extended Reporting Period set forth below for Claims first made against any Assured and reported to the Underwriters during the Extended Reporting Period, subject to the conditions set forth in the definition of Extended Reporting Period herein. In order for the Named Assured to invoke the Extended Reporting Period option, the payment of the additional premium for the Extended Reporting Period must be paid to Underwriters within 30 days of the non-renewal or cancellation.

| Premium | Extended Reporting Period |
|---|---|
| USD 406,875 (being 75% of the annual premium) | 12 months |
| USD 813,750 (being 150% of the annual premium) | 24 months |
| USD 1,085,000 (being 200% of the annual premium) | 36 months |

B. The total limit of the Underwriters' liability for all Damages and Claims Expenses arising out of Claims first made and reported to the Underwriters during the Extended Reporting Period shall not exceed in the aggregate an amount equal to the limit stated in Item 3(a) of the Declarations. This limit will be a separate aggregate limit for the period of the Extended Reporting Period.

C. The right to the Extended Reporting Period shall not be available to the Named Assured where cancellation or non-renewal by the Underwriters is due to non-payment of premium or failure of an Assured to pay such amounts in excess of the applicable Limit of Liability or within the amount of the applicable Self-Insured Retention.

D. All notices and premiums payments with respect to the Extended Reporting option shall be directed to Underwriters through the entity named in Item 8 of the Declarations.

E. At the commencement of the Extended Reporting Period the entire premium shall be deemed earned, and in the event the Named Assured terminates the Extended Reporting Period for any reason prior to its natural expiration, Underwriters will not be liable to return any premium paid for the Extended Reporting Period.

## X. OTHER INSURANCE

If the Assured has insurance provided by other insurers against a Claim covered by this Policy, the Underwriters shall not be liable under this Policy for a greater proportion of such Damages and Claims Expenses than the applicable Limit of Liability stated in the Declarations bears to the total applicable Limit of Liability of all valid and collectible insurance against such Claim, provided, however, that if the Assured has insurance provided by other insurers whose insurance is stated to be excess over any other insurance available to the Assured, this Policy shall also apply solely in excess of such other insurance, unless such other insurance is written only as specific excess insurance over the Limit of Liability of this Policy.

## XI. NOTICE OF CLAIM, OR CIRCUMSTANCE THAT MIGHT LEAD TO A CLAIM

A. The Underwriters agree that the Assured may settle Claims where the Damages and Claims Expenses do not exceed USD500,000, or where the Chief Financial Officer of the Named Assured believes the Damages and Claims Expenses are unlikely to exceed USD500,000.

B. The Assured shall provide Underwriters written notice by bordereau of any Claim where the Damages and Claims Expenses exceed USD50,000 (or currency equivalent), or where the Chief Financial Officer of the Named Assured believes the Damages and Claims Expenses are likely to exceed USD50,000 (or currency equivalent). Such bordereaux are to be submitted (in a format agreed between the Assured and the Underwriters) on a quarterly basis to Underwriters through the persons named in Item 7 of the Declarations, but in no event later than sixty (60) days after expiration of the Period of Insurance.

C. If any Claim is made against the Assured where the Damages and Claims Expenses exceed USD500,000, or where the Chief Financial Officer of the Named Assured believes the Damages and Claims Expenses are likely to exceed USD500,000, the Assured shall as soon as reasonably practicable forward to Underwriters through persons named in Item 7 of the Declarations every demand, notice, summons or other process received by him or his representative, but in no event later than sixty (60) days after expiration of the Period of Insurance.

D. In the event the "annual aggregate" Self-Insured Retention amount stated in Item 4 of the Declarations is exhausted by payments by the Assured of Damages and Claims Expenses, then paragraphs A., B. and C. above shall no longer apply for the remainder of the applicable annual period and the Assured shall as soon as reasonably practicable, in respect of any subsequent Claim made against them, forward to Underwriters through persons named in Item 7 of the Declarations every demand, notice, summons or other process received by him or his representative, but in no event later than sixty (60) days after expiration of the Period of Insurance.

E. If during the Period of Insurance the Chief Financial Officer of the Named Assured first becomes aware of an act, error, violation or omission that could reasonably be the basis for a Claim and if the Chief Financial Officer of the Named Assured gives written notice to Underwriters through persons named in Item 7 of the Declarations during the Period of Insurance of:

1. the specific act, error, violation or omission; and

2. the injury or damage which may result or has resulted from the act, error, violation or omission; and

3. the circumstance by which the Chief Financial Officer of the Named Assured first became aware of the act, error, violation or omission

then any subsequent Claim made against the Assured which is the subject of the written notice shall be deemed to have been made at the time written notice was first given to Underwriters.

F. A Claim shall be considered to be first made against the Assured when the Chief Financial Officer of the Named Assured receives a demand for money or services of the type described in Clause V. D.

G. A Claim shall be considered to be reported to the Underwriters when notice is first given to Underwriters through persons named in Item 7 of the Declarations of the Claim or of an act, error, violation or omission which could reasonably be expected to give rise to a Claim.

H. All Claims arising out of the same, continuing or related Professional Services shall be considered a single Claim and deemed to have been made at the time the first of the related Claims is reported to Underwriters and shall be subject to one Limit of Liability.

I. If any Assured shall make any Claim under this Policy knowing such Claim to be false or fraudulent, as regards amount or otherwise, coverage under this Policy for such Claim shall be forfeited.

## XII. ASSISTANCE AND CO-OPERATION OF THE ASSURED

The Assured shall co-operate with the Underwriters in all investigations, including investigations regarding the application and coverage under this Policy and, upon the Underwriters' request, assist in making settlements, in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization other than an employee of any Assured who may be liable to the Assured because of acts, errors, violations or omissions with respect to which insurance is afforded under this Policy; and the Assured shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses. Other than as provided for in paragraph A. of Clause XI., the Assured shall not, except at his own cost, admit liability, make any payment, assume any obligation, incur any expense, enter into any settlement, stipulate to any judgment or award or otherwise dispose of any Claim without the consent of the Underwriters.

## XIII. ACTION AGAINST UNDERWRITERS

No action shall lie against the Underwriters unless, as a condition precedent thereto, there shall have been full compliance with all terms of this Insurance, nor until the amount of the Assured's obligation to pay shall have been finally determined either by judgment or award against the Assured after actual trial or arbitration or by written agreement of the Assured, the claimant and the Underwriters.

Any person or organization or the legal representative thereof who has secured such judgment, award or written agreement shall thereafter be entitled to make a Claim under this Policy to the extent of the Insurance afforded by this Policy. No person or organization shall have any right under this Insurance to join the Underwriters as a party to an action or other proceeding against the Assured to determine the Assured's liability, nor shall the Underwriters be impleaded by the Assured or his legal representative. Bankruptcy or insolvency of the Assured or of the Assured's estate shall not relieve the Underwriters of its obligations hereunder.

## XIV. SUBROGATION

In the event of any payment under this Insurance, the Underwriters shall be subrogated to all the Assured's rights of recovery therefore against any person or organization other than any employee of the Assured and the Assured shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights. The Assured shall do nothing after the payments of Damages by Underwriters to prejudice such rights.

## XV. CHANGES

Notice to any agent or knowledge possessed by any agent or by any other person shall not effect a waiver or a change in any part of this Insurance or estop the Underwriters from asserting any right under the terms of this Insurance; nor shall the terms of this Insurance be waived or changed, except by endorsement issued to form a part of this Insurance, signed by Underwriters.

### XVI. MERGERS AND ACQUISITIONS

In the event that the Assured shall merge with or purchase or otherwise acquire all or any of the undertaking, assets or liabilities of another entity, where the undertaking, assets or liabilities of such entity do not exceed 20% of the Assured's sales as set forth in their most recent annual financial statement of income, then this Policy shall afford coverage for any Claim which arises or occurs directly or indirectly out of or in relation to all and any of such undertaking, assets or liabilities.

Where the undertaking, assets or liabilities of such entity exceed 20% of the Assured's sales as set forth in their most recent annual financial statement of income, then this Policy shall afford coverage for a period of 120 days for any Claim which arises or occurs directly or indirectly out of or in relation to all and any of such undertaking, assets or liabilities. Coverage beyond such 120 day period shall only be available if the Assured has obtained the Underwriters agreement in writing to the extension of cover under the Policy in relation to the same and then only upon such terms as may be stipulated by Underwriters after full disclosure of all material facts by the Assured.

### XVII. ASSIGNMENT

The interest hereunder of any Assured is not assignable. If the Assured shall die or be adjudged incompetent, such insurance shall cover the Assured's legal representative as the Assured as would be permitted by this Policy.

### XVIII. CANCELLATION / NON-RENEWAL

A. This Policy of Insurance may be canceled by the Named Assured by surrender thereof to Underwriters or by mailing to Underwriters written notice stating when thereafter the cancellation shall be effective. This Insurance may be canceled by the Underwriters by mailing to the entity named in Item 10 of the Declarations written notice stating when not less than 90 days thereafter such cancellation shall be effective, however, Underwriters rights to cancellation are strictly limited to reason of non-payment of premium within the agreed terms of trade. The mailing of notice as aforesaid shall be sufficient proof of notice. The time of surrender or the effective date and hour of cancellation stated in the notice shall become the end of the Period of Insurance.

B. If the Named Assured cancels this Insurance, earned premium shall be computed in accordance with the attached customary short rate table and procedure. If the Underwriters cancel this Insurance, they shall be entitled to the pro rata proportion of the premium hereon. Premium adjustment may be made either at the time cancellation is effected or as soon as practicable after cancellation becomes effective, but payment or tender of unearned premium is not a condition of cancellation.

C. If Underwriters elect not to renew this Insurance, they will mail written notice of nonrenewal by either registered mail or courier package to the entity named in Item 10 of the Declarations. The notice of nonrenewal shall be mailed at least 90 days prior to the expiration date of this Insurance, and shall state the reason for nonrenewal. The Correspondent shall maintain proof of mailing of such notice on a recognized U.S. Post Office form and a copy of such notice shall be sent to the Assured's producer. This paragraph shall not apply if Underwriters have manifested their willingness to renew to the Named Assured, and the Named Assured has failed to comply with the terms of the renewal.

## XIX. SINGULAR FORM OF A WORD

Whenever the singular form of a word is used herein, the same shall include the plural when required by context.

## XX. ENTIRE CONTRACT

By acceptance of this Policy the Assured agrees that the statements in the Declarations and application are his agreements and representations, that this Insurance is issued in reliance upon the truth of such representations and that this Policy embodies all agreements existing between the Assured and the Underwriters relating to this Insurance.

## XXI. ANNUAL REVIEW

The Named Assured shall provide turnover and Claims details to Underwriters at least 30 days prior to each Anniversary date, and Underwriters agree that the premium will not be reviewed unless:

A. The turnover increases for the relevant period by more than 20% as compared to the turnover figure previously declared to Underwriters,

B. The Claims experience deteriorates, by virtue of Claims paid / reserved exceed the "each Claim" Self-Insured Retention stated in Item 4 of the Declarations, to the extent that the annual premium hereon is eroded by more than 50%,

C. The operations of the Named Assured materially changes from the operations as detailed in the presentation provided to Underwriters.

Underwriters confirm that should any amendment to the current terms and conditions of the Policy be required, this will only take place as part of the Annual Review at the Anniversary Date. If amended terms are imposed, the Named Assured retains the option to cancel giving up to 90 days notice, and shall have the right to a return of premium calculated at pro rata of the premium hereon.

## XXII. AGENT OF THE ASSURED

The entity named in Item 10 of the Declarations shall be considered the agent of all Assured's with respect to the receipt of all notices pertaining to this Policy.

## XXIII. NUCLEAR INCIDENT EXCLUSION CLAUSE - LIABILITY - DIRECT

This Insurance does not apply:

A. To injury, sickness, disease, death or destruction

    1. with respect to which an Assured under this Insurance is also an Assured under a nuclear energy liability insurance issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada or would be an Assured under any such insurance but for its termination upon exhaustion of its limits of liability; or

    2. resulting from the hazardous properties of nuclear material and with respect to which (1) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (2) the Assured is, or had this Insurance not been issued would be, entitled to indemnity from the United States of America, or any agency thereof under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

B. Under any Medical Payments Coverage, or under any Supplementary Payments Provision relating to immediate medical or surgical relief, to expenses incurred with respect to bodily injury, sickness, disease or death resulting from the hazardous properties of nuclear material and arising out of the operation of a nuclear facility by any person or organization.

C. To injury, sickness, disease, death or destruction resulting from the hazardous properties of nuclear material, if

    1. the nuclear material (1) is at any nuclear facility owned by, or operated by or on behalf of, an Assured or (2) has been discharged or dispersed therefrom;

    2. the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an Assured; or

    3. the injury, sickness, disease, death or destruction arises out of the furnishing by an Assured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possessions or Canada, this Exclusion 3 applies only to injury to or destruction of property at such nuclear facility.

D. As used in this clause: "hazardous properties" include radioactive, toxic or explosive properties; "nuclear material" means source material, special nuclear material or by-product material; "source material", "special nuclear material" and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof; "spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor; "waste" means any waste material (1) containing by-product material and (2) resulting from the operation by any person or organization of any nuclear facility included within the definition of nuclear facility under paragraph (1) or (2) thereof; "nuclear facility" means

1. any nuclear reactor;

2. any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing spent fuel, or (3) handling, processing or packaging waste;

3. any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the Assured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

4. any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste;

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations; "nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material. With respect to injury to or destruction of property, the word "injury" or "destruction" includes all forms of radioactive contamination of property.

It is understood and agreed that, except as specifically provided in the foregoing to the contrary, this clause is subject to the terms, exclusions, conditions and limitations of the insurance to which it is attached.

## XXIV. WAR AND CIVIL WAR EXCLUSION CLAUSE

Notwithstanding anything to the contrary contained herein this Insurance does not cover Loss or Damage directly or indirectly occasioned by, happening through or in consequence of war, invasion, acts of foreign enemies, hostilities (whether war be declared or not), civil war, rebellion, revolution, insurrection, military or usurped power or confiscation or nationalization or requisition or destruction of or damage to property by or under the order of any government or public or local authority.

## XXV. SERVICE OF SUIT

1. It is agreed that in the event of the failure of Underwriters hereon to pay any amount claimed to be due under this Insurance, Underwriters hereon, at the request of the Named Assured, will submit to the jurisdiction of a court of competent jurisdiction within the United States. This Condition does not constitute and should not be understood to constitute an agreement by Underwriters that an action is properly maintained in a specific forum, nor may it be construed as a waiver of Underwriters' rights to commence an action in a court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another court as permitted by the laws of the United States or of any State of the United States, all of which rights Underwriters may expressly reserve. It is further agreed that service of process in such suit may be made upon the Underwriters' representative, designated in Item 9 of the Declarations, and that in any suit instituted against any one of them upon this Contract, Underwriters will abide by the final decision of such court in the event of an appeal.

2. The Underwriters' representative, designated in Item 9 of the Declarations, is authorized and directed to accept service of process on behalf of Underwriters in any such suit and/or upon the request of the Named Assured to give written undertaking to the Named Assured that they will enter a general appearance upon Underwriters' behalf in the event such a suit shall be instituted. Further, pursuant to any statute of any state, territory or district of the United States which makes provision therefor, Underwriters hereon hereby designate the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the statute or his successor or successors in office, as their true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Named Assured or any beneficiary hereunder arising out of this Contract of Insurance, and hereby designate the Underwriters' representative, designated in Item 9 of the Declarations, as the person to whom the said officer is authorized to mail such process or a true copy thereof.

## XXVI. SHORT RATE CANCELLATION TABLE

Notwithstanding anything to the contrary contained herein and in consideration of the premium for which this Insurance is written it is agreed that in the event of cancellation thereof by the Assured the Earned Premium shall be computed as follows:

A. For insurances written for one year:

| Days Insurance in Force | | Per cent. of One Year Premium | Days Insurance in Force | | Per cent. of One Year Premium |
|---|---|---|---|---|---|
| 1 | ............................................ | 5 | 154 - 156 | ............................................ | 53 |
| 2 | ............................................ | 6 | 157 - 160 | ............................................ | 54 |
| 3 – 4 | ............................................ | 7 | 161 - 164 | ............................................ | 55 |
| 5 – 6 | ............................................ | 8 | 165 - 167 | ............................................ | 56 |
| 7 – 8 | ............................................ | 9 | 168 - 171 | ............................................ | 57 |

| | | | | | |
|---|---|---|---|---|---|
| 9 - 10 | ..................................... | 10 | 172 - 175 | ..................................... | 58 |
| 11 - 12 | ..................................... | 11 | 176 - 178 | ..................................... | 59 |
| 13 - 14 | ..................................... | 12 | 179 - 182 | (6 months) ..................... | 60 |
| 15 - 16 | ..................................... | 13 | 183 - 187 | ..................................... | 61 |
| 17 - 18 | ..................................... | 14 | 188 - 191 | ..................................... | 62 |
| 19 - 20 | ..................................... | 15 | 192 - 196 | ..................................... | 63 |
| 21 - 22 | ..................................... | 16 | 197 - 200 | ..................................... | 64 |
| 23 - 25 | ..................................... | 17 | 201 - 205 | ..................................... | 65 |
| 26 - 29 | | 18 | 206 - 209 | ..................................... | 66 |
| 30 - 32 | (1 month) ..................... | 19 | 210 - 214 | (7 months) ..................... | 67 |
| 33 - 36 | ..................................... | 20 | 215 - 218 | ..................................... | 68 |
| 37 - 40 | ..................................... | 21 | 219 - 223 | ..................................... | 69 |
| 41 - 43 | ..................................... | 22 | 224 - 228 | ..................................... | 70 |
| 44 - 47 | ..................................... | 23 | 229 - 232 | ..................................... | 71 |
| 48 - 51 | ..................................... | 24 | 233 - 237 | ..................................... | 72 |
| 52 - 54 | ..................................... | 25 | 238 - 241 | ..................................... | 73 |
| 55 - 58 | ..................................... | 26 | 242 - 246 | (8 months) ..................... | 74 |
| 59 - 62 | (2 months .......................... | 27 | 247 - 250 | ..................................... | 75 |
| 63 - 65 | ..................................... | 28 | 251 - 255 | ..................................... | 76 |
| 66 - 69 | ..................................... | 29 | 256 - 260 | ..................................... | 77 |
| 70 - 73 | ..................................... | 30 | 261 - 264 | ..................................... | 78 |
| 74 - 76 | ..................................... | 31 | 265 - 269 | ..................................... | 79 |
| 77 - 80 | ..................................... | 32 | 270 - 273 | (9 months) ..................... | 80 |
| 81 - 83 | ..................................... | 33 | 274 - 278 | ..................................... | 81 |
| 84 - 87 | ..................................... | 34 | 279 - 282 | ..................................... | 82 |
| 88 - 91 | (3 months) ..................... | 35 | 283 - 287 | ..................................... | 83 |
| 92 - 94 | ..................................... | 36 | 288 - 291 | ..................................... | 84 |
| 95 - 98 | ..................................... | 37 | 292 - 296 | ..................................... | 85 |
| 99 - 102 | ..................................... | 38 | 297 - 301 | ..................................... | 86 |
| 103 - 105 | ..................................... | 39 | 302 - 305 | (10 months) ..................... | 87 |
| 106 - 109 | ..................................... | 40 | 306 - 310 | ..................................... | 88 |
| 110 - 113 | ..................................... | 41 | 311 - 314 | ..................................... | 89 |
| 114 - 116 | ..................................... | 42 | 315 - 319 | ..................................... | 90 |
| 117 - 120 | ..................................... | 43 | 320 - 323 | ..................................... | 91 |
| 121 - 124 | (4 months) ..................... | 44 | 324 - 328 | ..................................... | 92 |
| 125 - 127 | ..................................... | 45 | 329 - 332 | ..................................... | 93 |
| 128 - 131 | ..................................... | 46 | 333 - 337 | (11 months) ..................... | 94 |
| 132 - 135 | ..................................... | 47 | 338 - 342 | ..................................... | 95 |
| 136 - 138 | ..................................... | 48 | 343 - 346 | ..................................... | 96 |
| 139 - 142 | ..................................... | 49 | 347 - 351 | ..................................... | 97 |
| 143 - 146 | ..................................... | 50 | 352 - 355 | ..................................... | 98 |
| 147 - 149 | ..................................... | 51 | 356 - 360 | ..................................... | 99 |
| 150 - 153 | (5 months) ..................... | 52 | 361 - 365 | (12 months) ..................... | 100 |

B. For Insurances written for more or less than one year:-

1. If insurance has been in force for 12 months or less, apply the standard short rate table for annual insurances to the full annual premium determined as for an insurance written for a term of one year.

2. If insurance has been in force for more than 12 months:

(a) Determine full annual premium as for an insurance written for a term of one year.

(b) Deduct such premium from the full insurance premium, and on the remainder calculate the pro rata Earned Premium on the basis of the ratio of the length of time beyond one year the insurance has been in force to the length of time beyond one year for which the insurance was originally written.

(c) Add premium produced in accordance with items (a) and (b) to obtain Earned Premium during full period insurance has been in force.

**U.S.A.**

## RADIOACTIVE CONTAMINATION EXCLUSION CLAUSE-
## LIABILITY-DIRECT

*(Approved by Lloyd's Underwriters' Non-Marine Association)*

For attachment (in addition to the appropriate Nuclear Incident Exclusion Clause-Liability-Direct) to liability insurances affording worldwide coverage.

In relation to liability arising outside the U.S.A., its Territories or Possessions, Puerto Rico or the Canal Zone, this Certificate does not cover any liability of whatsoever nature directly or indirectly caused by or contributed to by or arising from ionising radiations or contamination by radioactivity from any nuclear fuel or from any nuclear waste from the combustion of nuclear fuel.

**13/2/64**
**N.M.A. 1477**

## APPLICATION FOR
## EXCESS PROFESSIONAL LIABILITY INSURANCE

**THIS IS AN APPLICATION FOR INSURANCE WRITTEN ON A "CLAIMS MADE" BASIS. ALL QUESTIONS MUST BE COMPLETELY ANSWERED, IF SPACE IS INSUFFICIENT TO COMPLETE AN ANSWER, ATTACH A SEPARATE SHEET REFERENCED TO THE SPECIFIC QUESTION BEING ANSWERED.**

### GENERAL INFORMATION SECTION

1. Name of applicant: __TRANS UNION CORPORATION__ _____

2. Address of principal office: __555 W. ADAMS STREET__ _____
(Number and Street)

| __CHICAGO__ | __IL__ | __60661__ | __312/258-1717__ |
|---|---|---|---|
| (City) | (State) | (Zip Code) | (Telephone No.) |

3. The applicant is currently organized as a: ( ) Partnership    (X) Corporation. Indicate when the applicant was first established: _____ __7/26/82__ _____
(Mo/Day/Yr)

4. Indicate the number of branch offices which are located in the United States: _____ __53__ _____

   If less than five, list the locations: _____
   _____

5. List the foreign countries where the applicant maintains offices: ___0_____

6. Does the applicant desire coverage for any wholly-owned or majority-controlled subsidiaries?
   ( ) Yes (X) No. If yes, list these subsidiaries on a separate sheet. Include the nature of their business, principal place of business, the percentage owned by the applicant and the date the subsidiary was acquired or created. If the revenues of such subsidiaries are not consolidated in the financial statements of the applicant, please indicate separately.

   **Note: The term "applicant" as used herein shall include those listed entities.**

7. Does the applicant desire coverage for any minority-owned subsidiary or affiliate" ( )Yes ( ) No.
   If yes, list these subsidiaries or affiliates on a separate sheet. Include the nature of their business, principal place of business, the percentage owned by the applicant and the date the applicant acquired the minority interest or became affiliated therewith. For affiliated companies please provide complete information on the nature of affiliation. Explain why coverage is being sought hereunder.

   **Note: Although coverage for the listed entities is not provided unless specifically endorsed on the policy, the application should be completed with the term "applicant" to include those listed entities.**

8. During the past five years has the name of the applicant been changed or has any other business been acquired by, or merged or consolidated with, the applicant? ( ) Yes (X) No. If yes, provide full details:

_____

_____

_____

9. Is the applicant owned or controlled by, or associated with, any other organization? (X ) Yes ( ) No. If yes, provide full details:   **WHOLLY OWNED SUBSIDIARY OF MARMON INDUSTRIAL**

**CORPORATION, AND A MEMBER OF THE MARMON GROUP OF COMPANIES.**

_____

10. Indicate the current number of worldwide staff:

|  | U.S.A. | Foreign | Combined |
|---|---|---|---|
| Partners, officers and directors | 21 | | |
| Professional staff | 1284 | | |
| Administrative staff | 1023 | | |
| | | Total Staff | |

## SCOPE OF SERVICES SECTION

11. Applicant's fiscal year ends on Month: **DECEMBER**_____ Day: ___**31**_____
Indicate the gross income for the applicable fiscal year:

| Gross income | U.S.A. | Foreign* | Total |
|---|---|---|---|
| (a) Actual for second previous fiscal year: | $402,764,000 | $_____ | $_____ |
| (b) Actual for most recent fiscal year: | $458,352,000 | $_____ | $_____ |
| (c) Estimate for current fiscal year: | $476,412,000 | $_____ | $_____ |

   *Converted to U.S. dollars at exchange rates for the end of the fiscal year.

12. Give a breakdown of the professional services which are rendered by the applicant and indicate the percentage of gross income for the most recent fiscal year derived from each type of service:

| Description of Services | % of Gross Income |
|---|---|
| MARKETING SERVICES | 15% |
| RESIDENTIAL SERVICES | 3% |
| LIST & INSURANCE | 18% |
| CREDIT REPORTING | 64% |

NOV 03 '98 17:52 FR ⬤ RISK SERVICES    312 701 4143 T⬤ ⬤11441713014696 P.05/18

13. Does the applicant foresee any major changes in the scope of services that will be rendered during the policy period of the insurance being applied for? ( ) Yes (X ) No.  If yes, provide full details:

_____

_____

## CLAIMS AND KNOWN INCIDENTS SECTION

14. Has any professional liability claim been made against the applicant or any predecessor in business or any of the past or present partners, officers, directors or employees during the past five years? (X) Yes ( ) No.  If yes, provide full details on a separate sheet.  The information should be presented clearly and in sufficient detail to enable X.L. Insurance Company, Ltd. To assess each claim.  The information must include:

(a) the full name of the claimant(s):
(b) the exact date of claim (month/day/year);
(c) the jurisdiction or location where the claim was made;
(d) a description of the professional services that were rendered;
(e) the individuals in the firm who are involved in the claim;
(f) a description of the alleged acts, errors or omissions that caused the claim;
(g) the damages or other relief sought by the claimant(s);
(h) the date the claim was reported to the applicant's insurance carrier(s);
(i) the amounts paid in settlement of the claim or in satisfaction of any judgment (inclusive of any deductibles);
(j) the expenses incurred in defense of the claim (inclusive of any deductibles);
(k) the current status of the claim, including most recent developments.

Provide copies of all notices of claims or potential claims to professional liability insurers submitted within the past five years.

**FAILURE TO COMPLY WITH THIS REPORTING FORMAT MAY RESULT IN THE REJECTION OF THE APPLICATION.**

15. After inquiry, does the applicant know of any circumstances, acts, errors or omissions that could result in a professional liability claim against the applicant or any predecessor in business or any of the past or present partners, officers, directors or employees? (X) Yes ( ) No.  If yes, provide full details:

**TRANS UNION HAS VARIOUS CONSUMER CLAIMS PENDING AGAINST IT THAT HAVE BEEN BROUGHT FOR ALLEGED VIOLATIONS OF FEDERAL AND STATE CONSUMER REPORTING LAWS.**

## INSURANCE HISTORY SECTION

16. Does the applicant have in place a formal risk management or loss control program administered by a risk manager, full-time administrator or compliance officer of partner? (X ) Yes ( ) No.  If yes, provide full details: **THE MARMON GROUP, INC. PROVIDES RISK MANAGEMENT SERVICES TO TRANS UNION CORPORATION.  TRANS UNION CORP. NAMED A COMPLIANCE OFFICER IN SEPTEMBER WHO WILL REPORT DIRECTLY TO THE BOARD OF DIRECTORS.  POSITION WILL INCLUDE DEVELOPING A RISK MANAGEMENT/ COMPLIANCE PROGRAM**

NOV 03 '98 17:52 FR ● RISK SERVICES    312 701 4143 T● ●011 41713014696 P.06/18

17. List the professional liability insurance (by layer) which has been carried by the applicant for the past five year:

| Name of Insurer | Limit of Liability | Premium | Expiration Date |
|---|---|---|---|
| SELF-INSURED | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

18. Has the applicant or any predecessor in business ever had an insurer cancel or refuse to renew any professional liability insurance? ( ) Yes (X) No.  If yes, provide full details: _____

_____

_____

19. Has the applicant or any predecessor in business ever purchased an "extended reporting period" or "discovery period" under a prior insurance policy which extended the claims reporting period of that policy following its cancellation or non-renewal? ( ) Yes (X) No.  If yes, provide full details: _____

_____

_____

20. The applicant is seeking excess professional liability insurance from X.L. Insurance Company, Ltd. for the annual period from: _____ **ASAP** _____ to _____ .
    (Mo/Day/Yr)                (Mo/Day/Yr)

21. List the other professional liability insurance which will be carried or is being applied for by the applicant for the period shown in question 20:

**Primary Insurance**

| Name of Insurer | Limit of Liability | Deductible | Premium |
|---|---|---|---|
| N/A | | | |

EXCESS INSURANCE (by layer)

| Name of Insurer | Limit of Liability | Premium |
|---|---|---|
| N/A | _____ xs _____ | |
| | _____ xs _____ | |
| | _____ xs _____ | |

22. Do any of the insurance policies shown in your response to question 21 limit coverage to claims relating to acts, errors or omissions committed after a specific date? ( ) Yes ( ) No. If yes, indicate the policy(ies) and the specific date(s):

_____ **N/A** _____

23. Does any policy of excess insurance shown in your response to question 21 contain coverage restriction or exclusions which are not in the primary insurance? ( ) Yes ( ) No. If yes, provide full details:

_____ **N/A** _____

24. Indicate the amount of excess insurance desired from X.L. Insurance Company, Ltd.: $**MAXIMUM**

**LIMITS AVAILABLE** _____

**PLEASE NOTE: IF A POLICY IS ISSUED, THE ACTUAL AMOUNT OF INSURANCE WILL BE SHOWN IN THE DECLARATIONS. THIS INSURANCE WILL APPLY IN EXCESS OF THE GREATER OF (A) A MINIMUM SELF-INSURED RETENTION OR (B) ALL OTHER INSURANCE AVAILABLE TO THE APPLICANT AND NOT EXPRESSLY IN EXCESS OF OR ON THE SAME LAYER AS SUCH POLICY.**

25. List the person designated to receive notices from X.L. Insurance Company, Ltd. if a policy is issued:

_____ **DAVID EMERY** _____          _____ **CFO** _____
         Name                                Title

NOV 03 '98 17:53 FR █ RISK SERVICES    312 701 4143 TO █11441713014696 P.08/18

## ADDITIONAL INFORMATION SECTION

26. This application must accompanied by copies of:

a. advertisements, promotional materials or brochures which describe the professional services rendered by the applicant; **www.tuc.com**

b. the applicant's latest 10-K report filed with the S.E.C. (if applicant's securities are publicity traded);

c. the applicant's latest annual report including audited financial statements;

d. the proposal form or application, including any attachments, for primary insurance.

27. The applicant agrees to file complete copies of the insurance policies referenced in question 21 with X.L. Insurance Company, Ltd. no later than 30 days after the applicant's receipt thereof.

THIS APPLICATION DOES NOT BIND THE APPLICANT OR X.L. INSURANCE COMPANY, LTD. ("X.L.") TO COMPLETE THE INSURANCE; HOWEVER, THIS APPLICATION WILL BE THE BASIS OF THE CONTRACT IF A POLICY IS ISSUED, AND IT WILL BE ATTACHED TO AND MADE A PART OF THE POLICY.

THE UNDERSIGNED PARTNER OR OFFICER, ACTING ON BEHALF OF THE APPLICANT AND ALL PERSONS PROPOSED FOR THIS INSURANCE, REPRESENTS THAT AFTER DILIGENT INQUIRY ALL STATEMENTS ON OR ATTACHED TO THIS APPLICATION ARE TRUE. THE UNDERSIGNED PARTNER OR OFFICER AGREES THAT IF ANY OF THE INFORMATION SUPPLIED ON OR ATTACHED TO THIS APPLICATION CHANGES BETWEEN THE DATE OF THE APPLICATION AND THE EFFECTIVE DATE OF THE POLICY APPLIED FOR, THE UNDERSIGNED PARTNER OR OFFICER WILL IMMEDIATELY NOTIFY X.L. OF SUCH CHANGES, AND X.L. SHALL HAVE THE RIGHT TO WITHDRAW OR MODIFY ANY OUTSTANDING QUOTATIONS AND/OR AUTHORIZATION OR AGREEMENT TO BIND THE INSURANCE.

IN THE EVENT THAT X.L. ISSUES A POLICY, THE UNDERSIGNED PARTNER OR OFFICER, ACTING ON BEHALF OF THE APPLICANT AND ALL PERSONS PROPOSED FOR INSURANCE, ACKNOWLEDGES THAT X.L. WILL HAVE RELIED UPON THE DECLARATIONS AND STATEMENTS WHICH ARE CONTAINED IN THIS APPLICATION AND WHICH ARE DEEMED TO INCORPORATED IN THE POLICY.

THE UNDERSIGNED PARTNER OR OFFICER, ACTING ON BEHALF OF THE APPLICANT AND ALL PERSONS PROPOSED FOR THIS INSURANCE, AGREES THAT DEFENSE AND SETTLEMENT EXPENSES WHICH ARE COVERED BY THE POLICY SHALL REDUCE, AND MAY COMPLETELY EXHAUST, THE LIMIT OF LIABILITY OF THE POLICY.

Signed: _W5 R. W. Webb_

Print Name: _R. W. Webb_

Title: _Secretary_
(Partner or Officer)

Date: _Oct 13, 1998_

NOV 03 '98 17:53 FR A  RISK SERVICES    312 701 4143 TO   11441713014696 P.09/18

CONFIDENTIAL

**TRANS UNION CORPORATION**
**COMPARATIVE INCOME STATEMENT (UNAUDITED)**
**FOR THE SIX MONTH PERIOD ENDED JUNE, 1998 AND 1997**
**($ IN 000'S)**

|  | 1998 | 1997 |
|---|---|---|
| REVENUE AND OTHER INCOME | 295,162 | 256,114 |
| COST OF SERVICES | 166,536 | 141,942 |
| GROSS MARGIN | 128,626 | 114,172 |
| SELLING, GENERAL AND ADMIN EXPENSES | 61,100 | 62,493 |
| INCOME BEFORE TAXES | 67,526 | 51,678 |
| FEDERAL, STATE AND FOREIGN INCOME TAXES | 28,408 | 22,531 |
| NET INCOME - CONTINUING OPERATIONS | 39,118 | 29,148 |
| MINORITY INTEREST | 626 | 691 |
| NET INCOME | 39,744 | 29,839 |

**TRANS UNION CORPORATION**
**BALANCE SHEET (UNAUDITED)**
**JUNE 30, 1998**
**( $ IN 000'S)**

CONFIDENTIAL

| ASSETS | | | LIABILITIES AND STOCKHOLDER'S EQUITY | | |
|---|---|---|---|---|---|
| CURRENT ASSETS: | | | CURRENT LIABILITIES: | | |
| CASH * | | 1,982 | ACCOUNTS PAYABLE | | |
| | | | TRADE | 26,643 | |
| TEMPORARY CASH INVESTMENT | | 1,029 | INTERCOMPANY | 602 | |
| | | | OTHER | 6,547 | |
| ACCOUNTS RECEIVABLE: | | | | | |
| TRADE | 96,388 | | TOTAL ACCOUNTS PAYABLE | | 33,792 |
| INTERCOMPANY | 23,212 | | | | |
| OTHER | 2,100 | | ACCRUED EXPENSES AND OTHER LIABILITIES: | | |
| TOTAL ACCOUNTS RECEIVABLE | 121,700 | | ACCRUED PAYROLL AND PAYROLL TAXES | 3,429 | |
| ALLOWANCE FOR DOUBTFUL ACCTS | (5,147) | | ACCRUED EXTRA COMPENSATION | 6,786 | |
| | | | ACCRUED VACATION | 1,639 | |
| NET ACCOUNTS RECEIVABLE | | 116,553 | ACCRUED EMPLOYEE BENEFITS | 12,926 | |
| PREPAID EXPENSES | | 2,841 | ACCRUED STATE/FEDERAL/FOREIGN INCOME TAXES | 17,861 | |
| SHORT TERM RECEIVABLES | | 0 | THIRD PARTY DEBT/SHORT TERM DEBT | 786 | |
| ALLOWANCE FOR S/T NOTES RECEIVABLE | | 0 | DEFERRED REVENUE | 3,886 | |
| | | | ACCRUED OTHER | 23,792 | |
| TOTAL CURRENT ASSETS | | 122,405 | | | |
| | | | TOTAL ACCRUED EXPENSES AND OTHER LIABILITIES | | 71,127 |
| DEFERRED CHARGES | | 9,683 | | | |
| | | | INTERCOMPANY DEBT DUE | 28,173 | |
| INVESTMENTS: | | | TOTAL CURRENT LIABILITIES | | 133,092 |
| INVESTMENTS IN NONCONSOLIDATED COMPANIES | 0 | | | | |
| LONG TERM RECEIVABLES | 1,200 | | | | |
| OTHER INVESTMENTS | 82,946 | | | | |
| GOODWILL FROM ACQUIRED BUSINESS | 14,580 | | THIRD PARTY DEBT/LONG TERM DEBT | | 475 |
| TOTAL INVESTMENTS | | 98,726 | | | |
| | | | | | |
| FIXED ASSETS: | | | MINORITY INTEREST | | 1,343 |
| LEASEHOLD IMPROVEMENTS/BLDG | 8,854 | | | | |
| EQUIPMENT | 88,028 | | | | |
| LAND | 100 | | | | |
| ACCUMULATED DEPRECIATION | (77,952) | | STOCKHOLDER'S EQUITY | | 118,481 |
| NET PROPERTY | | 19,030 | | | |
| | | | | | |
| CREDIT FILES (NET OF ACCUMULATED AMORTIZATION) | | 3,347 | | | |
| | | | | | |
| TOTAL ASSETS | | 253,391 | TOTAL LIABILITIES AND STOCKHOLDER'S EQUITY | | 253,391 |

*TRANS UNION CORPORATION HAS A CONCENTRATION CASH ACCOUNT WITH ITS PARENT COMPANY. CASH RECEIPTS EXCEED WITHDRAWALS BY $18,411 FOR THE SIX MONTH PERIOD ENDED JUNE 30, 1998.

IF YOU HAVE ANY QUESTIONS PLEASE CALL CYNTHIA TANG, EXT 3726.

CC: Claudia Vilim    Mark Marinko
    David Arney      Chuck Golfy

NOV 03 '98 17:51 FR ● ISK SERVICES    312 701 4143 TO ● 1 41713014696 P.02/18

**TRANSUNION– Claims:**
- With respect to the First National Bank of Omaha, a credit card was marketed to a group of individuals that it should not have been (Transunion was told not to market the card to FNBO groups and Transunion marketed the card to a "Credit Card Center" group, which turned out to be associated with FNBO). The settlement in early 1998, was for liquidated damages in the amount of $19 million with $5 million in legal expenses. Legal expenses were high because Transunion wanted to take every precaution in defending this case including utilizing a "mock trial". Since then, the liquidated damages clause has been removed from all contracts therefore removing the potential for a recurrence.
- The Terry Cousins case – The judge is currently taking this under advisement. Transunion strongly believes that there was no wrongdoing. If the judge does not throw this judgment out, Transunion will appeal.
- Steven LaBlanc case – This settled for $1.5 million.

**Y2K status:**
- Transunion is very up to speed with the issues at hand. They have not experienced any Y2K problems to date, expect to have the compliance process completed by 1st quarter 1999, implementation process currently in the remediations being tested stage (40%) and initial testing of mediation (60%), and expect to spend @ $7 million total on Y2K compliance. Transunion has received assurances from most key vendors, customers, clients and suppliers and does not have to publicly disclose anything because it is private.

**Additional Information:**
- Transunion develops conversions to accept data for Metro 2 and should be compliant by 1st quarter 1999
- What steps does TU take if an employee gives out or changes information illegally - Employee violations result in termination's. Audit controls are in place and background checks are performed on all employees

**Other:**
- Transunion utilizes 2 legal firms: Rudnick and Wolfe and another Marmon firm
- Transunion is looking for clearly defined terms in the policy and a clear cut claims process.

*Nick — This is an except from my conference call with Trans Union regarding questions from ERMA & AIG*

## ERRORS & OMISSIONS CLAIMS PER YEAR

| | Fees and Settlements paid | Open Claims | Closed Claims | Total Claims |
|---|---|---|---|---|
| Year 1994 | 1,459,000 | 21 | 130 | 151 |
| Year 1995 | 1,638,000 | 26 | 126 | 152 |
| Year 1996 | 2,071,000 | 47 | 85 | 132 |
| Year 1997 | 2,300,000 | 90 | 52 | 142 |
| Year 1998 (1/98–8/98) | 2,069,000 | 101 | 17 | 118 |
| **total** | 9,537,000 | 285 | 410 | 695 |

\* As of April 1998 Trans Union has a flat fee arrangement for E&O legal fees with two law firms.

Sheet1

# ERRORS & OMISSIONS LAWSUITS WITH POTENTIAL SETTLEMENTS GREATER THAN $1MM

| | TOTAL PAID | POTENTIAL SETTLEMENT | OPEN CLAIMS | TOTAL CLAIMS |
|---|---|---|---|---|
| YEAR 1994 | 0 | | 0 | 0 |
| YEAR 1995 | 0 | | 0 | 0 |
| YEAR 1996 | 0 | | 0 | 0 |
| YEAR 1997 | 1,209 | 4,500,000 | 1 | 1 |
| YEAR 1998 | 5,740 | 2,500,000 | 1 | 1 |
| **TOTAL** | 6,949 | 7,000,000 | 1 | 1 |

**Errors & Omissions lawsuits with potential settlements greater than $1,000,000**

*Judge in the process of writing/re-opened note*

Terry Cousins - Plaintiff previously sued us; he was a fraud victim and it took awhile to get his file cleared up. It appears that one or more fraud accounts have reappeared on the plaintiff's file in late 1996 or early 1997. Settlement could be $4.5 million.

Steven LaBlanc - Plaintiff alleges that Allstate impermissibly accessed their file for claims investigation purposes. The complaint contends that since we knew that Allstate had both permissible (underwriting) and impermissible (claims) purposes to request consumer reports, we should have required they individually certify permissible purpose every time they requested a consumer report. Settlement could be ~~$2.5 million.~~ $1,500,000 or 1,600,000 *settled*

| Plaintiff | Defendant | Service Date | Location | Demand | Settlement | Attorney Fees |
|---|---|---|---|---|---|---|
| Myers, Bette L. & G.E.T.M. d/b/a Desert Credit Bureau | Trans Union | 7/19/94 | Los Angeles | $5,000,000 | | $1,004,771 |
| | Desert Credit Bureau was set up as a satellite bureau of Trans Union's Fullerton office in 1980, for a 5-year term, with a 5-year renewal, but no provisions were made for after 1990. P claims that, in exchange for her agreeing to a price increase in storage charges, Trans Union verbally agreed to extend the contract though 3/3/95. Trans Union claimed, however, it could not continue honoring 1980 terms without a contract, that P refused to negotiate new terms, and that P refused to pay her receivables. Trans Union has filed an appeal. | | | | | |
| Nationsbank of Texas, N.A. | Trans Union | 3/1/95 | Dallas | $53,000 | | $17,786 |
| | Nationsbank seeks indemnity; it alleges that Trans Union inaccurately reported the status of consumer Ridgeway's account with the Mrs. Ridgeway was awarded a judgment against Nationsbank, which amount Nationsbank is now seeking form Trans Union. | | | | | |
| State & Sproul, Corp. | Trans Union | 10/10/94 | Philadelphia | $6,800 | $7,107 | None-in hous |
| | Plaintiff was Trans Union's Philadelphia Division's landlord. Plaintiff sued Trans Union for back rent which Trans Union was withholding in lieu of a plumbing problem. The case closed on 11/08/94. | | | | | |
| Trans Union | Gramercy Brokerage, Inc. | 5/24/94 | New York | $176,152 | | $53,678 |
| | Gramercy entered into a lease agreement with TU to sublease a certain portion of commercial property located in NY. The term of lease was form 3/1/93 to 2/30/2000. Defendant breached and continue to breach the agreement by failing to take possession of the Premises or pay the $6346 monthly rent, plus other costs. As of 5/1/94, Defendant owed TU $76,152 plus other costs. | | | | | |
| Trans Union | Carney Direct Marketing | 5/7/97 | So. CA | | | $10,363 |
| | Trans Union and Carney had disputes regarding each other's performance under their business agreement. To resolve this disput the parties entered into a written settlement agreement whereby Carney agreed to pay Trans Union $300,000. Carney, however, not pay the settlement amount by the required date of Feb 28, 1997, but in fact still owes Trans Union $226,000. | | | | | |

NOV 03 '98 17:54 FR 90DISK SERVICES 312 781 4143 TO 14417138147696 P.14/18

## CONTRACT CLAIMS LITIGATED
### 9/1993 - 9/1998

| Plaintiff | Defendant | Service Date | Location | Demand | Settlement | Attorney Fees |
|---|---|---|---|---|---|---|
| Ashburn Account Service, Inc. | Trans Union | 8/12/98 | Chicago | | | |
| | Ashburn alleges that Trans Union misreported account balances. As a result, Ashburn lost its key customer, Advocate System. | | | | | |
| Brooks Construction Group, Inc. | Trans Union | 1/28/98 | New York | | $24,921 | |
| | This suit relates to a build out done for Gramercy Brokerage and representations made to Brooks during the course of that suit. | | | | | |
| Buy Rite Office Products | Trans Union | 7/21/97 | Cleveland | | | $590 |
| | Buy Rite sued TU for not paying a bill for furniture and related office equipment. Trans Union claims Buy Rite is holding one of our conference tables. | | | | | |
| Consultants to Executive Management, a/k/a CEMCO | Trans Union | 2/25/98 | Chicago | $21,000 | | $1,742 |
| | P, a recruiter, alleges Trans Union requested them to procure a potential employee, and Trans Union subsequently hired the individual. P claims Trans Union failed to pay them the appropriate fee according to our agreement with them. | | | | | |
| Data Services of Kansas, Inc. | Trans Union | 8/2/96 | Wichita | $191,410 | | $35,233 |
| | Plaintiff alleged that a division of InterServ entered into a contract with Trans Union whereby Trans Union agreed to provide lists of 60,000 names for a job for AT&T, and that Trans Union agreed to purchase plaintiff's data for another three years from the expiration of the current contract. Trans Union, however, informed plaintiff that Trans Union decided not to buy software and not to renew contract. Plaintiff alleged Trans Union breached its agreement.. | | | | | |
| Fenton, James (Apartment Credit Resources) | Trans Union | 6/20/95 | Albuquerque, NM | $25,000 | $25,000 | $8,500 |
| | Trans Union terminated business with ACR. Plaintiff alleged that the termination was retaliatory since plaintiff notified Attorney General of New Mexico of Trans Union's fraudulent misrepresentation (Plaintiff claims our tenant reporting database was not as represented) and alleges he lost business due to Trans Union's breach of contract. The case was dismissed on 2/12/96. | | | | | |

14417130146696 P.15/18   312 781 4143 TO   RISK SERVICES   FR   NOV 03 '98 17:54

*(handwritten annotations: "Complete Case Trial list", "18 Mill", "18,750", "1,000,000 service")*

| Plaintiff | Defendant | Service Date | Location | Demand | Settlement | Attorney Fees |
|---|---|---|---|---|---|---|
| First National Bank of Omaha | Trans Union | 3/10/95 | Nebraska | 2x amount each name error | | $5,024,854 |
| | P alleges that Trans Union failed to exclude and suppress FNBO tradelines from the extraction, prescreen and marketing lists created by Trans Union for its customers. P further alleges that Trans Union's failure to maintain confidentiality has resulted in FNBO customers being inundated with multiple solicitations from competing banks seeking to have FNBO customers use their competitive cards to "pay off" existing balances with FNBO. | | | | | |
| Haley Company | Trans Union | 12/3/96 | Philadelphia | $4,779 | $1,545 | |
| | P brought this action against TU for "service work" | | | | | |
| Info Tech Data Corporation | Trans Union | 2/9/94 | Boston | $22,000 | $20,000 | $9,252 |
| | Suit alleges breach of contract. Problem with public record Infotech provided; not providing correct date of filing. We refused to pay for additional data after the problem was resolved, nor did they assist us in correcting bad data they previously gave us. We intend counterclaim. | | | | | |
| Interserv Services Corporation | Trans Union | 8/30/96 | Atlanta | $132,150 | $75,000 | $17,393 |
| | Plaintiff's complaint alleges that a division of InterServ known as Elrick & Lavidge entered into a contract with TU in April, 1995, whereby Trans Union agreed to provide a list of 60,000 names and telephone numbers, which Elrick needed to perform services for AT&T. The lists were to be based on two criteria: first, that the individuals hold a bank card and/or a travel card, and second, that they live nationwide. Elrick discovered, however, that TU actually used additional criteria to compile the lists it provided to Elrick. P's complaint claims the additional criteria in effect made the lists worthless. | | | | | |
| Lundahl, Holli, a/k/a Mission Trail Medical Group | Trans Union | 8/4/94 | Orange Cty, CA | $230,000 | | |
| | Plaintiff entered into a written contract with Trans Union for pulling credit reports. The Cty of Riverside falsely commenced criminal charges against plaintiff. Plaintiff alleged that during the prosecution, Stock contracted Trans Union and conspired with Trans Union to deny plaintiff her right to contract. The Court dismissed the case when the plaintiff failed to show up. | | | | | |

NOV 03 '98 17:55 FR AMERISK SERVICES 312 701 4143 TO 114417131214696 P.16/18



# THE MARMON GROUP, INC.

225 West Washington Street, Chicago, Illinois 60606-3418
Telephone (312) 372-9500 Fax (312) 845-5305 www.marmon.com

RECEIVED

JUL 1 5 1999

FIRTH TEAM

July 13, 1999

Ms. Mary T. Gander-Kulinski
Senior Vice President
Aon Risk Services, Inc.
123 North Wacker Drive
Chicago, Illinois 60606

RE:   Trans Union LLC, et al.
      Professional Liability Insurance

Dear Mary:

Enclosed, per the request of underwriters, are the following:

1) an update / confirmation to the professional liability insurance application completed by Trans Union LLC (f/k/a Trans Union Corporation) in 1998.

2) a summary (financial and claim count) of errors and omissions claims by year for 1994 through June 15, 1999.

3) a narrative summary of errors and omissions lawsuits with a potential settlement value of more $1 million.

4) a summary (financial and claim count) of errors and omissions lawsuits with a potential settlement value of more $1 million. Be aware that this information does *not* include the potential values of three (3) class action suits.

Be aware that the loss information *includes* loss data relating to various Trans Union subsidiaries, such as Flood Zones, Inc. and Trans Union Employment Screening Services, Inc.

Please let me know if you have any questions or require any further loss information at this time.

Very truly yours,

*Bill*

William T. Sweeney
Director of Risk Management

enclosures

# TRANS UNION

555 West Adams Street
Chicago, Illinois 60661
Telephone: (312) 466-6724

David M. Emery
Chief Financial Officer

## Application for Excess Professional Liability Insurance

Original application is being resubmitted with changes as noted below:

Question 1 -        Name change to Trans Union LLC

Question 3 -        Applicant is currently organized as a Limited Liability
                    Company. Trans Union Corporation merged into Trans
                    Union LLC on December 31, 1998 and ceased its existence.

Question 8 -        Yes, Trans Union LLC, formerly known as Trans Union
                    Corporation.

Question 11 -       TULLC consolidated revenue:

                    1996 -      $486,856,000
                    1997 -      $531,906,000
                    1998 -      $627,813,000
                    1999 - est. $666,149,000

All other information contained in the Application for *Excess Professional Liability
Insurance* signed by David Emery, CFO, has not changed since originally
submitted.

Date: 7/15/99

David M. Emery, CFO
Trans Union LLC

A member of The Marmon Group of companies

## ERRORS & OMISSIONS CLAIMS PER YEAR

|  | Fee & Settlements Paid | Open Claims | Closed Claims | Total Claims |
|---|---|---|---|---|
| Year 1994 | 1,459,000 | 21 | 130 | 151 |
| Year 1995 | 1,636,000 | 26 | 126 | 152 |
| Year 1996 | 2,071,000 | 47 | 85 | 132 |
| Year 1997 | 2,300,000 | 90 | 52 | 142 |
| Year 1998 | 4,728,000 | 235 | 41 | 276 |
| Year 1999 (1/99-6/99) | 3,833,000 | 306 | 34 | 340 |
| **total** | 16,029,000 | 725 | 468 | 1,193 |

* As of April 1996 Trans Union has a flat fee arrangement for E&O legal fees with two law firms.