**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| In re TRANS UNION CORP. PRIVACY ) LITIGATION ) | **Lead Case No. 00 C 4729** |
| _____ ) | |
| ) | **MDL Docket No. 1350** |
| **This Document Relates To:** ) | |
| ) | **Judge Robert W. Gettleman** |
| **ALL ACTIONS.** ) | |
| _____ ) | **Magistrate Judge Michael T. Mason** |

**REPORT & RECOMMENDATION**

Michael T. Mason, United States Magistrate Judge:

On September 7, 2005, the District Court referred this multi-district litigation (the "MDL Actions") to this Court for settlement negotiations.  On November 8, 2005, we began the first of a series of settlement negotiations among the parties.  The plaintiffs have reached an agreement on a proposed settlement (the "Proposed Settlement") with the defendants, Trans Union Corporation, LLC ("Trans Union") and Acxiom Corporation ("Acxiom").[1]  Plaintiffs and defendants (collectively the "Proponents") have filed a Joint Motion for Preliminary Approval of a Class Action Settlement Agreement (the "Motion").  The Proposed Settlement would resolve all claims and would require the defendants to provide products and services to consumers and pay cash into a settlement fund which, after payment of attorneys' fees and other expenses, will be distributed to consumers who do not have Internet access.  In exchange, plaintiffs will release defendants from all claims, subject to certain rights retained under the Fair Credit Reporting Act ("FCRA" or the "Act").

---

[1]At the time of the alleged improper conduct, Trans Union was the majority shareholder of Acxiom.

The Proposed Settlement also involves the certification[2] of a plaintiff settlement class (the "Plaintiff Settlement Class" or "Settlement Class") and approval of notice and a notice plan (the "Notice Plan") to the Plaintiff Settlement Class. The District Court has referred this matter for a Report and Recommendation on the Motion. For the following reasons, this Court recommends that the District Court deny the Motion.

## I.    BACKGROUND[3]

Trans Union is one of three major consumer reporting agencies in the United States. Trans Union's core business is comprised of assembling and evaluating consumer credit information, including consumers' credit and payment patterns, for the purpose of selling consumer reports to third parties. Beginning in 1987, Trans Union diversified into "target marketing," the sale of specialized lists of consumers who meet various credit and financial criteria. Trans Union offered target marketing lists ("target marketing lists" or "TML") in the form of consumer names and addresses selected from its master file on the basis of likely consumer interest for the purpose of making offers to purchase goods or services or to make contributions to charitable or political organizations. Because Trans Union had culled out the names of consumers that did not satisfy a customer's specific

---

[2]On August 17, 2005, the District Court certified a class of Illinois firm offer consumers and on August 27, 2004, the Civil District Court for the Parish of New Orleans, Louisiana certified a class of Louisiana consumers.

[3]A detailed description of plaintiffs' allegations and the history of the Federal Trade Commission's ("FTC") enforcement proceedings against Trans Union, upon which plaintiffs' claims are based, can be found in the District Court's previous opinions, *In re Trans Union Corp. Privacy Litigation*, 211 F.R.D. 328 (N.D. Ill. 2002) ("*Trans Union I*") and *In re Trans Union Corp. Privacy Litigation*, 326 F. Supp.2d 893 (N.D. Ill. 2004) ("*Trans Union II*"); and two District of Columbia Circuit Court opinions reviewing the FTC's enforcement decisions, *Trans Union Corp. v. Federal Trade Commission*, 81 F.3d 228 (D.C. Cir. 1996) and *Trans Union Corp. v. Federal Trade Commission*, 245 F.3d 809 (D.C. Cir. 2001).

criteria, the customer knew additional information about each consumer on the list, including that each person on the list had at least two active credit accounts.

Plaintiffs allege that the target marketing lists constituted consumer reports containing credit information, and that defendants violated the FCRA because the disclosure of such consumer reports was not made for a permissible purpose under the Act. 15 USC §§ 1681b, 1681e(a). In other words, plaintiffs contend that the defendants violated the FCRA by selling consumer reports for an impermissible purpose – target marketing. Plaintiffs further contend that the defendants unlawfully disclosed private financial information and other confidential information to third parties for use in target marketing schemes. Based on these assertions, plaintiffs allege that each consumer name disclosed on every target marketing list violated the FCRA and that each such disclosure is the subject of a claim in this litigation. The exact number of individual names included on the various target marketing lists is unknown. Trans Union claims that there are no existing copies of the target marketing lists that were sold and that recreation of the lists would be cost prohibitive. Trans Union further claims that, assuming that the lists could in fact be recreated, the process would generate tens of millions of duplicate records. However, Trans Union's master file list, from which the target marketing lists were created and eventually sold (and which was itself occasionally sold to vendors), tracks and contains the names of approximately 190 million individuals.

In addition to target marketing lists, Trans Union sold computerized lists of consumers' names and addresses selected on the basis of credit eligibility. These lists were used for the purpose of making firm offers of credit or insurance ("firm offer" or "FO"). Trans Union's firm offer business is also regulated by the FCRA. Section 604(c) of the

FCRA allows a consumer reporting agency, like Trans Union, to provide a consumer report to a customer that intends to make a firm offer of credit or insurance. Under the FCRA, there are limitations placed on the information that can be made available to customers in connection with a firm offer list. *See* 15 USC §§ 1681b(c)(1)(B)(I), (c)(2). Plaintiffs allege that defendants violated the FCRA by providing telephone numbers and access to Social Security numbers to credit grantors making firm offers of credit to consumers. Again, the number of consumers who were the subject of such disclosures is not readily determinable.

## A.    The Litigation

On or about August 31, 1998, a class action was filed in the Superior Court of California, *Frey v. Trans Union, et al.*, Case No. 798893 (the "Frey Action"), asserting claims related to Trans Union's provision of target marketing lists. A federal class action complaint was filed shortly thereafter and other lawsuits followed. On August 2, 2000, the Judicial Panel on Multidistrict Litigation transferred eight related actions to the Northern District of Illinois (where one related case was pending) for all pretrial proceedings. The District Court consolidated these cases[4] for pretrial purposes and appointed lead counsel for the MDL Actions. The Frey Action and the MDL Actions are referred to as the "Actions."

Plaintiffs subsequently filed a consolidated amended complaint seeking certification of seven separate classes. Defendants moved to dismiss the complaint. In an opinion dated September 10, 2002, the District Court granted defendants' motion in part and

---

[4]Following the consolidation of nine cases in the Northern District of Illinois in August 2000, the Judicial Panel on Multidistrict Litigation transferred five additional cases pending in various federal districts. In addition to the fourteen matters which form the MDL Actions and the Frey Action, there are claims pending in various state courts which may be covered by the Proposed Settlement but are not expressly included in the Actions.

dismissed plaintiffs' declaratory and injunctive claims and state law claims for invasions of privacy and misappropriation.  Judge Gettleman also struck plaintiffs' claim for nominal damages.   At that time, defendants also challenged the plaintiffs' allegations of a national target marketing class seeking statutory damages of $100-$1,000 per class member.  Judge Gettleman rejected defendants' argument that a class action is unavailable or prohibited under the FCRA, but found the potential for catastrophic liability made a class action an inferior method of adjudicating plaintiffs' FCRA claims.  *Trans Union I,* 211 F.R.D. at 349-51.  Accordingly, the District Court declined to certify a nationwide class for statutory damages.

On November 2, 2002, plaintiffs filed the second amended consolidated complaint (the "Complaint") against defendants Trans Union and Acxiom.[5]   The Complaint charged defendants with violating the FCRA, invasion of privacy, misappropriation, violating California state consumer fraud statutes and unjust enrichment.   Defendants moved to dismiss the Complaint.  In a July 6, 2004 opinion, the District Court granted defendants' motion in part and dismissed with prejudice plaintiffs' claims for invasion of privacy, misappropriation and unjust enrichment.  The Court upheld plaintiffs' FCRA claims and their claim under California's state consumer fraud statute.   *Trans Union II*, 326 F. Supp. 2d at 897-902.  Plaintiffs then moved for certification of three classes: (1) a nationwide punitive damage class; (2) an Illinois firm offer class; and (3) a California class for defendants' alleged violation of the California Business and Professional Code.  With regard to the proposed punitive damage class, the District Court found the same rational which caused

---

[5]Acxiom is alleged to have assisted Trans Union by assembling and furnishing to end users the information culled from Trans Union's database.

it to reject plaintiffs' request for a nationwide statutory damage class (the enormity of the class, potential for catastrophic damages and balanced statutory scheme) militated against certification of a nationwide punitive damage class. *In Re Trans Union Corp. Privacy Litigation,* 2005 U.S. Dist. LEXIS 17548. *13-14 (N.D. Ill. Aug. 17, 2005) ("*Trans Union III*"). The District Court further found that certification of a separate punitive or statutory damage class would "cripple the statutory scheme designed by Congress to achieve compliance with the Act." *Id.* at *15. The District Court stayed certification of the proposed California class because it involved issues unique to California law that were being decided by the California court. *Id.* at *16-18. Finally, the District Court certified the Illinois firm offer class. *Id.* at *16.

## B. The Objectors[6]

Named plaintiffs Yvonne Morse and Robert Morse and class member Mark Andrews, acting individually and as representatives of a certified class of approximately four million Louisiana class members, and Donald Jowers, acting individually and as a representative of a putative class of Texas consumers (collectively the "Objectors"), oppose the Motion. To a certain extent, counsel for the Objectors were involved in the settlement negotiation sessions that led to and culminated in the Proposed Settlement. However, the Objectors declined to join the Proposed Settlement and filed a formal opposition to the

---

[6]This Court is aware that conditional class certification or preliminary approval of the Proposed Settlement has not been granted. Thus, the Objectors are not "objectors" as the phrase is commonly used within the context of Federal Rule of Civil Procedure 23(e)(4). However, the phrase "Objectors" is a convenient shorthand for those opposing the instant Motion and its use does not inject imprecision or confusion into these proceedings. Therefore, this Court uses the phrase throughout this R&R when referring to plaintiffs Yvonne & Robert Morse, Mark Andrews and Donald Jowers. Similarly, this Court refers to the remaining plaintiffs, Trans Union and Acxiom collectively as the "Proponents" of the Proposed Settlement Agreement.

Motion.

### C.     The Proposed Settlement

The Proponents submitted the Motion for Preliminary Approval of Proposed Settlement to the Court for approval on September 28, 2007.  The Proposed Settlement is Exhibit A of the Motion.  A description of the Proposed Settlement follows.

#### 1.     Class Structure

The Proposed Settlement defines the Plaintiff Settlement Class as "all consumers who had an open credit account or an open line of credit from a credit grantor located in the United States at any time from January 1, 1987 to the present.  Excluded from the Plaintiff Settlement Class are (a) Defendants and their predecessors, affiliates, subsidiaries, officers, directors and employees; (b) counsel for any of the Settling Parties in these Actions; and (c) any and all judges and justices assigned to hear any aspect of the Actions, along with the spouses of the foregoing and any children residing in their households." Individual consumers who timely opt-out of the Proposed Settlement are also excluded from the Plaintiff Settlement Class.

#### 2.     Notice to Class Members

Notice to class members of the Proposed Settlement's terms, the date and time of the final fairness hearing and the rights of class members to opt-out or object to the settlement will be provided by several mechanisms, each of which will be funded by Trans Union and can not be charged against the settlement fund discussed below.

First, Trans Union will create and maintain a dedicated settlement website (www.tulistsettlement.com) to provide Settlement Class members with information

regarding the Proposed Settlement. The Proponents will negotiate the design, form, content and duration of the website. In the event they are unable to reach an agreement on any issue, the Proposed Settlement provides that the Court shall decide the issue.

Second, the claims administrator will establish a toll-free telephone number where Settlement Class members may obtain additional information regarding the Proposed Settlement, including opt-out rights. This toll-free number will be in service between the time of the publication notice and the final hearing. Subject to the agreement of Settlement Class counsel and defendants, the toll-free number shall also be in service between the final hearing and the ultimate approval of the settlement. The Proposed Settlement does not specify the hours of operation for the proposed toll-free number, but states that its design, form, content and duration will be negotiated by the defendants and Settlement Class counsel.

Third, a paid media consultant will administer the Notice Plan under which notice will be provided through advertisements in traditional print media and websites, a press release and an audio news release, as well as the dedicated settlement website and toll-free number discussed above.

Finally, Trans Union will inform approximately 5 million Settlement Class members of the Proposed Settlement in connection with routine written file disclosures (*i.e.* cover letters for credit reports mailed to individual consumers). These notices will refer individuals to the dedicated settlement website and toll-free number.

### 3. Settlement Fund

It is anticipated that the majority of Settlement Class members will receive "In-Kind Relief" in the form of Trans Union products and services provided electronically via the

Internet. However, defendants will contribute a lump sum payment of $20 million in cash (the "Settlement Fund") to be used for the purpose of making payments to Settlement Class members who do not have access to the Internet and therefore cannot utilize the In-Kind Relief (the "No-Internet Claimants") as well as all attorneys' fees and costs to plaintiffs' counsel. The Settlement Agreement provides that attorneys' fees will be up to the Court's discretion. However, the sample legal notice contained in the Notice Plan reflects amounts for plaintiffs' attorneys' fees and out of pocket expenses totaling $10,000,000.

The Settlement Fund will not be used to make cash payments to Settlement Class members who have Internet access as they are limited to the In-Kind Relief discussed below. Notice and administration costs of the Proposed Settlement will be paid by Trans Union and are not chargeable against the Settlement Fund. Certain tax expenses incurred by the Settlement Fund will be paid for by the Settlement Fund. In the event there are any residual or unused funds remaining after distribution of all required payments, such funds will be dispersed as *cy pres* awards to non-profit entities focusing on consumer privacy and credit rights as agreed upon by the Proponents and submitted to the Court for approval.

### 4.    No-Internet Claimants and In-Kind Relief

Settlement Class members who certify, within 180 days of the final hearing, that they do not have Internet access and would have accepted the In-Kind Relief if it were available outside the Internet will receive a cash payment of up to $25 from the Settlement Fund. If the Settlement Fund is insufficient to pay each No-Internet Claimant $25, then each No-Internet Claimant will receive his or her pro rata share of the net Settlement Fund, after payment of attorneys' fees and expenses.

All Settlement Class members who do not timely opt-out of the settlement may

9

submit an In-Kind Relief claim form.  Each Settlement Class member who submits a claim form will be entitled to six months of free credit monitoring valued at $49.75 (the current retail value) per Settlement Class member.  Credit monitoring includes the following: (1) free Internet access to a Settlement Class member's Trans Union credit report and credit score; (2) monitoring of the consumer's credit report by email; and (3) identity theft insurance with a limit of $25,000 (where allowed by law).  The In-Kind Relief claim form will be available exclusively through the settlement website and the period for submitting claims will remain open for two years after the settlement receives ultimate approval.  While Settlement Class members may transfer their right to obtain In-Kind Relief to another person, no individual may receive more than six months of In-Kind Relief in addition to the six months they may otherwise receive under the settlement.  Defendants have also agreed to provide free credit score disclosures to Settlement Class members.  However, as the Objectors point out, this relief is duplicative of the benefits provided in connection with the free credit monitoring.  There is no cap on the amount of In-Kind Relief that defendants will make available to the Settlement Class members over this two year period.  Further, defendants will provide a "guaranteed minimum retail dollar amount of ... In-Kind Relief ... of no less than $20 million in total combined retail value."

### 5.    Injunctive Relief Provisions

Under the Proposed Settlement, defendants will be enjoined, for a period of one year from the date of ultimate approval, from asserting any "statute of limitations defenses, prescription defense, or any defense based on laches to any individual claims brought by Settlement Class Members under the FCRA arising out of, or related to, the facts and claims alleged in the Actions."  However, this provision does not apply to claims brought

10

by consumers who opt-out of the settlement.  The Proposed Settlement further provides that "[n]othing in this Stipulation shall prevent Defendants from raising any defenses (including any limitations defense, presumption defense or defense based on laches) against any person who opts out of the Settlement Class."

### 6.    The Release and Retention of Certain Rights

Under the Proposed Settlement, the Settlement Class members will release defendants from all claims, including unknown claims, arising out of or related to the facts or claims alleged in the Actions (the "Release").  The  scope of the Release varies depending on the relief claimed by Settlement Class members.

With regard to the named plaintiffs, each named plaintiff who does not timely and individually opt-out of the settlement will be deemed to have released defendants from all claims arising from or related to the claims alleged in the Actions.  If more than one named plaintiff opts out of the Proposed Settlement, the settlement is voidable at Trans Union's option.

As is the case with the named plaintiffs, all Settlement Class members who claim In-Kind benefits or who receive a cash payment as a No-Internet Claimant will be deemed to have released defendants from all claims arising from or related to the claims alleged in the Actions.  Consumers who timely opt-out of the settlement are not included in the Release.

Finally, all Settlement Class members who do not claim In-Kind Relief or No-Internet benefits or opt-out of the Proposed Settlement (*i.e.* those who do not receive notice of the Proposed Settlement or those who receive notice and elect to "do nothing"), will be deemed to have released their right to bring or continue to participate in any claim on behalf of, or

11

as a member of, a class relating to defendants' use of target marking and firm offer lists. In other words, these Settlement Class members cannot participate in a future class action for any claim arising from or related to the claims alleged in the Actions. However, they retain the right to bring an individual claim[7] against the defendants under the FCRA (and only the FCRA) seeking to recover: (1) statutory damages of up to $1,000 and attorneys' fees, but not punitive damages; or (2) actual damages, attorneys' fees and punitive damages up to but not exceeding nine times the amount of actual damages.

### 7.    Fee Awards

The Proponents stipulate that Trans Union will pay incentive awards in the amount of $3,500 to each of the named plaintiffs[8] who do not opt-out. While the Proposed Settlement correctly acknowledges that awards of attorneys' fees and costs are subject to the Court's discretion, in pleadings before this Court plaintiffs have represented that the costs and fees incurred total $10 million, half of the Settlement Fund. Defendants have agreed to "remain neutral" on the fee and expense application.

### 8.    Opt-outs and the Opt-out Period

In the event the total number of opt-outs exceeds 25,000 persons or if more than one named plaintiff opts out of the Proposed Settlement, Trans Union has the option to void the settlement within 30 days of receiving notice. Opt-out requests must be made on an

---

[7]This Court cannot determine if the Release limits subsequent claims under the FCRA to statutory damages of $1,000 per individual or per alleged violation.

[8]The named plaintiffs include those in the MDL Actions and the Frey Action: Cynthia Albert, Jeffrey Beadle, Cecilia Comstock, David Feige, Megan Gogerty, Donald Jowers, Victoria Scott Kearley, Geri Mann, Marci Martinelli, Robert and Yvonne Morse, Lawrence and Joan Palazzolo, Heather Payne, Boris and Alla Rozenblitt, Randall J. Stein, Elizabeth H. Turner, Alan Wayne, Nancy M. Winkelmann, Nancy M. Woods, and Josh Frey.

individual basis by mailing a signed written request to the claims administrator during the opt-out period. The opt-out period is the 120 days following the last publication notice to the Settlement Class.

## II. LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 23(e), a class action settlement must be approved by the court before the case may be dismissed or compromised. "[I]n the context of a case in which the parties reach a settlement agreement prior to class certification, courts must peruse the proposed compromise to ratify both the propriety of the certification and the fairness of the settlement." *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003). The first step is to assess whether a class exists. *Id.* (citing *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 620, 117 S. Ct. 2231, 2248 (1997)). If the proposed settlement class meets the requirements for class certification, the district court must then determine if the proposed notice plan complies with the requirements of Rule 23(e)(1)(B). *See Gautreaux v. Pierce*, 690 F.2d 616, 621 n. 3 (7th Cir. 1982); *In re Compact Disc Minimum Advertised Price Antitrust Litig.,* 292 F. Supp. 2d 184, 186 (D. Me. 2003). Finally, the district court must evaluate whether the Proponents met their burden to establish that the settlement is within the range of what will ultimately be found "fair, reasonable and adequate." *Kessler v. American Resorts Int'l's Holiday Network, Ltd.*, 2007 U.S. Dist. LEXIS 84450, * 17 (N.D. Ill. Nov. 14, 2007).

As the Manual on Complex Litigation indicates, this threshold inquiry often involves no more than an informal presentation of the parties' proposals to the court. Manual for Complex Litigation, § 32.21, at 632 (4th ed. 2007) ("in some cases this initial [fairness] evaluation can be made on the basis of information already known ... or informal

presentations by the settling parties.") Conditional certification and preliminary approval: (1) triggers a mechanism for more formal notice to all potential class members; (2) determines whether opt-out rights are afforded to putative class members; (3) defines the scope of discovery to be conducted from that point forward - that is, focuses discovery on the fairness and adequacy of the proposed settlement to the class, as well as on any issues which might call into question the propriety of final certification of the matter as a class action; (4) sets in motion those judicial processes that will culminate in a detailed, full, and final fairness hearing (at which time the question of fairness is reviewed *de novo*); and (5) establishes procedures for class members to object to or support the proposed settlement. *See id.*

## III.    CONDITIONAL CLASS CERTIFICATION

As described above, the Proponents have defined the Plaintiff Settlement Class to include approximately 190 million people.  The Proponents seek conditional certification of the Plaintiff Settlement Class, solely for the purposes of the Proposed Settlement.  To be certified for purposes of settlement, a two-step analysis is required.  First, the class must meet the requirements of Rules 23(a) of the Federal Rules of Civil Procedure.  *Amchem,* 521 U.S. at 613-14, 117 S. Ct. at 2245.  Second, the class must satisfy at least one of the conditions of Rule 23(b).  *Id.* at 619-22, 2246-48.  In this case, the Objectors argue that the lawsuit does not comply with Rule 23(a)(4) which requires that "the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  The Objectors further contend that the proposed certification of the nationwide class and notice of the Proposed Settlement do not comply with the requirements of Fed. R. Civ. P. 23(b)(3).

14

### A. Rule 23(a)

Rule 23(a) sets forth four prerequisites for class certification: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. Fed. R. Civ. P. 23(a); *Amchem*, 521 U.S. at 613, 117 S. Ct. at 2245.

#### 1. Numerosity

To satisfy the requirement of numerosity, the proposed class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Here, the Plaintiff Settlement Class is estimated to consist of every adult in the United States with an open line of credit, potentially over 190 million people geographically dispersed throughout the United States, its Commonwealths and Territories. There is no dispute that joinder is impracticable under the circumstances. Thus, this Court concludes that the Plaintiff Settlement Class satisfies the numerosity prerequisite.

#### 2. Commonality

In order to maintain a class action, there must be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Complete identity of legal claims and factual circumstances is not required. Rather, this requirement is satisfied "if all class members are in a substantially identical factual situation and the questions of law raised by the plaintiff[s] are applicable to each class member." *In re Compact Disc Minimum Advertised Price Antitrust Litig.,* 216 F.R.D. 197, 204 (D. Me. 2003) (quoting *In re Disposable Contact Lens Antitrust Litig.*, 170 F.R.D. 524, 529 (M.D. Fla. 1996) (citations omitted)). Here, the facts and law common to every class member are nearly the same. All class members are credit consumers during the class period. While there may be slight factual variations

among specific claims, they stem from a common course of conduct and give rise to common questions of law. This Court concludes that the factual and legal questions in this case are sufficient to support a finding of commonality.

### 3.     Typicality

The claims or defenses of the named plaintiffs also must be "typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3).    This requirement is satisfied if the representative plaintiffs' claims "arise from the same event or practice or course of conduct that gives rise to the claims of other class members and are based on the same legal theory." *In re Mexico Money Transfer Litigation*, 164 F. Supp. 2d 1002, 1013 (N.D. Ill. 2000), *aff'd* 267 F.3d 743 (7th Cir. 2001) (internal quotation omitted).   In this case, the claims of the named plaintiffs are typical because, like all class members, they allege that during the class period, Trans Union provided telephone numbers and Social Security numbers to credit grantors making firm offers of credit to consumers in violation of the FCRA. The named plaintiffs also allege that each consumer name disclosed on a target marketing list during the class period violated the FCRA, and each such disclosure is the subject of a claim in this litigation.   Therefore, this Court concludes that the typicality requirement is satisfied.

### 4.     Adequacy of Representation

Finally, the representative plaintiffs must fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a)(4). This inquiry focuses on both the adequacy of the named plaintiffs and the adequacy of class counsel. It is satisfied if: (i) the interests of the representative parties do not conflict with the interests of any class members; and (ii) the plaintiffs' counsel is qualified, experienced, and able to prosecute the action on behalf of

16

the class vigorously. *Andrews v. Bechtel Power Corp.*, 780 F.2d 124, 130 (1st Cir. 1985); *see also*, *In re Anicom, Inc. Securities Lit.*, 2002 U.S. Dist. LEXIS 5575, * 9 (N.D. Ill. Mar. 26, 2002). As previously noted, the named plaintiffs' injuries are the same or substantially similar as those of the Settlement Class members. Therefore, this Court concludes that the named plaintiffs are adequate representatives of the interests of the class.

With respect to class counsel, the Objectors argue that lead class counsel are inadequate to represent the class under Rule 23(a)(4) because a conflict exists between the class counsel for the Illinois firm offer class and the Settlement Class members. Objectors further contend that class counsel is inadequate because they did not zealously represent the class in settlement negotiations, as allegedly evidenced by the settlement terms. Neither of these objections are persuasive.

The Objectors first claim that a conflict exists between class counsel for the Illinois firm offer class and the Plaintiff Settlement Class. The Objectors' theory is that the firm offer counsel learned, after Judge Gettleman certified the Illinois firm offer class, that the claims of the FO class are "worthless" because there are actually few consumers in the class who have standing to bring claims or recover damages. According to the Objectors, class counsel for the FO class was faced with the decision to settle the firm offer claims or fund the costs of notifying the Illinois class of the certification under Rule 23(c)(2). This Court finds the Objectors' claim that the potential notice costs forced counsel to settle the firm offer claims completely unsupported and unfounded. Thus, based on the evidence before us, we find the Objectors have failed to identify any actual conflict. *See Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992) (conflict does not exists if it is illusory or is based on mere imaginative speculation).

17

The Objectors further argue that Settlement Class counsel did not adequately represent the class as a whole (and Louisiana plaintiffs in particular) because counsel agreed to a settlement which, in the words of the Objectors, is "cheap" and "unfair."  In other words, the Objectors allege Trans Union enjoyed an improper advantage in settlement negotiations because it negotiated with the "weakest counsel," rather than with counsel for Louisiana plaintiffs whose target marketing claims are certified by the Louisiana Circuit Court.

This Court rejects the Objectors' characterization of class counsel.  While an imbalance between the cash value of the settlement to the class as a whole and the amount of attorneys' fees in the agreement may be a preliminary indicator of collusion, this Court finds no evidence of collusion in this case.  Objectors rely on *Figueroa v. Sharper Image* to support their claim that the Proposed Settlement is weak and  procedurally unfair as a result of a "reverse auction."  2007 U.S. Dist. LEXIS 78316, *47-48 (S.D. Fl. Oct. 11, 2007).  In that case, discovery was limited to class certification issues and class counsel did not engage in independent settlement negotiations, but simply incorporated the enhancements suggested by others.  *Id.*  Those persuasive factors are not present here.  At the request of this Court, and in order to resolve any concern over the amount of discovery conducted in the Actions, counsel prepared a summary of the discovery undertaken by plaintiffs in this litigation.  That summary states that, among other things, the plaintiffs have conducted discovery on willfulness and related liability issues, served extensive written discovery requests, reviewed approximately one-quarter to one-half million pages of documents, taken depositions, and analyzed thousands of pages of transcripts from the FTC proceedings.  Counsel have also represented that the Proposed Settlement followed "lengthy, hard-fought"

18

arm's-length negotiations. Thus, based on the evidence before us, we find class counsel have competently and adequately protected the interests of the class.

## B.  Rule 23(b)(3)

In addition to the prerequisites of Rule 23(a), the class must also satisfy one of the conditions of Rule 23(b). The provisions of Rule 23(b)(1) and (b)(2) are not applicable to the Actions. Thus, the Proponents seek certification under Rule 23(b)(3) which requires that: (1) questions of law or fact common to class members must predominate over any questions affecting only individual members; and (2) the class action must be superior to other available methods for the fair and efficient adjudication of the matter. In determining whether these requirements are met, we must consider these factors:

> (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Fed. R. Civ. P. 23(b)(3).

### 1.  Common Questions Predominate

The Rule 23(b) predominance inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623, 117 S. Ct. at 2249. While common questions of law or fact must predominate, they need not be exclusive. *Tatz v. Nanophase Techs. Corp.*, 2003 U.S. Dist. LEXIS 9982, *25-26 (N.D. Ill. June 12, 2003). Rather, predominance is satisfied "unless it is clear that individual issues will overwhelm the common questions and render the class action valueless." *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 517 (S.D.N.Y. 1996). Here, it is

evident that issues of law and fact that flow from the defendants' alleged violations of the FCRA predominate over any individual issue.

## 2. A Class Action is Superior

This Court finds a class action is superior to other means of adjudication for several reasons. First, there is a common core of law and facts pertaining to defendants' alleged violations of the FCRA. Because it would be grossly inefficient for 190 million credit consumers to bring individual actions to recover statutory penalties from Trans Union for its alleged violations of the FCRA, class treatment is the more efficient means of adjudicating this matter. Indeed, any alternative means of resolving this matter would create unnecessary duplication of actions, "the evil that Rule 23 was designed to prevent." *Califano v. Yamasaki*, 442 U.S. 682, 690, 99 S. Ct. 2545, 2552 (1979).

Second, class members will benefit from class treatment. The potential recovery to each individual member, between $100 and $1000 in statutory damages per claim, is likely not high enough to provide them with the incentive to sue individually, especially in light of the high litigation costs. While the Objectors contend that the claims of Louisiana plaintiffs, who certified their targeting marketing class, have an increased value and may deviate from those of the Plaintiff Settlement Class, this Court rejects that argument for the reasons discussed above.

Third, principles of judicial economy and efficiency favor a class action. Not only are the questions of fact and law almost identical for each class member, but maintenance of the class will be manageable. Under the Proposed Settlement, the relief afforded to each class member is either: (1) credit monitoring services; or (2) up to $25 in relief for No-Internet Claimants. There is no concern about complicated calculations of damages.

20

The Judicial Panel on Multidistrict Litigation ordered the coordination and transfer of these cases for pre-trial proceedings on the basis that centralization of the many federal court actions would serve the convenience of the parties and witnesses, promote the just and efficient conduct of the litigation, avoid unnecessary duplication of discovery and judicial rulings, and conserve the resources of the parties, counsel and the judiciary. There are no unusual difficulties to be encountered. This Court therefore concludes that the requirements of Rule 23 are satisfied and a class action is the superior method for resolving this controversy. *See Tatz*, 2003 U.S. Dist. LEXIS 9982, at *28-29 ("class certification is the best way to manage this situation which could otherwise disintegrate into piecemeal adjudication of many individual actions involving essential identical questions of law and fact.")

## IV. NOTICE

Before reaching the issue of whether the Proposed Settlement is within the range of what will ultimately be found fair, reasonable and adequate, thus warranting notice to the Plaintiff Settlement Class, we consider if the proposed notice complies with the requirements of due process and Rule 23. The Proposed Settlement is presented for approval under Rule 23(b)(3). Therefore, "the court must direct to class members the best notice practicable under the circumstances, *including individual notice to all members who can be identified through reasonable efforts.*" Fed. R. Civ. P. 23(c)(1)(B) (emphasis added).

### A. Individual Notice

The Proposed Settlement does not provide any individual notice which complies with the requirements of Rule 23(c)(1)(B). The Notice Plan developed by the Proponents purports to provide notice to approximately 5 million individuals who can be identified

21

through their receipt of routine written file disclosures.  However, this notice is in the form of a four line post-script attached to the bottom of a regularly scheduled mailing which does not include the information required for proper notice under Rule 23(c).  Rather, it informs consumers who have "had a credit account or open line of credit at any point since 1987" that they "may be eligible for benefits under a settlement Trans Union has entered into regarding marketing lists" which "may also affect your legal rights."  It then refers the recipient to the settlement website and (assuming it is still operable) toll-free number maintained by Trans Union.

Perhaps anticipating that this Court would find that the post-script does not amount to individual notice, the Proponents claim that the 2003 amendment to Rule 23 created a different regime for settlement classes under which only "reasonable" notice is required which "may, but need not, include individual notice."  While Proponents accurately cite the provisions of Rule 23(e)(1)(B), they ignore Rule 23(c)(2)(B) which requires "individual notice to all members who can be identified through reasonable efforts" in matters, such as this one, presented for class certification under Rule 23(b)(3).  Moreover, the Advisory Committee Note (the only authority upon which Proponents rely to support their interpretation of Rule 23), acknowledges that individual notice may be required for certification of a Rule 23(b)(3) class and is appropriate when "class members are required to take action - such as filing claims - to participate in the judgment, or if the court orders a settlement opt-out opportunity under Rule 23(e)(3)."  Fed. R. Civ. P. 23 Advisory Cmte. Note (2003).

This Court also rejects the Proponents' assertion that individual notice is not required because the parties cannot identify with any reasonable degree of reliability the names and

addresses of "the large majority" of class members or, alternatively, because individual notice is financially untenable due to the tens of millions of consumers included in the class. Essentially, Proponents concede that an unspecified number of class members can be identified, but ask this Court to excuse their obligation to provide direct notice to those class members due to the costs. We cannot. Individual notice to class members who are identifiable through reasonable effort is mandatory in Rule 23(b)(3) actions. *See, e.g. Eisen v. Carlisle & Jacquelin et. al.*, 417 U.S. 156, 175, 94 S.Ct. 2140, 2151 (1974). At a minimum, the named plaintiffs are readily identifiable and should be provided with direct notice of the Proposed Settlement.

Moreover, we do not see how the Proponents reasonably concluded that they need not provide direct notice to the approximately 190,000 Settlement Class members who currently subscribe to Trans Union's credit monitoring service. It is evident that these Settlement Class members are readily identifiable through reasonable efforts. *See, e.g. In re Mexico Money Transfer Lit.*, 164 F. Supp. 2d at 1011 (approving procedure where direct notice provided via first class mail to 13.5 million unique names and addresses in defendants' computer records and through print and electronic media to those whose information could not be ascertained from available transaction records at a cost of $16 million); *Mangone v. First USA Bank,* 206 F.R.D. 222, 233-34 (S.D. Ill. 2001)(citing cases to support the proposition that individual notice should be provided to class members who can be identified and publication used to notify others).

Proponents may also be able to identify other current and past subscribers and/or consumers through computer records readily accessible to Trans Union. For example, in its Response to MDL Plaintiffs' Special Interrogatories, Trans Union identified the number

23

of subscribers to its credit monitoring services for each month from January 2004 to June 2006, identified the number of free consumer disclosures provided under the FCRA from June 2006 to August 2006, identified the number of free consumer disclosures provided under state law from June 2006 to August 2006 and identified the total number of credit scores sold to consumers in 2004, 2005 and 2006. The identification of a specific number of consumers calls into question the Proponents' assertion that the names and addresses of these potential Settlement Class members cannot be identified through reasonable efforts and individual notice is not required. Similarly, in response to the Objectors' contention that the class is overly broad because the class period does not end on October 23, 2001, when the FTC's injunction regarding target marketing became final, the Proponents state that "Trans Union provides firm offer lists to the present day, and certain claims related to these firm offer lists are included in the settlement." This Court does not have sufficient information before us to resolve this issue, but nevertheless question how Trans Union can admit that it continues to provide firm offer lists which are included in this settlement while simultaneously claiming it cannot reasonably identify any of the firm offer consumers.

In short, this Court concludes that because individual notice is not provided to the members of the Settlement Class who can be identified through reasonable efforts, we cannot recommend approval of the proposed notice.

**B**.    **The Notice Plan**

In lieu of direct notice,[9] the Proponents have developed the Notice Plan, which primarily consists of print and electronic publication, and a short-form and long-form notice,

---

[9]Direct notice will be mailed only to those who request the long-form *Notice of Proposed Class Action Settlement* as a result of seeing the publication notice.

each of which is discussed below. Both forms of notice describe the basic elements of the case, the general terms of the Proposed Settlement, the legal rights of effected consumers, and the process for filing a claim, but the short-form provides a more basic summary. The short-form notice also includes the dedicated settlement website, mailing address and toll-free telephone number that consumers can use to obtain additional information about the Proposed Settlement or to request a copy of the long-form notice. The long-form notice provides greater detail regarding the terms of the Proposed Settlement.

The short-form notice will appear in numerous paid media outlets, including nine consumer magazines and two nationally-circulated newspaper supplements ("Parade" and "USA Weekend"). Two of the nine consumer magazines are Spanish language publications. The long-form notice will be published on the dedicated settlement website and sent by direct mail to anyone who requests it. The Notice Plan calculates that these efforts will reach at least 86% of credit consumers in the country with an average estimated frequency of slightly more than three times. The Notice Plan also includes sending a press release to major national print and electronic outlets. Thus, other print and electronic media may voluntarily cover the Proposed Settlement and the claims process.

The Objectors contend that the Notice Plan is fatally flawed because more than twenty-six million class members will not receive notice of the Proposed Settlement. Proponents acknowledge that, under the Notice Plan, 14% of the class will not receive notice, but claim notice to 86% of the class members is adequate. In order to resolve the issue, this Court must consider whether the Notice Plan satisfies due process and the Requirements of Rule 23(c).

The fact that individual notice to each class member may not be possible does not

preclude approval of the proposed Notice Plan. *See, e.g. Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 317, 70 S. Ct. 652, 658 (1950) (noting that in the case of persons missing or unknown, there is no constitutional bar to notice by publication); *Mirfasihi v. Fleet Mortgage Corp.*, 356 F.3d 781, 786 (7th Cir. 2004) ("When individual notice is infeasible, notice by publication ... is an acceptable substitute.") Rather, this Court must determine if the Notice Plan provides the "best notice practicable under the circumstances," as required by Rule 23(c).

We find that it does not. Of particular concern is the exclusion of certain procedures from the Notice Plan which may increase the percentage of class members who receive notice of the Proposed Settlement. For example, the Notice Plan does not adequately inform Trans Union's current and future subscribers of the settlement. Each individual who requests a credit score or subscribes to Trans Union's credit monitoring service between the date of the first publication notice and the deadline to submit a claim form should be provided with notice. Trans Union should not be able to profit from those who, unaware of their rights under the settlement, elect to purchase credit services which they may otherwise be entitled to as In-Kind Relief. It is axiomatic that neglecting to inform consumers who contact Trans Union of the settlement is not the "best notice practicable under the circumstances."

We further question how Proponents can claim to provide the "best notice practicable" without prominently placing notice of the Proposed Settlement on Trans Union's website, www.transunion.com. *See, e.g. In re Compact Disc Lit.*, 292 F. Supp. 2d at 185-86 (approving revised notice arrangement where defendants' websites were continuously updated and maintained to reflect the terms of amended settlement). For example, Trans

Union could post a link to the dedicated settlement website on its home page, login page and consumer support page, as well as other websites maintained by Trans Union including www.transunioncs.com, www.truecredit.com, www.freecreditprofile.com and www.knowyourloanrate.com. At a minimum, this will minimize the potential difficulties class members may encounter while attempting to locate the settlement website.

This Court cannot determine if the proposed advertising expenditures are reasonable. The Proponents have budgeted $5,000 per month for Internet advertising, specifically the purchase of a sponsored link on Google and Yahoo! for the terms "credit class action" and "credit report." The Proponents claim that insuring placement of the settlement website within the top three sponsored links in Google and on the first page of Yahoo! for keyword "credit report" searches is cost prohibitive. The Proponents failed to provide us with any information regarding the cost of placing searches for the keywords "credit class action" or "credit class settlement" within the top three sponsored links on Google and Yahoo!. Therefore, this Court has insufficient information to conclude that placement of those keyword searches would be cost prohibitive. Similarly, we cannot determine why the Proponents concluded that paid broadcast notice, which would reach any class members who cannot read, is not necessary.

This Court is also concerned with the limited duration and scope of the toll-free number. The Proposed Settlement provides that the number shall be in service between the time of publication notice and the final hearing and may be in service between the final hearing and ultimate approval, "subject to the agreement of Settlement Class Counsel and Defendants." The toll-free number should be in service through ultimate approval, and for the two years that follow during which Settlement Class members may claim In-Kind Relief.

27

Live support should be available through the toll-free number and, along with the toll-free telephone script, available in both English and Spanish.[10]

In summary, this Court concludes that the contents of the notices will provide class members with sufficient information to make an informed and intelligent decision about whether to file a claim, seek exclusion from the class, or object to the Proposed Settlement. However, we find the proposed Notice Plan is not reasonably calculated to provide class members with the best notice practicable under the circumstances. Therefore, this Court cannot recommend approval of the proposed Notice Plan.

## V. PRELIMINARY ASSESSMENT OF THE PROPOSED SETTLEMENT

In deciding whether there is good cause to issue notice to the class and to proceed with a fairness hearing, this Court must determine if "the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, and falls within the range of possible [judicial] approval." Manual for Complex Litigation, § 30.44 (2nd ed. 1985); *see also*, Herbert B. Newberg & Alba Conte, Newberg on Class Actions, §§ 11.24-11.25 (3rd ed. 1992). When a settlement is presented for final approval, the district court must quantify the net expected value of continued litigation to the class by estimating the range of possible outcomes and ascribing a probability to each point on the range. *Synfuel Technologies, Inc. v. DHL Express (USA), Inc.* 463 F.3d 646, 653 (7th Cir 2006); *Reynolds,* 288 F.3d at 283. To this end, the district court must "insist that

---

[10]In response to a prior request by this Court, the Proponents stated that the settlement website, toll-free telephone number script and class notices will be translated into Spanish. However, this accommodation is not reflected in the Proposed Settlement and Notice Plan.

the parties present evidence that would enable possible outcomes to be estimated, so that the court can at least come up with a ballpark valuation." 463 F.3d at 653 (internal quotations omitted). This Court need not conduct as in depth of an analysis. Rather, we must decide if the Proponents have met their burden to show the Proposed Settlement is "within the range" of what will ultimately be found fair, reasonable and adequate. *Kessler,* 2007 U.S. Dist. LEXIS 84450, *14. We evaluate whether the Proposed Settlement is potentially fair, reasonable and adequate by comparing the strength of plaintiffs' case on the merits balanced against the amount offered in settlement. *Synfuel Technologies,* 463 F.3d at 653 (quoting *In re General Motors Corp Engine Interchange Litig.*, 594 F. 2d 1106, 1132 (7th Cir. 1979)).

### A.     The Settlement Delivers Insufficient Relief to the Class

Here, the Proponents and Objectors have presented evidence as to the plaintiffs' potential recovery and the various risks and costs of continued litigation in order to assist this Court in determining if the Proposed Settlement is within the range of possible approval. The Proponents claim that the minimum value of the Proposed Settlement is $42 million. For the limited purposes of this analysis, this Court will accept that figure.

With regard to the plaintiffs' potential recovery, the Proponents acknowledge that, assuming a nationwide class of 190 million members, the statutory amount that plaintiffs could be awarded at trial would range between $19 billion and $190 billion. Objectors contend the maximum value of plaintiffs' claims is more than twice that number, because the firm offer and target marketing claims are distinct claims founded on different duties, each worth from $100 to $1000 in statutory damages, plus punitive damages, attorneys' fees and costs. Objectors rely on Judge Gettleman's prior decision in *Trans Union II*, 326

F. Supp. 2d at 898-99, to show that plaintiffs have a better than 50% chance of recovering on their target marketing claims and ask that those claims be assigned an individual value of no less than $500, exclusive of punitive damages, fees and costs. Finally, Objectors contend that there is insufficient evidence for this Court to determine the litigation value of the firm offer claims, which they cite as another basis to deny preliminary approval of the Proposed Settlement.

Not surprisingly, Trans Union[11] disputes the Objectors' analysis of the strength of plaintiffs' case, including the likelihood that plaintiffs will be able to establish liability for willful conduct. Trans Union claims that, at the time of the FTC/Trans Union litigation, the law was in conflict as to what constitutes a consumer report, what constitutes a permissible purpose, and the application of the First Amendment to the FCRA's prohibitions on speech. Trans Union further claims that the Supreme Court adopted a new standard for willfulness in *Safeco Ins. Co. of America v. Burr*, 127 S. Ct. 2201, 167 L.Ed 2d 1045 (2007), that, when applied to this case, will defeat any claim that defendants' conduct constituted a willful violation of the FCRA and preclude both statutory and punitive damages. This Court rejects these contentions.

Trans Union's claim that it has a "completely defense" to plaintiffs' allegations that it willfully violated the Act is contradicted by prior rulings in this case. In response to this same claim, the District Court found that the procedural history of the FTC proceedings "demonstrates the lack of merit in Trans Union's argument that it could not have willfully

---

[11]Proponents' Joint Memorandum in Support of the Proposed Settlement carefully distinguishes between the positions of the plaintiffs, who state that they have identified evidence to substantiate their allegations, and Trans Union, who contends that plaintiffs cannot establish a willful violation of the FCRA at trial and therefore cannot recover statutory or punitive damages.

violated the FCRA because there was no authoritative ruling that its activities were unlawful." *Trans Union II,* 326 F. Supp. 2d at 899. The Supreme Court's recent holding in *Safeco* does not alter this analysis. In *Safeco,* the Court resolved a conflict between the Circuits and found that liability under §1681n(a) for willfully failing to comply with the FCRA applied to reckless disregard of a statutory duty. 127 S. Ct. at 2208, 167 L. Ed 2d at 1058. In so holding, the Court distinguished the case before it from instances where "the business subject to the Act had the benefit of guidance from the courts of appeals or the Federal Trade Commission (FTC) that might have warned it away from the view it took." 127 S. Ct. at 2216, 167 L. Ed. 2 at 1066. This "dearth of guidance" is simply not present here.[12]

While this Court will not undertake a definitive quantification of the net value of continued litigation at this time, we note that the litigation value of plaintiffs' claims are extraordinary. Further, the likelihood that plaintiffs can establish willfulness and recover statutory and punitive damages at trial is significantly higher than estimated by Trans Union. *See id.; see also Killingsworth v. HSBC Bank Nevada, N.A.*, 2007 U.S. App. LEXIS 26124, *18 (7th Cir. Nov. 9, 2007) ("FCRA contemplates possible awards of statutory damages where the violation is willful .... actual damages are not necessarily a precondition for suit.") Even assuming that the minimum value of the settlement is $42 million, the Proposed Settlement does not adequately compensate plaintiffs for the claims they are releasing. Therefore, this Court concludes that the Proposed Settlement is not within the range of what may be found fair, reasonable and adequate.

### B.    Proponents Overstate the Value of the In-Kind Relief

---

[12]The District Court's analysis of the procedural history of this case is set out in *Trans Union II*, 326 F. Supp. 2d 893 (N.D. Ill. 2004).

This Court finds fault with the value assigned to the In-Kind Relief on the basis that the Proponents' calculation of a minimum $20 million inflates the cost of the services provided and may include duplicative relief. The key portion of In-Kind Relief is the six month credit monitoring service. While the current retail value of that service may in fact be $49.75, that is not the cost to Trans Union.[13] "Compensation in kind is worth less than cash of the same nominal value since, as is typical with coupons, some percentage of the [in-kind consideration] claimed by class members will never be used and, as a result, will not constitute a cost to [defendant]." *Synfuel Technologies*, 463 F.3d 646, 654 (quoting *In re Mexico Money Transfer Litig.*, 267 F.3d at 748)(internal quotations omitted). Similarly, the $7.95 retail value assigned to the free credit scores fails to take into account the fact that free credit scores are readily available to individual consumers under certain circumstances or that the credit scores are a component of the credit monitoring service (and thus may not be double counted in calculating the value of In-Kind Relief).

Further, we are unable to determine how the Proponents will guarantee that Trans Union will provide a minimum of $20 million in total In-Kind Relief. In response to a prior query by this Court, Proponents provided us with information regarding the likely claims rate and stated that, in the event Trans Union does not provide $20 million worth of In-Kind Relief, it will continue to provide benefits to class members until the $20 million figure is reached. There is no such language, however, in the Proposed Settlement.

## VI. OTHER ISSUES PRECLUDING PRELIMINARY APPROVAL OF THE PROPOSED SETTLEMENT

---

[13] During the April 24, 2007 status conference, Trans Union was ordered to identify the actual cost of the credit monitoring services, as opposed to the retail value. On May 18, 2007, Trans Union was granted leave to submit that information for *in camera* review.

### A.     The Release

The District Court previously found, in connection with its denial of plaintiffs' motion to certify a nationwide punitive damage class, that the availability of both statutory and punitive damages is an integral part of the FCRA. *Trans Union III*, 2005 U.S. Dist. LEXIS 17548, *15. The Proponents do not sufficiently credit the District Court's ruling, as evidenced by their continued inclusion of a provision allowing limited punitive damages to claimants who can demonstrate actual damages, but denying punitive damages to those who claim statutory damages, in the Proposed Settlement.

Under the proposed Release, Settlement Class members who do not timely and individually opt-out or claim In-Kind or No-Internet benefits will retain only the right to bring an individual action under the FCRA for: (1) statutory damages for up to $1,000 plus attorneys' fees but not punitive damages; or (2) actual damages and punitive damages up to but not exceeding nine times the actual damages, as well as attorneys' fees. This provision, which cuts-off the Settlement Class members' right to recover statutory and punitive damages for violations of the FCRA, cannot be approved by this Court.

Actual injury under the FCRA is inherently difficult to prove, which is why the Act provides for the recovery of statutory and punitive damages. As the District Court previously observed, "[i]t is the availability of both punitive damages and attorney fees that provides the incentive for individuals with relatively minor or no actual damages to bring suit ... Disconnecting the availability of punitive damages from individual claims for actual or statutory damages would thus cripple the statutory scheme designed by Congress to achieve compliance with the Act." *Trans Union III*, 2005 U.S. Dist. LEXIS 17548, *15.

Consistent with the district court's prior holding, this Court finds that the Proposed Settlement impermissibly severs a claimant's right to recover statutory and punitive damages under the FCRA.

The Objectors also claim the Release is overly broad because it releases "any and all claims related to Defendants' alleged distribution of Firm Offer information or lists," which includes firm offer claims that are the subject of other pending actions. Specifically, Objectors contend the Release improperly includes an unspecified number of "pre-screen" claims, which challenge whether marketers impermissibly obtained credit information in connection with offers which do not meet the requirements for firm offers of credit. These claims are pending in various districts, including the Northern District of Illinois. In response, Proponents point out that Trans Union is not a defendant in either of the suits specifically referenced by Objectors and therefore the Release does not limit the rights of the parties in those cases. Proponents further state that, because Trans Union provides firm offer lists "to the present day," "certain claims" related to these firm offer lists are included in the settlement. Significantly, Trans Union does not identify which of the "certain claims" relating to firm offer lists are included. Indeed, it appears that Trans Union is intentionally vague on this point. Furthermore, Trans Union claims to have stopped its target marketing practice in October 2001, if not before. We question the Proponents' continued assertion that all firm offer claims (specifically those occurring after October 23, 2001, when the FTC's target marketing injunction was finalized) are a subset of the target marketing claims.

Finally, the Objectors allege the Release is overly broad in that it releases the firm offer claims of Robert and Yvonne Morse and Donald Jowers, three of the four Objectors and named plaintiffs in the Actions. We note that if the Morses and Jowers, or any other

34

claimant, wish to maintain their claims, they can opt-out of this settlement.  That being said, if more than one named plaintiff or 25,000 individual Settlement Class members opt-out of the Proposed Settlement, the settlement is voidable at Trans Union's election.  This Court is concerned that a broad release may result in wide spread opt-outs which in turn could cause Trans Union to void the settlement.  Accordingly, we counsel the Proponents to address the Objectors' concerns and continue working towards a more palatable settlement.

### B.    Trans Union's Role as De Facto Claims Administrator

Under the Proposed Settlement, a claims administrator will be appointed to administer the No-Internet claims and process the opt-out requests. The settlement does not provide for a claims administrator for those seeking In-Kind Relief, effectively rendering Trans Union the claims administrator for these Settlement Class members.  While this Court does not find that a claims administrator must be provided for all claims, based on the present record we are inclined to credit the Objectors' contention that Trans Union may be conflicted in serving as claims administrator.  For example, there is no mechanism in place to insure that a member of the Plaintiff Settlement Class who requests a credit score or credit monitoring services in the two years following ultimate approval will be informed that they may have a right to file a claim for In-Kind Relief, in lieu of purchasing the requested credit services from Trans Union.  It is reasonable to question whether Trans Union, in its role as de facto claims administrator, will insure that all individuals who contact Trans Union through avenues other than the resolution this dispute (*i.e.* through Trans Union's website, mailing address or general business number) receive notice of the settlement and are provided with an opportunity to claim any relief to which they are entitled.

### C.    The Statute of Limitations

The Proposed Settlement precludes defendants from asserting "any statute of limitations defenses, prescription defense, or any defenses based on laches, to any individual claims brought by Settlement Class Members under the FCRA," for a period of one year. Objectors contend this provision adversely affects Settlement Class members who would otherwise be entitled to bring claims, upon culmination of this action, for a tolled limitations period of up to two years. In response, Proponents state that this provision does not alter the rights Settlement Class members may have under the applicable statute of limitations or limit their ability to assert a tolling of the statute of limitations, but rather precludes defendants from raising a limitations defense. We find the statute of limitations provision, as written, could reasonably be interpreted to limit the time Settlement Class members have to bring claims after the culmination of this action and should therefore be revised to reflect the Proponents' position as clarified in their briefing.

### D. The Proposed Settlement's Treatment of Opt-Outs

The Objectors take issue with the requirement that all Settlement Class members who wish to opt-out of the settlement must file an individual request. Specifically, the Objectors claim, without citing any supporting authority, that the provision stating that opt-out requests "must be made on an individual basis, and not on a group or class-wide basis" impermissibly limits counsel's right to act with respect to the state law claims certified by the Louisiana court. From a practical standpoint, if counsel for the Morse plaintiffs were empowered to opt-out of the settlement on behalf of the Louisiana consumers (which are well in excess of 25,000 individuals), they would have veto power over the Proposed Settlement. We find no reason to grant them such authority. *See, e.g. Sloan v. Winn-Dixie Raleigh, Inc.* 2002 U.S. App. LEXIS 863, *3 (4th Cir. Jan. 22, 2002)("class representatives

36

cannot opt-out on behalf of other putative class members"); *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1024 (9th Cir. 1998) ("the right to participate, or to opt-out, is an individual one and should not be made by the class representative or class counsel.")

This Court finds the Objectors' claim that the 120 day opt-out period is improper is also without merit. While 120 days may in fact be "extraordinarily long" when compared to other class actions, given the size of the class and the potential difficulties in providing notice to Settlement Class members, 120 days is reasonable.

### E. Payment to Representative Plaintiffs

The Proposed Settlement provides for a $3,500 incentive award to each of the named plaintiffs who do not opt-out of the settlement. The named plaintiffs have expended significant effort in representing the Settlement Class members during this litigation. Among other things, they have consulted with counsel, reviewed pleadings and participated in discovery. All but three (Jowers and the Morses) have responded to written discovery and a number have sat for depositions in connection with plaintiffs' motion for class certification. The $3,500 incentive award adequately compensates the named plaintiffs for these efforts. *See, e.g. Spicer v. Chicago Bd. Options Exch., Inc.*, 844 F. Supp. 1226, 1267-68 (N.D. Ill. 1993).

## VII. CONCLUSION

This Court recognizes that the Proponents invested considerable time and effort in arms-length negotiations and, after reaching an initial agreement, made a number of modifications to the settlement in response to issues identified by this Court and the District Court. The improvements made to date are significant. Nonetheless, certain defects remain which preclude preliminary approval of the Proposed Settlement. After careful

review, this Court must conclude that the Proposed Settlement is not yet within the range of possible approval. Therefore, for the reasons stated above, we recommend that the District Court deny Proponents' Motion for Preliminary Approval of Proposed Class Action Settlement. Specific written objections to this report and recommendation may be served and filed within 10 business days from the date that this order is served. Fed. R. Civ. P. 72(a). Failure to file objections with the District Court within the specified time will result in a waiver of the rights to appeal all findings, factual and legal, made by this Court in the report and recommendation. *Lorentzen v. Anderson Pest Control*, 64 F.3d 327, 330 (7th Cir. 1995).

**ENTER:**

**MICHAEL T. MASON**
**United States Magistrate Judge**

**Dated:      January 3, 2008**