IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: TRANS UNION CORP. PRIVACY LITIGATION, | ) ) ) | |
| _____ | ) | No.  00 C 4729 |
| | ) | MDL Docket No. 1350 |
| THIS DOCUMENT RELATES TO: | ) | Judge Robert W. Gettleman |
| | ) | |
| ALL CASE | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

The remaining issues in this multi-district litigation arise from an overabundance of greed

by two sets of lawyers recognized by the court as among the attorneys representing the plaintiff

class.  After many years of litigation and hammering out a successful global settlement,[1] this

court and Magistrate Judge Michael Mason encouraged plaintiffs' attorneys to agree on the

amount of fees that would be sought, and Magistrate Judge Mason attempted to mediate an

agreement among the various groups of lawyers as to amount and allocation.  That attempt failed

because Texas counsel[2] demanded $2.85 million in fees, which was greater than the

(undisclosed) allocation agreed by the remaining attorneys, who sought a total fee award of

$15.1 million.

By order dated April 6, 2009 (the "April 6 Order"), this court decided to award a total of

$10.83 million in fees.  <u>In re Trans Union Corp. Privacy Lit.</u>, 2009 WL 937158.  When that order

---

[1]The settlement created a $75 million cash fund (the "Fund") to be distributed to a
nationwide class pursuant to a complex formula (see Order entered September 17, 2008, Doc.
No. 515) and capped attorneys' fees at 25% of the Fund ($18.5 million) subject to approval by
the court.  The settlement also included substantial in-kind relief.

[2]Michael A. Caddell, Cynthia B. Chapman and Corey Fein of Caddell & Chapman, and
Mitchell A. Toups of Weller, Green, Toups & Terrell, L.L.P.

was vigorously contested by Texas and Louisiana counsel,[3] by order dated June 11, 2009 (Doc. No. 635) the court vacated the award and appointed Edward W. Feldman as Special Master pursuant to Fed. R. Civ. P. 53 to: (a) examine the time records of all counsel; (b) recommend a fee award; (c) investigate any ethical issues, including those related to Louisiana counsel identified in the April 6 Order; and (d) perform additional inquires related to the duties specified above.

On October 1, 2009, the Special Master submitted (but did not file in the public record) a 76 page Report and Recommendation (the "R&R"), which the court finds to be remarkable not only for its content, but for its style, thoroughness and overall excellence.  Consequently, because the court approves and adopts the R&R in its entirety, the court attaches and incorporates the R&R to this opinion.

The R&R recommends a total fee award of $12,980,000, representing 17.3% of the Fund, allocated as follows: $7,836,683 to MDL and Frey counsel (hereafter, together, "MDL counsel");[4] $2,722,360 to Louisiana counsel; $1,815,319 to Texas counsel; $550,000 to liaison counsel;[5] and $55,638 to the Special Master.  The award to liaison counsel was agreed by all parties and has been distributed, as have approved out-of-pocket expenses.  The award to the Special Master represents ½ of his fees and expenses, and was so ordered by this court's June 11,

---

[3]Dawn Adams Wheelahan, and Steven J Lane, Stephen I. Herman and Soren E. Gisleson of Herman, Herman, Katz & Cotlar, L.L.P.

[4]Joy Ann Bull and Eric J. Niehaus of Coughlin, Stoia, Geller, Rudman & Robbins, L.L.P.; Jon W. Borderud of Law Offices of Jon W. Borderud; Matthew Righetti of Righetti Law Firm and John N. Zarian of Zarian, Midgley & Johnson PLLC.

[5]Terry Rose Saunders and Thomas A. Doyle of Saunders & Doyle.

2009, order.  The other half is to be paid from the proceeds remaining to be distributed to the class.

The only parties to object to the R&R were, not surprisingly, Louisiana and Texas counsel.  In addition to seeking even more fees, Louisiana counsel seeks to suppress the Special Master's discussion of the ethical issues that this court directed him to investigate.  For the reasons discussed below, the objections to the R&R are overruled, Louisiana counsel's request to suppress the portions of the R&R dealing with attorney Dawn Wheelahan's ethical lapses is denied, and MDL counsel are directed to distribute the money remaining in the Fund to the attorneys pursuant to the allocation recommended by the Special Master, with the remaining funds to be distributed to the plaintiff class as specified in the order approving the settlement agreement.

## Louisiana and Texas Counsels' Objections to the R&R

Louisiana counsel's principal objection to the R&R can be summed up simply: they (principally attorney Dawn Wheelahan) believe that they should be credited with most if not all of the difference between the original and final settlement agreements, and awarded a generous percentage of that difference (and 75% of the fees associated with that difference).  Texas counsel's objection to the R&R is limited to the Special Master's conclusion that MDL counsel should be awarded 50% of the difference.  These arguments ignore many factors that distinguish this case from the cases these lawyers – particularly Ms. Wheelahan –  rely on.[6]  These factors

---

[6]These cases include In re Synthroid Marketing Litigation, 264 F.3d 712 (7th Cir. 2001), and In re Synthroid Marketing Litigation, 325 F.3d 974 (7th Cir. 2003), and their progeny.

are unique to the instant litigation and are well known to this court through its extensive

involvement in the contested proceedings as well as the settlement negotiations.  These include:

(a)     Trans Union's liability in the instant case, at least for its target marketing

activities, was never in doubt, as this court noted in its April 6 Order.  The 2001

opinion by the United States Court of Appeals for the District of Columbia

confirmed Trans Union's liability for violating the FCRA.  See, Trans Union

Corp. v. FTC, 245 F.3d 809, (D.C. Cir. 2001).  The principal challenges facing

plaintiffs' counsel were how to structure the class(es) and achieve a recovery that

would be collectible without forcing Trans Union (which had a net worth of

approximately $1 billion) into bankruptcy.

(b)     Louisiana and Texas counsels' entry into the MDL litigation was relatively late,[7]

after many of the issues had been litigated and narrowed through the efforts of

MDL counsel.

(c)     The increase in the Fund resulted as much from the tireless, patient efforts by

Magistrate Judge Mason as from the efforts of any of plaintiffs' counsel.[8]

Magistrate Judge Mason, with the concurrence of this court, made it quite clear

---

[7]The instant litigation began in 1999, and was approved as an MDL in 2000.  Louisiana counsel filed the Andrews action (03 C 4331) in 2003, and successfully sought to remand it to state court in Louisiana.  It was not until December 2004 that Louisiana counsel filed the Morse action (05 C 831) in the U.S. District Court for the Eastern District of Louisiana, which that counsel unsuccessfully sought to remove from the MDL.  Louisiana counsel later brought in Texas counsel, who had filed their case (Jowers, 06 C 3074) in the Eastern District of Texas in April 2006.

[8]Unlike Louisiana counsel, MDL counsel is gracious enough in its fee petition briefs to acknowledge this indisputable fact.

that the original settlement offers were inadequate, and that Trans Union would have to put substantially more money on the table if the court were to seriously consider a proposed class-wide settlement.  As detailed below and in the R&R, the course of these discussions took some rather unusual turns.

(d)     The path that led the parties and the court to the ultimate settlement in this case took some novel, unexpected twists and turns that belie Louisiana counsel's attempts to denigrate and minimize the contribution of other attorneys to the settlement ultimately achieved.  First, shortly after Pretrial Order No. 1 was entered by Judge Aspen (who preceded the undersigned judge) in late 2000, at Judge Aspen's urging the parties attempted to mediate a settlement with Judge Abner J. Mikva (Ret.).  Next, in 2002, based on the circuit court precedent then existing, this court denied a nationwide statutory damages class under the FCRA, dismissed claims for declaratory and injunctive relief and nominal damages, and dismissed state law claims for invasion of privacy and misappropriation.[9]  These holdings were reaffirmed by the court in connection with the second amended complaint filed in November 2002.[10]  These rulings obviously diminished the settlement value of the case at that time.

(e)     Despite these setbacks, MDL counsel aggressively pursued this litigation, taking extensive discovery, resisting a series of motions filed by the defendants, and successfully seeking a certification of a statewide firm offer class.  <u>In re Trans</u>

---

[9]<u>In Re Trans Union Privacy Litigation</u>, 211 F.R.D. 328 (N.D. Ill. 2002).

[10]<u>In Re: Trans Union Privacy Litigation</u>, 326 F. Supp.2d 893 (N.D. Ill. 2004).

Union, 2005 WL 2007157.  These efforts, among others pursued by MDL

counsel, kept this litigation alive throughout the years that led to the March 2008

hearing in which this court informed the parties that, in light of recent changes in

precedent and other matters, it might reconsider the denial of a nationwide class

(even if that meant putting Trans Union out of business), and encouraged the

parties to reconsider their settlement positions.[11]  As detailed in the R&R and in

MDL counsels' briefs, this event was a major factor that led the parties to the

ultimate settlement.[12]

(f)     Louisiana counsel's initial efforts in the MDL were aimed at displacing the MDL

counsel who had been appointed by Judge Aspen in Pretrial Order No. 1.  Failing

that, Ms. Wheelahan then devoted most of her energy trying to extricate her

Louisiana case (Morse) from the MDL.  A great deal of time and judicial

resources were wasted in these activities.

(g)     As described in the court's April 6 Order and in detail by the Special Master in

his R&R, Ms. Wheelahan has engaged in unprofessional and marginally unethical

behavior.  Ms. Wheelahan's inexcusable padding of her time records would be

cause enough to cut her fees substantially or deny them outright.  Brown v.

Stackler, 612 F.2d 1057, 1059 (7th Cir. 1980).  Indeed, the lack of integrity of

---

[11]Indeed, as the Special Master has noted, at a January 15, 2009, hearing the court
discussed the change in precedent and the possibility of revisiting certification of a nationwide
class.

[12]For these reasons, Texas counsel's narrow objection to the R&R's conclusion that MDL
counsel should receive 50% of the enhancement of the Fund is overruled.

those time records was one of the principal reasons that the court appointed a

special master to examine the fee petitions, thus delaying the final resolution of

this case and distribution of the Fund to the class, and causing added expense to

the class and other counsel.  Ms. Wheelahan's ceaseless and irresponsible attacks

on MDL and Texas counsel, Magistrate Judge Mason,[13] and even the Special

Master,[14] and her needlessly prolonging this litigation would justify sanctions

cutting her fees far more than the Special Master recommends.  See Mirfasihi v.

Fleet Mortgage Corp., 551 F.3d 682, 687 (7th Cir. 2008), cert. denied., Perry v.

Mirfasihi, 129 S.Ct. 2767 (2009).

As previously recognized by this court, Ms. Wheelahan and her colleagues no doubt

contributed to the settlement that was ultimately achieved in this case.  They are being rewarded

handsomely for their efforts.  Their objections to the Special Master's R&R are unseemly and,

frankly, embarrassing to the legal profession that has taken enough hits in the public perception.

Although this court would have been inclined to impose sanctions on Ms. Wheelahan for her

conduct in this case, in light of the thorough and well reasoned discussion by the Special Master,

---

[13]It has recently come to the court's attention that, in her submissions to the Special
Master, Ms. Wheelahan disparaged Magistrate Judge Mason's motivations and judicial behavior.
As just one example, in an improper October 1, 2009, ex parte email to the Special Master, Ms.
Wheelahan states: "Judge Mason seems to have a chip on his shoulder as big as the world, where
I'm concerned, simply because I opposed two inadequate settlements that he wanted – and he
wanted them because he just didn't know any better, and wouldn't listen in the way that Judge
Gettleman, who is intelligent, did.  That is what Mason resents."

[14]In her latest maneuver, Ms. Wheelahan filed a "Motion for a Status Report" in which
she erroneously claimed that the Special Master, through his law firm's representation of an
entity related to certain individuals who controlled Trans Union, was somehow disqualified from
acting as Special Master.  As this court ruled on November 17, 2009 (Doc. No. 687), Mr.
Feldman's response to this attack clearly established that no such conflict existed.

the court chooses to exercise its discretion to forego such sanctions, approve the report in its entirety, and allow the class to receive the relief for which its members have waited far too long.

For these reasons, rather than prolong this opinion unnecessarily, the court incorporates the Special Master's thorough analysis of the arguments advanced by the various sets of lawyers, his analysis of the case law (particularly the <u>Synthroid</u> cases relied upon by Louisiana counsel) and the history of this litigation, his application of a percentage basis of recovery, "cross checked" by a "rough" lodestar analysis, and his allocation of fees among counsel.  It would be difficult to improve on the Special Master's report, and the court will not endeavor to do so.


**<u>Ethical Issues Related to Attorney Wheelahan</u>**

With respect to the ethical issues raised by attorney Dawn Wheelahan's conduct, the court, in the exercise of its discretion, reluctantly adopts the Special Master's recommendation not to impose sanctions against her.   The R&R thoroughly analyzes the emails Wheelahan sent to her co-counsel in an attempt to threaten them with a circuitous, ill-advised and likely to fail effort to torpedo the settlement to enhance her own fees.  The Special Master concluded that, although her conduct was reprehensible, unprofessional and "stray[ed] far beyond conduct becoming of an attorney" (R&R at 61), Wheelahan should not be sanctioned because she took no action to carry out the threats and likely would not have succeeded to defeat the settlement even if she had done so.

This court remains disturbed (and disappointed) by conduct of a lawyer that would even come close to the line of betraying the interests of a client (especially a consumer class for which the court has recognized the lawyer as its representative) in order to augment the lawyer's fees.

8

Even more disturbing is the Special Master's conclusion, amply supported by the record, that Wheelahan made misrepresentations to him in her attempt to explain the emails by claiming that the use of the term "motion to dismiss" in the November 19, 2008, email was an "accident," and that she did not intend to convey a threat to Texas counsel to undermine the settlement in an effort to convince them to lower their fee demand (R&R at 46-61).  While the court agrees with the Special Master that Wheelahan's conduct did not rise (or sink) to the level of extortion or sanctionable deception (R&R at 62-69), coupled with her unseemly attacks on her co-counsel and the integrity of both the Special Master and the Magistrate Judge, as well as her grossly excessive time sheets, her conduct deserves censure by the court.[15]

## CONCLUSION

For the foregoing reasons, the court approves, adopts and incorporates herein the attached Report and Recommendation of Special Master submitted to the court on October 1, 2009, and orders a total fee award of $12,980,000 to be allocated as follows:  $7,836,683 to MDL counsel; $2,722,360 to Louisiana counsel; $1,815,319 to Texas counsel; $550,000 to liaison counsel; and $55,638 to the Special Master.  MDL counsel are directed to pay these fees forthwith and distribute the balance to the plaintiff class and the Special Master pursuant to the settlement

---

[15]In her arguments to the Special Master and in her objections to the R&R, Ms. Wheelahan contends that discussion of her ethical transgressions should be held in confidence pursuant to L.R. 83.25 (governing disciplinary proceedings before the court's Executive Committee).  As pointed out in the R&R, L.R. 83.25 does not include "sanctions or contempt" proceedings.

agreement and the order appointing the Special Master.  MDL counsel are further directed to file

a report indicating compliance with this order within 28 days.


**ENTER:**        **December 9, 2009**

**Robert W. Gettleman**
**United States District Judge**

ATTACHMENT

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: TRANS UNION CORP. PRIVACY LITIGATION, | ) ) ) | |
| _____ | ) | No. 00 C 4729 |
| | ) | MDL Docket No. 1350 |
| THIS DOCUMENT RELATES TO: | ) | Judge Robert W. Gettleman |
| | ) | Special Master Edward W. Feldman |
| ALL CASES | ) | |

## REPORT AND RECOMMENDATION OF SPECIAL MASTER

Edward W. Feldman
*Special Master Pursuant to Order of June 11, 2009*
Miller Shakman & Beem, LLP
180 North La Salle Street, Suite 3600
Chicago, IL  60601
(312) 263-3700

## TABLE OF CONTENTS

I.  INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.  Summary of Order and Assignment  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    B.  Summary of Steps Taken to Carry out the Assignment . . . . . . . . . . . . . . . . . . . 1

    C.  Summary of Recommendations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        1.  Total fee recommendation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        2.  Allocation recommendation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        3.  Summary of recommendations regarding ethical and billing
            issues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II.  FEE AWARD DETERMINATION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    A.  Litigation Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    B.  Legal Standards for Determining Common Fund Fee Awards . . . . . . . . . . . . . . 6

    C.  Relevant Market Data . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        1.  Actual fee agreements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        2.  Awards in other cases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        3.  Class Counsel Auctions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    D.  Application . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    E.  Cross-Checks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

    F.  Allocation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

        1.  The amounts requested by counsel . . . . . . . . . . . . . . . . . . . . . . . 31

        2.  Allocation standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

        3.  Allocation analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

III.  INVESTIGATION OF THE WHEELAHAN NOVEMBER 19
      E-MAILS AND OTHER ETHICAL ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

      A.    Summary of the Issue and Recommendation . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

      B.    Ms. Wheelahan's Procedural Objections . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

      C.    Description of the Relevant E-Mails . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

      D.    Ms. Wheelahan Did Not Actually Betray or Harm the Settlement Class . . . . . . 46

            1.    Ms. Wheelahan's denial is supported by the record and
                  common sense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

            2.    Texas Counsel's theory that Ms. Wheelahan actually tried to
                  undermine the settlement is implausible and unsupported . . . . . 50

      E.    Ms. Wheelahan's Intent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

            1.    The e-mails were intended as threats . . . . . . . . . . . . . . . . . . . . . . . 56

            2.    Ms. Wheelahan acted alone in making the threat . . . . . . . . . . . . 61

            3.    The threats do not warrant a sanction . . . . . . . . . . . . . . . . . . . . . . 61

IV.   OTHER ETHICAL ISSUES – BILLING PRACTICES . . . . . . . . . . . . . . . . . . . . . . . . . 70

      A.    Charges for Travel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

      B.    Supreme Court Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

      C.    Other Items Flagged by the Court . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

      D.    General Review of Billing Records . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

V.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

Special Master Edward W. Feldman, appointed pursuant to the Court's order of June 11, 2009 (Doc. 635, "June 11 Order"), respectfully submits the following Report and Recommendation.

## I.   <u>INTRODUCTION</u>

### A.   **Summary of Order and Assignment**

In the June 11 Order, the Court provided that my duties were to include (i) examining the time records of all counsel, (ii) recommending whether to base the fee award on a lodestar or percentage basis, (iii) investigating any ethical issues raised by Louisiana Counsel's (or any other counsel's) time records and communications discussed in the court's April 6, 2009 memorandum opinion and order (Doc. 591, "April 6 Order"), and (iv) any other similar issues that may be raised during the performance of my duties.  By Order dated July 30, 2009 (Doc. 637), the Court clarified that assignment (ii) included making a recommendation as to the total amount of an award and an allocation of that amount among plaintiffs' counsel.

### B.   **Summary of Steps Taken to Carry out the Assignment**

Throughout the assignment I was assisted by Roger Perlstadt of my firm.  (My partner Diane Klotnia also provided helpful comments on a draft of this Report.)  Our work included the following: review of various pertinent pleadings in the record; conducting phone conferences with counsel; requesting from counsel and then reviewing documents, such as detailed time and billing records and communications among counsel relevant to the ethical issues; examining several counsel of record (Ms. Wheelahan and Messrs. Toups, Zarian, Fein, Borderud and O'Neil); researching applicable law; and drafting this Report.  All counsel cooperated fully with my investigation.

Plaintiffs' counsel fall generally into four groups, which are discussed herein: MDL Counsel, Louisiana Counsel, Texas Counsel and Liaison Counsel.  Louisiana Counsel consists of Dawn A. Wheelahan LLC and Herman, Herman, Katz & Cotlar.  Texas Counsel consists of Caddell &

Chapman; Weller, Green, Toups & Terrell, LLP, and Edelman, Combs, Latturner & Goodwin, LLC, their local counsel in Chicago.  Liaison Counsel is Saunders & Doyle.  MDL Counsel consists of all other plaintiffs' counsel in this matter, including Zarian Midgley & Johnson, who may be referred to individually as ("*Frey* Counsel").  Collectively, Louisiana Counsel, Texas Counsel, Liaison Counsel and MDL Counsel will be referred to as "Plaintiffs' Counsel."

### C.    Summary of Recommendations

#### 1.    Total fee recommendation

The Stipulation of Settlement establishes a cap on attorneys' fees of $18.75 million.  In the fee petitions previously filed with the Court, plaintiffs' counsel collectively requested $17.95 million.  In its April 6 Order, which the Court later vacated, the Court applied the percentage-of-fund method and awarded $10.83 million.  For reasons explained below, I recommend that the total attorneys' fee award be determined on the percentage-of-fund method.  Having received detailed time records from counsel, which had not been provided to the Court by most counsel, I also used a rough lodestar analysis as a cross-check on the reasonableness of the fees determined by the percentage method.  Applying that methodology, I recommend a total attorneys' fee award of $12,980,000.  This figure represents 17.3% of the cash settlement fund of $75 million and 11.8% of the total settlement value of $109.6 million.

#### 2.    Allocation recommendation

After determining that the total recommended fee would be $12.98 million, I disclosed the figure to plaintiffs' counsel and gave them a short period to determine whether they could agree on an allocation based on that figure.  They could not do so.  They then submitted briefs regarding a proposed allocation.  After careful consideration of their briefs and review of applicable portions

2

of the record, I recommend the following allocation of the $12.98 million award, should the Court

adopt it:

- By prior agreement and court order, $550,000 to Liaison Counsel.
- Pursuant to the June 11, 2009 Order, one-half of the Special Master's fees and expenses, $55,638, to the Special Master.
- For the balance, $12,374,362:
  - ○ $7,836,683 to MDL Counsel (including *Frey* Counsel).
  - ○ $2,722,360 to Louisiana Counsel.
  - ○ $1,815,319 to Texas Counsel.

### 3.     Summary of recommendations regarding ethical and billing issues

I investigated each of the ethical issues raised in the Court's April 6, 2009 Order, with

primary emphasis on the November 19, 2008 e-mails attached as Appendix B to that opinion.  While

those e-mails were wholly inappropriate and, as the Court put it, "reprehensible," under the totality

of the circumstances I do not recommend that any formal sanction be imposed on Ms. Wheelahan.

Likewise, Ms. Wheelahan's inclusion of travel time in her billing detail, although unreasonable and

based on an untenable reading of Seventh Circuit case law, was not so egregious as to warrant a

sanction.  Finally, the other billing issues noted by the Court, while involving excessive or unreas-

onable time entries, also do not warrant any sanction.  It is disappointing that none of Plaintiffs'

Counsel appear to have exercised any billing judgment to review duplication or inefficiencies and

reduce their raw lodestars.  However, I did not find any sanctionable transgression.

## II.     FEE AWARD DETERMINATION

### A.     Litigation Background

Because the history of the case is relevant to determining the fee award under the *ex ante*

market-based approach prescribed by the Seventh Circuit, I give a brief summary.  In August 1998,

a putative class action was filed by *Frey* Counsel in California state court (the "*Frey* Action"), alleging various violations by Trans Union Corp. ("Trans Union") of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §1681 *et seq*.  A similar action against Trans Union was also filed shortly thereafter in California state court (the "*Martinelli* Action").  In early 1999, the *Martinelli* Action was removed to federal court in California.  Other cases making similar allegations were filed by various MDL Counsel in other federal district courts in 1999 and 2000.  In 2000, the Judicial Panel on Multidistrict Litigation transferred the *Martinelli* Action and the other federal cases to this district.  Ultimately, fourteen cases were consolidated in this district, including one filed by Louisiana Counsel in federal court in Louisiana in 2005 (the "*Morse* Action"), and one filed by Texas Counsel in federal court in Texas in 2006 (the "*Jowers*" Action).  The fourteen consolidated federal cases will be referred to collectively herein as the "MDL Action."  In addition, Louisiana Counsel filed a similar case in Louisiana state court in December 2002 (the "*Andrews* Action").

In 2004, a "target marketing" class was certified in the *Andrews* Action.  In 2005, a "firm offer" class was certified in the MDL Action.  In 2006, MDL Counsel, Liaison Counsel and Trans Union agreed in principle to a class settlement (the "First Proposed Settlement"), and a motion for preliminary approval of the First Proposed Settlement was filed in November 2006.  The amount of the First Proposed Settlement was $20 million cash, plus in-kind relief.  Louisiana Counsel objected to the motion for preliminary approval, and the motion was ultimately withdrawn in April 2007.

After further negotiations, a motion for preliminary approval of another proposed settlement (the "Second Proposed Settlement") was filed in September 2007.  Under the Second Proposed Settlement, Trans Union agreed to provide to a nationwide class of consumers free online credit monitoring services valued at around $50 per consumer, and establish a $20 million fund to provide

cash payments of $25 each to class members without internet access.  Louisiana Counsel again objected to the motion for preliminary approval, this time joined by Texas Counsel.  In January 2008, Magistrate Judge Mason recommended that the Second Proposed Settlement not be approved.  The Court overruled all objections to the recommendation, and ordered a settlement conference before the Magistrate Judge.

Further negotiations quickly led to a third proposed settlement in April 2008 (the "Final Settlement").  The Court granted preliminary approval of the Final Settlement in May 2008 and final approval in September 2008.[16]  The Final Settlement provided $75 million cash, plus "basic" and "enhanced" in-kind relief, the retail value of which ultimately redeemed by class members totaling just over $34.6 million.

The Final Settlement capped the potential attorneys' fee award at 25% of the cash settlement fund of $75 million, *i.e.*, $18.75 million.  After the Final Settlement was approved, in October and November 2008, Magistrate Judge Mason attempted to mediate an agreement among Plaintiffs' Counsel as to the total amount of attorneys' fees that would be sought from the Court, and the allocation of such fees.  No agreement was reached, and Plaintiffs' Counsel moved for a fee award.  All Counsel except Texas Counsel jointly requested $15.1 million in fees, to be allocated pursuant to an undisclosed agreement among them.  Texas Counsel requested a total fee award of $2.85 million.  Only Louisiana Counsel submitted hourly detail in support of the request.  Other Plaintiffs' Counsel alleged total hours worked and amounts claimed, breaking the work down in seven broad categories without supporting billing detail.

---

[16]    Several objectors filed appeals of the final approval, all of which have now been resolved.

On April 6, 2009, the Court entered an order awarding all Plaintiffs' Counsel a total attorneys' fee of $10.83 million. This award was based on the "percentage-of-fund" method notwithstanding the Court's general preference for the "lodestar" approach. The Court directed Plaintiffs' Counsel to determine whether they could agree on an allocation of the $10.83 million award. They were unable to agree. In addition, Louisiana Counsel filed a Rule 59(e) motion to amend the fee award. The Court ultimately vacated the April 6 Order. Among the tasks assigned to me was to recommend whether to use the percentage or lodestar method, and recommend an appropriate award and allocation based on the chosen method.

### B.    Legal Standards for Determining Common Fund Fee Awards

In common fund cases such as this, a court has the equitable power to compensate attorneys from the recovery won for plaintiffs. *Harman v. Lyphomed, Inc.*, 945 F.2d 969, 973 (7th Cir. 1991). Because the payment of attorneys' fees comes from the common fund, after attorneys secure a settlement, their role with respect to fees changes from one of fiduciary for their clients to that of claimants against the fund created for their clients' benefit. *Cook v. Niedert*, 142 F.3d 1004, 1011 (7th Cir. 1998). Consequently, "the court becomes the fiduciary for the fund's beneficiaries and must carefully monitor disbursement to the attorneys by scrutinizing the fee applications." *Id.* Basically, "the district court must ensure that plaintiffs pay no more than what is reasonable." *Id.* at 1012. As an agent of a court, a special master necessarily assumes the same fiduciary function.

Courts in common fund cases have discretion to choose either the lodestar or percentage method of calculating fees. *Florin v. Nationsbank of Ga., N.A.*, 34 F.3d 560, 566 (7th Cir. 1994). The Seventh Circuit has noted advantages and disadvantages to both approaches. The chief advantage of the percentage approach is simplicity of administration. *See, e.g., Florin*, 34 F.3d at 566; *In re Continental Ill. Sec. Litig.*, 962 F.2d 566, 572-73 (7th Cir. 1992). The chief advantage

6

of the lodestar approach is accountability.  *See, e.g., Harmon*, 945 F.2d at 974; *Cook*, 142 F.3d at

1013 (citing *Harmon*).

Ultimately, in the Seventh Circuit, the market controls.  Thus, the Seventh Circuit is less

concerned with the choice between the lodestar or percentage method than with approaching the

determination through the lens of the market.  The analysis should be determined from what an

arms-length negotiation between the class and the lawyers at the beginning of the case would have

likely produced.  *In re Synthroid Marketing Litig.*, 264 F.3d 712, 718-19 (7th Cir. 2001) ("*Synthroid

I*") ("Timing is more important than the choice . . . between percentage and hourly rates, for [both]

of these systems have their shortcomings.").  Thus, under either approach, the Seventh Circuit

requires that "when deciding on appropriate fee levels in common-fund cases, courts must do their

best to award counsel the market price for legal services, in light of the risk of nonpayment and the

normal rate of compensation in the market at the time."  *Id.* at 718.

While the Seventh Circuit is agnostic as between the lodestar and percentage methods, this

Court expressed a preference for the former, although it ultimately employed the latter in the April

6 Order because of the inadequacy of the time records submitted by Plaintiffs' Counsel.  Now that

Plaintiffs' Counsel have produced hourly billing records pursuant to my request, it would now be

possible to engage in a thorough and detailed lodestar analysis.  However, I chose to employ the

percentage method and recommend that to the Court.  I did this for two reasons.

The first is time and expense.  As noted above, the percentage method is much less

burdensome than the lodestar method to administer.  As a fiduciary to the class, I am particularly

sensitive to that factor here.  I do not wish to charge the class what it would cost for me to pore line

by line through the billing records of over thirty law firms recording time in some sixteen lawsuits.

In most lodestar cases, the district court judge presiding over the class action assesses the

7

reasonableness of the hours and an adversary has culled the billings to flag issues.  I have no familiarity with the efforts of Plaintiffs' Counsel in the MDL Action during the litigation and there is no adversary.  And neither I nor the Court is familiar with the work that was done in the separate lawsuits outside of the proceedings in the MDL Action.  Engaging in detailed line-by-line review, including review of activities in other venues, which would be required to assess reasonableness, would be expensive under any circumstances and even more so here.  These burdens do not outweigh any purported advantage of the lodestar approach over the percentage approach.  Rather, by employing a rougher "lodestar cross-check" below, I have retained most of the "accountability" of that approach, while preserving the administrative ease of the percentage approach.

A second advantage to the percentage approach in this case is that it is more consistent with the market-mimicking approach endorsed by the Seventh Circuit.  As discussed below, that approach suggests that an *ex ante* arms-length negotiation between a hypothetical class representative and a hypothetical single law firm would have resulted in a contingent, percentage-based fee agreement rather than an hourly fee arrangement.  While that fact is not determinative, *see Cook*, 142 F.3d at 1013 ("market's preference" for percentage-based fee is only one of several factors), it does lend additional support to following the percentage approach.

## C.    Relevant Market Data

In *Synthroid*, determining a market-based percentage fee was relatively easy.  One group of sophisticated plaintiffs had, at the outset of their relationship, negotiated an arms-length fee agreement.  Thus, there was an actual market-based transaction in the record that, in that case, "*define[d]* the market." *Synthroid I*, 264 F.3d at 720 (emphasis in original).  No such luck here.  Instead, I must hypothesize an arms-length negotiation at the outset between a sophisticated party representing the interests of the class and counsel seeking to represent the class.  While recognizing

8

the mistiness of trying to determining *ex post* (nearly 10 years later) what an *ex ante* fee agreement would have looked like, the Seventh Circuit has suggested three guiding lights: (1) any actual fee agreements between plaintiffs and their attorneys, (2) data from other common fund cases, and (3) information on class-counsel auctions, in which judges solicit bids from different attorneys seeking the right to represent a class.  *See Synthroid I*, 264 F.3d at 719; *Taubenfeld v. Aon Corp.*, 415 F.3d 597, 599 (7th Cir. 2005).  I address each of these guides in turn.

### 1.    Actual fee agreements

This is the least helpful guide in this case.  At my request, Plaintiffs' Counsel provided their contingent fee agreements with individual plaintiffs in the various actions here, which range from 25% to 45%.  Such agreements shed only a flicker of light here, for two reasons.

First, *Synthroid I*'s reference to negotiated fee agreements is not well-suited beyond the type of facts in that case.  The fee agreements in *Synthroid* were negotiated by insurance companies, "sophisticated purchasers of legal services," at the outset of their engagement of counsel.  *Synthroid I*, 264 F.3d at 720. *See also In re Synthroid Marketing Litig.*, 325 F.3d 974, 976 (7th Cir. 2003) ("*Synthroid II*") ("All of the [insurance companies] are sophisticated financial intermediaries with in-house counsel who can (and do) shop for legal services in a national market.").  As noted above, such agreements, where they exist, can "*define* the market." *Synthroid I*, 264 F.3d at 720 (emphasis in original).  Here, in contrast, the fee agreements were entered into by presumably less sophisticated individual consumers.  *See id.* ("The [insurance company] contracts provide little guidance on how to compute fees for the consumer class.").

Second, the contingent fee agreements here are between the lawyers and individual plaintiffs, not the entire class.[17]  As one district court applying the Seventh Circuit's market-mimicking approach has noted, "the paramount question remains what the lawyer would hypothetically charge in a *class action* specifically."  *Nilsen v. York County*, 400 F. Supp. 2d 266, 279 (D. Me. 2005) (emphasis in original).[18]  In *Synthroid*, the insurance companies were negotiating over *their* money. The fees were going to come out of any award to the clients negotiating the agreements.  Here, in contrast, no individual plaintiffs were negotiating over the class's money, and thus, "no member of the class ha[d] a sufficient stake to drive a hard–or any–bargain with the lawyer." *Continental*, 962 F.2d at 572.  *See also In re Comdisco Sec. Litig.*, 150 F. Supp. 2d 943, 949-50 (N.D. Ill. 2001) (Shadur, J.).  Thus, in this context, the fee agreements have minimal relevance to determining a proper award.  *See Nilsen*, 400 F. Supp. 2d at 279-80.  *See also Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1049 (9th Cir. 2002).

### 2.    Awards in other cases

In *Synthroid I*, the Seventh Circuit's consideration of fees in other common fund cases appeared to be limited to other cases in which fees had been privately negotiated.  264 F.3d at 720 ("A second benchmark for determining legal fees is data from securities suits where large investors have chosen to hire counsel up front.").  Thus, under the market-based approach, the pertinent awards in other common fund cases may be limited to cases in the securities or similar contexts

---

[17]     Indeed, one of the fee agreements submitted to me expressly declines to establish a fee if a class is certified, noting that the attorneys will ask the Court to award attorneys' fees if a class is certified.

[18]     Although obviously not bound by Seventh Circuit precedent, the court in *Nilsen* "adopt[ed] the methodology of the Seventh Circuit as most reflective of what a judge does instinctively in setting a fee as well as most amenable to predictability and an objective external constraint on a judge's otherwise uncabined power."  400 F. Supp. 2d at 278.

where there were institutional or sophisticated plaintiffs to negotiate fees up front.[19]  Our research

uncovered no FCRA suits in which sophisticated plaintiffs negotiated attorneys' fees up front.

Nevertheless, awards in other class actions generally (even where no fees were negotiated *ex ante*)

may provide some marginally useful information about hypothetical market negotiations, because

they may influence the expectations of lawyer and client engaging in the hypothetical negotiation.

*See Nilsen*, 400 F. Supp. 2d at 282-83 ("Other courts' awards necessarily affect the expectations of

lawyers and, therefore, what they might agree to in voluntary negotiation.").

A body of academic literature analyzes data on attorneys' fees in various class actions.  A

few recent published opinions attempt to sift through some of the literature, with varying

conclusions.  The court in *Nilsen* found that "[m]edian attorney fee awards in other class actions

generally . . . range within a few percentage points on either side of 30%."  400 F. Supp. 2d at 281.

Another court determined that "considerable authority (both statistical and judicial) exists to support

a finding that the prevalent percentage attorney fee awards range from a low of around 20 percent

. . . to a high of between 25 to 30 percent. . . ."  *In re Cabletron Sys. Inc. Sec. Litig.*, 239 F.R.D. 30,

42 (D.N.H. 2006).[20]  The court in *Cabletron* pointed out, however, that one of the studies it cited

---

[19]     For example, in the Enron securities litigation, a large sophisticated lead plaintiff
(the Regents of the University of California) negotiated an *ex ante* fee agreement with one of the
MDL Counsel law firms (Coughlin Stoia), which provided an increasing sliding scale of an 8%
fee on the first billion dollars, 9% on the second billion, and 10% on recoveries above $2 billion.
The Court ultimately approved a fee award of $688 million, representing 9.52% of the total
recovery.  *See In re Enron Corp. Securities, Derivative & ERISA Litigation*, 586 F. Supp. 2d
732, 766-79 (S.D. Tex.2008).  The Enron fee agreement is of limited guidance here, since the
balance of risks and rewards were much higher in that case (there was never any realistic
prospect of a recovery in the billions here), and the work and out-of-pocket expenditures
required to litigate the matter dwarfed what was required here.  See id. at 771 *et seq.* (detailing
the risks and work).

[20]     Like *Nilsen*, the court in *Cabletron* was not bound by Seventh Circuit precedent,
but nonetheless adopted its market-mimicking approach.  239 F.R.D. at 40-41.

determined that awards were typically lower in non-securities common fund cases as compared to securities cases. *Id.* at 42 (citing Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees in Class Action Settlements: An Empirical Study*, 1 J. Empirical Legal Stud. 27 (Mar. 2004)).  Indeed, Eisenberg and Miller determined that the mean fee award in common fund consumer class actions ranges from 16.2% to 24.3%.  1. J. Empirical Legal Stud. at 51, Table 1.

Eisenberg and Miller further found that "the level of client recovery is by far the most important determinant of the attorney fee amount [and that a] scaling effect exists, with fees constituting a lower percent of the client's recovery as the client's recovery increases."  1 J. Empirical Legal Stud. at 28.  As noted above, the client recovery here was $75 million cash, plus in-kind relief valued at over $34 million.  The Eisenberg and Miller study reports the mean fee award for a recovery of $109 million to be 17.6% to 19.5%, and, looking only at the cash component here, the mean fee for a recovery of $75 million to be 16.9% to 23.9%.  *Id.* at 73, Table 7.[21] Eisenberg and Miller propose that an attorneys' fee award within one standard deviation of the mean for any particular recovery level should be viewed as generally reasonable. *Id.* at 74.  Applying the

---

[21]     Table 7 of the Eisenberg and Miller study reports mean fee award percentages based on two data sets: published federal and state opinions reporting class action fee determinations, and an article in Class Action Reports that surveyed more than 600 common fund class actions.  The award percentages reported from each data set are broken into deciles by size of client recovery, which is measured in 2002 dollars.  The percentages based on the Class Action Reports data further breaks out non-securities cases.  Thus, the figures noted above were taken from the mean fee award percentages reported in Table 7 based on the published opinion data and the non-securities Class Action Reports data for client recoveries in the ninth decile ($79 to $190 million) for the total value of the settlement here, and the eighth decile ($38 to $79 million) for only the cash portion of the settlement.  *See Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 2d 830, 864 n.30 (E.D. La. 2007) ("[Looking to Eisenberg and Miller's data sets to determine an average percentage for cases of similar magnitude] is similar to the 'market-mimicking approach' employed by courts within the Seventh Circuit.").

standard deviations reported by Eisenberg and Miller suggests a reasonable range of 8.4% to 27.8% of the $109 million total, or 6.7% to 32.9% of just the cash component. *Id*. at 73, Table 7.[22]

### 3.      Class Counsel Auctions

The Seventh Circuit has described class counsel auctions as follows:

> [T]he word "auction" is an imprecise description of the process that judges have used to choose lead counsel in class actions.   Judges don't look for the lowest bid; they look for the best bid–just as any private individual would do in selecting a law firm, an advertising firm, or a construction company.   Bidding law firms provide the judge with firm profiles, testimonials of former clients, predictions of expected recovery, fee proposals, and arguments on why their firm provides good value.   The judge in turn acts as an agent for the class, selecting the firm that seems likely to generate the highest recovery net of attorneys' fees.

*Synthroid I*, 264 F.3d at 720 (internal citations omitted).   One district court in 2006 reported the winning bid structures of seven auction cases from various other courts.   *Cabletron*, 239 F.R.D. at 43-44.   Although the court did not attempt to survey every case in which an auction was used, it reported "bidding cases for which information relating to the fee structure was readily accessible electronically."   Id. at 43 n.21.   The results of that survey are reprinted below:

**In re: Oracle Securities Litigation**
No. 3:90-cv-0931-VRW (N.D. Cal.)

| Recovery | 0-12 Months | 13+ Months |
|---|---|---|
| First $1M | 24% | 30% |
| Next $4M | 20% | 25% |
| Next $10M | 16% | 20% |
| Excess of $15M | 12% | 15% |

---

[22]      The standard deviation reported for the 17.6% mean fee award on a $109 million recovery in the published opinion data set is 9.2.   The standard deviation reported for 19.5% mean fee award on a $109 million recovery in the Class Action Reports data set for non-securities cases is 8.3.   The standard deviation reported for the 16.9% mean fee award on a $75 million recovery in the published opinion data set is 10.2.   The standard deviation reported for the 23.9% fee award on a $75 million recovery in the Class Action Reports data set for non-securities cases is 9.0.

**In re: Wells Fargo Securities Litigation**
No. 3:91-cv-1944-VRW (N.D. Cal.)

| Recovery | <12 Months | >12 Months | Trial Forward |
|---|---|---|---|
| First $3M | 24% | 27% | 32% |
| Next $7M | 22% | 25% | 30% |
| Excess of $10M | 20% | 23% | 28% |

**In re: Amino Acid Lysine Antitrust Litigation**
No. 1:95-cv-7679 (N.D. Ill.)

| Recovery | |
|---|---|
| First $5M | 20% |
| Next $10M | 15% |
| Next $10M | 10% |
| Excess of $25M | no additional fee |

**Wenderhold v. Cylink Corp.**
No. 3:98-cv-4292-VRW (N.D. Cal.)

| Recovery | Pleading - MTD | MTD - SJ | SJ - Trial | Posttrial- Final Appeal |
|---|---|---|---|---|
| $0 - $.5M | 10% | 25% | 30% | 35% |
| Next $.5M | 10% | 17.5% | 25% | 30% |
| Next $4M | 5% | 15% | 17.5% | 20% |
| Next $5M | 5% | 10% | 15% | 12.5% |
| Next $5M | 5% | 7.5% | 12.5% | 12.5% |
| Next $5M | 5% | 5% | 10% | 10% |
| Excess of $20M | 5% | 2.5% | 5% | 10% |

**In re: Bank One Shareholders Class Actions**
No. 1:00-cv-880 (N.D. Ill.)

| Recovery | |
|---|---|
| First $5M | 17% |
| Next $10M | 12% |
| Next $10M | 7% |
| Excess of $25M | no additional fee |

**In re: Comdisco Securities Litigation**
No. 1:01-cv-2110 (N.D. Ill.)

| Recovery | |
|---|---|
| Any sum recovered | 7.5% |

**In re: Quintas Corp. Securities Litigation**
No. 3:00-cv-4263-VRW (N.D. Cal.)

| Recovery | Pleading - MTD | MTD - SJ | SJ - Trial | Posttrial- Final Appeal |
|---|---|---|---|---|
| First $4M | 7.5% | 8.5% | 9% | 9% |
| Next $4M | 7% | 8% | 8.5% | 8.5% |
| Next $4M | 6.5% | 7.5% | 8% | 8% |
| Next $4M | 6% | 7% | 7.5% | 7.5% |
| Next $4M | 5.5% | 6% | 6.5% | 6.5% |
| Excess of $20M | 5% | 5.5% | 6% | 6% |

*Id.* at 43-44.  Applying these fee structures to the present settlement would result in fee awards ranging from 4.4% to 23.3% if only the $75 million cash portion is considered, or from 3.8% to 23.2% of the entire $109.6 million cash plus in-kind amount.[23]

It should be kept in mind that, except for *Amino Acid Lysine*, an antitrust case, these auction cases were all in securities litigation, which Eisenberg and Miller noted generally result in higher fee awards.  (A typical securities or antitrust case involves more risk than was present in this case; I discuss risk below.)  In any event, as with the *ex post* fee awards in other cases considered above, the fee structures in the auction cases considered here are, at best, only illustrative.  Each case has unique facts and risk factors.  Yet the auction cases do offer insight into what attorneys may be willing to accept to represent a class before the outcome of litigation is known.  These cases belie common rules of thumb or conventional wisdom, such as a "norm" of a 25% or 33% contingent fee,

---

[23]    As former math and physics majors, respectively, who fled a life of mathematical rigor for the law, Mr. Perlstadt and I arguably should not be trusted with a calculator. Nevertheless, if we are right, our calculations reveal that application of the auction case fee structures to the settlement here would result in the following fee awards:  *Wenderhold*: 4.4% of cash, 3.8% of total; *Bank One*: 7.0% of cash, 6.4% of total; *Amino Acid Lysine*: 8.0% of cash, 7.1% of total; *Quintas*: 6.0% of cash, 5.8% of total; *Comdisco*: 7.5% of cash, 7.5% of total; *Oracle*: 16.4% of cash, 16.0% of total; *Wells Fargo*: 23.3% of cash, 23.2% of total.  In the cases of *Bank One* and *Amino Acid Lysine*, we modified the scale slightly.  The winning bids in each case had a self-imposed cap on fees.  The Seventh Circuit criticized that result in *Synthroid I*, 264 F.3d at 720-21, as eliminating an incentive for class counsel to increase recoveries for the class.  Thus, our calculations assumed a 5% fee recovery at the highest tier in each of those two cases.

15

which underlie some of the *ex post* fee awards from other Circuits analyzed in the Eisenberg & Miller study discussed earlier.

### D.    Application

In trying to apply *Synthroid I*'s imperative to "do [my] best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time," 264 F.3d at 718, I now try to imagine a hypothetical negotiation at the outset of the litigation between a single sophisticated representative of the potential class and a single - group of lawyers proposing to represent the potential class. This approach obviously omits much of the complexity present in this litigation, but my goal here is not the impossibility of replicating exactly an *ex ante* market transaction, but simply to approximate one as best I can given the information available. *See Synthroid I*, 264 F.3d at 719 (noting that it is "impossible" to derive the *ex ante* result years later, but consideration of other market transactions is a "starting point"); *Nilsen*, 400 F. Supp. 2d at 279.

First, I believe a negotiation likely would have resulted in a contingent, rather than a pure hourly, fee arrangement, as were most of the insurer agreements in *Synthroid*. *See Synthroid II*, 325 F.3d at 976. The fact that the individual fee agreements here were contingent lends further support to this conclusion.[24]

Next, I believe that a negotiation likely would have resulted in a downward sliding scale, such that, as in most of the auction cases noted above, the attorneys' fee award percentage decreases as total class recovery increases. While some judges in the auction cases told bidding law firms that

---

[24]    It is not uncommon that a blended arrangement might be negotiated, e.g., a discounted or blended hourly rate combined with a contingent bonus at a smaller percentage than would pertain to a pure contingency fee situation. However, such arrangements are negotiated when the client has the funds to pay a reduced hourly rate. That is not the case in a consumer class action like this case.

16

they preferred a sliding scale, Judge Shadur in *Bank One* and *Amino Acid Lysine* left it within the discretion of bidding counsel to determine how to formulate their proposals. *See* Laura L. Hooper & Marie Leary, *Auctioning the Role of Class Counsel in Class Action Cases: A Descriptive Study*, 32 (Fed. Judicial Ctr. 2001) (reprinted at 209 F.R.D. 519).   Whether as a result of judicial pressure or on counsel's own initiative, the auction cases suggest (consistent with the Eisenberg and Miller study) that counsel competing in the market are willing to accept class action representations on a downward sliding fee basis.   A hypothetical sophisticated representative of the class here would likely have demanded it.   *See also Synthroid II*, 325 F.3d at 975 ("[T]he market rate, as a percentage of recovery, likely falls as the stakes increase.").   Further, in its own application of the market-mimicking approach in *Synthroid II*, the Seventh Circuit ultimately awarded fees to consumer class counsel on a downward sliding scale. 325 F.3d at 980 (awarding class counsel 30% of the first $10 million in class recovery, 25% of the next $10 million, 22% of the next $26 million, and 15% of all amounts over $46 million up to the $88 million recovery).

Finally, I believe that a hypothetical *ex ante* negotiation would have resulted in a lower contingent fee percentage for in-kind relief.   Presumably, the class here (indeed, probably most classes) would rather have cash than in-kind relief.   A check for $60 is more valuable to most people than getting free credit monitoring services with a retail value of that amount.   The consumer might prefer to spend the money on groceries or something else.   Thus, the class would want to incentivize counsel to push for more cash relative to in-kind relief.   The class also would not want attorneys' fees on in-kind relief to drain the cash portion of any settlement.   And they would want the in-kind recovery forming the basis for a fee award to be valued at the amount of in-kind benefits actually redeemed, not those potentially available.   Valuing a coupon recovery based on redeemed value is now required for percentage fee awards under the Class Action Fairness Act ("CAFA"), 28 U.S.C.

§1712(a).  While not applicable to this case, CAFA's objective of tying the attorneys' fee to the actual redeemed recovery is likely a point the negotiator for the class would have insisted on.  Thus, the *ex ante* agreement would assign a lower percentage to the redeemed in-kind recovery of the class.

Determining the foregoing criteria (contingent fee, sliding scale, lower fee for in-kind relief) was the easy part.  Now comes the hard part.  In an exercise that is clearly more art than science, I must attach actual numbers to the hypothetical downward sliding contingent fee agreement.  To summarize the three types of data discussed above (with their varying relevance and utility), the actual fee agreements here entered into between individual plaintiffs and their counsel range from 25% to 45%, fee awards from other (mostly *ex post*, non-market based) cases suggest a total fee award here of anywhere from 6.7% to 32.9%, and the auction cases suggest a total fee award of anywhere from 3.8% to 23.3%.  The breadth of these ranges reveals an irony.  The Seventh Circuit criticized the non-market approach of other Circuits as "chopped salad" because they relied on vague and ultimately arbitrary notions of fairness without the objectivity and discipline of the market.  *Synthroid I*, 264 F.3d at 719.  However, as is evident from the above discussion, when trying to imagine a hypothetical market transaction nearly a decade after the fact, the market data provide only limited and inconsistent guidance.  In this case, the market approach may not produce "chopped salad," but the variety of data it generated still seems to yield something akin to a vegetable stir-fry.

Culinary metaphors aside, one additional, important factor advances the analysis and helps narrow the range of market information:  consideration of the *ex ante* risks and potential rewards of

the litigation.  *See Sutton v. Bernard*, 504 F.3d 688, 693 (7th Cir. 2007) (market price is determined, in part, by risk of nonpayment and the stakes of the litigation), *citing Synthroid I*, 264 F.3d at 721.[25]

The potential rewards here were substantial. If a nationwide class could be certified, and statutory damages were available, the potential exposure to Trans Union was in the billions.[26] Facing potentially company-destroying exposure, a settlement of eight or low-nine figures appears to have been a reasonable *ex ante* prospect, anywhere from $20 million at the low end, to $40 or $50 million in the middle, to $75 to $100 million or more at the high end.

In contrast, regarding risk, the Court determined in its April 6 Order that the risk to the attorneys in taking on this litigation was relatively low.  By 1994, the FTC had determined that Trans Union was violating the FCRA.  Although that decision was reversed by the D.C. Circuit in 1996, the FTC on remand again held in 2000 that Trans Union was violating the FCRA, which was ultimately upheld by the D.C. Circuit in 2001.  *See generally Trans Union Corp. v. FTC*, 245 F.3d 809 (D.C. Cir. 2001).  Up to this point, I have not specified exactly *when* the hypothetical negotiation should be considered to have taken place, other than to describe it as *ex ante* or "at the outset."  Recall that the *Frey* Action and the *Martinelli* Action were filed in 1998 and 1999.  In 1998, the FTC action appears to have been in the remand stage following the D.C. Circuit's original reversal.  Thus, Trans Union's liability for FCRA violations had not been definitively determined at that time.  However, since we are considering a negotiation concerning a nationwide recovery,

---

[25]    Obviously other factors would affect the final outcome of any negotiation, such as skill of the negotiators on each side, the relationship between the parties, and the class negotiator's assessment of the attorneys' quality.  Such intangibles are impossible to consider in the absence of actual *ex ante* negotiations, and their omission here does not undermine this approach, which, as noted above, is market-mimicking, not market-replicating.

[26]    The FCRA provides for statutory damages from $100 to $1,000 for willful violation of the act.  15 U.S.C. § 1681n(a)(1)(A).  A nationwide class reportedly could have covered 190 million people.

I think it is reasonable to assume that the hypothetical negotiation would have occurred some time during 2001, after the MDL assignment to this Court and coordinated, nationwide proceedings were commencing.   Given the FTC's continued litigation against Trans Union, and the ultimate affirmance of Trans Union's liability by the D.C. Circuit in 2001, I believe that the negotiating parties would assess the risk of a ruling that Trans Union did not violate the FCRA as relatively low. *See* April 6 Order at 9  ("[T]he risk of no recovery was virtually nonexistent due to the FTC action.").  The anticipated costs of discovery and experts would have been less here than in many large class cases with complicated technical issues, such as securities, product liability or antitrust cases.  As the Court found, *id.* at 3, the *ex ante* risks in the actions here would have revolved around the scope and structure of class certification, and establishing willfulness for purposes of statutory damages, matters that go to the amount rather than fact of recovery.  I am unable to quantify these risks with precision, but the total *ex ante* risks to counsel in accepting these representations were relatively low, certainly lower than most contingent class actions.  That conclusion is borne out by the fact that over thirty law firms here ultimately participated as plaintiffs' counsel.  Many law firms plainly perceived a favorable risk/reward ratio here.

In any event, the risks to Plaintiffs' Counsel here appear to be lower than the risks facing the consumer class counsel in *Synthroid*.  *See Synthroid II*, 325 F.3d at 978 ("Consumer class counsel . . . took the risk that they would come away with nothing . . . [and] that was a significant risk, for the consumer class did not have an easy road.").  In *Synthroid*, the district court had divided plaintiffs into two classes, one of consumers, and one of third-party payors such as insurers. *Synthroid II*, 325 F.3d at 976.  After noting that the consumer class faced much more risk than the third-party payor class, the Seventh Circuit held that in order to compensate for risk-bearing, the marginal attorneys' fee rates for each band of recovery should be higher for consumer class counsel

20

than for the third-party payor class counsel, who had negotiated a flat 22% rate.  *Id*. at 978. Applying that concept here, given the lower risks to counsel here than to class counsel in *Synthroid* and the absence of any  market data other than the broad ranges discussed earlier, I conclude that a reasonable and plausible *ex ante* negotiation here would have resulted in something akin to the *Synthroid* fee structure awarded to consumer class counsel, with reduced percentages of 5% to 7% at each potential band of recovery.  Further, as discussed above, I believe a reasonable *ex ante* negotiation here would have resulted in a lower percentage fee for in-kind than cash relief. Therefore, I believe the following fee structure is a reasonable approximation of what an *ex ante* arms-length market transaction would have produced in this action, as compared to that determined by the Court in *Synthroid II*:

| Recommendation | | | Synthroid II | | |
|---|---|---|---|---|---|
| Recovery | Fee Percentage | | Recovery | | Fee Percentage |
| $ 0-10 million | 25% | | $ 0-10 million | | 30% |
| $10-20 million | 20% | | $10-20 million | 25% | |
| $20-45 million | 15% | | $20-46 million | 22% | |
| $45+ million | | 10% | $46+ million | | 15% |
| In-Kind Relief | 5% | | | | |

Plugging these percentages into the $75 million cash recovery and the $34.6 million value of the in-kind relief yields a total attorney fee award of $12.98 million.

Of course, it is possible that an actual negotiation might have resulted in a higher scale or a lower scale.  It might have yielded a formula resulting in something like the $10.83 million award in the Court's April 6 Order, or something closer to the $18.75 million cap. But no one can know here what *the* market-based result would have been in a transaction that never occurred.  There are no market tables, Kelly Blue Books or Ebay auctions to consult to gauge the going rate in 2001 for multi-district FCRA lawsuits.  However, the above analysis yields *a* plausible and reasonable

market-based result consistent with the criteria set forth in the Seventh Circuit cases.  That is sufficient under the cases.  In addition, the cross-checks discussed below confirm the reasonableness of the recommended award.

### E.      Cross-Checks

On an overall percentage basis, the award of $12.98 million represents 17.31% of the $75 million cash portion of the settlement, and 11.84% of the $109.6 total settlement amount (cash plus in-kind).  These numbers fall comfortably within the ranges suggested by Eisenberg and Miller (6.7% to 32.9% of the cash, 8.4% to 27.8% of the total) and the auction cases (4.4% to 23.3% of the cash, 3.8% to 23.2% of the total).  I recognize, as the Court in *Nilsen* noted, "that the fact that my award falls within the range of other judicial awards serves mostly to give me comfort against embarrassing comparisons."  400 F. Supp. 2d at 283 n.41.

As a further check on the reasonableness of this recommended award of $12.98 million, I think it is useful to run "cross-checks."  First, as a final exercise of *ex ante* imagination, I have tried to gauge how the hypothetical plaintiffs' law firm would have evaluated the tiered percentages recommended above.  Any rational firm engaged in such an *ex ante* negotiation would want to estimate the opportunity cost of the engagement:  How many hours would it need to invest that might be more profitably spent elsewhere?  What likely lodestar would be generated and would the engagement probably provide a premium over the forecast lodestar to compensate for the risk?  As noted above, the plaintiffs' firm would probably have valued the case at about $20 million at the low end, $50 million in the middle and $75 to $100+ million at the high end.  The tiering suggested above would yield a fee of $4.5 million on a cash recovery of $20 million, $8.75 million on a cash recovery of $50 million, and $11.25 to $13.75 million on a cash recovery of $75 to $100 million.  At an assumed blended 2001 hourly rate of about $300 (which is probably generous), the lower

recovery would support a projected hourly investment of about 15,000 hours (without multiplier) while the top recovery would support an hourly investment of 25,000 to 33,000 hours (without multiplier).   The hypothetical plaintiffs' firm would find a fair amount of cushion for these investments of time and find the suggested tiering attractive in this case.[27]

As an additional cross-check, I turn now to an *ex post* analysis, based on the actual historical lodestars.  I first discuss the lodestars claimed by Plaintiffs' Counsel, and then I discuss my estimate of what the actual lodestars would be after a more rigorous analysis, which I believe provides a more valid cross-check than simply taking the claimed lodestars at face value.

Many courts, including at least one court in this district, have used a lodestar cross-check against a percentage fee award.   *See, e.g., In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 305 (3rd Cir. 2005); *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 50 (2d Cir. 2000); *Abrams v. Van Kampen Funds, Inc.*, No. 01 C 7538, 2006 WL 163023, at *7-*8 (N.D. Ill. Jan. 18, 2006) (Hart, J.).

The purpose of a lodestar cross-check is simply to determine whether a proposed fee award is excessive relative to the hours reportedly worked by counsel, or whether the fee is within some reasonable multiple of the lodestar.  *Rite Aid*, 396 F.3d at 306 ("The lodestar cross-check serves the purpose of alerting the trial judge that when the multiplier is too great, the court should reconsider its calculation under the percentage-of-recovery method. . . ."); *Vizcaino*, 290 F.3d at 1050 ("[T]he lodestar may provide a useful perspective on the reasonableness of a given percentage award.").[28]

---

[27]     Here, Plaintiffs' Counsel reported a combined total of over 38,000 hours worked, but, as discussed below, that figure is excessive.

[28]     *But see In re Comdisco Sec. Litig.*, 150 F. Supp. 2d 943, 948 n.10 (N.D. Ill. 2001) ("To be sure, when a fee award is enormously disproportionate to the lawyers' expenditure of time . . . , it may be useful for a court to express the disapproval of that disparity in terms of pointing to a correspondingly staggering lodestar multiplier–a sort of *Jacobellis v. Ohio* ('I know it when I see it') demonstration.  But when the issue comes down to whether a multiplier of 2 or

(continued...)

When used merely as a cross-check, the lodestar analysis can be "abridged." *Rite Aid*, 396 F.3d at

305; *see also id*. at 306-07; *Goldberger*, 209 F.3d at 50.

I believe there is a role for a lodestar cross-check, notwithstanding the statement in *Synthroid*

*II* that the efficiency (or lack thereof) of counsel should not be used "to reduce class counsel's

percentage of the fund that their work produced." 325 F.3d at 979-80. Consistent with *Synthroid*

*II,* the *ex ante* percentages above were derived from the *Synthroid II* tiers and without regard to any

lack of efficiency of counsel during the lawsuit. However, as noted above, this case lacks the type

of actual, arms-length agreement that "defined" the market in *Synthroid*, and we were forced to

engage in the imprecise estimation of the *ex ante* agreement. That approach relied on several

assumptions and widely dispersed data from other cases. The uncertainty here is greater than in

*Synthroid II*. In this context, then, there is a proper role for considering the actual hours spent in the

case as a cross-check on the proposed percentages. A wide divergence between the lodestar and the

percentage might indicate a problem that would warrant revisiting the assumptions underlying the

percentage method. As discussed below, as it turns out, there is no wide divergence here, and no

reason to reconsider the percentages.

MDL Counsel, Liaison Counsel, *Frey* Counsel, and Louisiana Counsel reported a total

lodestar of $18.25 million. (Doc. 564-2 at 18.) Texas Counsel, after my request to remove time

related to the attorneys' fee proceedings, reported a lodestar of $1.49 million. (Texas Counsel's

Response to Special Master's Request, Aug. 18, 2009, at 2.) Combined, all counsel reported a total

lodestar of $19.74 million. The actual award of $12.98 million thus represents a multiplier of 0.66

---

[28](...continued)
5 or 7 (or what have you) is or is not 'reasonable,' so as to serve as some sort of check on the
reasonableness of a percentage-of-recovery fee award, candor compels recognition of the fact
that the process has become wholly subjective. . . .").

on the lodestar claimed by Plaintiffs' Counsel. This fractional multiplier does not raise a red flag for me to suggest that the $12.98 million award is unreasonable for several reasons.

First, Plaintiffs' Counsel (except Texas Counsel), in their joint fee petition, acknowledged that their total fee request of $15.1 million was significantly less than their claimed lodestar. Courts employing a lodestar cross-check have entered percentage awards that did not fully compensate counsel for their claimed lodestar. *See In re Insurance Brokerage Antitrust Litig.,* MDL No. 1663, 2009 WL 2855855, at *32, *35 (3d Cir. Sept. 8, 2009) (lodestar multiplier of 0.4)*; Blackman v. O'Brien Envtl. Energy, Inc.,* No. Civ.A. 94-5686, 1999 WL 397389, at *2 (E.D. Pa. May 12, 1999) (0.82 multiplier); *Fanning v. Acromed Corp. (In re Orthopedic Bone Screw Products Liability Litig.),* No. 1014, C.A. 97-381, 2000 WL 1622741, at *8 (E.D. Pa. Oct. 23, 2000) (0.62 multiplier).

Second, and more importantly, even without conducting a detailed lodestar analysis, it is readily apparent that the lodestars claimed by Plaintiffs' Counsel are excessive. The 0.66 multiplier is, essentially, a fiction resulting from plugging an excessive lodestar into the denominator. While some courts take claimed lodestars at face value for purposes of running the cross-check, *see, e.g.*, *Rite Aid*, 396 F.3d at 307; *Goldberger*, 209 F.3d at 50; *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 342 (3d Cir. 1998), courts are not required to do so. Indeed, under the venerable principle "garbage-in-garbage-out," the cross-check itself can have little validity if the lodestar itself is invalid. Thus, "any lodestar cross check should be based on billings that have some semblance of reasonableness." *In Re Keyspan Corp. Sec. Litig.*, No. 01 CV 5852 (ARR), 2005 WL 3093399, at *18 (E.D.N.Y. Sept. 30, 2005) (reducing claimed fee lodestar by 20% to account for excessive rates, excessive hours and failure to bill certain tasks at lower rates, resulting in a 1.42 multiplier as compared to 1.14 multiplier based on claimed lodestar); *Abrams*, 2006 WL 163023, at *7-*8 (Hart, J.) (reducing claimed fee lodestar by about 40% to account for excessive hourly rates

25

and top-heavy staffing, resulting in a multiplier of 1.88 as compared to 1.14 multiplier on claimed lodestar).  I therefore consider the claimed hourly rates and hours billed to determine an adjusted lodestar with "some semblance of reasonableness."

The lodestar reported by Plaintiffs' Counsel reflects a total blended hourly rate of roughly $514.[29]  This appears excessive relative to normal Chicago area rates (assuming Chicago market rates apply to all counsel, which is debatable[30]).  For example, of the four Chicago law firms responding to a 2008 survey of the nation's largest law firms by The National Law Journal, none

[29]    MDL Counsel, Liaison Counsel, *Frey* Counsel, and Louisiana Counsel reported over 35,800 hours worked.  Texas Counsel reported over 2,600 hours worked.  Dividing the $19.74 million total lodestar by the 38,400 hours claimed by all counsel equals approximately $514 per hour.

[30]    One might question whether Chicago rates should be used, as opposed to the rates prevailing in each of the cities in which the various lawsuits here were filed or of the cities in which each Plaintiffs' Counsel normally practices.  The law is not entirely clear on this point.  In statutory fee shifting cases, the Seventh Circuit presumes that the attorney's actual billing rate, rather than a local forum market billing rate, applies, although a court has some discretion to use forum rates in some circumstances, such as where an attorney (like Ms. Wheelahan, whose practice is entirely contingent) is unable to provide evidence of actual billing rates.  *See Mathur v. Bd. of Trustees of Southern Ill. Univ.*, 317 F.3d 738, 743-44 (7th Cir. 2003).  Matters are more complex in an MDL matter.  This is not a single lawsuit.  It may not make sense for the hourly rates to depend upon the fortuity of the venue chosen by the MDL Panel, as opposed to the venues in which the individual lawsuits were filed or the "hometown" rates of Plaintiffs' Counsel.  However, since I am merely looking to the lodestar as a cross-check against the market-mimicking application of a percentage recovery, and not rigorously examining the hours and rates and each of the dozens of counsel from across the country, my simplifying comparison to a single market is not unreasonable.  *Cf. In re "Agent Orange" Product Liability Litig.*, 818 F.2d 226, 232 (2d Cir. 1987) ("[W]e conclude that, in an exceptional multiparty case such as this, where dozens of non-local counsel from all parts of the country are involved, public policy and administrative concerns call for the district court to be given the necessary flexibility to impose a national hourly rate when an adequate factual basis for calculating the rate exists."); *Eli Lilly & Co. v. Zenith Goldline Pharmaceuticals, Inc.*, 264 F. Supp. 2d 753, 764 (S.D. Ind. 2003) (MDL cases may justify use of a single "national" rate scale).  For present purposes, a comparison to the Chicago market, with which I am most familiar, is not unfair either to Plaintiffs' Counsel or the class.  *See In re Folding Carton Antitrust Litig.*, 84 F.R.D. 245, 264-65 (N.D. Ill. 1979) (adopting a report recommending that "a proper hourly rate structure for a national class action would reflect the rates prevalent for attorneys in the Chicago Metropolitan Area").

reported a firm-wide average hourly rate of more than $500. *See A Nationwide Sampling of Law Firm Billing Rates*, The National Law Journal (Dec. 8, 2008) (available at http://www.law.com/jsp/-nlj/PubArticleNLJ.jsp?id=1202426491559) (last visited Sept. 19, 2009).[31] Indeed, only seven of the 127 law firms responding to the survey reported a firm-wide average hourly rate of more than $500.[32] And these firms represent the peak of the market. In a lodestar analysis, counsel is entitled to a reasonable, market-based rate, not the highest rates that lawyers can cherry-pick from the market. Some recent decisions in this district in statutory fee cases have approved of market rates substantially below those claimed by many Plaintiffs' Counsel here. *See, e.g., Dupuy v. McEwen*, No. 97 C 4199, 2009 WL 2498197, at *5-*6 (N.D. Ill. Aug. 13, 2009) (Pallmeyer, J.) (approving 2007 attorney rates ranging from $230 to $520, with two experienced lead counsel at $460 and $415)[33]; *Robinson v. City of Harvey*, No. 99 C 3696, 2008 WL 4534158, at *7 (N.D. Ill. Oct. 7, 2008) (Lefkow, J.) (finding reasonable and below market an hourly rate of $395 for "singularly formidable" civil rights trial lawyer). And in 2004, this Court approved rates ranging from $175 to $375 for the Edelman firm, who serve as local counsel for Texas Counsel. *Zaghloul v. DaimlerChrysler Services, LLC*, No. 03 C 4499, 2004 WL 2203427, at *2 (N.D. Ill. Sept. 29, 2004).

---

[31]    Jenner & Block, one of the four responding Chicago firms, did not report a firmwide average. It did, however, report an average billing rate of $616 for partners, and $393 for associates. Brinks Hofer Gilson & Lione reported a firmwide average billing rate of $392, Vedder Price reported a firmwide average billing rate of $385, and Winston & Strawn reported a firmwide average billing rate of $448.

[32]    Though I note that two of those seven, Milwaukee firm Foley & Lardner ($508/hour) and New York firm Loeb & Loeb ($534/hour) do have offices in Chicago.

[33]    Disclosure: I represented plaintiffs' counsel regarding the fee petition in *Dupuy*, and my 2007 hourly rate of $410 was among the rates approved by Judge Pallmeyer. My 2009 rate is $440.

A comparison to the so-called *Laffey* Matrix, adjusted for the Chicago market, also suggests that a total blended hourly rate of $514 is too high.  The *Laffey* Matrix is a chart of hourly rates for attorneys of varying experience prepared and updated by the Civil Division of the United States Attorney's Office for the District of Columbia.  *See Laffey Matrix 2003-2009* (available at http://www.usdoj.gov/usao/dc/Divisions/Civil_Division/Laffey_Matrix_7.html) (last visited Sept. 19, 2009).  Although the *Laffey* Matrix was designed for use in statutory fee-shifting cases, *see id*. (explanatory note 1), it has been used in lodestar cross-checks of awards in common fund cases.  *See, e.g., Martin v. FedEx Ground Package Sys., Inc.*, No. C 06-6883, 2008 WL 5478576, at *6-*8 (N.D. Cal. Dec. 31, 2008).[34]  Because the *Laffey* Matrix is tailored to the Washington D.C. market, an upward adjustment of 1.1% is appropriate.[35]  This adjustment yields a range of $227 per hour for attorneys with one to three years of experience, to $470 per hour for attorneys with over twenty years of experience.  As with the National Law Journal Survey results, the adjusted *Laffey* Matrix suggests that a total blended hourly rate of $514 is too high.

The excessiveness of the blended rate becomes more apparent when one makes a brief granular inspection of claimed rates of individual lawyers and firms.  Louisiana and Texas Counsel provide clear examples.  Ms. Wheelahan, who logged most of the hours claimed by Louisiana Counsel, claims an hourly rate of about $625.  Even if we assume Chicago rates apply to her, as opposed to something closer to the hourly rate of $225 approved in 2005 by the court in her home

---

[34]     Judge Lefkow also considered the Matrix in reviewing the hourly rates for a statutory fee award in *Robinson, supra.*

[35]     The 1.1% figure comes from comparing the U.S. Office of Personnel Management's 2009 General Schedule Locality Pay Tables for Chicago and Washington D.C., available at http://www.opm.gov/oca/09tables/indexGS.asp.  *See generally In re HPL Techs., Inc. Sec. Litig.*, 366 F. Supp. 2d 912, 921-22 (N.D. Cal. 2005) (adjusting *Laffey* Matrix to San Francisco market).

district, *see White v. Imperial Adjustment Corp.*, No. Civ.A. 99-3804, 2005 WL 1578810, at *8 (E.D.

La. June 28, 2005), *and see* n.15 above, it is likely that a reasonable Chicago market rate for her

would be at least 25-30% lower.  Similarly, the claimed rates of Houston lawyers Caddell ($725),

Chapman ($600), and Fein ($450), are about 20% or more above what I would recommend in a

lodestar analysis based on their respective years of experience.  Indeed, the Chicago rates of Liaison

Counsel, Ms. Saunders ($575), and local counsel for Texas Counsel, Mr. Edelman ($550), are in the

ballpark of reasonableness for attorneys of their experience, which coincides with the $575 rate of

Texas Counsel's Mr. Toups.  Finally, while the rates of some MDL Counsel appear reasonable and

may be below the Chicago market (e.g., Boise attorney and *Frey* counsel, John Zarian, who claims

a $395 rate and is one of the few counsel in the case who has clients actually paying that rate), other

claimed MDL Counsel rates are too high and would warrant a reduction similar to that of Texas

Counsel.  For example, the blended hourly rate of The Righetti Law Firm was nearly $670 and

Coughlin Stoia nearly $517.

Turning from rates to claimed hours, it is clear that deep cuts in hours would be made if a

formal lodestar analysis were used.  The most obvious case is the more than 7,000 hours claimed

by Ms. Wheelahan.  Even after eliminating the obvious excesses identified by the Court in its April

6 Order (the travel time of about 400 hours and hours for clerical tasks), the hours appear excessive.

There are vast numbers of hours spent on research and writing, for example.  Not only is it likely

that fewer hours could have been expended, much of that time should have been billed at lower rates

than the single "partner-level" rate she charges for all of her tasks.[36]  I conservatively estimate that

---

[36]     Sometimes partners can do research more efficiently than associates, due to
greater experience or familiarity with a case.  However, it is often the case that research tasks
can and should be done by associates at lower rates, and fee-paying clients sometimes insist on
that.  A practitioner is free to make a business decision not to hire associates, but neither a

(continued...)

a detailed review of Ms. Wheelahan's claimed hours would result in a reduction of at least 25-33%, and possibly much more. *See White*, 2005 WL 1578810, at *15-*16 (reducing Ms. Wheelahan's research and writing time by 25% and reducing total time by about 34%).[37]

While Texas Counsel made some use of professionals billed at lower rates where appropriate, my cursory review of their billing records reveals some duplication, top-heaviness and excess that would result in moderate hourly cuts of at least 10% on top of the rate cuts of about 20%. The same is true of MDL Counsel, and one could legitimately question whether substantial cuts would be made in the hours they expended unsuccessfully pursuing the First and Second Proposed Settlements. Finally, all counsel had duplication in the parallel motions for final approval of the Final Settlement, which resulted from the failure of counsel to agree on a common approach. Without assigning blame for that result, I nevertheless am confident that a detailed lodestar analysis

---

[36](...continued)
paying client, nor a court acting as a fiduciary to a class, must accept partner-level rates for associate-level work where such work can be more efficiently done at the lower level.

[37]     I note that this reduction gives Ms. Wheelahan the benefit of a substantial doubt. I have not deducted from her lodestar the more than 1,300 hours she claims to have spent on the state court *Andrews* Action. MDL Counsel point out that in persuading this Court to remand that action to Louisiana state court in 2003, Ms. Wheelahan "'disclaim[ed] any right to recover attorney's fees in the state law [complaint],' either from defendant or from any recovery by the class members by way of common fund or otherwise." Dec. 3, 2003 Op. and Order at 4. Ms. Wheelahan acknowledges this disclaimer, but contends that the waiver was only of the named-plaintiff's right to seek a statutory fee award, which would have increased the amount in controversy, not counsel's right to seek a fee from a common fund, which does not bear on the amount in controversy. Further, she argues that the Stipulation of Settlement put the *Andrews* lodestar back in play because the Stipulation's definitions included that case within the settled "Actions" and it further provided that the fee award would cover fees "incurred in connection with prosecuting and settling the Actions." Doc. 462-3 at 24, §4.1. These definitions, however, do not answer whether fees, if previously waived, can be unwaived, particularly where they were arguably waived in order to convince a court that federal jurisdiction was lacking. This raises a question of judicial estoppel, which, if valid, would reduce the claimed Louisiana lodestar by about another $800,000. However, since I am only performing a rough cross-check, I am giving Louisiana Counsel the benefit of the doubt and am not resolving the issue or making any deduction.

would not charge the class for the consequences of counsels' failure to agree, and substantial reductions would be made.

For the foregoing reasons, the more realistic and reasonable lodestar of Plaintiffs' Counsel is well below the claimed amount of $19.74 million.  While Louisiana Counsel claim a lodestar of about $4.7 million based on 7,524.6 hours, the reductions in hours and rates noted above would result in a total lodestar reduction of *at least* 50-60%, to around $1.88 to $2.35 million.  Texas Counsel's claimed lodestar of $1.49 million would probably be reduced by about 25-33%, to around $990,000 to $1.12 million.  The claimed lodestar of about $12.9 million by MDL/*Frey* Counsel would also likely be reduced by about 25-33%, to about $8.6 to $9.7 million.  Thus, adding in the $550,000 agreed payment to Liaison Counsel (whose lodestar was claimed to be about $613,000) the lodestar that reflects a "semblance of reasonableness" would range from about $12 to $13.7 million (and quite possibly lower).  As compared to the recommended percentage-based award of $12.98 million, this yields a multiplier  of 0.95 to 1.08.  Accordingly, I am satisfied that the recommended fee award of $12.98 million derived from application of the market-mimicking approach is comfortably within the range of reasonableness.

F.      **Allocation**

1.      **The amounts requested by counsel**

"Allocating a limited pot of common benefit fees among numerous counsel, all of whom are talented and capable attorneys and many of whom have made a significant contribution to the ultimate success of this case, is an unenviable task that is sure to lead to hurt feelings and bruised egos.  Nevertheless, it has to be done."  *Turner v. Murphy Oil U.S.A., Inc.*, 582 F. Supp. 2d 797, 812 (E.D. La. 2008) (internal citation omitted).  To avoid the "unenviable task," I gave Plaintiffs' Counsel advance notice that I would recommend a total fee award of $12.98 million, so that they could make another attempt at agreeing to an allocation.  After the attempt failed, I requested briefs.

The allocation briefs were remarkable for the size of the requests.  While I expected counsel to aim high, I did not expect them to ask for *more* than they had previously requested from the Court.  Nor, in light of the $12.98 million pie they were asked to divide, did I expect them collectively to shoot for more than the settlement cap of $18.75 million. Yet they did ask for more. Much more.

Most remarkable was the swelling of Texas Counsel's request.  In their fee petition to the Court, Texas Counsel requested $2,850,000 in fees.  They claimed their lodestar was $1,613,578.75.  (Doc. 570-2 at 15.)  This request was made when it was unknown what total fee the Court might award, subject only to the overall cap of $18.75 million.  When I reviewed Texas Counsel's billing records (which had not been provided to the Court), I determined that they had incorrectly included in their lodestar a substantial amount of fees related to the attorneys' fee proceedings, which are not recoverable from common fund awards.  *See* April 6 Order at 7.  I asked them to revise their billing statement to eliminate such time.  Their revised, adjusted claimed lodestar dropped to $1.49 million.  Even though the funds potentially available for allocation had dropped from $18.75 million to

$12.98 million, and their claimed lodestar had fallen by about $121,000, Texas Counsel *increased* their requested share of the fees by nearly a million dollars, from $2,850,000 to $3,729,212.50.  The claimed lodestar multiplier implicit in this request increased from 1.77 in the initial request to 2.50. Texas Counsel provided no explanation for this tacit amendment of their original fee petition, nor any explanation for why their share should have increased by $1 million in the face of a shrunken available pie.

Not to be outdone, Louisiana Counsel's allocation brief requests $7,915,000, which represents  about 61% of the total recommended fee award.  As part of that request, as if to provide a new definition of the term *"chutzpah,"* Louisiana Counsel claims an entitlement to the entire increase of about $2 million between my recommended award and the award in the Court's vacated April 6 Order.  Louisiana Counsel attributes the increase entirely to the Rule 59(e) motion she filed, which is not only incorrect, but ignores her involvement in the ethical issues prompting my appointment.

The allocation position of MDL/*Frey* Counsel, who consist of about thirty law firms, is more realistic under the circumstances.  They seek $9,380,000, about 72% of the total.  All told, the fees sought by Plaintiffs' Counsel, including the $550,000 allocated to Liaison Counsel by agreement, total $21,574,212.50, nearly $3 million over the settlement cap and nearly $9 million more than the pie they were asked to divide.  Clearly, something has to give.

The following chart summarizes the proposed allocations of counsel and the recommended allocation I determine below.[38]

---

[38]     The figures in the chart do not include the $550,000 allocated to Liaison Counsel or one-half of the Special Master's fees and expenses (which I had told them to assume would be about $50,000, and turned out to be $55,638), and, thus, do not add up to $12.98 million.  Texas counsel only suggested a figure for themselves, without recommending allocation between MDL

(continued...)

|  | MDL | Louisiana | Texas | Total |
|---|---|---|---|---|
| MDL Proposal | $9,380,000 | $1,800,000 | $1,200,000 | $12,380,000 |
| Louisiana Proposal | $3,115,000 | $7,915,000 | $1,400,000 | $12,430,000 |
| Texas Proposal | N/A | N/A | $3,729,212.50 | N/A |
| **Special Master's Recommendation** | **$7,836,683 (63.33%)** | **$2,722,360 (22%)** | **$1,815,319 (14.67%)** | **$12,374,362 (100%)** |

I approach the allocation issue mindful of my limitations. Of all of the relevant participants (the Court, Plaintiffs' Counsel, and me), I know the least about the history of the case and the relative contributions of counsel to the outcome. I was not there. I have gleaned a fair amount from review of the court record, the billing records, some of the statements of counsel made in e-mails produced to me, and the allocation briefs. But this after-the-fact education is no match for the Court's immersion in the case and knowledge of the participants. Nevertheless, sometimes the perspective of an outsider has value, and I hope the following analysis is helpful to the Court.

### 2. Allocation standards

I directed counsel to include in their allocation briefs citations to cases setting forth the standards applicable to the allocation analysis. Only MDL Counsel attempted to comply with this request, and the authority they cited was not directly apposite. They cited *Sutton*, 504 F.3d at 692-93, which reaffirmed the *Synthroid* standards that, in approximating the *ex ante* market determination of fees at the outset of the litigation, the Court should consider factors such as the "risk of nonpayment," "amount of work necessary to resolve the litigation," and "the stakes of the case." But the allocation analysis here cannot be based on the *ex ante* approach of *Synthroid* and *Sutton*. In some cases, it might be possible to approximate what allocation terms might have been

---

[38](...continued)
and Louisiana Counsel. Louisiana and MDL Counsel proposed allocations among all counsel. Louisiana's figures apparently did not subtract anything for Special Master fees.)

34

negotiated at the outset of a lawsuit, but here no one would have predicted that outside lawyers would parachute into the case, successfully object to a proposed class settlement, become involved in negotiating the final settlement, and earn an entitlement to share in the common fund recovery. Little can be said other than it would reasonable to assume that the class would agree at the outset that the allocation be based on relative contributions of counsel to the ultimate recovery. Beyond that broad generalization, the allocation analysis must be done on an *ex post* rather than *ex ante* basis.

"There is very little case law concerning the allocation of attorneys' fees among co-counsel." *In re FPI/Agretech Securities Litigation*, 105 F.3d 469, 473 (9th Cir. 1997). Relevant criteria include whether the attorney's services benefitted the fund by helping create, increase, protect or preserve it, as well whether the allocation is reflective of the relative work performed (*i.e.*, lodestars). *Id. See also id.* at 474 ("we hold that the relative efforts of, and benefits conferred upon the class by, co-counsel are proper bases for refusing to approve a fee allocation proposal"). This is an equitable determination as to which the Court necessarily has broad discretion and which requires no more than a concise explanation. *Id.* at 473. Some of the *ex ante* factors noted in *Sutton* thus appear to remain relevant after all to the *ex post* analysis: risk of nonpayment, quality of per-formance and amount of work (lodestar). All of these relate to the overarching factor noted above: the extent to which each group of lawyers contributed to the ultimate success of the case. Thus, the analysis below will focus on this question of "contribution," with attention paid to additional factors such as relative risk and lodestars. I note that Plaintiffs' Counsel implicitly assumed that "contribution to the outcome" is the most important inquiry, since that was the focus of their briefs.

### 3.    Allocation analysis

The competing groups of counsel gave widely divergent accounts of their relative contributions to the overall settlement.  Louisiana Counsel and Texas Counsel rely heavily on the fact that they successfully objected to the prior proposed cash settlement of $20 million, which resulted in the ultimate realization of $55 million of additional cash relief and about $14 million of "enhanced" in-kind relief.  They argue that MDL Counsel is entitled to little or no credit for fees based on the additional settlement value Louisiana and Texas allegedly procured for the class.

Their agreement ends there.  As for allocating fees between them, Louisiana and Texas Counsel train their fire on each other.  Louisiana Counsel claims that they (primarily Ms. Wheelahan) bore most of the risk and did most of the work.  They argue that Texas Counsel were opportunistic latecomers, who stood on the sidelines, jumping into the fray in earnest only after the Second Proposed Settlement was rejected and a bigger settlement and ultimate payday for counsel were a virtual certainty.  (MDL Counsel also point out that about 70% of Texas Counsel's hours were incurred after a March 4, 2008 status hearing, in which the landscape and risks changed dramatically.)  In contrast, Texas Counsel claims that Louisiana Counsel is writing revisionist history, and is ignoring the substantial contributions they made to the ultimate outcome, which they made at the behest of Louisiana Counsel, who repeatedly praised their efforts in e-mails.

MDL Counsel, on the other hand, acknowledge the contributions of Louisiana and Texas Counsel to the ultimate outcome, but argue that they contributed substantially as well to the final result notwithstanding their unsuccessful promotion of the earlier proposed settlements.  They point out that they began filing their initial lawsuits in 1998 (*Frey*) and 1999, when the risk was greatest and outcome least certain.  They sought and achieved the MDL reassignment.  They conducted extensive discovery.  They catalog various additional tasks they performed.  As for the failed First

and Second Proposed Settlements, they say they took a reasonable, albeit unsuccessful, position, based on the then-current risk analysis, which included the fact that the Court had held in 2002 that it would not certify a national "target marketing" class due to the potentially catastrophic liability it would impose on Trans Union and the fact that the Magistrate Judge had supervised the mediation that resulted in the proposed settlements.  It was not until March 4, 2008, after the Court adopted the Magistrate Judge's recommendation that the Second Proposed Settlement be rejected, that the landscape changed.  At that hearing, the Court stated that it was open to reconsideration of the denial of a national target marketing class, Mar. 4, 2008 Tr. at 8; and that Trans Union needed to put "a lot more money on the table."  *Id.*  Although not noted by MDL Counsel, the Court had suggested a few months earlier that class certification law had evolved since 2002, and reconsideration of the denial of a national class might be warranted.  Jan. 15, 2008 Tr. at 7 ("my original opinion on class certification is going to be influenced by later case law from this circuit that calls into question my original conclusion, because I think it was based on current case law at the time.  But things have changed since then.")  In any event, MDL Counsel contend that the steep increase in the value of the settlement resulted primarily from these comments by the Court, which had much more influence on increasing the settlement value of the case than the efforts of Louisiana and Texas Counsel, and the ultimate outcome resulted primarily from the foundation MDL Counsel had laid by prosecuting the case up to that point.

I think the truth lies somewhere between these positions.  I agree with Louisiana and Texas Counsel that they are entitled to credit for being "right" about the First and Second Proposed Settlements and judging that this case had much greater value than MDL Counsel had thought.  They reached that correct conclusion before the Court changed the landscape in early 2008 with comments about potentially reconsidering class certification.  Indeed, internal e-mails submitted by Texas

Counsel indicate that Texas Counsel had recognized the evolution in class action law and were urging the filing of a reconsideration motion.  However, I disagree that their correct analysis vested them with an entitlement to 100% credit for the additional $69 million ($55 million cash and $14 million enhanced in-kind relief) in settlement value that was realized.  MDL Counsel are right that they laid the foundation and created much of that value.

The argument of Louisiana and Texas Counsel proves too much and would, in my judgment, result in a windfall to them.  Their premise is that the first two proposed settlements did not reflect the true value of the case for the class.  But who "created" that extra value?  It was principally the efforts of MDL Counsel, enhanced somewhat later by the Court's comments in early 2008, and also by the certification of a target marketing class in Louisiana.  The argument of Louisiana and Texas Counsel tacitly acknowledges that the value was already there when they made their objections.  Under their logic, MDL Counsel should be deemed to have forfeited any right to share in the value MDL Counsel created because they miscalculated the value or did not anticipate the Court's later comments about reconsidering a nationwide class.  I do not believe such a forfeiture would be fair or reasonable.  Louisiana and Texas Counsel may have correctly adduced and helped unlock the true enhanced value in this case, but they did not solely create it.  MDL Counsel remain entitled to share in the value of the case above and beyond the original $20 million in cash and $20 million of in-kind value embodied in the rejected settlement.

That brings us, again, to the hard part, the actual calculation of an allocation.  As with the determination of the total fee award, this cannot possibly be done with scientific precision.  Rather, it is based on broad estimates.  In light of the foregoing discussion, I assign the relative contributions of counsel to the settlement as follows.

Regarding the cash value of the settlement, $75 million, MDL Counsel are entitled to full credit for having created the first $20 million of value through their efforts leading up to the prior proposed settlements.  Under the analysis above, it would also be fair to give them credit for 50% of the additional $55 million in cash settlement value ultimately realized.  Louisiana and Texas Counsel therefore get credit for the remaining 50% of the additional $55 million in cash value realized through their objections and subsequent efforts.  Thus, MDL Counsel get credit for "creating" 63.33% of the total cash settlement value.[39]

That leaves 36.67% of cash value created jointly by Louisiana and Texas Counsel, to be divided between them.  I recommend a 60/40 split, respectively, resulting in an assignment of 22% "credit" to Louisiana Counsel and 14.67% to Texas Counsel.  I am persuaded by the arguments of Texas Counsel, supported by time records and contemporaneous e-mails, that they came into the case at the behest of Louisiana Counsel, in part because of the additional firepower and credibility they would bring to her status as lonely objector; that Ms. Wheelahan was responsible in part for their relatively passive role before the rejection of the Second Proposed Settlement; and that they contributed substantially to the final result, including by conducting essential legal analysis and fronting the expenses of hiring helpful expert witnesses.

Louisiana Counsel exaggerate their contribution relative to that of Texas Counsel.  The ratio Louisiana proposes, of about 5.5 to 1, is excessive.  A ratio of 3 to 2 (a 60/40 split) more accurately and fairly reflects their relative contributions, including the fact that Louisiana Counsel were involved longer, bore greater risk, secured a class certification in *Andrews*, and fought for a time from the difficult and lonely position of being a solitary objector.  Ms. Wheelahan gets credit for

---

[39]    This is calculated as follows:  100% credit times $20 million in value, plus 50% credit times $55 million in value, yields $47.5 million in created cash value.  That is 63.33% of the $75 million cash recovery.

correctly determining that the initial settlements were inadequate and for bringing Texas Counsel into the case.  Notwithstanding her unorthodox ways, and her alienation of her co-counsel and, sometimes, the Court and the Magistrate Judge, the simple and undeniable fact remains that she was instrumental in increasing the class cash recovery by $55 million.  Results count, and she delivered. Thus, allocating a somewhat larger share to Louisiana Counsel than to Texas Counsel is appropriate under the circumstances.

Next, I conclude that the same percentages should apply to assigning "credit" for the in-kind portion of the settlement.  Texas Counsel suggest that their "credit" (and, implicitly, that of Louisiana Counsel) should be based on the value of about $14 million in "enhanced" in-kind relief added to the final settlement.  One could try to derive different percentages to apply to the in-kind portion of the recovery, but I conclude that the foregoing percentages (63.33%, 22%, 14.67%), being themselves rough approximations, are close enough to the relative contributions to the in-kind portion of the award.  There is no reason to complicate the analysis further by estimating different percentages for that portion.  Thus, those are the percentages I recommend for assigning "credit" for relative contributions to the total settlement value.  The allocation figures set forth in the table on page 33 above represent a simple application of these percentages to the $12,374,362 recommended fee award remaining after deducting fees of Liaison Counsel and Special Master.

As with the determination of the total fee award, a cross-check of the lodestars against these figures is useful to determine whether any assumptions in the analysis might warrant reconsideration.  Earlier, I concluded that after applying reductions for appropriate hourly rates and elimination of excessive or duplicative time, the lodestars would be roughly as follows (and perhaps lower):  MDL, $8.6 to $9.7 million; Louisiana, $1.88 to $2.35 million; Texas $990,000 to $1.12 million.  The allocation suggested above is reasonable when compared to these estimated lodestars.

MDL Counsel would receive a slight discount on their adjusted lodestar.  The lack of an enhancement fairly accounts for the misjudgment they made regarding the proposed settlement.  In contrast, my recommended allocation would give each of Louisiana and Texas Counsel moderate multipliers on their approximate adjusted lodestars.  Although they had less risk than MDL Counsel (especially Texas Counsel), they "bet right" on the earlier proposed settlements, so some enhancement over lodestar is appropriate under the circumstances.

MDL Counsel have asked me to recommend that the Court enter separate judgments with respect to the fees allocated to each of the counsel groups because they expect Ms. Wheelahan to appeal any award lower than her request.  I sympathize with the motivation for their request.  They want to get paid.  But I do not see how separate judgment orders would give MDL Counsel the realistic option of avoiding participation in an appeal and getting paid their fees.  Unless Louisiana Counsel were to limit the appeal to seeking for themselves fees in excess of the $12.98 million I have recommended, any appeal will almost certainly implicate the allocation issues and drag MDL Counsel in.  Also, this request may ultimately touch upon Rule 62 matters such as appeal bonds or stays pending appeal, and as such, I decline to make any recommendation regarding the form of judgment(s) unless asked to do so by the Court.

## III.   INVESTIGATION OF THE WHEELAHAN NOVEMBER 19 E-MAILS AND OTHER ETHICAL ISSUES

### A.   Summary of the Issue and Recommendation

Attached to the Court's April 6 Order was a copy of a series of e-mails sent on November 19, 2008 by Louisiana Counsel Ms. Wheelahan to Texas Counsel Mr. Toups.  Texas Counsel had given the e-mails to the Magistrate Judge during an *ex parte* mediation session on November 20, 2008.  Because of the ethical issues raised in the e-mails and their potential implications for the

certified settlement class, the Magistrate Judge subsequently gave a copy of the e-mails to the Court. The Court characterized the e-mails as "reprehensible." April 6 Op. at 8. As part of its assignment to me, the Court directed me to "investigat[e] any ethical issues raised by Louisiana counsel's . . . communications." June 11 Order (Doc. 535) at 2.

When I first read the e-mails my initial reaction is that Ms. Wheelahan's conduct was sanctionable. However, I came to view this as a close question. While I agree that the e-mails were "reprehensible," as I understand it, my assignment is not to evaluate the e-mails on a tactical, logical or civility level, but rather to investigate and recommend whether any Court Rules or ethical or fiduciary duties were broken such that a sanction should be imposed on Ms. Wheelahan. In carrying out this task, my principal concerns were whether there was ever any real danger to the rights that had been secured for the settlement class, any serious violation of applicable rules of professional conduct, or any serious affront to the integrity and administration of the judicial process. As I explain below, based on my review of the documents produced to me by counsel, my examinations of Ms. Wheelahan and Mr. Toups, my inquiries of other counsel for plaintiffs and Trans Union, and my analysis of the context in which the remarkable e-mails were sent, while I do not condone her conduct in any respect, I do not recommend that the Court sanction Ms. Wheelahan in connection with the sending of the e-mails or conduct relating to the subject matter of the e-mails.

### B.    Ms. Wheelahan's Procedural Objections

Ms. Wheelahan raises several procedural objections to the ethics inquiry. First, Ms. Wheelahan questions the propriety of Texas Counsel giving a copy of the November 19 e-mails to the Magistrate Judge. She claims that doing so violated Local Rule 83.5, which provides generally for the confidentiality of statements made in "ADR" proceedings. I disagree, but, more importantly, the Court has already implicitly rejected this argument. *See* May 1, 2009 Order at 2 (Doc. 613)

(denying Motion of Louisiana Counsel to Strike from the Record Confidential Materials based on LR 83.5).  The shroud that generally covers settlement communications does not and cannot envelop potential ethical violations or other misconduct that may have occurred in such proceedings.  Having received the November 19 e-mails on November 20, it was proper for Texas Counsel to give a copy promptly to the Magistrate Judge.  Although, as discussed below, Texas Counsel were perplexed as to what Ms. Wheelahan was up to, they rightly concluded that, read literally, the e-mails did appear to raise a potential violation of ethical duties owed by an attorney to the same certified settlement class they represented.  In that circumstance, it was appropriate to disclose that communication to the tribunal with jurisdiction over the settlement and duties to the class.  I also disagree with Ms. Wheelahan's assertion that Texas Counsel's motivation for disclosing the e-mails was entirely tactical.  Texas Counsel were motivated, at least in part, by ethical rather than parochial concerns.[40]

Second, Ms. Wheelahan asserts that the investigation of her alleged ethical transgressions was required to be conducted in confidence pursuant to Local Rule 83.25(e).  She misreads the Rule.  The confidentiality provision in that Rule pertains to "[p]roceedings before the Executive Committee."  Such proceedings concern whether "discipline" should be imposed on a lawyer practicing in this district.

> The term "discipline" shall include disbarment, suspension from practice before this Court, reprimand or censure, and such other disciplinary action as the circumstances may warrant, including, but not limited to, restitution of funds, satisfactory

---

[40]       Contrary to Mr. Toups's testimony (Toups Tr. 77-78), however, I doubt they were motivated entirely by duty:  I think it likely that they also believed that giving the e-mails to the Magistrate Judge might produce a collateral benefit to them in the negotiation process or litigation over fees thereafter.  Further, it would have been a better practice for Texas Counsel to have informed Ms. Wheelahan that they had given the Magistrate Judge a copy of the e-mails, although Mr. Toups testified that they believed that the Magistrate Judge had discussed the e-mails separately with her and they therefore thought there was no need to notify her.

completion of educational programs, compliance with treatment programs, and community service. ***The term discipline is not intended to include sanctions or contempt.***

Local Rule 83.25(a)(3) (emphasis added).  Local Rule 83.25(c) and the Committee Comment also make clear that the rules are not intended to usurp the authority of a judge over conduct in proceedings before him or her.  While the Court could have chosen to refer this matter to the Executive Committee to investigate whether "discipline" is appropriate, it was not required to do so.  It plainly had not been stripped by Local Rule of its inherent authority to investigate whether to "sanction" a lawyer for a possible ethical transgression, occurring under the auspices of a mediation conducted by a Magistrate Judge, which had implications for a settlement class that the Court had certified and to which it owed fiduciary obligations.  The e-mails also had potential implications for the fee award and allocation questions at issue before the Court, since a full or partial fee forfeiture might have been an available sanction if Ms. Wheelahan had actually engaged in a "clear and serious violation of duty to a client."  *Restatement (Third) of the Law Governing Lawyers*, §37 (2000).

Finally, Ms. Wheelahan objects that the Court publicly aired the e-mails and criticized her without prior notice and an opportunity to explain her position regarding the e-mails and other matters cited by the Court.  However, the Court imposed no sanction, vacated the April 6 Order containing the criticism, and appointed a Special Master to investigate the ethical issues.  Ample notice and process have been afforded Ms. Wheelahan.  Throughout my assignment, I have allowed Ms. Wheelahan to present whatever evidence and arguments she wanted in connection with my investigation and report, and she was represented by counsel for at least part of the proceedings before me.

### C.     Description of the Relevant E-Mails

The following facts are drawn from the November 19 e-mails and Ms. Wheelahan's testimony. The relevant e-mail string contains four e-mails, written *seriatim* by Ms. Wheelahan and sent to Mr. Toups without any intervening response. She acted alone. She had no input from any other counsel. She thumbed the first three on her BlackBerry while having a solitary late dinner the night of November 19, 2008. This followed a long and frustrating mediation session conducted by the Magistrate Judge, during which he tried to facilitate an agreement regarding the amount and allocation of fees among the various groups of Plaintiffs' Counsel. The settlement talks were stalling, and Ms. Wheelahan was particularly upset that Texas Counsel's position was higher than a lodestar she considered already inflated, while she was being asked to take less than what she considered to be her lodestar and her contribution to the success of the lawsuits.

Although the printed document states that the first three e-mails were sent during the wee hours of November 20, it appears there was a problem with the clock on her BlackBerry. I find credible Ms. Wheelahan's testimony that she typed the first three messages during her late dinner, probably between 9 and 10 p.m. She then apparently forwarded the three e-mails to her America Online e-mail address, and sent a fourth e-mail shortly before midnight to Mr. Toups from her laptop in her Chicago hotel. Mr. Toups did not see the e-mails until the next morning.

The first two e-mails, which are fairly innocuous, state Ms. Wheelahan's displeasure with the then-current state of the fee negotiations. She wanted to persuade Texas Counsel to reduce their requested share of the fee pie, which she felt was not only inflated, but unfair relative to her contribution to the class settlement outcome. She drank at least three glasses of wine at dinner while sending the e-mails, and it is apparent that her frustration with the day's events increased. The third e-mail upped the temperature from the first two. It said:

45

> But here's what can happen.  The 7th van [*sic*] find that class claims for statutory.
> Damages [*sic*] were abandoned after cert denied in 2002 when MDL coins [*sic*]
> didn't move to certify them, and cert of the punitives was denied in 2005.  Leaving
> no live class claims.  Then I'll amend my LA suit to add FCRA claims and settle w
> TU for less than 75M but plenty.  More to me than 4.5.

This e-mail, on the surface and standing alone, is illogical in the context of the negotiation, since it

does not make sense that the outcome of the objectors' appeal should affect the settlement position

of Texas Counsel in the fee negotiations.  By itself this e-mail does not raise ethical red flags, since

it does not overtly threaten to undermine the class settlement.  The fourth e-mail, on the other hand,

expanded on the third, and gave rise to this investigation (italics added):

> And the more I think about this, *the better it's looking to me.  The 7th rejects
> the settlement, on a motion to dismiss*, and there are then no live class claims that can
> be certified, because the statute has run on them.  LA asserts additional claims that
> relate back to our original filing in 2002 for the co-extensive LA class, and *we settle
> with TU for around 40M.  TU saves a pile of money, and we get paid in a very
> friendly LA court, 25% of 40M.  So my LA co-counsel get 3M, and I get 7M.  And TU
> saves 35M, and their lawyer looks great*.  And the MDL counsel who abandoned the
> statutory damages claims, and failed to certify the punitives, are left with an Illinois
> class of firm offer claims that they cannot prove up, bec they are not and never were
> classwide violations—and TU will not settle them.  *Tell me why 4.5M shd look better
> to me than that scenario?*

The meaning of this e-mail is plain:  it purports to threaten Texas Counsel.  As the Court put it, it

"seem[s] to express an intention to manipulate the court proceedings in connection with the

settlement for the sole purpose of augmenting the fee award."  April 6 Order at 8.  Ms. Wheelahan,

who was then working on a motion to dismiss the pending appeal, appears to be threatening to

somehow cause the Seventh Circuit, via her motion to dismiss, to reject the settlement.  Because the

settlement had extended the limitations period for many claims, its rejection would put limitations

issues back in play.  Ms. Wheelahan's Louisiana state case, in which a "target marketing" class had

been certified, did not present the same limitations problems.  Thus, her e-mail suggested that the

rejection of the MDL settlement might actually be "better" for her (and Trans Union) than the $4.5

million fee then on the table in the negotiations, since she claimed she could make a deal with Trans Union in Louisiana that would provide less money for nationwide class members and more attorneys' fees for her.  The e-mail does not specify how a motion to dismiss would cause the Seventh Circuit to reject the settlement, but other e-mails sent before and after this e-mail (discussed later) establish that she was contemplating raising the statute of limitations (viz. the objectors) in a motion to dismiss the appeal, which she thought could prompt the Seventh Circuit to *sua sponte* reject the settlement on jurisdictional grounds.

### D.      Ms. Wheelahan Did Not Actually Betray or Harm the Settlement Class.

Notwithstanding the clearly threatening tone and content of the November 19 e-mails, Ms. Wheelahan denies that she intended the e-mails to convey any threat to undermine the settlement. I discuss the issue of her intent in the next section.  As a threshold matter, regardless of her testimony about her intent, I sought to determine whether or not Ms. Wheelahan ever actually engaged in any conduct to undermine the settlement, whether pursuant to the plan outlined in the November 19 e-mails or otherwise.  If Ms. Wheelahan had taken any step to implement such a scheme—*i.e.*, to plant a limitations or other issue in a motion to dismiss the appeal, designed to scuttle the approved settlement so that she could cut a deal with Trans Union in Louisiana that would pay her more and class members less—there is no question she would thereby have earned a severe sanction and a referral to the Executive Committee for additional "discipline."  The duty of loyalty to a client is perhaps the most basic duty of a lawyer, especially of one appointed counsel for a certified settlement class.  Among the applicable ethical rules such conduct would implicate are Rule 1.1(a) (duty of competent representation); Rule 1.2(a) (duty to abide by client's decision whether to accept an offer to settle a matter); Rule 1.7(a)-(b) (regarding conflicts of interest between clients and between lawyer and client, here conflicting interests among  the Louisiana state court

class, the national MDL class and Ms. Wheelahan herself); Rule 1.8(b) (regarding conflicts of interest and prohibited transactions, here the use of information regarding the statute of limitations to the disadvantage of a client); Rule 8.4(a)(4) (conduct involving dishonesty, fraud, deceit or misrepresentation, here the appearance of acting on behalf of the Settlement Class in the course of filing a motion planting a time bomb calculated to blow up the settlement).[41]   However, for several reasons, I am convinced that Ms. Wheelahan did not actually attempt to overturn the Settlement. She remained loyal to the Settlement Class.  Despite the November 19 e-mails, the Settlement Class was never in any genuine danger of betrayal.

### 1.      Ms. Wheelahan's denial is supported by the record and common sense.

The record and surrounding circumstances corroborate Ms. Wheelahan's categorical denial of taking any step intended to harm or betray the class.  None of the documents produced to me suggest that she took any step to undermine the settlement, including during the time period from November 20 to April 6, when she had no reason to think that the Court or anyone other than Texas Counsel had seen the e-mails.  To the contrary, it appears that, in fact, she opposed the objectors in the Court of Appeals and participated to some extent in the settlement proceedings in that Court with the goal of ending the appeal and preserving the settlement.

I also conclude that the class was never in danger because the scenario Ms. Wheelahan spun out to Mr. Toups made no sense.  What she proposed there could not have been pulled off, and Ms. Wheelahan is more than smart enough to have understood that.

First, it is unlikely that the Seventh Circuit would "reject the settlement" based on a motion to dismiss the appeal.  Such a motion, if successful, would lead to dismissal of the appeal, not

---

[41]      I cite to the Rules via the nomenclature of the ABA's Model Rules of Professional Conduct.  The Rules applicable here to Ms. Wheelahan are part of the Court's Local Rule 83.50.1 *et seq.*  Thus, the actual cite, for example, to Rule 1.7 is Local Rule 83.51.7.

rejection of the settlement.  (Ms. Wheelahan testified that the "motion to dismiss" phrase was nonsensical and a mistake; that is discussed further below.)  Although it is not unheard of for the Seventh Circuit to opine on issues not presented by the parties, particularly jurisdictional issues, it is almost inconceivable here that it would have vacated a settlement—resolving a nearly decade-old MDL matter—on limitations grounds that had been knowingly waived by Trans Union and that were not pressed by the objectors.  Indeed, a fundamental premise of the "threat scenario" in the November 19 e-mails was incorrect:  that the Seventh Circuit might decide *sua sponte* that the statute of limitations was a *jurisdictional* impediment to the settlement that could not be waived. Although to my knowledge the Seventh Circuit had not addressed this issue in the context of FCRA, it has emphatically declared that federal statutes of limitation are generally non-jurisdictional; private parties may waive them.  In *Lawyers Title Ins. Corp. v. Dearborn Title Corp.*, 118 F.3d 1157, 1165-67 (7th Cir. 1997) (Posner, J.), the Seventh Circuit held that the one-year statute of limitations of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §2601, is non-jurisdictional and waivable.  In so ruling, the Court wrote:  "we cannot find any case that holds a federal statute of limitations jurisdictional on this ground. With one exception to be noted, courts hold federal statutes of limitations to be jurisdictional only when the United States is a defendant–that is, out of regard for the defendant (and in keeping with the general reluctance of courts to estop the government to assert its statutory rights) rather than out of regard for the courts or for the social interest in burying old claims."  *Id.* at 1166.  The Seventh Circuit also observed that federal statutes of limitations are "universally regarded as nonjurisdictional," including the limitations period of the Truth in Lending Act, and it declined to follow the "one exception," a D.C. Circuit TILA case going against the "universal" rule.  *Id.*  Hence, while RESPA and TILA are not FCRA, the likelihood was virtually nil that the Seventh Circuit would *sua sponte* issue a decision finding FCRA not subject to the

"universal" rule.[42]  The FCRA statute of limitations is waivable and presented no jurisdictional risk in the appeal.  If the e-mails were threatening sabotage by raising a limitations question (which Ms. Wheelahan denies), the threat was empty.

Second, it is speculative and highly doubtful that Trans Union would have agreed to the sweetheart deal imagined in the e-mail or that Ms. Wheelahan could have secured the large fee based on it.  Ms. Wheelahan and Mr. Toups testified, and I have no doubt, that Trans Union was represented by excellent lawyers.  The Settlement they negotiated contains a statute of limitations waiver.  They certainly knew what their client was waiving, and what the applicable limitations law is.  If the limitations period here were jurisdictional and if Trans Union could have defeated much of this lawsuit on that ground and secured a more favorable resolution in Louisiana, its sophisticated counsel would have pursued that path before agreeing to settle the MDL matter for over $100 million in cash and in-kind benefits.  Any notion that Ms. Wheelahan had a silver bullet unbeknownst to Trans Union was fantasy.  And Trans Union in fact worked to settle the appeals with the objectors rather than take any risk of the settlement being overturned.  It clearly believed the settlement was in its best interest, better than cutting some sweetheart deal in Louisiana. Finally, there may have been no sweetheart deal to cut.  When Ms. Wheelahan wrote the e-mail she probably had forgotten that the Court had stated that she had waived a fee recovery in *Andrews* in connection with persuading the Court to remand that case to Louisiana.  *See* n.22 above.  But Trans Union would not have forgotten that arguable waiver, and so the prospect of a better fee recovery in *Andrews* was doubtful.

---

[42]        I also asked plaintiffs' counsel to provide me any authority of which they were aware holding that the FCRA statute of limitations is jurisdictional.  None was provided.

Third, notwithstanding what the November 19 e-mails say, it was plainly not in Ms. Wheelahan's interest—it was not really "better" for her—to seek to undermine the MDL settlement. Her ultimate share of the $109 million MDL settlement, if upheld on appeal, even the $4.5 million fee then apparently on the negotiating table (or, as it turns out, the much lower fee I recommend above), was more valuable than gambling on derailing the MDL settlement to land a better fee (even if one had not been disclaimed) from a speculative Louisiana settlement.

Finally, there is no plausible way in which Ms. Wheelahan could actually have succeeded in betraying the class. Any attempt to have done so would have been bizarre and subject to an immediate coordinated attack from at least some of her co-counsel, and probably from Trans Union as well. Texas Counsel had already taken a step in that direction by giving the e-mails to the Magistrate Judge. The prospect of a lawyer betraying the class she represented would have ensured that the betrayal would quickly flame out. Accordingly, I conclude that there was neither actual harm nor realistic threat of harm to the settlement class occasioned by the sending of the e-mails or Ms. Wheelahan's subsequent conduct relating to the threat in the e-mails.

### 2. Texas Counsel's theory that Ms. Wheelahan actually tried to undermine the settlement is implausible and unsupported.

As noted, if Ms. Wheelahan had done anything to try to undermine the settlement, it is unlikely that other counsel would not have found out about it and immediately taken action to squelch it. To confirm that she had not done so, I specifically directed Plaintiffs' Counsel (after reminding them of their duties to the Settlement Class and the Court) to advise me if they "know or have reason to suspect that the drafting or transmission of the Wheelahan November 19-20, 2008 emails caused any harm to the settlement class, or that Ms. Wheelahan ever took any affirmative step to undermine the approved MDL settlement in order to pursue a separate settlement in the Louisiana

lawsuit?"  July 30, 2009 Memo from Special Master to Counsel.  I also asked them to produce any

documents relating to this question.  No counsel other than Texas Counsel claimed there was any

such evidence.  The single fact identified by Texas Counsel in its written response was, in my

judgment, irrelevant and non-responsive.  (It was Ms. Wheelahan's recent purported refusal to

dismiss the Louisiana lawsuit that prompted a motion by Trans Union's counsel (Doc. 641) that was

later withdrawn.  (Doc. 647.))

However, Mr. Toups contended during my examination of him that he had recently

concluded that Ms. Wheelahan did, in fact, try to undermine the settlement in a manner outlined in

the November 19 e-mails.  Toups Tr. at 53-57.  He claimed she did so in a motion to dismiss the

appeal, which she ultimately filed on June 15, 2009, nearly seven months after sending the

November e-mails, two months after this Court rebuked her for sending the e-mails, and four days

after my appointment as Special Master.  When Ms. Wheelahan filed the motion, the appeal had

been stalled in mediation for several months under the auspices of the Seventh Circuit's mediation

program.  Mr. Toups identified the following paragraph from page 2 of Ms. Wheelahan's motion

to dismiss as a "Trojan Horse" through which he believes she was providing the Seventh Circuit

ammunition to overturn the settlement on jurisdictional grounds:

> The conduct that is the subject of all of the actions in the MDL ceased in
> 2001 pursuant to an injunction imposed after the Federal Trade Commission's
> successful enforcement action.  Other than the claims of the certified Louisiana
> *Andrews* class that are included in the settlement, no state law claims have been
> asserted based on the conduct that is the subject of the MDL actions, after the district
> court's dismissal of state law claims in July, 2004.  Objectors have not appealed that
> order.

Motion to Dismiss Appeals (Examination Exhibit 21) at 2 (internal citations omitted).  I am

unpersuaded that this paragraph  was written to initiate the demise of the settlement, or could have

done so.  While a reader of the statement might infer that newer state law claims might be untimely

(if one knew the applicable state limitations period), I believe the point of the paragraph, like other statements in the brief, is to make the factual and equitable point that the settlement is *good* for the class and for the objectors.  Later in the motion, Ms. Wheelahan refers to the fact that the settlement does not release individual claims and extends the limitations period to bring such claims.  *See id.* at 4.  Part of her argument for dismissal was that the appeals were moot since the objectors' rights to bring individual claims would not be improved by overturning the settlement; they could only be harmed by overturning the settlement.  The limitations waiver in the settlement was germane to that argument.  And, as noted earlier, the law is quite clear that the FCRA statute of limitations is non-jurisdictional.  Thus, although one could question the legal strategy of filing the motion to dismiss during the midst of a mediation, I detect no whiff of foul play in this filing.  Indeed, the possibility that Ms. Wheelahan would try to undermine the settlement in June 2009, after the Court had publicly aired the November 19 e-mails and appointed a Special Master to investigate the matter, is remote.  Ms. Wheelahan may sometimes march to the beat of her own drummer, but she is not suicidal, as Mr. Toups's argument implies.

Although I found Mr. Toups's theory improbable and born, at least in part, from deep mistrust of Ms. Wheelahan arising from the deterioration of their working relationship, I found his belief in it sincere and I took it seriously, particularly because he has much greater familiarity than I with the case and with Ms. Wheelahan.  Thus, in addition to questioning Mr. Toups on the subject, I questioned his co-counsel Mr. Fein, Trans Union counsel Mr. O'Neil, and MDL Counsel Mr. Borderud.  I also requested on short notice and received promptly from counsel documents (principally e-mails) concerning Ms. Wheelahan's filing of the motion to dismiss and its impact, if any, on the settlement of the appeals.  The additional testimony and documents do not support Mr. Toups's conclusion, and do not suggest to me that Ms. Wheelahan tried to undermine the settlement.

Mr. Toups says that Mr. Fein had reported to him a conversation he had with Trans Union counsel, Mr. O'Neil, about whether Ms. Wheelahan's motion to dismiss was detrimental to the settlement.  Both Mr. Fein and Mr. O'Neil confirmed that they spoke in August 2009, *after* the settlement of the appeal had concluded.  Mr. O'Neil called Mr. Fein, probably in connection with the motion he was then preparing concerning Ms. Wheelahan having not agreed to dismiss the Louisiana lawsuit on terms satisfactory to Trans Union.  Mr. Fein recalls Mr. O'Neil stating that something in the motion to dismiss "might be geared towards getting the 7th Circuit to take a closer look at the case and maybe dismiss the whole settlement," and that was one reason they settled so quickly with the objectors.  Toups Tr. at 143.  According to Mr. Fein's account, "[t]hey [Trans Union] were concerned that that was Dawn's secret purpose and it was a risk." *Id.* at 144.  Up until the call, Mr. Fein had not suspected anything nefarious about the motion to dismiss.  "When I read her motion . . . I took it for what it was, that she was trying to get rid of the objectors." *Id.* at 143.

Mr. O'Neil does not know whether Ms. Wheelahan had any specific intent to derail the settlement.  He believed that her filing of the motion to dismiss was a mistake, since it created the possibility that the Seventh Circuit might set a briefing schedule and address the merits of the appeal, and he and plaintiffs' counsel wanted to avoid any risk of the settlement being overturned. He thought the filing placed the settlement at risk because it recited facts concerning the merits of the settlement, creating the possibility that the Seventh Circuit might be tempted to address the merits and perhaps render an unfavorable ruling.  To avoid any such risk, even a small one, he, MDL Counsel and Texas Counsel worked together to finalize quickly a settlement with the objectors that mooted the appeals.  (Ms. Wheelahan did not participate in the final phase of the settlement process, although she had participated in earlier phases.)  After the settlement was finalized, Mr. O'Neil was looking anew at the November 19 e-mails and suspected that perhaps the motion to dismiss, because

it discussed matters other than the standing issue raised in the motion, might have had a hidden agenda. Sept. 11, 2009 Tr. at 11-18.

Messrs. O'Neil and Borderud's recollections of their conversation were sketchy, and shed no additional light. They agreed, however, that they shared a concern to avoid the unpredictability inherent in a review by the Seventh Circuit of the merits of the appeal. 9/11/09 Tr. at 14. None of MDL Counsel stated that they believed Ms. Wheelahan had a specific intent to undermine the settlement. Rather, they believe that she viewed the Louisiana case as a backup if the settlement should fall apart, but would not go so far as to claim that she tried to make that happen through the motion to dismiss or otherwise. 9/11/09 Tr. at 23-25.

For her part, Ms. Wheelahan explained her strategy in an e-mail to her fellow Louisiana Counsel the day she filed the motion to dismiss, and in other e-mails: she filed the motion to dismiss because the mediation process had languished for half a year. She believed Trans Union had no interest in accelerating the process because delay deferred implementation of the settlement. She concluded that filing the motion to dismiss made sense because (i) it might succeed, (ii) it carried no risk to the merits of the appeal, and (iii) the standing issue might pressure the objectors to come to the table with a more reasonable demand. Document HHKC Trans Union 000296-297 (6/15/09 e-mail from Ms. Wheelahan to other Louisiana Counsel explaining her reasons for filing).

In the final analysis, I view the disagreement among counsel over the filing of the motion to dismiss as one of strategy, not ethical propriety. One could argue that the collective judgment of Trans Union, MDL Counsel and Texas counsel— that the motion to dismiss should not have been filed—was more sound (certainly it was more conservative) than Ms. Wheelahan's, which was, as is her wont, to go it alone and file the motion. But I was not appointed to second-guess strategy. What is important is that the disagreement here is a legitimate one over strategy, and the evidence

does not support the notion that Ms. Wheelahan had a hidden agenda to lose the appeal and kill the settlement.[43]   Counsel's relationship with Ms. Wheelahan (especially that of Texas Counsel) has so deteriorated that little trust remains and her motives are usually viewed with suspicion and in the worst light.   That lack of trust appears to have led some counsel to suspect an unethical motive behind the filing of the motion to dismiss.   However, finding no significant evidence to support the suspicion, I respectfully disagree with Mr. Toups's theory and conclude that Ms. Wheelahan did not file the motion to dismiss the appeal as a subterfuge to undermine the settlement.

### E.      Ms. Wheelahan's Intent

Having concluded that Ms. Wheelahan took no steps to harm the class, I turn to Ms. Wheelahan's intent.   I find credible her testimony that, notwithstanding what the November e-mails say, she never actually intended to betray the class or undermine the approved settlement in the Seventh Circuit.   Her success in defeating the prior proposed settlements and helping to achieve the much greater final settlement was a significant professional achievement she had every right to be proud of.   "The supposition was never that I would do anything to overturn the settlement that is frankly the pinnacle of my career.   I am very proud of that settlement."   Wheelahan Tr. 48-49.   I am persuaded that Ms. Wheelahan never harbored any genuine intent to detonate the pinnacle she believed she had just climbed, and, as discussed above, did not try to do so.

But that does not end the analysis.   While I have concluded that Ms. Wheelahan never intended or attempted to betray the settlement class, the most natural reading of the November 19

---

[43]      Ironically, whatever one thinks of Ms. Wheelahan's strategy, it led to a result that all counsel wanted:  a settlement with the objectors and the dismissal of the appeal.   While certain counsel may be unhappy with the particular terms of the settlement (which are subject to a confidentiality provision and will not be discussed herein), it appears from the e-mails produced to me that Ms. Wheelahan's motion did catalyze the remaining parties to come to terms quickly and end the appeal.

e-mails is that she nevertheless *threatened* to do so.   This raises the question of whether it is sanctionable for a lawyer during a negotiation to threaten to commit an illegal or unethical act as bargaining leverage.

### 1.     The e-mails were intended as threats.

Ms. Wheelahan denies the premise of this question.   She testified that her e-mails were not intended as a threat or bluff.   Rather, she claimed that she was merely trying to communicate to Mr. Toups, albeit carelessly due to the late hour and her anger, "the problems in his case."   Wheelahan Tr. 79.   She also testified that the phrase in the e-mails, "motion to dismiss," was simply a careless mistake, and what she really meant to do was explain the course of events that could ensue from a successful appeal by the objectors, not from anything she would insert in a motion to dismiss.

For several reasons, I find that portion of her testimony strained and not credible.   The e-mails read as a threat.   I see no innocent construction.   And Ms. Wheelahan's testimony was not entirely consistent on this point.   While objecting to the term "threat," she first denied and then acknowledged that there were elements of attempted "arm-twisting" in the e-mails.   Wheelahan Tr. 57-59, 72.   I questioned her at length about her intent, and, while she did not articulate it clearly, her explanation as to what she was trying to say to Mr. Toups, and why it supposedly was not a threat to blow up the settlement, appears to be:  (i) she wanted to keep a "food fight" among Plaintiffs' Counsel out of the record because something said in a public fight might be seized upon by the objectors to overturn the settlement; (ii) if the settlement were overturned on appeal, Texas counsel would lose the limitations protection of the settlement (their suit was filed in 2006), but the certified Louisiana lawsuit would have no limitations problem; and (iii) therefore, Texas Counsel should lower their fee demand because they have more to lose by not settling and risking the public food fight that could give ammunition to the objectors.   Thus, she described the e-mails as merely a

poorly worded and clumsy attempt to point out to Texas Counsel the problems and risks in their

negotiating position.  Wheelahan Tr. 67-71.

This explanation is weak, because it does not square with the threatening language or tone

of the e-mails (e.g., "the better it looks"), and it does not make sense that a "public fight" over fees

should have influenced Texas Counsel's thinking about what fee to negotiate.  Any public briefing

about fees would be outside the appellate record and irrelevant to the issue on appeal:  the Court's

decision, well before any public fee fight occurred, to approve the settlement.  Because the fee

decision was independent of the issues on appeal, there would be no reason for Texas counsel to

base their negotiation position on the fate of the appeal.  In contrast, the most natural reading of the

e-mails—as a threat to sabotage the settlement in the appeal if Texas counsel did not lower its fee

demand— does logically link the fate of the appeal to Texas's negotiating position.  In this reading,

the "threat" makes some internal logical sense because an intentional destruction of the settlement

would result in a vacatur of any fee award.

I also reject Ms. Wheelahan's position that the phrase "motion to dismiss" in the November

19 e-mail was a mistake.  If the November 19 e-mails were an aberration, a poorly drafted and not

entirely coherent product of anger and exhaustion, perhaps Ms. Wheelahan's "mistake" explanation

might have some plausibility.  But the concept expressed in the e-mail had been germinating for

some time before November 19 and similar threats were conveyed or hinted at before and after

November 19, during normal business hours and under less exhausting circumstances.

On October 23, 2008, nearly a month before the November 19-20 mediation, Ms. Wheelahan

and Mr. Caddell got into an argument via e-mail over a $250,000 refund check from Hilsoft, the

third-party involved in providing class notice.  Mr. Caddell had asked Hilsoft to send the money to

his firm's client funds account and Ms. Wheelahan thought the money should be sent to the Escrow

Agent for the settlement.  The exchange became personal and, frankly, juvenile, and included some sniping over attorneys' fees and some threats.  Ms. Wheelahan dismissed the exchange as "two angry lawyers throwing threats at one another," Wheelahan Tr. 93, and said they "were sent back and forth between us in anger with the intention of annoying one another."  *Id.* at 99.  Mr. Caddell bragged that his firm had recovered a lot in fees during the past year, while needling Ms. Wheelahan for not having done so.  Having tweaked her financially, he said that "we are considering suggesting to Mason and Gettleman that we wait until the settlement is complete [*i.e.*, all claims finalized] before deciding attorney's fees. ☺"  Examination Exhibit 5 (smiley-face "emoticon" in original).  Ms. Wheelahan took the bait, suggested that Texas Counsel had ulterior motives for delaying an attorneys' fee award, and then followed up with an e-mail in the early afternoon:

> And by the way, if the Settlement Agreement is not adhered to, we won't be asking the Louisiana court to dismiss the certified Louisiana class–or perhaps the Louisiana court will decide that the settlement does not release the Louisiana claims, or should not–and then I do not believe there will be any attorney's fees coming from it, now or ever.  *It would be a simple thing for me to tell [Trans Union counsel] Brian [Brooks] exactly how his client is in a better position than they know, if the Settlement were overturned.  And the judgment of a district court without subject matter jurisdiction is worth exactly nothing.*

Examinations Exhibit 5 (italics added).  This e-mail alludes to the "jurisdiction" issue noted above and threatens to "tell Brian" how Trans Union could be put in a better position if the settlement were overturned.  The references in this e-mail are oblique, and I do not believe any counsel at the time fully understood what she was implying or took it seriously.  None responded to the substance of this last e-mail.[44]  This e-mail too was an empty threat, and an unclear one as well.  However, its

---

[44]     Ms. Wheelahan did not realize at the time that defense counsel (although not Mr. Brooks) had been copied on and were privy to the e-mail string.  However, I do not believe that this oversight caused any harm because, as discussed earlier, there was no genuine jurisdiction issue.

59

significance is that the concept later expressed more clearly  in the November 19 e-mails was in Ms.

Wheelahan's mind several weeks earlier and foreshadowed in these e-mails.

And the concept remained in play after the November 19-20 mediation.  On November 26,

2008 at 10:34 a.m., she sent an e-mail to John Zarian, one of the *Frey* counsel aligned with the MDL

Counsel group.  Following the failure of the fee mediation, he was acting as a go-between to Toups

and Texas Counsel, since they no longer wanted to communicate directly with Ms. Wheelahan.  She

e-mailed him to offer ammunition for those discussions.  Her first paragraph of the November 26

e-mail said:

> Hi, John.  Thanks, again, for all your efforts.  If it helps you at all to get Tx
> to come down some–because I'm still not seeing why they're entitled to a multiplier
> over their lodestar, when everyone else is taking a cut, and when they only submitted
> one pleading in the entire case–I've attached the Order lifting the stay in our certified
> state law case.  We remain willing to seek fees there.  *And if the MDL settlement falls
> apart, bec the statute has run on the claims, or for another reason, our state law case
> is ready to go forward, in a very favorable court, as I explained to you.*

Examination Exhibit 10 (italics added).   Again, she linked the limitations issue to the MDL

settlement "falling apart," followed by pursuing the Louisiana state case "in a very favorable court."

Similarly, in a December 1, 2008, 6:24 p.m. e-mail to her Louisiana co-counsel, Mr. Lane, she wrote

about the status of Mr. Zarian's efforts to negotiate with Mr. Toups.  In relevant part, she wrote:

> I told John [Zarian] that, since I'd be traveling, I thought Friday was my own
> deadline for filing motions to dismiss the appeals in the 7th Cir.  *These are the same
> motions that would raise the issue that the statute of limitations has run on all claims
> except ours and John Zarian's.  Mitch might be particularly concerned about this*,
> bec he lost something in the LA 4th Cir on just this issue . . . .

Examination Exhibit 11 (italics added).  Finally, in a December 5, 2008 e-mail, at 10:21 a.m., Ms.

Wheelahan wrote directly to Mr. Toups about the apparent collapse of the fee negotiations.  The

third and fourth paragraphs said:

And I also think there is a serious chance the 7th Cir. might find a statute problem with all the cases and class statutory damages claims filed after September, 2004, when those were arguably abandoned by the MDL counsel after the Sept 2002 ruling. I think the tolling provision in the settlement might be the only thing keeping those claims alive, but the court had no jurisdiction to enter a judgment approving the settlement if the statute had run and the claims were moot before it did. LA's certified unjust enrichment claims, and John Zarian's CA state claims, might be all that's left. Which is not what I stayed in Chicago to see happen.

John said you've worked hard to bring your group along. We're just about ready to take another road, but hope you can make some progress with them today. Let me know if I can help.

Examination Exhibit 13.

These e-mails establish that the November 19 e-mails were not a mere aberration fueled by anger, wine and exhaustion. Neither was the use of the phrase "motion to dismiss" an accident, since she had been drafting such a motion and thought it might mention the limitations issue. As a general matter, Ms. Wheelahan considered the certified Louisiana lawsuit to be an ace in the hole. It was a fallback for her if the MDL settlement should fall apart (through legitimate process and without her assistance). She also considered it a possible avenue to obtain a separate fee award through a legitimate process involving prior approval of the MDL court.[45] And, as evidenced by the series of e-mails listed above, she tried to use the pendency of the Louisiana lawsuit as leverage to try to persuade Texas Counsel to lower their fee demand, with the threat that a motion to dismiss might cause several dominoes to fall, the last being a rejection of the settlement on limitations/jurisdictional grounds by the Seventh Circuit. Ms. Wheelahan's current characterization

---

[45]     Ms. Wheelahan sent several e-mails to her colleagues, and also suggested to the Magistrate Judge during settlement talks, that perhaps the parties and the Court would agree to entry of a lower fee judgment in the MDL Action and permit her to seek additional fees in Louisiana in the *Andrews* Action, so long as the total fees awarded did not exceed the $18.75 million cap in the settlement. The Magistrate Judge immediately rejected the concept and no other counsel showed any support for it. This concept, while it had no genuine chance at being approved, presents no ethical issue.

of the e-mails as not conveying a threat to undermine the settlement is, under all of the circumstances, unconvincing.

### 2.     Ms. Wheelahan acted alone in making the threat.

It should be noted that none of plaintiffs' other counsel were party to or, in most cases privy to, the threats.  Specifically, Mr. Zarian and Mr. Toups agree that Mr. Zarian did not convey to Mr. Toups any of the "ammunition" Ms. Wheelahan had tried to feed him.  Mr. Zarian was neither aware of the November 19 e-mails nor of any intent by Ms. Wheelahan to threaten to undermine the settlement to gain a negotiating advantage.  He largely ignored her suggestions, sometimes because he didn't understand them and sometimes because he thought them meritless, and his settlement communications with Mr. Toups were focused on numbers.  I do not believe he or other MDL Counsel were privy to or supported the concept of threatening to undermine the settlement. Likewise, Ms. Wheelahan's Louisiana co-counsel, Mr. Lane and others at his firm, were unaware of the November 19 e-mails.  While they were privy to some communications with Ms. Wheelahan regarding a possible motion to dismiss the appeals, the limitations issue and the negotiations with Texas counsel, I do not believe that they were aware of or supportive of any clear threat by Ms. Wheelahan to scuttle the settlement.

### 3.     The threats do not warrant a sanction.

Having rejected Ms. Wheelahan's argument that the e-mails were not intended as a threat to undermine the settlement, I turn, finally, to whether the threats in the November 19 e-mails are sanctionable.  My conclusion that they are not should not be viewed as condoning Ms. Wheelahan's conduct.  I have never seen anything quite like the e-mails.  The notion that a lawyer would even threaten to betray a client, let alone a class, is indeed "reprehensible," and strays far beyond conduct becoming of an attorney.  However unseemly the conduct, I conclude that it did not violate any

62

specific rule of professional conduct or fiduciary duty.  It was disrespectful of Texas Counsel, but not directly contemptuous of the Court.[46]  Accordingly, I recommend no sanction.

The applicable Rules of Professional Conduct deal extensively with a lawyer's duties to her client and her conduct before a tribunal, but they say little about her conduct with other counsel in the context of a negotiation.  There is little question that the Rules and legal culture tolerate and expect less decorum when lawyers bargain in private than when they battle in public.  In the hurly-burly of negotiation, depending on the style of the lawyer, it is not uncommon to encounter posturing, brinkmanship, bluster, puffing, bluffing, braggadocio, and some sharp elbows.  Styles differ.  Some lawyers are quiet persuaders and others are yellers.  All lawyers in negotiations make what might be called "threats," to the extent that it is common to point out to the other side the consequences of not agreeing.  Many such "threats" cross no ethical boundary, such as a promise to take legal action ("settle for our demand or we'll sue") or assert a legal or factual position in a case ("settle or we'll depose your client and seek summary judgment").  Certain other threats are clearly sanctionable, such as a threat to seek criminal prosecution or disciplinary action (*see* Rule 1.2(e)) or a threat that would itself constitute criminal extortion.  *See State v. Hynes,* No. 2008-371, 2009 WL 2382550 (N.H. Aug. 5, 2009) (affirming conviction of lawyer under New Hampshire extortion statute for obtaining $500 settlement from store owner by threatening a suit he had no right to bring because, *inter alia*, he had no client); 720 ILCS 5/12-6 (Illinois crime of "intimidation," defined as including, *inter alia*, threats without lawful authority to inflict physical injury or to defame); *Ethical Guidelines for Settlement Negotiations*, American Bar Association (August 2002),

---

[46]     I note that in certain other e-mails produced to me by counsel, Ms. Wheelahan sometimes used sharp and disrespectful language to certain describe rulings or statements by this Court or the Magistrate Judge with which she disagreed.  Some of the statements were intemperate, but I do not believe they violated Local Rule 83.58.2(a).

Section 4.3.2 (available at http://www.abanet.org/litigation/ethics/settlementnegotiations.pdf) (last visited Sept. 24, 2009) (listing as unethical threats that would be extortion or defamatory); *but see In re Finkelstein*, 901 F.2d 1560 (11th Cir. 1990) (reversing suspension of civil rights lawyer for writing a letter threatening his opponent in a race discrimination case with a product boycott and embarrassing publicity campaign if a settlement were not reached); *United States v. Pendergraft,* 297 F.3d 1198, 1205 (11th Cir. 2002) (threats to file a lawsuit based on a false affidavit do not violate the Hobbs Act).

Here, Ms. Wheelahan's threat fell somewhere between these poles. I have construed the e-mails as a threat, made to attempt to gain a negotiating advantage over co-counsel to the class, to assert a non-frivolous legal proposition in a case for an improper, veiled motive—to betray the class they both represented. At first blush, one might think the threat implicates Rule 1.2(f)(1), which provides that "[i]n representation of a client, a lawyer shall not . . . assert a position . . . or take other action on behalf of the client when the lawyer knows or reasonably should know that such action would serve merely to harass or maliciously injure another." However, the threat here was not made "on behalf of the client," and the action would not "serve *merely* to harass or maliciously injure another." Similarly, without any action to carry out the threat, I do not believe that the conflict of interest rules, Rules 1.7 or 1.8, were violated.

While a lawyer would not necessarily have to commit criminal extortion to be subject to a civil sanction or discipline for making a threat, extortion cases discussing threats to pursue litigation shed some light on the analysis. Most cases considering the issue hold that threats to sue or file legal papers, even if made in bad faith, do not constitute criminal extortion. *See, e.g., Pendergraft*, 297 F.3d at 1205 (collecting cases). Threatening to file court papers is not considered "wrongful" under the Hobbs Act because courts do not want to discourage parties from using courts to resolve

disputes, and civil remedies (such as malicious prosecution or Rule 11 sanctions) are considered sufficient to police abuses. *Id.* at 1206-07.

 The recent *Hynes* case did affirm a conviction of a lawyer for sending extortionate demand letters, but the conduct there differs as well from that of Ms. Wheelahan.  Hynes's letters threatened to sue hair salons for discriminatory pricing (for men, women's and children's haircuts) if he was not paid $1,000 to settle.  Hynes had neither a client nor any standing to sue individually.   One hair salon agreed to pay him $500 to avoid the threatened suit.  He was convicted under the New Hampshire theft-by-extortion statute, which provides in relevant part that extortion includes a threat to do any "act which could not in itself substantially benefit him but which would harm substantially any other person with respect to that person's . . . business."  *Hynes*, 2009 WL 2382550, at *2. Hynes had no claim of right to the proceeds or to use the means threatened to procure them.  In contrast, as noted, Ms. Wheelahan did have a claim of right to the moneys she was demanding (a higher share of the fee allocation), and the threatened means were in part legitimate (filing a motion to dismiss the appeal).

 In sum, the e-mails do not constitute criminal extortion, and, while they have an extortionate flavor, I found no authority suggesting that they are sanctionable as a civil matter.  Texas Counsel took it upon themselves to cite a few authorities, which they suggest support the proposition that a threat to breach a fiduciary duty is itself sanctionable.  Two of the authorities do indicate that a non-criminal threat itself can be unethical, although in each case the threat was acted upon.  More importantly, however, in each case the threat was made directly *to the client*, to whom the lawyer owed the fiduciary duties, not to a sophisticated co-counsel in an arms-length negotiation.  In that context, the threat itself was an act of direct disloyalty to the client.  *See In re Whitney Dove Hardy*, Comm. No. 03 SH 104 (Ill. ARDC Oct. 27, 2005) (available at http://www.iardc.org/-

03SH0104RB.HTML) (last visited Sept. 24, 2009) (lawyer threatened client that he would (and later did) reveal confidential information damaging to client's case if client did not pay fee balance); *Sessions & Co., P.S. v. Carlson,* 119 Wash. App. 1066, 2003 WL 23019953, at *3 (Dec. 29, 2003) (unpublished opinion) (lawyer threatened client that he would, without withdrawing, cease work for the client, to the client's detriment, if unpaid bill were not paid).   As discussed further below, the fact that the recipient of the threat here was not the client, the opponent or a third party, but rather a sophisticated attorney, who was co-counsel to the same class, is an important factor cutting against a conclusion that the threat should be sanctioned.

Apart from the question of extortion, one might contend that the e-mails were deceptive, and, therefore, potentially sanctionable under Rule 4.1(1) (lawyer "shall not knowingly . . . make a false statement of material fact to a third person") or Rule 8.4(a)(4) (a "lawyer shall not . . . engage in conduct involving dishonesty, fraud, deceit or misrepresentation"). Because Rule 8.4(a)(4) does not prohibit conduct that is permissible under Rule 4.1, *see* ABA Formal Op. 06-439, *Lawyer's Obligation of Truthfulness When Representing a Client in Negotiation: Application to Caucused Mediation*, at 5 n.2 (April 12, 2006), I focus on Rule 4.1.

The Rule 4.1 argument would be that, as I've construed them, the e-mails were a deceptive bluff.  Ms. Wheelahan made a threat to do something improper that she had no genuine intent to carry out.  But the proscriptions of Rule 4.1 apply to statements of fact.  The Committee Comments to the Rule state:

> Whether a particular statement should be regarded as one of fact can depend on the circumstances. Under generally accepted conventions in negotiation, certain types of statements ordinarily are not taken as statements of material fact. Estimates of price or value placed on the subject of a transaction and a party's intentions as to an acceptable settlement of a claim are in this category, and so is the existence of an undisclosed principal except where nondisclosure of the principal would constitute fraud.

66

This comment defines away, as a matter of formal professional ethics, much of the feinting that occurs in some negotiations.  In this case, the statement or promise at issue is about future conduct, not historical fact.  Such future-oriented statements are typically not considered "factual" under fraud case law.  *See, e.g., Continental Bank, N.A. v. Meyer*, 10 F.3d 1293, 1298 (7th Cir. 1993) ("A statement . . . which relates to future or contingent events, expectations or probabilities, rather than to pre-existent or present facts, ordinarily does not constitute an actionable misrepresentation under Illinois law.") (internal quotations omitted)*; Restatement (Second) of the Law*, Contracts, §159 cmt. c ("facts" include past events or present circumstances, but not future events unless there is an implication of false present or past fact).  Thus, while an attorney can be disciplined for lying in a negotiation about an objective material fact, such as the amount of available insurance coverage or the death of the client, *see* ABA Formal Op. 06-439 at 3,[47] a threat to take particular legal action is a statement about the future and is not generally received as a hard promise, but rather as something the speaker "might" do.

> Context is everything:
>
> Whether a statement should be so characterized [as one of fact] depends on whether the person to whom the statement is addressed would reasonably regard the statement as one of fact or based on the speaker's knowledge of facts reasonably implied by the statement, or instead regard it as merely an expression of the speaker's state of mind.  Assessment depends on the circumstances in which the statement is made, including the past relationship of the negotiating persons, their apparent sophistication, the plausibility of the statement on its face, the phrasing of the statement, related communication between the persons involved, the known negotiating practices of the community in which both are negotiating, and similar circumstances."

---

[47]     Other examples of misrepresentations of fact in a negotiation include lying about how much a particular term will cost a party or falsely claiming that certain documentary evidence exists.  Formal Op. 06-439 at 1.

*Restatement (Third) of The Law Governing Lawyers*, § 98, cmt. c (2000).  These factors, particularly

consideration of the audience receiving the threats, cut strongly in favor of construing the threats

as non-factual.

- *"Past relationship" and "apparent sophistication."*  Ms. Wheelahan did not threaten a
  stranger, the opponent to her client, her client, or a vulnerable non-lawyer.  She had worked
  with Mr. Toups on previous matters and was still his co-counsel in this case.  He is a very
  experienced and sophisticated lawyer.  He impressed me as someone who would not be
  intimidated or snookered easily.

- *"Plausibility" and "phrasing of the statement."*  As discussed earlier, the statement was
  hardly "plausible on its face" and its phrasing was not a model of clarity.  Indeed, the
  "threat," such as it was, baffled Mr. Toups at the time.  He testified that he understood the
  gist as a threat to betray the class, but could not figure out what Ms. Wheelahan was
  planning or how she could pull it off.  He only later came to understand the internal logic of
  the threat after this investigation began and documents were produced.  Toups Tr. 45-46.
  On the morning he received the threat, he and his co-counsel Mr. Fein exchanged e-mails
  in which Mr. Fein opined that he thought "she's just making nonsensical threats."
  Examination Exhibit 20.  Mr. Toups testified that he did not concur with that assessment, but
  he also did not understand at the time how she could carry out the threat.  Toups Tr. 81-87.

- *"Related communication between the persons involved."*  As noted above, Ms. Wheelahan
  sent other e-mails that had other threats, or unorthodox suggestions, such as the suggestion
  that the MDL Court might agree to enter a lower fee judgment while granting Louisiana
  Counsel permission to seek additional fees from the Louisiana Court.  The paper record
  reveals that no counsel specifically responded to these suggestions, and none agreed to them.
  Mr. Toups himself did not respond to her December 5 e-mail that again raised the limitations
  issue.  *See* above at 59-60.  In general, it appears that Plaintiffs' Counsel generally let Ms.
  Wheelahan blow off steam from time to time and ignored her more unusual statements or
  unorthodox procedural ideas.

- *"Known negotiation practices in the community."*  I cannot comment on negotiation
  practices in Louisiana or Texas, but doubt that the culture diverges greatly from that in

Chicago in this context.  In my experience, most lawyers take with a grain of salt statements by adversaries about what they might do in the future in a lawsuit, and do not consider them in the same light as a representation of objective fact.

These considerations lead to the conclusion that, while the threat was imbued with an element of deception, it was not a dishonest misrepresentation of "fact" as meant in the ethical Rules.  Making outrageous or misleading statements about future conduct (bluffing) might ultimately damage a lawyer's credibility or poison a relationship with a colleague or opposing counsel.  Doing so would be eschewed by many lawyers as "reprehensible" and contrary to their personal ethics and standards for the appropriate practice of law.  But they are not *per se* a violation of the applicable Rules of Professional Conduct, and were not so in this factual situation.

Accordingly, I concur with Mr. Fein's initial impression of the e-mails the morning after they were sent.  They were "nonsensical threats."  They had no real bite.  They did not influence Texas Counsel.  They caused no harm to the class.  They were not acted upon.  They were not "prejudicial to the administration of justice."  Rule 8.4(a)(5).[48]  In light of all of these circumstances, including the fact that there is no rule or clear legal authority specifically addressing this situation, *cf. Finkelstein*, 901 F.2d at 1565 (reversing suspension of lawyer because there was no clear authority prohibiting overreaching threats he made to his opponent), I do not recommend that the Court sanction Ms. Wheelahan for what was, at the end of the day, outrageous "nonsense" spouted to her co-counsel.  And, for what it is worth, I also believe that this investigation in and of itself, as well the criticisms expressed above, has already exacted a substantial *de facto* toll on Ms. Wheelahan.

---

[48]      The e-mails might have hastened the demise of the fee mediation, but it seems clear that it was heading for impasse in any event.

69

One last loose end:  Texas Counsel cite authority holding that a lawyer who breaches a fiduciary duty to a client might be subject to a full or partial forfeiture of fees.[49]  *Burrow v. Arce*, 997 S.W.2d 229, 238-245 (Tex. 1999).  There is indeed authority, in Illinois and elsewhere, sometimes referred to as the "disloyal servant" doctrine, stating that an agent or other fiduciary can forfeit compensation earned during the period of a willful breach of duty.  *See, e.g., Clinton Imperial China, Inc. v. Lippert Marketing, Ltd.,* 377 Ill. App.3d 474, 481-82, 878 N.E.2d 730, 737 (1st Dist. 2007); *Dowd & Dowd, Ltd. v. Gleason,* 352 Ill. App.3d 365, 385, 816 N.E.2d 754, 771 (1st Dist. 2004).  This includes lawyers' breaches of fiduciary duties to clients.  *See generally Restatement (Third) of the Law Governing Lawyers*, §37 (discussing when a forfeiture of "some or all" of a lawyer's fee is warranted when there has been a "clear and serious violation of duty to a client").  This authority is irrelevant here, since I have concluded that Ms. Wheelahan did not breach her fiduciary duty to a client.  Further, even if sending the e-mails were unethical, I do not believe a fee forfeiture would be an appropriate sanction (as opposed to a lesser sanction such as a reprimand or her removal as class counsel), where she took no action intended to betray the class by undermining the settlement.  *See Restatement*, §37 cmts. d & e (and cases cited in Reporter's Note) (describing criteria informing whether any fee forfeiture is proper).

---

[49]     At the outset of my appointment, to avoid a feeding frenzy, I had informed Plaintiffs' Counsel that if the ethical issues resulted in any recommended reduction of fees, the reduction would inure to the benefit of the class, not other counsel.  Texas Counsel are aware of that, and I believe they did not cite this authority to benefit themselves financially.

IV.    **OTHER ETHICAL ISSUES – BILLING PRACTICES**

I now turn to the remaining issues to which the Court referred in the April 6 Order.

A.    **Charges for Travel**

When Louisiana Counsel and Counsel other than Texas Counsel filed their joint fee petition, they sought fees under the percentage method.   However, as discussed above, they also made summary claims as to their lodestars in an effort to justify the percentage they were seeking.  Ms. Wheelahan also submitted detailed hourly billing records in support of her claimed lodestar.  In its April 6 Order, the Court criticized some of the categories of time, most notably a list of nearly 400 hours of time "travel time in Chicago," which it attached as Appendix A.  These were recorded in 12-hour increments, one 12-hour entry for each trip to Chicago, regardless of how many days she spent in Chicago for any trip.  These charges were in addition to any charges for time actually spent in transit or on work for this matter.  Thus, for example, if Ms. Wheelahan spent six hours traveling to Chicago on Day 1 and six hours returning to New Orleans on Day 2, she would bill the twelve hours for the actual travel time *to* and *from* Chicago, and would also add one flat twelve hour charge, on either Day 1 or Day 2, for travel time *in* Chicago.  If Ms. Wheelahan worked while traveling to or from Chicago, she did not "double bill" that time with the travel time "to" or "from" Chicago, but the twelve hour flat charges were entered regardless of the number of hours she was actually working on any matter or in transit.  Wheelahan Tr. 165.  The consequence of this practice is that there were travel days on which she billed close to, or even more than, 24 hours.

Ethical rules mandate that "[a] lawyer's fee shall be reasonable."  Rule 1.5(a).  *See also Cripe v. Leiter*, 184 Ill. 2d 185, 198, 703 N.E.2d 100, 107 (1998) ("[T]he attorney's fiduciary position prohibits the attorney from charging an excessive fee.").  These travel time charges are excessive and unreasonable.   In general, if a lawyer tried to charge such time to her fee-paying

clients, she would quickly generate a roster of angry ex-clients. Indeed, Ms. Wheelahan testified that if she had fee-paying clients, she would ask for approval before billing for travel as she did here. Wheelahan Tr. 171. Ms. Wheelahan should have treated the Court (which sits as fiduciary for the class on this issue) in the same fashion by raising the issue. However, as explained below, I do not believe a sanction is warranted for Ms. Wheelahan's failure to explicitly raise the issue or delete these charges from her fee detail.

Ms. Wheelahan's law practice is almost entirely contingent and she generally does not bill fee paying clients for travel or anything else. Even in the context of timekeeping for contingent matters, it was not Ms. Wheelahan's regular practice to record travel time in this manner. She did so for the first time in this case, based on her reading of two Seventh Circuit opinions, *In re Maurice*, 69 F.3d 830 (7th Cir. 1995), and *Henry v. Webermeier*, 738 F.2d 188 (7th Cir. 1984). Ms. Wheelahan explained that these twelve-hour charges were meant to compensate her for the opportunity cost of travel—for time that she was out of her office in New Orleans and away from home. She read *Maurice* and *Henry* to authorize her to bill "for the entire time, door-to-door, that the matter took her out of her offices," and implied that she is being generous to the class in only billing a flat twelve-hour fee (in addition to actual travel and work time) even if her time away from New Orleans was much longer. *See* Mot. to Amend Judgment (Doc. 597 at 22); Wheelahan Tr. 168-72.

Ms. Wheelahan ultimately acknowledged in her testimony that she misread *Maurice* and *Henry,* since the cases "don't say that I can do that [*i.e.*, bill portal-to-portal]. But they don't say that I can't do it either." Wheelahan Tr. 172. The cases plainly do not support her practice. *See Henry*, 738 F.2d at 194 (*dictum* stating that "opportunity cost is equal to the fee [lawyer] would have charged that or another client if he had not been traveling"); *Maurice*, 69 F.3d at 834 (stating that

a "trip to Chicago that diverts time from other paying engagements" is compensable, but not saying anything about a flat travel charge for time "in" Chicago).

Ms. Wheelahan misunderstood the concept of "opportunity cost" as discussed in those cases. If a lawyer has to be on a plane or in another city on behalf of client, and away from her desk during time when she would otherwise be billing clients, charging her client for the travel time for that client may be reasonable as a lost opportunity cost. But the mere time spent in another city away from family or home, while a personal cost of travel, is not normally a chargeable opportunity cost, unless it is "time [diverted] from other paying engagements," *Maurice*, 69 F.3d at 834, because, while at home, the lawyer doesn't bill a client for eating dinner with her family or sleeping. Ms. Wheelahan's billing practice effectively charged time for sleeping in a hotel.

Most clients would not tolerate such a practice, and it would be an easy decision for a court doing a formal lodestar analysis to eliminate all such entries as unreasonable and excessive. However, the fact that the charges were unreasonable does not make them *per se* sanctionable as a violation of professional ethics. First, in doing lodestar analyses courts routinely delete charges that are labeled "unreasonable," "excessive" or "duplicative." The mere fact that time entries are so labeled does not mean the lawyer submitting them has acted unethically. Second, the practice, while based on a fundamental misunderstanding of the "opportunity cost" concept, is not *per se* prohibited. In theory, an attorney who hated traveling and rarely took out-of-town representations and a sophisticated client who strongly desired that attorney's representation in an out-of-town matter could agree to a billing arrangement that included a travel premium, perhaps even in the form of an additional twelve-hour flat fee per trip. It would be a sort of retainer. Third, Ms. Wheelahan did not act deceptively. While she did not raise the issue, neither did she try to hide or disguise the charges. Although based on a poor reading of the law, they appeared in plain view in her fee detail.

73

In my view, this is principally a Rule 11 issue. *Maurice* and *Henry* offer such flimsy support for Ms. Wheelahan's interpretation that, if she did not violate it, she skated to the brink of Rule 11(b)(2) (legal contentions must be warranted by existing law or by a non-frivolous argument for extending the law or establishing new law). The Court has authority to impose Rule 11 sanctions on its own initiative, Fed. R. Civ. P. 11(c)(3), but any sanction must be "limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated." I believe the criticism of her position set forth herein already suffices to deter repetition by Ms. Wheelahan (who has already admitted her reading of the cases was mistaken) or others. Thus, I do not think it necessary to decide whether her reading was so strained that Rule 11(b)(2) was actually violated.

In the final analysis, then, I conclude that Ms. Wheelahan is guilty of very poor judgment, but not dishonest or sanctionable misconduct. She should have realized that billing 25-hour days would appear grossly overreaching, damage her credibility and anger the Court. She should not have included the time or at least should have explained why it was there. Instead, I suspect that she recorded the time based on her misreading of the law and then forgot about it when submitting her time records. That is, at best, sloppy practice. Nevertheless, because I found her misreading of the law sincere and her conduct non-deceptive, I do not recommend that the Court sanction her.

### B.    Supreme Court Argument

The Court also criticized Ms. Wheelahan for including in her fee detail time spent traveling to Washington, D.C. to attend a Supreme Court argument in a FCRA case that was not part of this MDL proceeding. April 6 Order at 7. Ms. Wheelahan defends the entries as appropriate because the argument involved the key FCRA issue of "wilfulness," and Trans Union counsel traveled to attend the argument. To the extent this time was for travel time "in" Washington, it presents the same issue discussed above. To the extent this time was for attendance at the argument, the fact that

Trans Union's counsel also attended the argument gave Ms. Wheelahan a good faith basis to include the time, although again she should have anticipated that the time would raise a serious question as to reasonableness and she should have explained why it was included.  But her inclusion of the Supreme Court time does not, in my view, warrant any sanction.

C.       **Other Items Flagged by the Court**

The Court referred to a few additional billing problems that, along with the preceding ones, caused it to "lack[ ] all faith in the veracity of the hours billed," April 6 Order at 8, not only of Ms. Wheelahan, but all Plaintiffs' Counsel.  These involved billing for clerical tasks, billing for unsuccessful tasks (such as MDL billing for the unsuccessful first and second settlements or Louisiana Counsel billing for certain pleadings that were stricken), billing for duplicative work, and vague billing entries.  *Id.* at 4-8.  As with the preceding issue, I do not believe these problems present any substantial question of sanctionable unethical conduct.  Rather, the issues noted by the Court are ones commonly encountered in lodestar litigation, and result in lodestar reductions. Because they were seeking a recovery under the percentage method, it appears that all Counsel simply dumped their raw lodestars on the Court (perhaps relying on cases, cited above, in which courts did cross-checks based on raw lodestars) and did little or nothing in the way of any review to eliminate administrative, duplicative, inefficient, or unreasonable dead-end time.  In my rough lodestar cross-

checks above, I accounted for such excesses in conservatively estimating substantial cuts in the putative lodestars.  Although Counsel's approach is not sanctionable, if Counsel wish to present lodestar figures or data in support of a common fund percentage fee request, a better practice in the future would be to review and reduce raw lodestars before presenting them to the Court, or to

acknowledge to the Court that the lodestar data is raw and unreviewed and attempt to defend that practice.

### D.   General Review of Billing Records

The June 11 Order appointing me as Special Master directed me to "examin[e] the time records of all counsel."  The foregoing discussion makes evident that I requested and examined counsel's time records.  Specifically, I asked for (or already had) time records of Louisiana Counsel, Texas Counsel, Liaison Counsel, *Frey* Counsel, Lead MDL Counsel and a representative sample of non-lead MDL Counsel firms.  Because I ultimately decided to do a lodestar cross-check rather than a full-blown lodestar analysis, I did not scrutinize every time entry.  Rather, I conducted enough of a review to make the rough estimates needed for the check.  I also made spot-check reviews of various time entries of Counsel to see whether there were billing irregularities other than those flagged by the Court.  I reviewed Louisiana Counsel's time entries in much greater detail.  Having done so, I saw no other issues of an ethical nature to report.

## V.   <u>CONCLUSION</u>

For the foregoing reasons, I recommend that the Court (i) order a fee award of $12.98 million including an allocation of $7,836,683 to MDL Counsel, $2,722,360 to Louisiana Counsel, and $1,815,319 to Texas Counsel, and (ii) impose no sanction on Ms. Wheelahan or other Plaintiffs' Counsel.  I thank the Court for the opportunity to be of assistance.

Pursuant to the June 11, 2009 Order appointing me, a statement detailing the time and expenses of me and my firm through September 30, 2009 is attached as Exhibit 1and is submitted for the Court's review and approval.  Please note that in the exercise of billing judgment, I reduced our raw time of $117,234.50 by $12,000 for a total request of $105,234.50 in fees and $6,041.56 in expenses, for a total request (after dropping the cents) of $111,276.  The expenses were incurred

principally to pay court reporters for my examinations of counsel and to transcribe telephone conferences with counsel. Charges for hosting conference calls (including for the examinations) and Westlaw research comprise most of the remainder.

Dated:   October 1, 2009                    Respectfully submitted,


                                            _____/s/ Edward W. Feldman_____
                                            Edward W. Feldman
                                            Special Master pursuant to order dated June 11, 2009