1

1              IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF ILLINOIS
2                      EASTERN DIVISION

3    In Re:  TRANS UNION            )
     CORPORATION, Privacy           )
4    litigation, et al.,            )
                                    )   No. 00 C 4729
5                                   )   MDL 1350
                                    )   Chicago, Illinois
6                                   )   September 10, 2008
                                    )   9:45 a.m.
7                                   )

8         TRANSCRIPT OF PROCEEDINGS - FAIRNESS HEARING

9        BEFORE THE HONORABLE JUDGE ROBERT W. GETTLEMAN

10
     APPEARANCES:
11   For the Plaintiffs:            SAUNDERS & DOYLE
                                    20 South Clark Street
12                                  Suite 1720
                                    Chicago, Illinois 60603
13                                  BY:  MR. THOMAS A. DOYLE
                                         MR. TERRY ROSE SAUNDERS
14
                                    THE BORDERUD LAW GROUP
15                                  11620 Wilshire Boulevard
                                    Suite 400
16                                  Los Angeles, California 90025
                                    BY:  MR. JON BORDERUD
17
                                    RIGHETTI LAW FIRM
18                                  220 Montgomery Street
                                    16th Floor
19                                  San Francisco, California 94104
                                    BY:  MR. MATTHEW RIGHETTI
20
                                    ZELLE HOFMANN VOELBEL MASON & GETTE
21                                  44 Montgomery Street
                                    Suite 3400
22                                  San Francisco California 94104
                                    BY:  MR. CHRISTOPHER MICHELETTI
23
     Official Court Reporter:       JENNIFER S. COSTALES, CRR, RMR
24                                  219 South Dearborn Street
                                    Room 1706
25                                  Chicago, Illinois 60604
                                    (312) 427-5351

1 | APPEARANCES:   (Continued)

2 | For Defendant Trans Union:   DLA PIPER
  |                              203 North LaSalle Street
3 |                              Suite 1900
  |                              Chicago, Illinois 60601-1293
4 |                              BY:  MR. PETER J. DONOGHUE

5 |                              O'MELVENY & MYERS
  |                              1625 Eye Street, N.W.
6 |                              Washington, DC 20006-4001
  |                              BY:  MR. BRIAN P. BROOKS
7 |
  |                              RICHARD J. PRENDERGAST, LTD.
8 |                              111 West Washington Street
  |                              Suite 1100
9 |                              Chicago, Illinois 60602
  |                              BY:  MR. RICHARD J. PRENDERGAST
10 |
  |                              TRANS UNION LLC
11 |                              555 West Adams Street
  |                              Chicago, Illinois 60661-3601
12 |                              BY:  MS. DENISE A. NORGLE

13 | For Defendant Acxiom:        ROSE LAW FIRM
  |                              120 East Fourth Street
14 |                              Little Rock, Arkansas 72201
  |                              BY:  MS. AMY STEWART
15 |
  | For the Louisiana           MS. DAWN ADAMS WHEELAHAN
16 | plaintiffs:                 650 Poydras Street
  |                              Suite 1550
17 |                              New Orleans, Louisiana 70130

18 | For certain plaintiffs:      EDELMAN COMBS LATTURNER & GOODWIN
  |                              120 South LaSalle Street
19 |                              18th Floor
  |                              Chicago, Illinois 60603
20 |                              BY:  MR. DANIEL EDELMAN

21 | For the Texas plaintiffs:    CADDELL & CHAPMAN
  |                              1331 Lamar, Suite 1070
22 |                              Houston, Texas 77010
  |                              BY:  MR. MICHAEL CADDELL
23 |                                   MS. CYNTHIA CHAPMAN
  |                                   MR. CORY FEIN
24 |

25 |

1  APPEARANCES:  (Continued)

2  For the Texas plaintiffs:        WELLER GREEN TOUPS & TERRELL
                                    2615 Calder
3                                   Suite 400
                                    Beaumont, Texas 77704
4                                   BY:  MR. MITCHELL A. TOUPS

5  For Frey plaintiffs:             ZARIAN MIDGLEY & JOHNSON, PLLC
                                    University Plaza
6                                   960 Broadway Avenue
                                    Suite 250
7                                   Boise, Idaho 83706
                                    BY:  MR. JOHN ZARIAN
8
   For David T. Murray:             CLASS ACTION FAIRNESS GROUP
9                                   2 Clock Tower Place
                                    Suite 260G
10                                  Maynard, Massachusetts 01754
                                    BY:  MR. JOHN J. PENTZ
11
   For Julius Dunmore:              MR. N. ALBERT BACHARACH, JR. P.A.
12                                  115 Northeast 6th Avenue
                                    Gainesville, Florida 32601
13
   For Robert Falkner:              MR. EDWARD W. COCHRAN
14                                  20030 Marchmont Road
                                    Shaker Heights, Ohio 44122
15
   For Christi Copeland:            MR. STEVE A. MILLER
16
   For D.J. Powers:                 MR. D.J. POWERS, Pro Se
17
   For Devern Wilson:               KIMBERLY PALMER
18                                  626 Northeast 1st Street
                                    Gainesville, Florida 32601
19

20

21

22

23

24

25

1        (Proceedings in open court.)

2            THE CLERK:  00 C 4729, In Re:  Trans Union Privacy

3    Litigation.

4            THE COURT:  Don't be shy, folks.  Come on, you're a

5    bunch of lawyers, nobody is shy here.

6            MS. WHEELAHAN:  Good morning, Your Honor.

7            Dawn Wheelahan, settlement class counsel for the

8    plaintiffs.

9            MR. DOYLE:  Good morning, Your Honor.

10           Thomas Doyle, liaison counsel for plaintiffs.

11           MR. BORDERUD:  Good morning, Your Honor.

12           John Borderud, settlement class counsel for plaintiffs.

13           MR. BROOKS:  Your Honor, Brian Brooks for Trans Union.

14           MR. DONOGHUE:  Your Honor, Peter Donoghue for Trans

15    Union.

16           MR. RIGHETTI:  Matthew Righetti, co-lead for MDL

17    plaintiffs.

18           MS. STEWART:  Amy Stewart for Acxiom.

19           MS. BULL:  Good morning, Your Honor.

20           Joy Bull on behalf of settlement class counsel.

21           MR. PRENDERGAST:  Good morning, Your Honor.

22           Richard Prendergast for Trans Union.

23           MR. CADDELL:  Mike Caddell and Cynthia Chapman for

24    settlement class counsel.

25           MR. TOUPS:  Mitchell Toups for the plaintiffs.

1          MR. ZARIAN:  Good morning, Your Honor.

2          John zarian for plaintiffs in the Frey California

3 action.

4          MR. MICHELETTI:  Good morning, Your Honor.

5          Chris Micheletti with Zelle Hofmann for the plaintiffs.

6          MR. LANG:  Good morning, Your Honor.

7          Steven Lang for plaintiffs.

8          MR. LAUGHLIN:  Good morning, Your Honor.

9          Mark Laughlin for the plaintiffs.

10          MR. BACHARACH:  Good morning, Your Honor.

11          Albert Bacharach for objector Dunemore.

12          THE COURT:  Good morning.

13          MR. PENTZ:  Your Honor, John Pentz, for David T. Murray,

14 objector.

15          THE COURT:  Good morning.

16          MR. COCHRAN:  Good morning.

17          Edward W. Cochran for objector Robert Falkner.

18          MS. PALMER:  Kimberly Palmer, associate of Paul

19 Rothstein, for Devern Wilson.

20          MR. POWERS:  Good morning, Your Honor.

21          D.J. Powers on my own behalf.

22          MR. MILLER:  Good morning.

23          Steve Miller for objector Christi Copeland.

24          MR. FEIN:  Cory Fein for the settlement class counsel.

25          THE COURT:  All right.  Good morning, everybody.  Did we

1  miss anybody?  Okay, great.  You can all have a seat, please.

2        This is here as you know for a fairness hearing.  We

3  have received briefs in support of final approval of the

4  settlement.  We received a number of objections, I believe 38 at

5  last count.  And some of them were what we would call pro se

6  objectors.  Some of them are represented by attorneys here today,

7  and I'm happy to hear them.

8        I think what we should probably do, we also got

9  responses to the objections by the plaintiffs and by Trans Union.

10        We did have, just so everybody is clear, we did meet in

11 chambers very briefly to discuss a matter that was under

12 protective order, and that's why we met in chambers.  So that

13 will become apparent later in these proceedings.

14        So I think at this time since I've heard so much from

15 the parties in this case, and I've read the objections filed by

16 the people who are here to speak, some of those folks have asked

17 to speak at this hearing to voice their objections, and I'm happy

18 to hear them.

19        We did pass around a legal pad.  If anybody wasn't here

20 that signed the legal pad, that signed in on the pad, is there

21 anybody here who didn't sign in?  I have six names here.  And I

22 would like to keep it to about 10 minutes apiece if we could.

23        So let's just start with Mr. Pentz then if he would like

24 to speak.

25        MR. PENTZ:  Good morning, Your Honor.

1          John Pentz for objector David Murray.

2          I'm used to sitting with some of these class counsel who

3    are here today in thicker class actions, including Mike Caddell,

4    Dawn Wheelahan and Mitch Toups.  I've been in no fewer than seven

5    other class actions with these same counsel in the role of

6    objector's counsel with me.  Those cases include Experion in the

7    District of South Carolina; Progressive in the Northern District

8    of Florida; Allstate in the Middle District of Tennessee; a case

9    called In Re:  Cosmetics in the Northern District of California;

10   a case against American Express for currency conversion fees in

11   the Southern District of Florida; a class action against

12   Firestone in Beaumont, Texas; and a case against Google in

13   Arkansas.

14          In each one of those cases, Mitch Toups, Mike Caddell,

15   and/or Dawn Wheelahan were also objectors with me on behalf of

16   their own clients.  And three of those cases were FCRA cases.

17   Those are Experion, Progressive and Allstate.

18          Now, in those cases, Cory Fein on behalf of

19   Mr. Caddell's firm argued that a free credit report from one of

20   the credit reporting bureaus is not worth the retail price that

21   they charge for those reports.

22          Miss Wheelahan argued, and, again, this is in Allstate

23   and Progressive, that those reports do not address the harm

24   complained of in the complaint.  These are just free credit

25   reports that the company is going to issue now for harm that

1  occurred ten or more years ago relating to something that can no

2  longer be redressed.

3        Now, in the Progressive case in particular, I wanted to

4  draw Your Honor's attention to that case, because it illustrates

5  three things that are also raised here by class counsel.  Number

6  one, in that case, and I take no delight in drawing Your Honor's

7  attention to this, but Mr. Caddell's firm was sanctioned in the

8  amount of $100,000 for his attempts to have class counsel in that

9  case replaced by his firm.

10        Now, I do have to tell you that that was reversed on

11  appeal by the Eleventh Circuit, and the Eleventh Circuit remanded

12  it back to the District Court for a hearing on that matter.  But

13  the point is that Mr. Caddell was sanctioned, and that I have

14  never been sanctioned in any case that I have appeared in.

15        The other notable thing, well, there are two other

16  notable things about that case, the issue that Mr. Caddell came

17  in to object to and try to get the class counsel down there

18  replaced on was the failure to include in the original notice of

19  the class action information about how objectors could exercise

20  their rights.  So Mr. Caddell was in that case a champion of

21  objectors and their right to come into a case, appear, and be

22  heard.  Yet in this case he has apparently seen fit to attack the

23  objectors and seen to take their clients' depositions.

24        Another notable aspect of that case is that in response

25  to the objections, which were ultimately accepted, and Judge Paul

1   in that case rejected the settlement for reasons that were raised

2   in the objectors' briefs, but in response to the filing of the

3   objections, class counsel in the Progressive case immediately

4   sought to depose each of the objector clients, and they did so.

5           Class counsel has included an excerpt of I believe it

6   was Mr. Bacharach's client in that case, and it turns out lo and

7   behold that Mr. Bacharach's client was related or married to his

8   secretary.  Well, what did Judge Paul do about that?  He didn't

9   do anything.  He rejected the settlement.  Mr. Bacharach's client

10  was right, the notice was defective, the settlement was

11  inadequate, and, therefore, the matters that they sought to raise

12  in these depos were irrelevant.  And Judge Paul did not sanction

13  Mr. Bacharach for representing his secretary's husband.

14  Apparently there is no such rule or prescription against that in

15  Florida.

16          I therefore urge Your Honor not to require such

17  burdensome and expensive -- to impose such an expense upon our

18  clients here, certainly not to travel to this court for a

19  hearing, and also not have to submit to a deposition on matters

20  that are completely irrelevant to what this Court has to decide,

21  which is whether the settlement is fair, reasonable, and

22  adequate, whether the class can be certified, and whether the

23  attorneys' fees requested are a reasonable amount.

24          THE COURT:  Let me interrupt you, because there is this

25  motion to compel that type of discovery.  I don't see any need to

1  address that at this point.  I don't really intend to do so.  I

2  don't intend to grant that motion.  I don't think it's necessary.

3  I would rather hear your objections, all of you, on the merits of

4  those objections.

5          MR. PENTZ:  Okay.

6          THE COURT:  And then we'll let the parties respond to

7  the merits.  We'll reserve whether or not anything has to be done

8  in the future, but I doubt it seriously.

9          MR. PENTZ:  Okay.  Thank you, Your Honor.  I did refer

10 to the Progressive order and to the Allstate transcript.  May I

11 submit those to the Court, permission to put them in the record?

12         THE COURT:  Sure, if you wish to.

13         MR. PENTZ:  Thank you, Your Honor.

14         One other aspect of Progressive that directly relates to

15 this case that I didn't mention is in Progressive, 10 percent of

16 the class members filed a claim for a free credit report.  That

17 was just one report in Progressive, not six months of credit

18 monitoring, which is offered here.

19         In this case according to Trans Union's latest filing,

20 out of 190 million class members, only 280,000 have signed up to

21 date.  Class counsel has to explain that.  There is only two

22 explanations that I can see for why fewer than one-fifth of 1

23 percent of the class members have filed claims in this case.

24 Either, number one, the notice campaign was not effective, and no

25 one is actually aware of this settlement, despite what the Hillsy

1  affidavit says, or people simply aren't interested in more free

2  credit reports, especially after the passage of FAFTA entitles

3  them to three free credit reports per year under federal law or

4  both.

5        It is most likely, Your Honor, a combination of both of

6  these things.  People, most people, probably fewer than 1 percent

7  of the class ever learned of this lawsuit through the banner ads

8  and the other media advertising that was carried out, and, number

9  two, those who learned of it really aren't that excited about

10  getting six months or nine months of credit monitoring.

11        The second issue I want to raise is the Crawford versus

12  Equifax case, which rejected a settlement identical to this one

13  where what was released was the right to bring a class action.

14  And in rejecting that, the Seventh Circuit said the very reason

15  for class actions is to give people with small claims the

16  leverage to get a decent recovery for that.  And if they're

17  stripped of the right to bring a class action, they really don't

18  have much of a prospect of bringing an action at all.

19        And I really question how many of these class members

20  are going to go out and file an individual action for their share

21  of that $75 million.  I can guarantee it's going to be a lot

22  fewer than --

23        THE COURT:  I think you misunderstand something.  The

24  settlement does not limit individual recoveries and individual

25  cases to the $75 million.  The amount, and this was an important

1  part of the consideration of the Court in approving,

2  preliminarily approving the settlement, Trans Union's liability

3  is unlimited as far as that is concerned.  It could be twice that

4  much or three times that much or ten times that much depending on

5  how many people file.  It would eat up the class, you know, the

6  cash reserve from the class payment, but their liability is not

7  limited to $75 million.  That's an important part of the

8  settlement.

9        MR. PENTZ:  I understand that, Your Honor.  They may

10  have to pay more than 75 million, but my guess is they won't,

11  because not enough individual actions will be filed.  And I would

12  be very curious if Trans Union had that data today, maybe they

13  can enlighten us about how many other actions are out there,

14  what's the universe?

15        If these class members weren't motivated enough to file

16  a claim for their credit monitoring, are they going to, are they

17  going to even understand that they have a right to and should

18  file an individual claim for either a portion of the 75 million

19  or amounts above and beyond that?

20        But the recovery in this case represents less than $1

21  per class member, which would be $190 million.  And in a similar

22  case where a similar per class member recovery was proposed,

23  Murray v GMAC, the Seventh Circuit said why should anybody get

24  anything?  Why shouldn't this case simply be dismissed, because

25  it only recovered $1 per class member, except for the lead

1 plaintiffs?

2       But the fact that this case could lead to the prospect

3 of millions of individual lawsuits being filed tends to undermine

4 the very argument that this needs to be a class action.  Class

5 actions are designed to avoid that very thing.

6       Class counsel also talks about the need of avoiding

7 conflicting and inconsistent adjudications on injunctive relief.

8 But that I don't understand, because this is a case for damages.

9 Trans Union has ceased the practices complained of, and it's also

10 required to comply with an FTC injunction.  Therefore, it's

11 unlikely that anyone would file a class action looking for

12 additional injunctive relief.  Instead, the class actions that

13 would likely be filed would be looking for damages for past

14 violations.

15       Each court is going to have to rule on the critical

16 issue of willfulness.  That's the only issue left in this case

17 according to Trans Union.  And it's a uniform issue that has

18 nothing to do with the merits of the individual claims.

19 Therefore, courts are virtually guaranteed to come down

20 differently on that issue setting up an appeal to the Supreme

21 Court.

22       Class counsel argues that federal courts have not

23 definitively determined whether injunctive relief is available to

24 private parties, but that would seem to have nothing to do with

25 this case.  Why should this Court have an interest in preempting

1  rulings on this issue by other courts and other circuit courts?

2  In fact, that's how law is developed in this country.  And it

3  falls to the Supreme Court to give a definitive answer to those

4  questions as it did in Safeco versus Burke.  And that is the only

5  way to really resolve this so-called federal conflict, which I

6  don't think is germane anyway, because the claims that would be

7  brought would be for damages and specifically statutory damages

8  of $1,000 per class member.

9          I will conclude there, Your Honor.  There are other

10 issues, but I believe the other objectors will be covering those.

11 Thank you.

12         THE COURT:  Thank you.

13         All right.  The next name I had on the list was

14 Mr. Bacharach.

15         MR. BACHARACH:  Bacharach.  Good morning again, Your

16 Honor.

17         THE COURT:  Good morning.

18         MR. BACHARACH:  The problem that underlies the

19 objections to the class action settlement and the class action

20 settlement's problem deals primarily with what was noted by this

21 Court's September of 2002 and a couple months earlier by two

22 dissenting United States Supreme Court justices, which is that

23 the value of this case would bankrupt Trans Union, that if there

24 are 190 million class members according to the FTC and at that

25 time I guess the D.C. Circuit, and each one of those class

1  members get $1,000, it's 190 billion dollars.  I couldn't write

2  that check, and I'm not sure that Trans Union could either.

3         And so it seems to me in reviewing what's been going on

4  in this Court, that has the benefit of a lot more information

5  than I have just looking at documents, is that the Court is

6  trying to reach some kind of balance between a reasonable

7  settlement of the class action so that the class action claims

8  can be dealt with with regard to these not particularly valuable

9  individual claims without putting the Court in a position where

10  as this Court said and the Supreme Court said the settlement

11  bankrupts Trans Union.

12         I believe that when Magistrate Judge Mason looked at all

13  of this in a report and recommendation about a year ago now, he

14  didn't translate it, but he walked through the same steps of

15  analysis with this big problem with regard to what to do with

16  this.  This is like the dog that chases the car and actually

17  catches it.  What do you do next?

18         The issue that I'd like to address briefly, because you

19  probably thought through this, I know it was mentioned by

20  Magistrate Judge Mason, is that doing a value analysis in the

21  Seventh Circuit under Reynolds, you have to look at the number,

22  the $19 billion of $100 apiece for 190 million people.

23         And then assuming, as Judge Posner did, that there is a

24  50/50 chance of loss, you still have a 50 percent possibility of

25  getting the low end of this case, and that's $9 billion.

1      If you juggle the numbers, and Judge Posner said, "Well,

2  you take a high, a medium, and a low and assign part of your

3  percentage of 50 percent to each of those numbers," even if you

4  went with the low, if you said you had, you know, you were going

5  to go with a 20 percent chance of getting half the money, $9

6  billion, I believe that it so far outweighs the value of this

7  settlement that the numbers don't match up.

8      And so Mr. Dunmore's problem with this is twofold.  One,

9  we think that the benefit is really ephemeral.  I think there is

10  an attempt to make it a nonephemeral benefit by putting language

11  in Section 2.8 that post approval by this Court, people can't

12  bring a class action with regard to Trans Union on the individual

13  or group claims.  You can't bring a class on behalf of all the

14  clients or, I'm sorry, all the persons in Florida that would meet

15  the standard.

16      And then they also say that you can't bring a joint

17  claim.  Now, that struck me, because in my real life I do

18  disability law, so I have a database of probably 6,000 or more

19  people that I've represented over the last 30 years against the

20  Federal government, either the VA or Social Security or some

21  agency, but I can't join those people in any kind of action in

22  order to get them paid out of the 75 million, and I can't

23  aggregate the claims, although I'm not any more familiar with

24  that term than I think most lawyers are.

25      I think the language clearly is to force people to bring

1 the claims one claim at a time against Trans Union, which is

2 interesting, because it would seem that Trans Union with regard

3 to the same $75 million has no incentive whatsoever to defend

4 these claims, because only the money paid out in terms of a

5 judgment or settlement of a Fair Credit Reporting Act violation

6 comes from the 75 million.

7         The actual attorneys' fees that Trans Union would have

8 to pay to defend these, I don't think they're putative, but I

9 can't think of a better word, putative claims, is Trans Union's

10 dime.  So it's structured so that the money that Trans Union is

11 giving to the settlement fund they retain a beneficial interest

12 in so that they can write checks off of it and settle each and

13 every claim that people file.  And to try and prevent that, it's

14 made harder for individuals and groups to bring these claims by

15 the language that prevents aggregating claims and filing on

16 behalf of numerous plaintiffs.

17         So even if the Court were inclined to accept the

18 structure of this particular settlement, that language should be

19 required to be removed to allow the people who are within the 190

20 million member class to move forward and collect from Trans Union

21 actual cash money benefits.

22         But because whether or not it's difficult, it's only

23 going to be difficult for poorer clients to do.  Wealthier

24 clients with wealthier attorneys can probably set this up as

25 people did when the court in Philadelphia approved the fen-phen

1  settlement to advertise for people, bring the claims, settle the

2  claims, take money from the 75 million, pay the lawyers and the

3  clients and keep it running.

4       But a group of working class people probably are not

5  going to be able to go together and say:  We're the Carpenters

6  Union Local 207, and we'd love to bring a claim and get some

7  money for our members.  So I really --

8       THE COURT:  Why couldn't they do the same thing you just

9  described?

10       MR. BACHARACH:  I'm sorry, what?

11       THE COURT:  Why couldn't they do the same thing you just

12  described?  If you had a bunch of people with a common interest

13  like a union, for instance, they could hire a lawyer and just

14  file a bunch of lawsuits?

15       MR. BACHARACH:  Sure, but --

16       THE COURT:  And knowing that if they recover, they're

17  going to get their filing fee back and all their costs and

18  attorneys' fees.

19       MR. BACHARACH:  Well, possibly.  But just as in this

20  case, we're short-circuiting the process and they're not taking

21  this to trial before you with regard to the issues.  I believe

22  the ABA statistics would show you that well over 80 percent of

23  all matters in federal and state court are settled, and so it's

24  not quite as linear as you say.

25       You're correct, it's just that faced with a large number

1 of suits, that there is probably going to be an issue of the

2 clients having to eat the costs, just like Trans Union on the

3 other side are going to be, you know, eating costs.  And so the

4 settlement, for example, on a claim might be for a thousand

5 dollars flat.  And in a jurisdiction where you pay $350 to file

6 your lawsuit, and you're going to be paying 40 percent to your

7 lawyer, it would be a better deal if the client were able to

8 aggregate and bring it actually on behalf of all of an

9 identifiable group, pay the filing fee one time, and lessen their

10 costs by thousands and thousands and thousands of dollars just

11 depending on the size of the group.

12        Also, it did occur to us that at the end of two years,

13 should people see this as a lucrative subspecialty of bringing

14 these Trans Union claims, there won't be any money left to

15 distribute to the class members.  And so on some level the Court

16 has to consider that the $75 million is somewhat ephemeral and

17 that it may not exist at the end of the two years.

18        So built in to Mr. Dunmore's objection is a request that

19 the Court not deal with any issues with regard to attorneys' fees

20 until the two-year period runs and the Court has some knowledge

21 as to whether or not the unnamed class members who have gone to

22 the website and done a little check mark, "If there is any money

23 left, I would like some in two years" actually get some.

24        Thank you, Your Honor.

25        THE COURT:  Thank you.

1        All right, Mr. Cochran.

2        MR. COCHRAN:  Edward W. Cochran of Cleveland, Ohio for

3   Robert Falkner.

4        Your Honor, sometimes when I get up I feel like I'm

5   stuck to my seat.  On this occasion, I literally was by a piece

6   of gum.  If that comes to your appearance, Your Honor, I

7   apologize.  That just happened.

8        THE COURT:  All right.  Who was chewing gum?  I

9   apologize if somebody left gum in my courtroom.  That would be a

10  first.

11       MR. COCHRAN:  Your Honor, I agree essentially with

12  Mr. Pentz and Mr. Bacharach and everything they had to say.

13       As far as Mr. Pentz's reference to the other objection

14  cases in which some of class counsel were involved, his point is

15  well taken as far as Your Honor has already addressed that

16  question.

17       I would like to say I was in most of those same classes,

18  including Progressive.  I don't think any of the objectors or

19  myself, I think Mr. Pentz included in the other, do not believe

20  that the sanction that was imposed on Mr. Caddell was deserved at

21  all.  I don't want there to be any impression to the contrary on

22  the record.

23       THE COURT:  I really think that's a red herring as far

24  as I'm concerned.

25       MR. COCHRAN:  I understand, Your Honor.

1          My objection, my principal objection to the structure of

2     this settlement is the conflict of interest it creates by

3     essentially creating two groups in conflict with each other.  The

4     way class counsel and defendant have decided to structure this

5     settlement as you well know is the lawsuit is over here, 75

6     million, whatever is left over to a group that doesn't file

7     lawsuits but does register.

8          That is right now about 280,000 people.  To me there is

9     clearly a conflict of interest between those people, because the

10    more that is paid out in those lawsuits, the less there is

11    remaining for those, let's say 300,000 people who have dutifully

12    registered for a claim and may indeed get nothing, but for sure

13    will get an amount that is in competition with the litigation

14    group, which I'll call them the litigation group and these people

15    the registration group.

16         THE COURT:  You mean the people who registered to share

17    in the remainder that might be left over after the two-year

18    period?

19         MR. COCHRAN:  That's correct, Your Honor.

20         THE COURT:  You're saying there is a conflict between

21    them and the people who actually take the initiative to file a

22    lawsuit?

23         MR. COCHRAN:  Yes.  I think that group I have been told

24    is roughly 280,000.  Yet, I believe there is a little time left.

25         But I don't think the Court should condone this.  I

1 think there is an easy remedy for it.  But if it goes as it is to

2 the Court of Appeals, I don't see how it can withstand the

3 scrutiny of that conflict and the various U.S. Supreme Court

4 cases and Court of Appeal cases who address this issue of

5 conflict.

6        Those two groups of people ideally should have separate

7 counsel appointed from among class counsel.  To negotiate in good

8 faith how each of those two groups share in this 75 million, if

9 it's going to be 75 million, then sobeit, I'm not addressing

10 that.  How is it to be split up?  That has not been done.  It

11 could still be done, or it could be done in negotiation with

12 objectors, of course, such as myself who have raised this issue.

13        The ancillary problems to this conflict are many.  First

14 of all, you have people filing lawsuits.  They're also incurring

15 filing fees and attorneys' fees and other expenses.  And the

16 people that take some of that $75 million via litigation are

17 probably going to face a net recovery of half.

18        If a lawyer charges a 40 percent fee, and expenses are

19 another 10 percent, or if he charges by the hour, Your Honor,

20 given the size of these claims, you're talking about a very large

21 portion of those litigated claims going to other lawyers, other

22 places in addition to the fees that are already being sought,

23 which are I presume going to be 25 percent.

24        Now we're going to pay millions more dollars in fees for

25 all that litigation out of the same money, which, by the way, is

1 reducing the amount for the 300,000 people, let's say, who have

2 thus far registered and --

3        THE COURT:  Wait a minute.  You're assuming that out of

4 a $1,000 settlement, the plaintiff would pay his attorney or her

5 attorney, correct, rather than getting a settlement of some

6 minimal amount plus attorneys' fees and costs?

7        MR. COCHRAN:  But that still comes out of the 75

8 million, does it not?

9        THE COURT:  I understand your point about that.  Now

10 you're making the same point I think that Mr. Bacharach was

11 making, that there is not going to be much incentive for a

12 plaintiff to file an individual case, because after paying a 40

13 percent fee -- I don't know if it would be a 40 percent fee, that

14 sounds high to me, but that's neither here nor there -- but after

15 paying a percentage fee to his attorney on a contingency basis

16 and costs and everything else, there won't be enough left for

17 them to be worth it, to be worth filing these cases, in which

18 case, if you are right, there will be a lot left in that $75

19 million.

20        MR. COCHRAN:  Yes.  We honestly don't know that answer,

21 Your Honor.  We won't know it for two years.  But I don't think

22 it makes sense to go into the process saying:  Let's just leave

23 it to chance.  Let's let the same counsel negotiate the

24 entitlements of the litigation group and the registration group.

25 And let's just send it into a litigation and claims process and

1  worry about it later.

2       I think the solution -- and, of course, needless to say,

3  if the case doesn't withstand the Seventh Circuit, all the more

4  reason to consider the issue.  To me there is a fairly simple

5  solution, which is to take a portion of the 75 million and set it

6  aside solely dedicated to the people who register for

7  administrative claims, here again I'm estimating 300,000.

8       If you were to do that, you could open up potentially or

9  possibly, but not necessarily, open up the claims process to that

10  fund as well via the Internet or other means and at least say to

11  the class that we have considered the interests of both interests

12  in this 75 million in advance.  We've compromised them in good

13  faith with separate attorneys having this interest and one

14  attorney having that interest.  And if it's me, Your Honor,

15  obviously I want that fund to be as large as possible, or I

16  wouldn't be making this objection.

17       If it's one of class counsel who are appointed to

18  represent that interest, sobeit.  But some number should be set

19  aside, whether it be 10 million, 20 million, 30 million, to put

20  some certainty into that process and to encourage people, notably

21  encourage people to file those claims perhaps instead of federal

22  court cases that may be filed.

23       I think if there were 300,000 people, and there were a

24  $30 million fund, doing the math in my head, it's about $100

25  apiece.  And I would sort of work off the 280,000 to determine

1  that if I were negotiating it, and I think 30 million is a fair

2  and sensible amount to set aside, it can be done.  I don't know

3  how much of an objection the defendant would pose to that, Your

4  Honor, but the defendant would be involved in those negotiations

5  as well.

6          And I think the settlement would be immensely better and

7  would certainly resolve my or anyone else's objection as to

8  conflict of interest among the class.  And I would, if it's not

9  clear already, Your Honor, love to volunteer for that job, but

10  I'm not insisting it be me.  I want it to be done.

11          Thank you.

12          THE COURT:  Thank you, Mr. Cochran.

13          Mr. Miller?

14          MR. MILLER:  Your Honor, Steve Miller on behalf of

15  Christi Copeland, objector.

16          At this point I'm not going to belabor, I join in the

17  objections that have been articulated to the Court.  Those points

18  were the points that I was going to make.  But I would like to

19  summarize a couple of things and I hope bring into focus that

20  Jeffrey Miller, the expert for the class and class counsel said

21  it I think quite accurately in his affidavit, his declaration,

22  "This is exactly the sort of case for which the class action

23  procedure was designed.  It is clear that the claims of some 190

24  million individual class members are too small to justify

25  individual litigation."

1          And I find it curious that in what is being touted as

2     the largest class action in history, that class counsel puts

3     themself in a conflict by negotiating a settlement that benefits

4     nonmembers of the class and set up a settlement fund that is

5     depleting.

6          In fact, in my 30 years of trying cases in state and

7     federal courts, if this were a non-class case, and counsel came

8     in on a contingent fee and negotiated a settlement in which the

9     counsel was guaranteed 25 percent of a fixed dollar amount, but

10    the client was subject to a depleting and possibly ultimately

11    zero recovery, no court in the land would permit that kind of

12    relationship or arrangement or settlement.

13         So I agree with Mr. Cochran that, one, and as Mr. Pentz

14    pointed out, that this case is clearly properly set up for class

15    action treatment.  And for people who are class members, which

16    apparently is half the country, there ought to be a fixed sum, a

17    fixed sum.

18         Mr. Cochran's proposal makes some sense, but I also

19    point out to the Court, which has been pointed out by other

20    objectors, that just if you assign a dollar, a dollar to each

21    potential class member, that's $190 million.  A $75 million

22    settlement fund is woefully inadequate.

23         So I suggest, Your Honor, that the amount of the fund

24    needs to be revisited, and that I agree with Mr. Cochran that a

25    fixed amount needs to be established for administrative claims

1   for class members, and that I also suggest that counsels' fee, if

2   the Court is not going to make those enhancements to the

3   settlement, then if the Court is going to permit a depleting

4   fund, then the counsels' fee needs to be attached to the

5   depleting fund.

6          In other words, the counsel should not receive 25

7   percent of $75 million, but, rather, after two years of claims

8   administration should receive whatever their client, the class

9   members ultimately get out of this.  And if it's close to zero,

10  then sobeit.

11          And then I'll make a final point that what I would call

12  coupon-like portion of this settlement, the six-month credit

13  monitoring and right to get a credit report as I've pointed out

14  in the written objection has very little value.  All the

15  objectors have pointed out, that the Federal Trade Commission has

16  even stated publicly, that you can get three of these reports

17  free annually if you do it right, and you can probably get a free

18  credit report, I'm sure you can, if you make a credit

19  application.  And otherwise the cost of getting a credit report

20  is not that great.

21          And so the value that's being given here to the class

22  members is nominal at best for, again, what I characterize as the

23  coupon portion.

24          So in summary, please reconsider the amount of the

25  settlement.  Please consider affixing a significant portion of

1  that settlement for class members.  And reconsider the attachment

2  of the attorneys' fees.  And if it's going to be a depleting

3  fund, then make the attorneys' fees attach accordingly.

4          Thank you, Your Honor.

5          THE COURT:  Thank you, Mr. Miller.

6          Mr. Powers?

7          MR. POWERS:  Thank you, Your Honor.

8          I'm here on my own behalf, although as you'll see in

9  sort of the law aspect of my objection that I am an attorney.

10         When I was in law school, the civil procedure professor,

11 I'll never forget, told me one of the greatest injustices are

12 always done through manipulating the rules.  And so what I want

13 to talk to you today is about how they're manipulating the class

14 action rule by trying to certify this class under Rule

15 23(b)(1)(a).

16         Before I address that though, Your Honor, I want to

17 address and object to an attempt by some of the class counsel to

18 change the settlement agreement apparently in opposition to other

19 class counsel and to the defendants.  Here is what I am talking

20 about.  And I've read through I think all the filings that they

21 have filed over the past week.

22         In the settlement agreement, and ironically on page 23

23 where it talks about class certification, it very clearly says

24 that "The class will be certified solely under Rule 23(b)(1)(a)."

25 In the proposed order at the time they provided it to you, it

1  said certification under 23(b)(1)(a).  In the order you signed,

2  Your Honor, it was 23(b)(1)(a).  We then objected, objected that

3  it is not certifiable under that rule.

4       After that, now, Ms. Wheelahan filed a brief, I think it

5  was document 489.

6       THE COURT:  Let him talk, Ms. Wheelahan.

7       MR. POWERS:  I'm sorry?

8       MS. WHEELAHAN:  I didn't file that.

9       MR. POWERS:  Well, there was a document 489 that I

10  believe had her name on it, but whatever the document, I believe

11  it is document 489 that argued solely for certification under

12  23(b)(1)(a).

13       Trans Union's response also just talked about Rule

14  (b)(1).  And document 507, which I think Ms. Wheelahan filed, but

15  I could be wrong on that, but it was document 507, makes a big

16  point that this is not a (b)(3) class.

17       So the notice we got before we had to fill our objection

18  was very clear, this is not a (b)(3) class.  It's a (b)(1)(a)

19  class.  Yet, and I believe it was the Caddell & Chapman firm's

20  memorandum, document 498 argues for a 23(b)(3) class.

21       MS. WHEELAHAN:  It's a mistake, Your Honor.

22       MR. POWERS:  Okay.  So we're clear that this class will

23  not be certified under 23(b)(3)?

24       MS. WHEELAHAN:  That filing was a mistake.  It was a

25  mistake.

1          MR. CADDELL:  Wait a minute.  Wait a minute.  Let's

2   listen --

3          THE COURT:  Excuse me, counsel.

4          MR. CADDELL:  Yes, Your Honor.

5          THE COURT:  Let's let him, Mr. Powers speak, and you'll

6   all have an opportunity to respond.

7          MR. CADDELL:  Thank you.

8          MR. POWERS:  Clearly, Your Honor, there is disagreement

9   apparently on the class counsel side.  From the objectors' side,

10  it absolutely could not be considered, because we were going to

11  have no notice whatsoever that this was going to be certified

12  under that rule, so I would object.

13         THE COURT:  Under (b)(3)?

14         MR. POWERS:  Under (b)(3), exactly.

15         THE COURT:  All right.

16         MR. POWERS:  With that, let me then turn to Rule

17  23(b)(1)(a) and talk about why it's not certifiable under that

18  rule.  That rule provides that the prosecution of separate

19  actions by or against individual members would create a risk of

20  incompatible standards of conduct.

21         The classic example, and I believe it's in the comments

22  to the rule, is that the lawsuits against a municipality where

23  some individual sued the municipality, won an injunction to issue

24  bonds, and others sued to stop the issuance of bonds.

25         And the problem you have is that you could have one

1  injunction saying issue the bonds, another one says don't issue

2  the bonds, and the city can't comply with both, because

3  compliance with one would violate the other.

4        That's the rare instance that we're talking about for

5  Rule (b)(1)(a), and that's what they're trying to do.

6        In their response to objection, they talk about the two

7  primary purposes of Rule 23, avoidance of duplicate litigation

8  and inconsistent standards.  This settlement is nothing on those

9  two things.   In fact, this settlement is the very antithesis of

10 what this rule is supposed to do.  The rule seeks to prevent

11 individual cases and instead consolidate them all into one case

12 on the issue that is being brought by the plaintiffs.

13        This case, this settlement is the exact opposite.  There

14 is no, even though we're all here in one MDL proceeding to get

15 one ruling, they're saying:  No, no.  We're not going to do that.

16 We're going to go out, and everybody has to file their own

17 individual case.

18        The second problem, the rule addresses the risk of

19 incompatible standards of conduct.  Again, the best way to get

20 rid of that risk would be to have one case, which is what we have

21 here in the MDL proceeding.

22        Where is the standard of settlement or the standard --

23 I'm sorry -- where is the standard of conduct in this settlement?

24 There is no injunction.  There is no declaratory judgment.  There

25 is no ruling of the law whatsoever ever.  The rule very clearly

1  says the purpose of certifying here is to get one standard of

2  conduct.  But we're not getting it.  So the rule is not met.

3       In fact, the settlement increases the risk of

4  inconsistent standards, because now we're going to have

5  potentially millions of lawsuits across the country with

6  potentially opposing outcomes.

7       The third point I want to make on this, Judge, is they

8  made misrepresentations to the Court in trying to get you to

9  certify this.  I'll give you one example that just jumps out.  In

10  their document they filed for preliminary approval, their memo at

11  462-2 at page 19, they said:  The plaintiff class, plaintiff

12  settlement class is also appropriate for certification under

13  23(b)(1)(a) because -- and here is the kicker -- this settlement

14  does not involve money damages.

15       I've just heard 30 or 40 minutes of people talking about

16  this $75 million in money damages that are involved in this case.

17  So their argument directly contradicts their entire claim for

18  this settlement.

19       The last thing I want to object to, their response to

20  the objections, they argue that 23(b)(1)(a) is proper, because

21  injunctions issued in other class actions, if the Court were, you

22  know, if there were other cases out there, other class actions

23  might conflict with each other or might conflict with the FTC

24  injunction.

25       Well, put aside the fact that this is an MDL proceeding,

1  so basically all those cases would come in here if there were

2  other cases filed anyhow.  Their first error is this, and this is

3  also in Professor Miller's affidavit there he makes, they talk

4  about the risk of other class actions.  That's not what the rule

5  talks about.  The rule talks about the risk of individual

6  actions.

7          The second thing is what are these potential conflicting

8  rulings that they're talking about?  They're saying there is a

9  possibility out there there might be these conflicting

10  injunctions.  Well, what are they?  When people sue under this

11  cause of action, it's been asserted they might get an injunction

12  saying, "Trans Union, you shall not release this data anymore."

13   Well, what's the other one it might be opposing?  The only

14  possible thing I can think of is an injunction saying "You must

15  release this data," right?

16          But no court in the land is going to if there is no

17  cause of action to support that.  There is absolutely no legal

18  theory to support a requirement for them to do that.  So there is

19  absolutely no potential for these alleged conflicting results in

20  these other cases.

21          But here is the real kicker, Your Honor.  Let's even put

22  that issue aside.  Let's assume that they can dream up -- and

23  they have never, by the way, identified any two potential

24  outcomes in these other cases that would be conflicting to

25  satisfy this rule, but assume that they could.  And, in fact,

1  let's just take the FTC injunction.  One of the arguments they

2  make is that one of these other cases might conflict with the FTC

3  injunction.  That very thing could happen under your settlement,

4  because people are allowed to file individual class actions or

5  individual actions.  So those outcomes could just as easily

6  conflict with the FTC injunction as the other class actions they

7  talk about.

8          So in conclusion, Your Honor, it's very clear that they

9  do not satisfy this rule.  It's a very, very limited rule.  It's

10  been very rarely used across the country.  This is not the case

11  to use it in.  So, therefore, I would also refer to the rest of

12  our objections that have been talked about.  Thank you.

13          THE COURT:  Thank you, Mr. Powers.

14          All right.  Ms. Palmer?

15          MS. PALMER:  Your Honor.

16          THE COURT:  Good morning.

17          MS. PALMER:  One of the big arguments for the fairness

18  of this settlement has been that it's addressing procedural

19  rights, that the class members are still retaining their

20  substantive right.  The problem I see with this is that at this

21  point there is no way to know what those procedural rights are

22  being surrendered for.

23          If the cash fund becomes completely consumed by people

24  bringing individual substantive claims, then the class, 190

25  million people have given up procedural rights for basically

1   nothing.  And procedural rights are at least as valuable as the

2   substantive rights in this case, because the procedural right is

3   what makes possible gaining the substantive rights in a practical

4   sense without the ability to bring a class action or even to join

5   claims or to, quote, aggregate cases.

6           Once the cash fund is gone, those class members who gave

7   up their procedural rights and did not bring a substantive claim

8   have given up something and received nothing.  And I just want to

9   add this to the other points made by Mr. Pentz, Mr. Bacharach,

10  Mr. Cochran, Mr. Miller, and Mr. Powers, and I want to reiterate

11  the objections in our original documents.  But it seems to me

12  here that procedural rights are being surrendered for possibly

13  nothing, and that just can't be fair.

14          Thank you.

15          THE COURT:  Thank you.  All right.  Is there anybody

16  else who didn't sign up who wants to say anything in support of

17  an objection?

18          All right.  Let me turn it over to the plaintiffs at

19  this point.

20          MS. WHEELAHAN:  Your Honor, if this works, I'll just go

21  one by one in the order that the objectors spoke rather than

22  segregating out the issues, unless you'd like to do it another

23  way.

24          THE COURT:  Go ahead.

25          MS. WHEELAHAN:  I'd like to correct just for the record

1  that Mr. Pentz and I have not participated in class actions or

2  objections together.  We both objected to a settlement in

3  Gainesville, and we objected to one in Nashville for entirely

4  different reasons.  And the other cases he mentioned I had

5  nothing to do with.  There was one in South Carolina as well.

6       Mr. Pentz mentioned the Crawford versus Equifax case.

7  That was a case that talked about the right to a class action

8  being given up.  Nothing was given to those class members for

9  giving up their rights.  In this case, these class members are

10  well compensated for the rights that they give up, the procedural

11  rights.

12       The other difference in the Crawford case was that class

13  certification had never been considered, let alone denied twice

14  in that case, which is the circumstance in this case.  The

15  procedural rights these class members are giving up has been

16  twice denied by this Court.

17       Mr. Pentz talked about Murray v. GMAC case.  That case

18  released all rights substantive as well as procedural, whereas

19  this case only releases procedural rights.  So I think the

20  valuation argument is erroneous, because in Murray they were

21  valuing the substantive rights.

22       There is an injunction in this settlement in Trans

23  Union's favor.  Rule 23(b)(1)(a), the advisory comments advice is

24  intended to protect defendants; whereas (b)(1)(b) is intended to

25  protect plaintiffs, (b)(1)(a) is intended to protect defendants.

1        The injunction entered by the settlement prohibits

2   future class actions.  And the only claims technically certified

3   in this case are those procedural claims.  That's why we picked

4   (b)(1)(a).  It's Trans Union after this settlement that needs the

5   protection.

6        Mr. Pentz raised an issue that each court would have to

7   rule on individual cases that were filed.  That's not so, because

8   collateral estoppel answers that.

9        Mr. Bacharach talked about Magistrate Mason's report.

10  That's considered an entirely different settlement.  That

11  released substantive rights to punitive damages.  This case does

12  not release those rights, and so, of course, the valuation

13  analysis is different.

14       Rule 23 specifically provides for divided

15  certifications, for certifications of cases with respect to

16  particular claims and particular issues.  Those things are cited

17  in my brief.  When there is something new, I'll tell you, and

18  I'll try to find Mr. Gilman a citation.  But for now, those

19  issues are addressed in our briefs.

20       Mr. Bacharach mentions that in his real life he does

21  disability claims.  This is my real life.  And the individual

22  claims that he talks about being brought by unions, we structured

23  this settlement the way that it is structured so that the fund

24  would not be unfairly dissipated by large what we call mills,

25  plaintiff mills, who would file up hundreds of claims with a

1  single filing fee and deplete the fund that way.

2          Now, even though the fund is not limited in any way,

3  even though Trans Union's liability is not limited by the fund,

4  still we did not think it would be fair to have those plaintiff

5  mills take all the money.

6          Your Honor raised a correct fact that anyone who pays a

7  filing fee gets it back if they have a legitimate claim.  They

8  get their costs and their fees.

9          There was some talk about attorneys' fees coming out at

10 the end in a depleting fund.  Any attorneys who come in and bring

11 claims for their clients will have done additional work.  We're

12 asking to be paid.  We'll address attorney fees later.  But in

13 this settlement we asked to be paid for the work that we've done.

14 We've made a fund available.  Trans Union has an incentive to

15 settle claims out of that fund, because the money is there, and

16 it doesn't revert to them.  It doesn't revert to Trans Union.

17         So FCRA provides for a statutory hourly attorneys' fees.

18 The money doesn't come out of the $1,000 that a plaintiff might

19 get.  FCRA provides for hourly fees.  Class action lawyers seek

20 fees on a common-fund basis.  It's a different basis for

21 compensation.  Individual lawyers would be paid hourly under

22 FCRA, and so they're entitled to be paid for additional work that

23 they do.  There is no need to approach it under any sort of

24 depleting-fund analysis.

25         There is a case called Boeing v VanGamert, it's Boeing,

1   and the last name is V-a-n-g-a-m-e-r-t.  It's a Supreme Court

2   case.  It talks about attorneys, common-fund attorneys being

3   entitled to be paid on the fund that they create even when the

4   fund remains unclaimed.  But we'll address those issues for you

5   later when we do the fees.

6            Mr. Cochran talked about a conflict among class members

7   because of the part that goes to registrants and the part that

8   goes to the litigants.  We don't see that as a conflict, and the

9   reason that we don't, first of all, it's speculative.  There is

10  nothing to suggest that that fund would be depleted by individual

11  lawsuits being filed, and the evidence is that it will not.

12           But the difference in a case like AmCam, for instance,

13  in which there was a conflict, and Ortiz as well in which there

14  was a conflict between asbestos claimants with present injuries,

15  and those with future injuries that would manifest later, the

16  difference in that case and this one and that these claimants in

17  this class have a right to choose right now whether they will

18  file an individual lawsuit or whether they will select to receive

19  benefits out of the fund.

20           The AmCam claimants, they didn't have a choice about

21  whether they would be a presently injured or a future injury

22  claimant.  They were who they were.  They didn't get to choose.

23           THE COURT:  Well, I think his point is that if you set

24  aside a certain portion of this fund for the people who are

25  opting for the residual claim, we'll call it, that would

1   guarantee that there would be something there for them.

2           MS. WHEELAHAN:  I would like to talk to Trans Union's

3   counsel about that.  We'd like to discuss that.  And I would also

4   suggest that there should be a top limit on how much people get.

5           THE COURT:  Well, it's going to be, he said -- are there

6   currently 280,000 people who have opted in to the residual?

7           MR. BROOKS:  No, Your Honor.  One of the things I'll

8   address in a moment is the complete breakdown of the current

9   numbers.  It's significantly larger than that --

10          THE COURT:  Okay.

11          MR. BROOKS:  And significantly smaller than the

12  residual.

13          THE COURT:  Smaller than that.

14          MS. WHEELAHAN:  Right.  There is no evidence that fund

15  is going to be depleted.

16          THE COURT:  All right.  But, I mean, the idea, I hadn't

17  heard that idea before, but that idea has some appeal --

18          MS. WHEELAHAN:  I thought so, too.

19          THE COURT:  -- that we at least guarantee some residual

20  amount at the end of the day, you know, that doesn't cost Trans

21  Union anything --

22          MS. WHEELAHAN:  Sure.

23          THE COURT:  -- additional than they have already

24  bargained for, but it would guarantee at least some people, those

25  who did elect to do that, rather than keep their options open, to

1  have something there to get.

2         Whether or not you think, you know, the evidence is

3  strong that there will be something left, you may be right, and

4  he may not, we just don't know at this point.

5         MS. WHEELAHAN:  Now that we have the numbers, Your

6  Honor, I think we're better able to do that.  My thinking at the

7  outset was that we didn't want to limit these claims in any way

8  that would prejudice the class members.  Now that we have the

9  numbers, I think we're able to do it.  And so we'll talk about

10 that.

11        Again, Mr. Cochran mentioned the fees, the attorneys'

12 fees.  I'll just address that.  Lawyers who file claims do

13 additional work, they're entitled to be paid for it.  We're just

14 looking to be paid for the work that we've done in creating that

15 fund.

16        Mr. Miller apparently misunderstands that people who

17 bring individual claims would not be class members.  Only class

18 members can bring individual claims.  Whether they choose to

19 register for part of the fund or to bring their own lawsuit, all

20 of them are class members.  There is not some people who are and

21 some people who aren't.  So what Mr. Miller mentioned is there is

22 a depleting fund, it actually goes to the class members, any

23 individual claim goes to the class members.

24        Mr. Powers talked about (b)(1)(a) structure.  Collateral

25 estoppel answers the individual issues argument.

1        Rule 23(b)(1)(a), the advisory comments note is intended
2   to protect defendants as I mentioned before.

3        This settlement does not certify damages claims.  People
4   can opt in to settle them on an opt-in basis, but this settlement
5   does not release anybody's damage claim that doesn't want it
6   released.  In fact, the settlement extends the statute of
7   limitations out two years to bring those claims.

8        The injunction that the 23(b)(1)(a) structure is based
9   on is the injunction in favor of Trans Union prohibiting a future
10  class joinder aggregated action.  The authority for that is
11  Kalavata v. Omosaki, which says that courts have broad powers to
12  enter injunctions in cases before them.

13       Ms. Palmer spoke about the procedural rights being
14  dismissed for nothing.  Well, they're not dismissed for nothing.
15  They're dismissed for a $75 million fund, which gives Trans Union
16  an added incentive to resolve individual claims that are brought,
17  because they don't get the money back anyway.  And they get, the
18  individual claimants get six months of not credit reports, credit
19  monitoring services, which provide a daily credit report, a daily
20  score any time they want to look at it for six months, and
21  identity theft insurance.

22       With the enhanced package, there are mortgage simulators
23  and insurance scores.  This Court has twice denied certification
24  of a nationwide class.  I think that considering that we have
25  valued these claims and compensated them very well.

1          And we have a problem with our preliminary order that

2    was submitted, and we would like to resubmit a different order.

3    There are a number of problems in it.  It mentioned the Andrews

4    case for one thing, and I think we have to go back to Louisiana

5    and get that one dismissed.  Judge, I don't think I'd like to

6    appear before her without doing that again.

7               THE COURT:  I'm sorry.  I couldn't hear you?

8               MS. WHEELAHAN:  We have a case in Louisiana called

9    Andrews that we'll need to get dismissed.  But it's certified, so

10   we have to go back to that judge and ask for her to dismiss it.

11   This Court can't do that.

12              THE COURT:  What other problems are there in the

13   preliminary order that you submitted?

14              MS. WHEELAHAN:  Well, there is that (b)(3) thing.

15              THE COURT:  The (b)(3).

16              MS. WHEELAHAN:  That got in there without my seeing it.

17   And I think unless there is another question you'd like for me to

18   answer --

19              THE COURT:  Well, let's see, I'll hear from everybody,

20   and then I may have some questions for all of you.

21              MS. WHEELAHAN:  Okay.

22              MR. BORDERUD:  Your Honor, could I just check with my

23   co-counsel for a minute and see if they have some additional

24   comments, and if not, we'll tender it over?

25              THE COURT:  Sure.

1    (Discussion off the record.)

2         MR. CADDELL:  Good morning, Judge Gettleman.

3         THE COURT:  Good morning.

4         MR. CADDELL:  Let me respond to a couple of things.

5    Mike Caddell settlement class counsel.

6         First, Your Honor, it's important to put this in

7    perspective, we've said it in our papers, but I think it bears

8    repeating, because it doesn't often, you're not often able to say

9    this, this is a settlement that's been hailed as unprecedented,

10   astonishing, mind-boggling, remarkable.

11        It's been lauded by State's Attorneys General.  It's

12   been lauded by consumer advocacy groups.  There have been reports

13   in everything from Forbes to Money Magazine to the LA Times, the

14   Washington Post about this settlement and what a tremendous

15   benefit it is for consumers.

16        People who mistakenly equate a single credit report,

17   which you're able to get for free, one from each of the three

18   major credit reporting agencies on an annual basis with six

19   months of credit monitoring miss the point, I mean, really don't

20   know what they're talking about.

21        We have objected, and Mr. Pentz is right, and we would

22   do so again and we did so in this case to any suggestion that a

23   mere credit report would confer some significant benefit, and the

24   Court is aware of that.

25        But in this case six months of credit monitoring or

1  alternatively the nine months of credit monitoring, which is only

2  accepted by a class member if the class member chooses to do so

3  is a tremendous benefit, because it provides the credit score,

4  which is not provided with a credit report and which consumer

5  advocates will tell you is the most important component of your

6  credit report.  And you can't get it with just getting a free

7  credit report.  You can get it with this settlement.  With the

8  enhanced package you also get insurance advice, mortgage advice,

9  things of that nature.  This is important for identity theft.

10         This is a very important benefit.  And it's lost in this

11  discussion, because what we've heard about is the $75 million

12  fund and class members who advance individual claims or class

13  members who register for the back-end pay-out, but, in fact,

14  hundreds of thousands of class members have registered for the

15  credit monitoring, and that's a benefit that is offered to all.

16         It's also a tremendous benefit offered to everyone.  It

17  is interesting, there have been attacks in the papers, and I am

18  not suggesting people have necessarily waived these arguments,

19  but not one of the objectors who has spoken today has attacked

20  the notice campaign with good reason.

21         This notice campaign was one of the most successful

22  notice campaigns on a national basis.  Over 87 percent of the

23  class received notice multiple times, not just once, as they

24  would have with some mailing, mailer.  They received it.  And

25  that's the $5.2 million notice campaign itself, that's in

1   addition to the media campaign, which has resulted to date in

2   over 700 news articles and periodicals across the country, over

3   16,000 radio public service announcements around the country,

4   Internet banners and advertising, over 29 million hits on the

5   website for the settlement.  This has been a remarkable,

6   astounding response.

7          If people choose not to accept credit monitoring, that's

8   certainly their choice, but it's offered to them at no cost, and

9   they can get six months of it without giving up their right to

10  file an individual lawsuit and without pursuing even the

11  back-end -- they can still retain the right to register for a

12  back-end pay-out if there is one.

13         Mr. Pentz mentioned Crawford.  I would like the record

14  to reflect the differences between this case and Crawford.

15  Crawford as the Court knows is a Seventh Circuit opinion offered

16  by Judge Easterbrook.  First, this case was certified under

17  23(b)(1)(a).  That case was a (b)(2).  This case included

18  substantial notice, Crawford did not.

19         In Crawford, the single most important difference is in

20  Crawford there was a class of some 200,000 people.  The only

21  person that received a benefit was the class rep, who received

22  cash payment plus an incentive fee.  The rest of the class

23  received nothing.  And, in fact, the opinion not only said that,

24  but in later opinions characterizing it, Jefferson v Ingersoll,

25  Judge Easterbrook said, "In Murray we treated the

disproportionate $2,000 for one class member, nothing for the
rest, as proof that the class device had been used to obtain
leverage for one person's benefit."  That was how the Seventh
Circuit characterized what happened in Crawford.

Sanders, in Crawford, Judge Sanders commenting on
Crawford, "Crawford and similar cases illustrate the all too
common abuse as a device for, quote, forcing the settlement of
meritless claims."

Judge Posner said "Namely, the denial of any relief to
an entire class," the kind of thing that led to the rejection of
the settlement in Crawford.

This is not that case.  This is a case where tremendous
benefits have been offered to millions of people across the
country.  Hundreds of thousands of them have taken advantage of
that.  And there is the opportunity, as Ms. Wheelahan noted,
there is the tolling of the statute of limitations, there is a
two-year period in which class members have the right to exercise
their individual rights.

The notice campaign not only afforded notice of the
settlement, but also afforded notice to these class members of
their rights to exercise their individual claims, that's a
tremendous benefit, and then the credit monitoring itself.

Your Honor, I don't feel the need and will not respond
to discuss other cases in which we have represented objectors.  I
think the Court has my declaration.  In fact, we set forth there

1  not only the fact that while we primarily serve as class counsel,

2  lead class counsel, or co-lead class counsel in virtually every

3  case in which we're involved, there have been fewer than 10

4  instances over the last ten years in which we have been involved

5  in what we viewed as inappropriate settlements.

6          The reversal of the sanctions in the Progressive case

7  speaks for itself.  That motion was later withdrawn

8  unconditionally.

9          Your Honor, it's an important point that seems lost on

10  the objectors, whether the money is paid in settlement of

11  individual claims or it is paid on a back-end distribution, the

12  money will go to class members.  And that was the thrust, the

13  goal of setting up a fund and structuring it in the way it did.

14          Class members have two ways in which to exercise their

15  rights to obtain monetary relief.  One is they can either file or

16  give notice of intent to file an individual suit, and they may

17  raise that with Trans Union's counsel and either settle that

18  claim or pursue it by filing it and then try to reach settlement.

19  Alternatively they can do nothing except register, something that

20  takes five minutes on the Internet, or they can register by mail

21  for a back-end distribution.

22          Either way, those funds, except for attorneys' fees and

23  expenses, the notice costs, will go to class members.  It's an

24  ideal way that is tailored to get the money to people who want to

25  make a claim.

1       THE COURT:  What do you think of the idea that was posed

2  by Mr. Cochran about setting aside some money at the end?

3       MR. CADDELL:  Your Honor, it could be done.  At the

4  present juncture, there are roughly 500,000 people or somewhat

5  less than that that have registered for total benefits.  That

6  includes some 100,000 or more who have registered for nine

7  months, which means they give up the right to make any claim on

8  the back-end.

9       If we assume, there are two weeks left in the

10  registration process, if we assume that another hundred thousand

11  register in this last two weeks, which could happen, there has

12  been an up-tick in claims filed, registrations in the last week

13  for several reasons.  There was a consumer advocate who is

14  syndicated across the country who came out with a favorable

15  article.  That has led to it.  There have been some additional

16  things like that.

17       But if we assume there are say 500,000, if you set --

18       THE COURT:  Well, are all those people opting into the

19  residual claim?

20       MR. CADDELL:  No, Your Honor, no, Your Honor, they're

21  not.  Not all of them are.  Many of them are.

22       MR. BROOKS:  20 percent are.  I'll go through the data

23  in a moment.

24       THE COURT:  Okay.

25       MR. CADDELL:  Mr. Brooks can with you.

1        But if you just take round numbers very quickly, if you

2   had 500,000, which is where we I think could be in two weeks,

3   it's hard to imagine we would be beyond that, but let's say we're

4   there at 500,000.  If you guarantee $10 million per person, that

5   would be $5 million.  It is hard to believe there won't be $5

6   million left.  And clearly that would justify the cost of a

7   distribution if you had $10 million to distribute.

8        THE COURT:  You mean $10 per person?

9        MR. CADDELL:  $10 per person.

10       THE COURT:  You said 10 million per person.

11       MR. CADDELL:  I'm sorry, Your Honor.  That would easily

12  be justified.

13       The flip side if you look at it, the converse, Your

14  Honor, where we are right now, if it appears that we've got, say,

15  500,000, I think it is unlikely, but we cannot guarantee this, it

16  is unlikely that there will be huge numbers of individual claims

17  filed.  If at the end of the day you had something like $40

18  million remaining in the fund after two years of claims had been

19  made and after payment of the administrative costs and attorney

20  fees, that $40 million, if you have 500,000 people, that would be

21  $80 per person, which is virtually equivalent to the minimum

22  statutory payment of a hundred.

23       So I think it can be done.  Frankly, Your Honor, I think

24  there will be, and I know the Court will judge the cy pres issue

25  or the distribution issue in adhering to the Seventh Circuit

1  guidelines on when a cy pres is appropriate.  I think frankly

2  there is very little chance that there will be a cy pres, because

3  it looks, every indication we have today is that there will be

4  more than enough to justify a distribution on the back-end to

5  individual class members.

6       I think we're happy to discuss with Trans Union the

7  notion of setting something aside so that there would be a

8  guaranteed amount at the end, and that may be something which

9  could be accomplished.

10      Your Honor, a word, a brief word on the structure.

11  Mr. Powers misunderstood what was stated in the brief that was

12  not the Caddell and Chapman brief I would point out, Your Honor.

13  That brief was filed on behalf of all counsel in this litigation

14  representing the plaintiffs, with the exception of Ms. Wheelahan.

15      And just so the Court knows, Ms. Wheelahan was afforded

16  copies of the briefs in advance or drafts of the brief in

17  advance, and she chose to file her own brief, which was fine, we

18  didn't object to that, and we have no objection to it.

19      I think there is a misunderstanding about what was said

20  about (b)(3) in that brief and in the response to the objections.

21  First, it was Mr. Weinstein on behalf of Mr. Powers, and

22  Mr. Powers says he's pro se today, who raised the 23(b) issue.

23  We felt an obligation to respond to that in filing our papers.

24  We had the objection on the 22nd.  Our papers were filed on the

25  2nd of September.  We looked at that.  We talked with Hillsoft.

1  Hillsoft initially drafted a declaration, and virtually identical

2  to what was filed with the Court, in which they said the notice

3  afforded the class was the best notice practicable under the

4  circumstances.

5       Your Honor, that's the Rule 23 test for notice, whether

6  it's direct mail notice, whether it's published notice, it's the

7  best notice practicable under the circumstances.

8       When I saw that, I thought, wait a minute, even though

9  we're under a (b)(1)(a) and the Court, it's very clear in our

10 papers that we believe the Court, it was proper to certify this

11 under (b)(1)(a), and I'll talk about the incompatible standards

12 of conduct standard in just a minute, but we also want the Court

13 to appreciate, and we think it's important to have it in the

14 record, and Professor Miller noted this in his declaration, that

15 the primary benefits of (b)(3), there is no magic to (b)(3), in

16 fact, Judge Easterbrook in the Ingersoll case said, "A court

17 should endeavor to select the most appropriate subsection, not

18 just the first linguistically appropriate one in the list."

19      So this is not intended to be a trap or gotcha, that if

20 you are not exactly this or exactly that, the Court has wide

21 discretion in tailoring a class, but the point is, while we think

22 it's very clear that this is perfect to be under (b)(1)(a), the

23 benefits of (b)(3) are primarily twofold, one would be notice,

24 the best notice practical under the circumstances, which we met

25 in this case; the second would be an opt-out right.  And the

1  opt-out right characterized by Judge Easterbrook in the Firestone

2  case is that opt-out right is the right to go it alone, to pursue

3  an individual claim.

4       Your Honor, this is the best opt-out right anyone could

5  have, because 100 percent of the class has effectively retained

6  all of their individual rights.  They have retained their

7  individual rights to sue for actual damages.  They have retained

8  their individual rights to sue for statutory damages.  They have

9  retained their individual rights to sue for punitive damages.

10  And they have retained their individual rights to seek attorneys'

11  fees and costs in doing so.

12       There can be nothing more that would have been given to

13  them if they had had an individual opt-out right.  We've given

14  this to 100 percent of the class, whereas under (b)(3) an opt-out

15  would have been afforded only to those who chose to exercise it,

16  which as the Court knows with much experience in class actions

17  it's almost always a tiny fraction of the class.  So, in fact, we

18  have afforded the due process protections.

19       That doesn't mean that we're suggesting that you should

20  not certify this class under (b)(1)(a).  What we're saying is we

21  satisfied the due process protections of (b)(3) so that, in fact,

22  Your Honor, this is a superb settlement on that basis as well.

23       Last, a word on the incompatible standards of conduct, I

24  would point out, Your Honor, that what Mr. Powers misses is there

25  is an injunction.  No injunction when there is a bar to

1    proceeding on an aggregate or class basis could affect more than

2    one individual; therefore, you could not have, you could not

3    impose under this settlement, you could not impose an

4    incompatible standard of conduct on Trans Union by an injunction

5    that deals with Trans Union's treatment of a single individual.

6            It's only in a class context or an aggregate context

7    where you could impose an incompatible standard of conduct on

8    Trans Union by forcing them through an injunction to vary their

9    conduct through a wide range of people, a whole class, or an

10   aggregate number, and that's why this is appropriate to certify

11   under (b)(1)(a).

12           Finally, Your Honor, I would mention, it's in my

13   declaration, but I would point out who is not here.  We do not

14   have Public Citizen.  We do not have Public Justice.  We do not

15   have the National Consumer Law Center.  And we do not have the

16   National Association of Consumer Attorneys.  I personally sent to

17   the leadership of each one of those organizations a copy of the

18   settlement agreement and a letter inviting them to raise any

19   issues with us.

20           I think it is noteworthy, and, in fact, we had

21   discussions, I personally talked with individuals from the

22   National Consumer Law Center, it's noteworthy that none of those

23   organizations filed an objection to this settlement.  I think the

24   fact that they didn't speaks for itself.  They are in the

25   business of protecting consumers.  They do it because it's the

1 right thing to do.  They're not here to extract a fee.

2          Thank you, Your Honor.

3          THE COURT:  All right.  Thank you, Mr. Caddell.

4          All right.

5          MR. DOYLE:  Your Honor --

6          THE COURT:  Yes.

7          MR. DOYLE:  If I may?  I'm Thomas Doyle, liaison counsel

8 for the plaintiffs.

9          I can give more precise updated numbers on what

10 participation rates are looking like right now.  Through

11 September 5th, which is last Friday, there were 426,151 people

12 who have registered for benefits with complete applications in

13 one form or another.

14          THE COURT:  Does that include the enhanced?

15          MR. DOYLE:  No.  That's the total number of people who

16 have asked for anything --

17          THE COURT:  For anything?

18          MR. DOYLE:  -- under the settlement.

19          THE COURT:  Including the enhanced?

20          MR. DOYLE:  Correct.  And that includes some of those

21 people have registered by mail, some of them over the Internet.

22 So the total number of people who have complete registrations in

23 is 426,000.

24          Of those there are 334,753 who have asked for cash in

25 one permutation or another.  And I can break that number down

1  into three buckets also.  There is 15,064 people who requested

2  cash with a mail-in registration.  There are 97,955 people who

3  have requested cash over the Internet as the only form of

4  distribution they're asking for.  There is 221,734 people who

5  have asked for the six months of credit monitoring plus a

6  possible cash distribution.  Adding those three together is

7  334,753.

8          It is the remainder of the people, which is 91,398, have

9  asked for some form of a credit monitoring package without asking

10 to participate in a cash distribution.  Of that 91,000, 19,916

11 have requested six months of credit monitoring without cash.

12 71,482 have asked for nine months of credit monitoring, and in

13 asking for the nine months under the settlement, they're not

14 eligible to request for cash.  Those two numbers together total

15 the 91,398 people who are non-cash registrants.

16         So we have until September 24th for people to submit

17 timely registrations in one form or another.  And that's the most

18 current numbers that we have through September 5th.

19         THE COURT:  What was the number who asked for the six

20 months without the cash?

21         MR. DOYLE:  Six months without cash is 19,916.

22         THE COURT:  And you say 7,000 --

23         MR. DOYLE:  No.  I'm sorry.  Nine months with no cash is

24 71,000 --

25         THE COURT:  71, 000.

1         MR. DOYLE:  -- 482.  Those numbers added together total

2    91,398.

3         Thank you, Your Honor.

4         THE COURT:  Thank you.

5         All right.

6         MR. BROOKS:  Your Honor, good morning.  Brian Brooks for

7    Trans Union.

8         I feel like I had to race to the podium less my thunder

9    gets stolen beyond the extent to which it already has.

10        Your Honor, I wanted to address three simple points.

11        THE COURT:  Do you agree with the numbers you just

12   heard, that group?

13        MR. BROOKS:  I do, although I wanted to put a gloss on

14   that, because we don't I think look at them quite the way

15   Mr. Doyle does.  But he is right, as of last week's end, 426,000

16   claims have been received.

17        The way we look at it, Your Honor, the only group of

18   people who have submitted cash only claims, that group is

19   112,000.  That is the number Mr. Doyle did not break out for you.

20   So everyone else submitted a claim for some form of other relief

21   sometimes coupled with a cash request, but only 112,000 out of

22   about 426,000 only asked for cash.

23        THE COURT:  And that's the residual group?

24        MR. BROOKS:  Right, correct.

25        Now, the rate at which claims are being received, Your

1  Honor, has over the last ten days or so been roughly 20,000 a

2  day.  And so if current trends persist over the next 14 days, we

3  would expect the total number of claimants would be somewhere

4  between 6 and 700,000, it seems like a reliable number.

5        If you look at historic class action settlement claims

6  rates where large numbers of claimants come in at the very end,

7  much as large number of objections come at the very end, the

8  number could be significantly higher than that.  So it will be

9  somewhere we think in the range of 6 to 700,000 claimants total.

10        The other data point, Your Honor, which I think is

11 relevant in the fairness determination is that the settlement

12 website, which is the principal portal through which claims are

13 coming, has had 33.9 million hits, 33.9 million, which has got to

14 be a record in terms of affirmative visits by class members to

15 assess their own class action rights.  We think that says that

16 the class members got the notice, know what it takes it protect

17 their rights and are fully informed.  That's the first point.

18        Your Honor, the second point I would like to address has

19 to do with a subject a couple of the objectors' counsel raised,

20 and that has to do with the overall valuation of settlement.  You

21 heard it discussed by two attorneys that potentially this case

22 would be worth $190 billion, a canard I think that has followed

23 us since the beginning of this litigation more than ten years

24 ago.

25        Your Honor, we know from Easterbrook's decision in

1  Murray v GMAC that, in fact, the proper course of proceeding in

2  an FCRA statutory damages class action is to remit based on due

3  process principles under Gore and Campbell the amount at the end

4  of a judgment.

5         And so what we know from that is that at the end of the

6  day whatever the disposition was after trial, the trial court

7  would be required to look at the factors of reprehensibility,

8  intentionality, disproportionality, and other due process factors

9  to determine what the correct amount is.

10        We think it's clear under established case law,

11  including as recently as this term's decision by the Supreme

12  Court in the Exxon case, that a remittitur analysis using due

13  process principles would result in a final judgment assuming

14  Trans Union lost everything on the merits, it would be in the

15  vicinity of a hundred million dollars.  And why would that be?

16  That would be because the Supreme Court says it is

17  unconstitutional to have a multiplier that is more than nine

18  times actual damages.  Here the Court has already made rulings

19  finding that there aren't any sufficient actual damages pled.

20        The Court would also look at issues like the profit

21  made.  As Your Honor knows from the filings, that the amount of

22  this settlement is significantly more than the profits earned by

23  Trans Union in its target marketing business.

24        So at the end of a remittitur --

25        THE COURT:  And that number is?

1        MR. BROOKS:  Well, after tax, that number is roughly $40

2   million.  Before tax, that number is roughly $65 million.  As of

3   the current date, $75 million in cash will be paid.  Roughly 20

4   million additional dollars in services at the retail value will

5   be paid.  So 95 million total.  And we have 14 days left to go in

6   the claims period.

7        So it's clear under a remittitur analysis that the

8   amount being paid here is equal to, we think, and potentially in

9   excess of the maximum amount that would be awarded post judgment

10  under Murray.

11       Your Honor, now let me turn to the last issue which Your

12  Honor has raised with the previous several counsel in terms of

13  would it be possible to rejigger the settlement at this point to

14  change its structure so that some amount of the $75 million were

15  set aside.  We think that that is both unnecessary and also

16  unwise.

17       The reason it's unnecessary, Your Honor, is that

18  everyone as Mr. Caddell pointed out, everyone who files a suit

19  against which Trans Union would pay out of the fund is by

20  definition a class member.  And so all of the claims process is

21  under the settlement, the litigation claims process is a claims

22  allocation mechanism designed to ensure that the people who get

23  first dibs on the money are the people who care the most about it

24  or most plausibly have an injury arising out of the alleged

25  conduct, but in any case, people who come forward and ask for it.

1          I think the false dichotomy that Your Honor heard from

2    objectors' counsel is that there is some difference between

3    litigation claimants and other class members, as though the

4    litigation claimants were somehow separate from the class that

5    needs to fund a claim on.

6          What's clear is the litigators, the litigators who will

7    show up post settlement are all class members who have elected

8    that mechanism as opposed to one of the other options in the

9    settlement to take their benefit.

10         Other people will take the six months of credit

11   monitoring.  Still others will take the nine months of credit

12   monitoring.  Some people, who aren't interested in doing this

13   sort of thing, will just see if there is money left over and will

14   take that as Mr. Caddell just described.

15         But there is no dichotomy here that would prevent anyone

16   from claiming their thousand dollars by sending a demand letter.

17   For that reason we think there is no need to do that.  But more

18   important, Your Honor, we think that's a very unwise course of

19   actions for the following reasons.  The first is notice has gone

20   out at a cost of nearly $6 million.  It is not for this

21   proceeding to decide whether a different settlement might have

22   been a good settlement as well or might have been even better

23   than a fair settlement represented today.

24         Our concern principally or initially is that were the

25   Court to suggest we go down that path, we're essentially back to

1   square one.  We will have to renotice the class.  We will have to

2   have another set of objectors.  We'll be back here again more

3   than ten years in.  You know, the bottom line is the question for

4   the Court today isn't:  Are there optimal settlements or better

5   settlements or different settlements?  The question for the Court

6   is:  Does this settlement pass the fair, adequate, and reasonable

7   standard?  We think the answer to that is yes.

8          The other issue though is this, the Court asked previous

9   counsel whether setting money aside would cost more, and the

10  surmise I think was it wouldn't.  We would just allocate more of

11  it to the residual claimants and less of it to litigation

12  claimants.

13         But, of course, as Your Honor remembers from the

14  settlement mediation and negotiation process that was reported to

15  the Court at the preliminary approval hearing, the structure of

16  this settlement and the $75 million number was hard fought by

17  Trans Union with one particular issue in mind, and that is the

18  $75 million is money that will be allocated toward litigation

19  claims.  We think it is quite possible that the amount of

20  litigation claims will be less than $75 million.  But we are by

21  no means as certain of that as the plaintiffs' counsel are.

22         And if Your Honor said that all we could do was have 70

23  million or 65 million or 60 million set aside to pay those

24  claims, then the fact that there is no cap means Trans Union's

25  risk exposure to litigation claims is far higher than it

1  negotiated for.  And there is no reason to believe sitting here

2  today that Trans Union would agree to this.

3        The $75 million number and the structure under which it

4  was agreed to go hand in glove.  And if someone were to tell

5  Trans Union that they must bear more than $75 million of certain

6  litigation exposure, there is no reason to think the answer to

7  that would be yes.

8        So, Your Honor, our view is this, ten years in, after

9  ten years of motion practice, after two and a half years of hard

10 fought negotiation, the question today isn't:  Are there other

11 structures that would work?  We have been through multiple

12 structures with the plaintiffs, with Magistrate Judge Mason, and

13 with Your Honor.  Our view is that this settlement is fair.  And

14 whether there are also other fair settlements is a question for

15 philosophers, but not for the participants in the proceedings.

16 We think this works, and we urge Your Honor to grant final

17 approval.

18       THE COURT:  Do you want to address the issue we talked

19 about in chambers?

20       MR. BROOKS:  Sure, Your Honor.  The issue in chambers

21 was:  What is this settlement relative to the net worth of Trans

22 Union?  Without commenting specifically on what Trans Union's net

23 worth today is, a number that I don't even know, we discussed in

24 chambers that in a previous litigation matter it was disclosed in

25 open court that Trans Union's net worth was approximately $1

1  billion or slightly below that number.

2        Assuming that that's right, what Your Honor knows is

3  that the amount of value Trans Union will pay in this settlement

4  is at or about 10 percent of its net worth.  That number itself

5  might fail due process scrutiny in a remittitur proceeding, but

6  the fact that we are paying an amount that large does demonstrate

7  the fairness and accuracy of this settlement.

8        Thank you, Judge.

9        THE COURT:  All right.  Thank you.

10        All right.  Anybody, any other counsel want to speak at

11  this point?

12        Do any of the objectors want to say anything else in

13  reply to what was said?

14        MR. COCHRAN:  May I, Your Honor?

15        THE COURT:  Sure.

16        MR. COCHRAN:  May I?

17        THE COURT:  Sure.

18        MR. COCHRAN:  Your Honor, I think the --

19        THE COURT:  Just for the record state your name again

20  please.

21        MR. COCHRAN:  I'm sorry.  Edward Cochran again for

22  Robert Falconer.

23        Your Honor, I think the comments that have been

24  generated on the alleged conflict of interest demonstrate the

25  fact that this issue really does need to be addressed by an

1  attorney representing that interest.  Class counsel seems to be

2  saying "Well, we think there is going to be so much left over

3  anyway, what's the difference" and indirectly saying "Whatever it

4  is it is.  We don't care.  Whatever it is in the end it will be."

5        I don't want to take that chance, and I don't want this

6  to come back from the Seventh Circuit after ten years on some

7  issue like this, because I think it will.  And I don't want to

8  take that chance.  And I just want to set aside a minimum for

9  this group.  We know roughly what it's going to be.  I'm not sure

10 I understood which was the relevant number that would share -- if

11 you don't mind, just tell me the actual number that would share

12 in the cash from claims is as of now?

13       MR. BROOKS:  Your Honor, the number, as I said, the

14 number of individuals who claim only cash, only residual cash is

15 112,000.  There are an additional 221,000 class members who

16 submitted claims for six months of credit monitoring service and

17 also the cash.

18       MR. COCHRAN:  Thank you.  I thought I understood that

19 correctly.

20       So I had said 300,00 before.  There is a little over

21 300,000 I think that would share in the statutory minimum is

22 $100.

23       What I would fight for if I were in the position of

24 resolving this, and maybe I will be depending on what happens

25 here or somewhere else, is that statutory minimum to be set aside

1   in a separate fund.  We know roughly and can project roughly what

2   the size of this group is going to be.  They could get that

3   hundred dollars, and they can get it now.  Otherwise they're

4   going to wait two or two and a half or three years, most of whom

5   will even forget they ever filed a claim.  They can get the money

6   now.

7          There are also -- another thing that indicates the need

8   for someone like me is the reference by defense counsel and a

9   little bit from the plaintiffs' side:  Is there really a conflict

10  here?  Is this really an issue?  I don't think the defense

11  counsel thinks there is.  But to me, and I think in the appellate

12  decisions I've read on these kind of conflicts of interest, the

13  question is whether party A, the more he gets, does he reduce

14  party B directly?  And that is the case here.

15         The more these litigation plaintiffs obtain of this $75

16  million literally dollar for dollar, they will reduce the claim

17  of their brothers who did not file suits.  That is an absolute

18  conflict of interest and I believe will be recognized if this

19  matter is appealed.  And it could be dealt with simply by

20  negotiating this amount.  And I think it should be $100.

21         I understand the notice problem.  Of course, no one

22  wants to have a notice problem of any kind added to the equation.

23  That can be dealt with, Your Honor.  All of us lawyers sitting

24  around the table, that can be dealt with.  I honestly believe --

25               THE COURT:  How?

1      MR. COCHRAN:  I think, Your Honor, that you could

2 provide Internet notice that the fund available to the class is

3 now being subject to a minimum for that part of the people who

4 are filing cash claims and simply notify the class on the

5 Internet, you are not --

6      THE COURT:  But for those people who have already filed

7 claims, let's say just for credit monitoring without a cash

8 residual claim, you know, now you're saying, "Well, there is

9 something extra that you could have gotten, but you can't get

10 anymore.  You've already registered."  I see a lot of

11 complications.

12      MR. COCHRAN:  Well, Your Honor, right now everyone knows

13 that there is a cash fund potentially there.  All we're saying is

14 we're going to put a floor on that fund versus the litigation

15 fund, and that we have to, because we recognize there is a

16 conflict of interest in here.

17      By the way, if it costs a couple hundred thousand or a

18 half a million dollars or even a million dollars to achieve this,

19 better now than a year from now were this to come back from the

20 Court of Appeals.

21      THE COURT:  I've got to decide what's in front of me

22 now.  I'm not going to be influenced by -- I don't want to do

23 anything wrong obviously, but I'm not going to be influenced by

24 that type of soothe saying.

25      What I'm concerned about I think is what Mr. Brooks just

1   said, and I think there is no real way to refute it, and that is

2   that it does change the mix of exposure to Trans Union that I

3   guess I really hadn't thought of before.

4        I'm not saying it wouldn't have been a good idea had we

5   thought of it before, to put a floor on this fund, because it has

6   a certain appeal to it.  But my job today, sort of like baseball

7   arbitrators in a way, you know, I've got to say:  Is the deal we

8   have a fair and reasonable deal to the class, not that we can't

9   think of a better deal.

10       If I thought a better deal, you know, rendered the one

11  we have unfair, that's one consideration and one conclusion

12  that's possible.  But to say that, well, maybe it could have been

13  better had we thought about this earlier, that doesn't mean that

14  this is not a fair and reasonable settlement for the class as it

15  stands.

16       For me to change the structure at this point I think, I

17  don't think I can do it by decree.  I'd basically have to reject

18  the settlement, and we'd be back where we started from and here a

19  year and a half from now again.

20       You know, you weren't involved in this.  A lot of the

21  folks I'm looking at sitting down at the tables here were.  This

22  was, and I'm sure just by looking at the docket in this case you

23  can appreciate that as an experienced lawyer --

24       MR. COCHRAN:  Yes.

25       THE COURT:  -- this was a very difficult, challenging

1  exercise for both Judge Mason and me, something totally unique in

2  my experience both as a lawyer for 25 years and as a judge for 14

3  years, I've never really experienced anything quite like this.  I

4  think this case is quite unique.

5          You know, to go back to square one now is not a

6  particularly attractive prospect, unless I was convinced by your

7  objections and others that this was unfair or otherwise violated

8  the rules as I've heard today.  I appreciate your comments,

9  Mr. Cochran.  Maybe it would have been nice to have had them much

10 earlier.  But I don't see my ability, very frankly, my authority

11 to restructure a settlement or condition an approval on something

12 like this at this times because of the factors we've discussed.

13          MR. COCHRAN:  Yes.  And I appreciate that, Your Honor.

14 I don't disagree with anything you've said, of course.  I would

15 only point out that we are focusing on the adjustment to the

16 settlement that my objection led to.

17          Let's focus on the objection.  If there is a conflict,

18 an interclass conflict, the settlement cannot be approved.  And

19 if that means there has to be some adjustment, additional costs

20 of notice, or it means you're going back to litigation, the fact

21 is the conflict is either there or it is not.  Forget about the

22 minimum.  Forget about the suggestion I had.  The conflict is

23 there.  And I think both sides ought to realize it and do

24 something about it now.  That's my only point.

25          THE COURT:  But except for the people who have opted for

1 the enhanced credit reporting, the nine-month credit reporting

2 and gave up their claims to cash or their right to file suit,

3 everybody who has signed up for the residual possibility here has

4 a right to file their own lawsuit as well.

5           MR. BROOKS:  Right.

6           THE COURT:  So I'm not sure there really is a conflict

7 here.  They're still on the same even playing field as far as

8 their substantive, their ability to pursue their substantive

9 rights, which is part of the core of this settlement.  You know,

10 I don't see a conflict there.  Their interests are protected in

11 two different ways.  This is sort of like a little icing on the

12 cake at the end that they can sign up for.  But they can also go

13 ahead and pursue their claims.

14           These are people who have -- you know, it's a smaller

15 number frankly than I would have thought, because all you have to

16 do, I've been on the website myself, all you've got to do is

17 check a box and you're there, and not that many people have done

18 that for reasons that I guess are known only to them.  But those

19 same people have the right to file a lawsuit tomorrow.

20           And they obviously have read enough to sign up for this

21 thing, because you get to this by going on the website and then

22 finding, you know, the claim process by following the prompts on

23 the website.  So I don't see a conflict here.  I see this as sort

24 of an added potential benefit to people who were already given

25 their substantive rights.

1          I'm going to be taking a break now.  I think we all

2   could use probably a little break and probably come back right

3   after the lunch hour anyway.  But I'll give this some more

4   thought.  But I appreciate your comments.

5          MR. COCHRAN:  Before I sit for the record, Your Honor, I

6   would like to make clear my client Falconer is not filing a

7   lawsuit.  He's going to rely on what's ever left over.  I think

8   he's definitely in conflict.  Thank you.

9          THE COURT:  Thank you, Mr. Cochran.

10         MS. WHEELAHAN:  Can I say a word or two about the

11  conflict issue, Judge?

12         THE COURT:  Sure.  Go ahead.

13         MS. WHEELAHAN:  I'll be short, I promise you.  The

14  difference in the conflict that Mr. Cochran is talking about and

15  every other conflict case that you'll see coming out of the

16  Seventh Circuit is that the people are immutably in the

17  conflicted classes that they are.  They're defined at the outset

18  as you are in this section and the other person being in another

19  section, and they have a conflict.

20         This case is different, because these class members have

21  chosen the category in which they are.  They're not put there by

22  the class definition.

23         THE COURT:  Okay.

24         MR. POWERS:  Your Honor, just 30 seconds?

25         THE COURT:  Mr. Powers?

1       MS. BULL:  Your Honor, may I just add something on the

2  conflict issue?

3       THE COURT:  Sure.  Please state your name for the

4  record.

5       MS. BULL:  Yes, Your Honor.  Joy Bull on behalf of the

6  plaintiffs.

7       This is not really a conflict issue.  This is a set

8  amount of money to be allocated among class members.  And it

9  depends on the value of their claims.  So obviously someone who

10 thinks they have a better claim comes forward and files a lawsuit

11 or makes a demand on the company should have more funds than

12 someone who just files for whatever is left over at the end.  And

13 that's basic, basic case law on allocation of settlement funds

14 that courts deal with in every case, because you always have a

15 set amount of money, and those better claims should be allocated

16 a higher percentage of the cash fund.

17      You know, it's the basic premise upon which all

18 settlement funds are distributed.  Not every claimant gets the

19 same dollar value in every settlement case.  If you have a better

20 claim, those claims are usually allocated a higher percentage of

21 the funds.

22      THE COURT:  Okay.  Thank you.

23      Mr. Powers?

24      MR. POWERS:  Thank you.

25      Very quickly just two things.  I wanted to correct the

1 record, Mr. Weinstein did not represent me in this case.  I filed

2 my objection myself.

3         But I want to point out all this discussion you've just

4 had goes exactly to my point about the (b)(3).  Counsel got up

5 and told you:  Hey, we realized last week at the last minute that

6 we should have done this as a (b)(3) class, because we comply

7 with it.

8         Now, I disagree with all that, but if he wants to change

9 the settlement which very clearly says it's not a (b)(3)

10 settlement, it's a (b)(1)(a) settlement and make it a (b)(3),

11 we've got the entire discussion, we've got to do new notice,

12 we've got to do all that other stuff.  So his comments about

13 we've figured out a better deal later goes to exactly what the

14 Court --

15         THE COURT:  I mean, there may have been some problems

16 with some of the language in the settlement agreement or the

17 prior order, but there is no question this is a (b)(1)(a) class.

18         MR. POWERS:  Okay.

19         THE COURT:  Let's just make that very clear.

20         MR. POWERS:  Sure.

21         THE COURT:  You know, you can certainly take issue with

22 whether it should be a (b)(1)(a) class.  I understand that point.

23 Frankly, it's the most technically challenging point in this

24 whole case.  But it was the only way that we could see getting

25 this done in a manner that was in my view fair at the time we

1  approved it.  And to the extent there may have been some language

2  that contradicted that, it shouldn't have been there.

3          MR. POWERS:  Okay.  Thank you, Your Honor.

4          THE COURT:  Thank you, Mr. Powers.

5          Mr. Pentz, did you want to say something?

6          MR. PENTZ:  I'm prepared to wait until after lunch, Your

7  Honor, if that's acceptable.

8          THE COURT:  Well, no.  After lunch it's going to be my

9  turn.

10          MR. PENTZ:  Okay.  I just wanted to make the point that

11  in light of, in light of the number of claims that have been

12  received, 334,000, therefore, the likely recovery for people who

13  just wait for the cash fund residual is going to be no more than

14  a hundred dollars give or take a few, I certainly feel an

15  obligation and I believe any lawyer who finds out about that is

16  going to file a lawsuit rather than wait and take their chances

17  for something that may be a hundred dollars, it may be less than

18  that.

19          And I did want to correct something that Ms. Bull said,

20  she said this was designed so the people with the stronger claims

21  could file a lawsuit.  There is no indication of that.  I don't

22  know how anyone could have a stronger claim, because there is no

23  actual damages here.  These are claims for statutory damages.

24  Everybody has the same claim.  It's a thousand bucks.  And this

25  is really, it's kind of unique.  It's a class action.  It's

1  rewarding people who have initiative and the wherewithal to file

2  a lawsuit and the fact --

3          THE COURT:  I guess I should point something out.  You

4  know, this hundred dollars to a thousand dollars apiece, that's

5  per class member, it's potentially more than that.  I mean,

6  theoretically it's per violation.  It could be that any

7  individual class member, and I'm sure there are a number who have

8  had their information sold more than once, so it could be even a

9  much bigger number than that and probably would be.  If we had to

10 do these each, 190 million people, some of them would have claims

11 for multiple violations.  This $19 billion figure minimum would

12 probably double or triple.  Who knows?  I mean, that's one

13 consideration that the Court took into account when it was

14 looking at this.  And it was discussed among or during our

15 settlement discussions quite a bit, that when we talk about --

16 it's simple to talk about $19 billion at $100 apiece.  That's a

17 staggering enough figure really, but it was probably a bigger

18 figure than that.

19         MR. PENTZ:  My only question there, Your Honor --

20         THE COURT:  So you're stronger versus weaker, I don't

21 know, it may be somebody who feels they want to at least file a

22 lawsuit and serve some discovery to see how many times their

23 information was disclosed improperly would have a stronger case

24 than someone who didn't.  But they probably wouldn't know that

25 until they filed their lawsuit.

1          MR. PENTZ:  Okay.

2          THE COURT:  Okay.

3          MR. PENTZ:  Thank you, Your Honor.

4          THE COURT:  Thank you.  All right, folks.  It's actually

5   about five after 12:00.  Let's reconvene at about 1:20, and I

6   think it will be my turn as I said before.  Thank you all.

7      (Recess at 12:05 p.m. until 1:20 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                 IN THE UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF ILLINOIS
 2                        EASTERN DIVISION

 3   In Re:  TRANS UNION              )
     CORPORATION, Privacy             )
 4   litigation, et al.,             )
                                      )  No. 00 C 4729
 5                                    )  MDL 1350
                                      )  Chicago, Illinois
 6                                    )  September 10, 2008
                                      )  1:20 p.m.
 7                                    )

 8           TRANSCRIPT OF PROCEEDINGS - FAIRNESS HEARING

 9         BEFORE THE HONORABLE JUDGE ROBERT W. GETTLEMAN

10
     APPEARANCES:
11   For the Plaintiffs:          SAUNDERS & DOYLE
                                   20 South Clark Street
12                                 Suite 1720
                                   Chicago, Illinois 60603
13                                 BY:  MR. THOMAS A. DOYLE
                                        MR. TERRY ROSE SAUNDERS
14
                                   THE BORDERUD LAW GROUP
15                                 11620 Wilshire Boulevard
                                   Suite 400
16                                 Los Angeles, California 90025
                                   BY:  MR. JON BORDERUD
17
                                   RIGHETTI LAW FIRM
18                                 220 Montgomery Street
                                   16th Floor
19                                 San Francisco, California 94104
                                   BY:  MR. MATTHEW RIGHETTI
20
                                   ZELLE HOFMANN VOELBEL MASON & GETTE
21                                 44 Montgomery Street
                                   Suite 3400
22                                 San Francisco California 94104
                                   BY:  MR. CHRISTOPHER MICHELETTI
23
     Official Court Reporter:      JENNIFER S. COSTALES, CRR, RMR
24                                 219 South Dearborn Street
                                   Room 1706
25                                 Chicago, Illinois 60604
                                   (312) 427-5351
```

```
 1  APPEARANCES:   (Continued)

 2  For Defendant Trans Union:    DLA PIPER
                                  203 North LaSalle Street
 3                                Suite 1900
                                  Chicago, Illinois 60601-1293
 4                                BY:  MR. PETER J. DONOGHUE

 5                                O'MELVENY & MYERS
                                  1625 Eye Street, N.W.
 6                                Washington, DC 20006-4001
                                  BY:  MR. BRIAN P. BROOKS
 7
                                  RICHARD J. PRENDERGAST, LTD.
 8                                111 West Washington Street
                                  Suite 1100
 9                                Chicago, Illinois 60602
                                  BY:  MR. RICHARD J. PRENDERGAST
10
                                  TRANS UNION LLC
11                                555 West Adams Street
                                  Chicago, Illinois 60661-3601
12                                BY:  MS. DENISE A. NORGLE

13  For Defendant Acxiom:         ROSE LAW FIRM
                                  120 East Fourth Street
14                                Little Rock, Arkansas 72201
                                  BY:  MS. AMY STEWART
15
    For the Louisiana            MS. DAWN ADAMS WHEELAHAN
16  plaintiffs:                   650 Poydras Street
                                  Suite 1550
17                                New Orleans, Louisiana 70130

18  For certain plaintiffs:       EDELMAN COMBS LATTURNER & GOODWIN
                                  120 South LaSalle Street
19                                18th Floor
                                  Chicago, Illinois 60603
20                                BY:  MR. DANIEL EDELMAN

21  For the Texas plaintiffs:     CADDELL & CHAPMAN
                                  1331 Lamar, Suite 1070
22                                Houston, Texas 77010
                                  BY:  MR. MICHAEL CADDELL
23                                     MS. CYNTHIA CHAPMAN
                                       MR. CORY FEIN
24

25
```

```
 1   APPEARANCES:   (Continued)

 2   For the Texas plaintiffs:      WELLER GREEN TOUPS & TERRELL
                                    2615 Calder
 3                                  Suite 400
                                    Beaumont, Texas 77704
 4                                  BY:  MR. MITCHELL A. TOUPS

 5   For Frey plaintiffs:           ZARIAN MIDGLEY & JOHNSON, PLLC
                                    University Plaza
 6                                  960 Broadway Avenue
                                    Suite 250
 7                                  Boise, Idaho 83706
                                    BY:  MR. JOHN ZARIAN
 8
     For David T. Murray:           CLASS ACTION FAIRNESS GROUP
 9                                  2 Clock Tower Place
                                    Suite 260G
10                                  Maynard, Massachusetts 01754
                                    BY:  MR. JOHN J. PENTZ
11
     For Julius Dunmore:            MR. N. ALBERT BACHARACH, JR. P.A.
12                                  115 Northeast 6th Avenue
                                    Gainesville, Florida 32601
13
     For Robert Falkner:            MR. EDWARD W. COCHRAN
14                                  20030 Marchmont Road
                                    Shaker Heights, Ohio 44122
15
     For Christi Copeland:          MR. STEVE A. MILLER
16
     For D.J. Powers:               MR. D.J. POWERS, Pro Se
17
     For Devern Wilson:             KIMBERLY PALMER
18                                  626 Northeast 1st Street
                                    Gainesville, Florida 32601
19

20

21

22

23

24

25
```

1      (Proceedings in open court.)

2          THE COURT:  All right.  Obviously we've all given this a

3   great deal of thought.  And I think some of the objectors -- the

4   motion to take discovery and all that and compel appearances is

5   going to be denied.  I think some of the points raised by the

6   objectors are interesting, and I'll try to deal with everything

7   in time here, but I think I can summarize a lot of the points by

8   saying that the perfect can't be the enemy of the good.  And my

9   job is to decide what a fair and reasonable resolution of this

10  very difficult and challenging case should be.

11         And I believe, I continue to believe that the settlement

12  we reached, though not perfect, is a reasonable settlement that

13  should be approved as the best deal that we can hope for in a

14  case like this.  And let me just go through my reasoning with

15  you.

16         One of the primary objections as we all know is that the

17  damages here are anywhere from 19 billion to $190 billion for the

18  class.  And as I said before, it actually could be greater than

19  that, because that's per member rather than per violation.  So it

20  could even be a bigger number.  But once you reach infinity, it

21  doesn't much matter how far you go.

22         As Trans Union has pointed out, and that's why I had

23  that in camera meeting this morning with counsel, because this

24  had been protected in this case before then, although it

25  apparently had disclosed, but the best that we can, the most

1  recent net worth number that we had for Trans Union was a little

2  less than $1 billion.  That's a lot of money, no doubt.  But I

3  think that the class counsel and the defendant's counsel are

4  correct in pointing out that under the case law in this circuit

5  that there would almost certainly be a remitter of that to some

6  rational amount that would probably approximate the profit made

7  by Trans Union, which is approximately $65 million.

8          Another way to look at it would be to compare the FCRA

9  recovery, which doesn't have a cap in class actions, to some of

10 the other consumer protection statutes, which has a 5 percent cap

11 as some sort of national bench mark that we sometimes consult or

12 sometimes we're bound by it in Truth in Lending cases, for

13 instance, and similar legislation.  5 percent of a billion would

14 be 50 million max.  So this is much better than that even if you

15 just look at the $75 million cash that Trans Union has already

16 put down.

17         So when you combine that with the absolute

18 uncollectability of a $19 billion award and likely destruction of

19 Trans Union if such a judgment were to be entered and actually

20 enforced, I don't think that is good for the public.  I don't

21 care about the Pritzker family, I know somebody has raised that

22 as an issue.  That bears no weight at all with me.

23         But taking one of the three credit reporting agencies

24 out of the market can't be good for the public interest at all.

25 And that would likely happen if such a judgment were actually

1  entered.

2         So for all of those reasons, I believe that the notion

3  that this is a very small percentage of 19 billion to 190 billion

4  or more really doesn't carry a great deal of weight.

5         The $75 million that's put there, true, it is a

6  diminishing figure, because the attorneys' fees will be paid out

7  of it, and I'll get back to attorney fees at the end of this, but

8  the attorneys' fees will be paid out of it, costs will be paid

9  out of it.  But that was the deal that we made.  It was a hard

10  fought deal, believe me, with the plaintiffs' counsel, with Judge

11  Mason, who did just an outstanding job in helping to fashion this

12  settlement.

13         I think you know from his prior award, his prior orders

14  in this case that he didn't jump to any easy out.  He rejected

15  previous settlements.  He was convinced and I became convinced as

16  well when we were working together on it that this was the most

17  we could get.  It was far greater than the initial offers or even

18  the interim offers.  Again, I say it's greater than the profit

19  made on the target marketing, the pre-tax profit on target

20  marketing, I assume that this will be tax deductible as well.

21         So I think that that is a reasonable number given all of

22  those circumstances.  The in-kind relief, I've talked a lot about

23  that, Trans Union says it's at least $20 million worth of benefit

24  to the class.  Of course, the cost of Trans Union is less than

25  that.  We all know that.  It looks to me like we're getting a

pretty fair number of people who are opting into that, a small
proportion of the population of the United States who has credit,
I agree, but still a very respectable number when you are talking
close to half a million people who have opted in one way or the
other here.

I think that's a pretty respectable number.  And,
frankly, it's a number that I find -- and we still have 10 days
to go or two weeks to go.  If that number is increasing 20,000 a
day, I mean, we're getting up to a very respectable figure in
this.

I think we have to keep in mind that nothing here is
being released, this is unusual, I understand that, except,
except the right to bring collective or aggregate actions.  And I
realize that's a strange looking animal.  That is what was
negotiated.  It could actually mean greater exposure to Trans
Union ultimately if they're sued by a bunch of individuals and
have to settle them out than settling some sort of aggregate
litigation.  But, of course, you know, to allow future class
actions to somehow arise from a settlement of this class action
makes no sense at all.

And you have to remember too that I denied a nationwide
class for damages as unworkable on several occasions.  And
without some sort of settlement like this, we might be left with
no class relief at all in this.  I certified one state class for
the firm-offer class, and that was all I certified and that I was

1   prepared to certify.  So this does broaden the relief remarkably

2   I think over where the case stood before we entered these

3   negotiations.

4          Again, I think it's important to know that, again,

5   unique to this case, we are preserving the class members' right

6   to seek individual damages in their own lawsuits.  And there is

7   no limit at all on Trans Union's liability as a result of that.

8          I agree with some of the objectors' points, that this is

9   kind of contrary to why we have class actions, we don't want to

10  encourage individual actions.  But, again, in this case, unique

11  as it is, I think that this made sense to not preclude people

12  from pursuing their own individual rights.  And I think some of

13  the objectors here today actually reaffirmed that, that there is

14  every incentive for class members who have educated themselves

15  about the nature of this claim to go ahead and do just that.

16         Time will tell.  I don't know whether I'm hoping a lot

17  of people do it or I'm hoping a lot of people don't do it, but I

18  think giving people each the responsibility and the option to

19  exercise their own rights is about as broad a substantive relief

20  as we can given a case like this given the realities of the size

21  of the class and the potential damages here.  There may come a

22  time when Trans Union regrets having agreed to that.  We will

23  see, we will see.  But we're hoping that it's a reasonable number

24  and that there will be something left at the end of the day.

25         The in-kind relief, there has been a lot of talk about

1   that, too.  When I first heard about it, I had the same reaction

2   frankly as some of the objectors raised, and that was:  Well, we

3   can all get free credit reports.  We see it on the television all

4   the time.  I've never done it.  But I suspect that you can get

5   something.

6          But that's not what we're getting here.  We're getting

7   credit, I mean, they've offered more than that.  That fact that

8   hundreds of thousands of people have taken them up on it kind of

9   affirms that it is something of value.

10          I don't want to go into all the details.  I don't think

11   I have to.  It's been explained in the written submissions and by

12   counsel.  But there is just a far greater quality to the six

13   months that everybody is entitled to of credit monitoring.  And

14   it also includes identity theft insurance, scores, and things

15   that you don't get otherwise.

16          And then the enhanced credit monitoring is a little

17   enticement to get people to release their claims.  Apparently a

18   fair number of people, you know, 60 or 70,000 people, I forget

19   the exact number, have taken them up on that, so that can't be

20   such a bad deal either.  I think it's a good deal.

21          The retail value of $115, again, that doesn't equate to

22   what it costs Trans Union to do this, but it is a benefit to the

23   people who choose it.  And people who make that choice obviously

24   have studied the settlement and made a choice to get that type of

25   information including their insurance scores, mortgage scores,

1  and that sort of thing.  It's obviously a benefit, and it should

2  be taken into consideration in looking at all of this.

3          Some of the things that were also raised in some of the

4  objections, I've gone through all of these objections, you know,

5  some of them were written by laymen, some of them were written by

6  experienced counsel.  The cy pres award of $150,000 guaranteed is

7  to account, just to make sure everybody understands it, even

8  though nobody mentioned it today, that's to account for the fact

9  that we know there are a lot of people out there that don't have

10 Internet service or don't use it and to somehow compensate

11 organizations that are engaged in consumer protection in some

12 amount for that I think was appropriate, and that's the number

13 that we settled on in our negotiations.

14          And, of course, we all know that this residual fund

15 still, that we hope that there will be a residual fund for those

16 people.  Frankly, if enough people sign up for the cash award,

17 the residual cash award, that money will go to them and not any

18 other cy pres organizations as far as I can tell.  I can't see

19 any reason why we would do anything but distribute it to class

20 members.

21          The incentive awards for the named plaintiffs of 3750 I

22 find to be reasonable.  It's not a big amount of money.  You

23 could quibble about it.  But that's all it is is quibbling.  I

24 think that people should be rewarded for putting their names and

25 their identities out there as named plaintiffs in cases like

1    this.  I find that to be a reasonable award.  It's not enough

2    money to really fight about.

3         As far as fees are concerned, I have yet to even make

4    any, believe me, the Court has made no commitment whatsoever,

5    I've made it very plain to the plaintiffs' lawyers that I've made

6    no commitment to their request.

7         The defendant has said it wouldn't object if it were as

8    much as 25 percent.  I can tell you right now I'm going to take a

9    very, very close look at the fee petition, and it will be a

10   reasonable amount.  We'll set a date for that at the end of the

11   proceedings today.

12        The 23(b)(1)(a) certification, we should talk about the

13   order.  That was the vehicle that we decided was the only vehicle

14   that could be used.  It seems to fit within the general purpose

15   of the rule, because we are not awarding damages here per se.  In

16   fact, we're allowing the individual damages to remain.

17        And I should point out too that we're starting the

18   statute of limitations all over again.  And that's a great

19   benefit to people who want to think about pursuing their own

20   claims.

21        But this is a unique, this is a unique action.  We

22   couldn't -- we talked about notice.  Notice is something that I

23   always have considered very important in any type of class

24   settlement.  And I realize that under this rule we don't have to

25   give individual notice.  And in a way, that drove a lot of our

1  thinking on it as well as some of the other points that were

2  raised today and have been raised in the written submissions.

3          But the difficulty in identifying who we've got that is

4  a class member from the existing database that Trans Union has

5  would be very, very severe.  It would be incredibly expensive to

6  send individual notice to people.  I explored that in some detail

7  when we were having our settlement discussions, and I was

8  convinced that the cost would be in the tens of millions of

9  dollars, and it would be one more piece of junk mail.

10         The way they have done it now as least as far as I'm

11  crediting, I don't think anybody has really taken issue with the

12  fact, with the conclusion of the submissions by the parties here

13  that these ads reached 87 percent or more adults in this country

14  at least several times.  I've seen them on television.  There has

15  been ads in the paper and magazines.

16         Is it perfect?  No, it's not perfect.  It would be great

17  if everybody got a class notice.  But it would be prohibitively

18  expensive, and I'm not sure it would be much more effective.  You

19  have to balance these things.  I mean, that's what we do as

20  judges, we balance the results we're trying to reach with the

21  costs, and we do our best in doing that.

22         We settled on the 23(b)(1)(a) to avoid any inconsistent

23  adjudications.  There may be a point that what kind of injunction

24  could be issued here?  There is different types, there is

25  different case law in different circuits and to say, "Well, you

1  go to the Supreme Court to resolve it," that doesn't help.

2  That's what we try to avoid.  I think we have avoided it by doing

3  it the way we did it here.

4        So those are the high points I think as I see them.  A

5  number of other individual points were raised.  The idea that

6  Mr. Cochran raised about maybe setting aside some money, again,

7  just to repeat what I said before, that's an intriguing idea, but

8  it does change the equation significantly with a risk for Trans

9  Union.  That's not what they bargained for.  And I don't think

10 that what they did bargain for and what has been accepted here is

11 unfair in any way.

12        I think this is a good result.  To perhaps repeat what

13 counsel stated earlier, this settlement has received some very

14 favorable attention by consumer advocates in the press.  As far

15 as I could tell, there has been no negative -- well, there has

16 certainly been no objections by any of the big consumer groups.

17 And it seems to me that a lot of the articles that were cited by

18 the parties were in a sense free notice, free additional notice

19 if you will to a lot of other people who read those publications

20 or listen to those broadcasts that would incentivize people to

21 get on the bandwagon.  Maybe the cumulative effect of all of that

22 is driving some of the increase in registrations for these

23 benefits.  I would hope so anyway.

24        Again, is it perfect?  No.  But negotiation, like courts

25 have held in a lot of these cases, settlement is settlement, you

1  have to give and you have to take.  And I think the parties here

2  worked very hard to get the best deal they could.  And I'm

3  prepared to approve the final or to sign an order of final

4  approval.

5       Now, I was marking up the one, because you did put 23(b)

6  in there.

7       MR. BORDERUD:  A quick point, Your Honor.

8       MS. WHEELAHAN:  I didn't do that.

9       THE COURT:  It doesn't matter.

10      MR. BORDERUD:  In terms of the proposed order, I think

11 the stipulation requires the parties to agree on a joint proposal

12 and then submit it.  And we're going to do that I think, because

13 I'm not sure they have had a chance to actually review that.

14 That was a proposed order I think went in with the submission.

15      THE COURT:  Okay.  Well, you know, that language

16 should -- and you wanted to do something about the Louisiana

17 case?

18      MS. WHEELAHAN:  I think we need to take those state

19 cases out of there, because we need to take those to the state

20 courts and have those courts dismiss those cases.

21      THE COURT:  Well, all right.  But you're committing to

22 do that?

23      MS. WHEELAHAN:  Absolutely.

24      THE COURT:  Because this class settlement includes those

25 classes.

1          MS. WHEELAHAN:  I'll let Brian speak if he wants to, but

2    I don't think we have a disagreement about that.

3          MR. BROOKS:  Your Honor, the stipulation of settlement

4    makes clear that as a condition of the settlement, the parties

5    will go to the respective courts and effectuate dismissal.

6          The bottom line I think of this discussion shows is that

7    all of these parties need to sit down and put together a joint

8    proposed order, which could be done I would guess almost

9    immediately.  What you have in front of you is prepared just by

10   one group and submitted by them.

11         THE COURT:  Okay.  Well, I wasn't clear on that I guess.

12   But that's fine.  I think we should do that and then set -- I'm

13   not going to be here after this afternoon for the rest of the

14   week, but I'll be back next week on Tuesday.  So if I can get

15   something, can you get something to me before that?

16         MR. BROOKS:  I would think we can get something by

17   Monday, let's say.  Does that work for you?

18         MR. BORDERUD:  That's fine.

19         THE COURT:  If you can get it Monday, I'll see it

20   Tuesday morning.  And if I have a problem, we'll bring you back

21   here.

22         Now, what about the fee petition?  When do you want to

23   file your fee petition?  You know, we have a local rule that

24   governs fee petitions.  You may be familiar with it or not.

25         MR. BORDERUD:  90 days, it has to be filed within 90

1  days?

2        THE COURT:  Yes.  It encourages -- well, of course, this

3  is different.  All right.  I would like to ask all of you

4  plaintiffs' lawyers, I know this has been a fluid situation in

5  many respects, but I would like to request that you try to reach

6  some sort of agreement, maybe it's impossible, but I'm going ask

7  you anyway, as to how to allocate, you know, within your group

8  expanded as it is any fee award that I give so I won't have to

9  deal with that.

10        MS. WHEELAHAN:  We'll try, Judge.

11        THE COURT:  If I have to, I will.  I may refer this to

12  Judge Mason, because I think he probably spent more time with you

13  than I did.  I haven't made up my mind yet.  And Judge Mason's

14  law clerk is with us here today, and she'll warn him.  But it

15  depends what I get from you.  Ultimately, of course, I'd have to

16  approve it.

17        But I want you to be reasonable.  I want to know what

18  the lodestar is obviously in this case.  And I want you to be

19  mindful of, you know, what you should be compensated for and what

20  you shouldn't be compensated for in this case.  So I expect a

21  professional submission from you.  I don't expect it to be

22  perfect either.  But if you could agree on the split among you,

23  that would really be a big help to the Court.  If you can't, then

24  we'll deal with it.

25        So I think that's really all we have to do today, unless

1  somebody else can think of anything?

2      MS. WHEELAHAN:  Your Honor, if you can give us something

3  on the record saying that you'll approve the settlement?

4      THE COURT:  I think I did.

5      MS. WHEELAHAN:  If we have an order, I will go to the

6  Louisiana judge and we can --

7      THE COURT:  It's on the record.  I approve the

8  settlement as submitted with the changes, the little changes that

9  we've made that we talked about as far as 23(b) is concerned.

10  It's 23(a)(1) class.  Other than that, I think everything else is

11  approved.

12      MS. WHEELAHAN:  Thank you, Your Honor.

13      THE COURT:  My request to the Court in Louisiana would

14  be to dismiss that case in favor of this case or conditioned on

15  the ultimate signing of the order in this case, which I hope to

16  do early next week.  All right, everybody?

17      Okay.  Well, thank you again.

18      MR. BORDERUD:  Your Honor, just one last point.  We'll

19  try to reach an agreement.  If we can't, then we can submit some

20  kind of a briefing schedule?  Is that what you would like us to

21  do?

22      THE COURT:  Well, I suppose I should give you a date.

23  Maybe we should just set a date.  Do you need the 90 days?

24      MS. WHEELAHAN:  No.

25      MR. BORDERUD:  We need at least 30 I think.

1          THE COURT:  Yes, that's fine.

2          MR. CADDELL:  Judge, if I might, we raised this, we

3   discussed this, but the Court may not recall, we discussed

4   possibly splitting this into two parts, because, frankly, it may

5   be easier to work out an allocation if we know the amount of

6   fees.  And what we'd like to do or what we propose doing is

7   setting up the initial phase where we make -- it doesn't have to

8   be a joint application, I think everyone could make a joint

9   application.  But if Ms. Wheelahan doesn't want to, that's fine.

10          MS. WHEELAHAN:  Well, actually --

11          MR. CADDELL:  But make an application for the total

12   amount of fees that would be awarded by the Court.  Of course,

13   lodestar would be important to that.  But I think there would be

14   a lot less unpleasantness is one way to put it, if we could focus

15   on that.  Then that would give us an opportunity to work amongst

16   ourselves and perhaps with the assistance of Magistrate Mason to

17   see if we can work on an allocation.  And that would be easier

18   once we knew the amount.  Obviously, that could affect that

19   significantly.

20          THE COURT:  If you knew how big the pie was, you would

21   know how to slice it is what you are saying?

22          MR. CADDELL:  It would be easier, Judge.  And it might

23   give us a chance to work this out amicably if we knew that in

24   advance.

25          MS. WHEELAHAN:  It is difficult, if I could answer that,

1 it is difficult to submit a fee petition to you asking for a

2 total amount in two parts that way.  I mean, we can give you a

3 gross lodestar.  We can certainly do that.  But part of that,

4 because it's a common fund case, is arguing for the benefit that

5 we've provided to the plaintiffs.  It almost front-loads, it

6 almost front-loads the dispute rather than giving us a chance to

7 resolve it.

8           THE COURT:  I'm not sure what that means.

9           MS. WHEELAHAN:  It almost puts us arguing as to what

10 benefit we have provided to the class among ourselves before we

11 have a chance to see if we can agree.

12           THE COURT:  Well, you can do it either way I suppose.

13 It would make sense to me to see what a range would be at least

14 and then see how you would want to allocate that among

15 yourselves, because I'm looking at this more globally than you

16 are.  You're looking, you know -- if I say I think a reasonable

17 fee would be X dollars for everybody, and that's how I see it --

18           MS. WHEELAHAN:  Right.  Well, we need to show you what

19 that's based on.

20           THE COURT:  Right.  Yes, I understand.  Then you could

21 talk about allocation among yourselves.  If you say, well, I've

22 got to look at each one, each group's contribution separately, to

23 me, that's more backwards than forwards.  So I would rather do it

24 the other way.

25           Maybe what I should do is this, I should set this down

1  for a mid-October status, and you could come back and let me know

2  where you are at with this.  You could have a fee petition ready

3  for me then or not, it doesn't much matter.  But I'm not asking

4  for it by then, but the sooner the better.  I would like to just

5  wrap this up to be honest with you, because this order will be

6  basically, the order I'm going to enter next week is going to

7  terminate the case statistically, and all we have is the fee

8  petition left at that point.

9        So I think anybody, if any of the objectors want to

10  appeal, I think that would be the time, the time would start

11  running then.  It wouldn't wait for the fee petition.

12        So why don't we say October 15th.  Maybe you could get

13  me a report, I think you could put some work in on this and get

14  me some sort of status report before then at least, let's say the

15  Friday before that, the 10th.  And let's say 10:30 on the 15th,

16  and we'll see where we are.

17        We could talk about the best approach at that point, and

18  I can give you whatever ideas I have.

19        MR. ZARIAN:  Your Honor, if I may?  John ZARIAN.  Just

20  for the sake of completeness, it was represented the Andrews

21  state court action.  There was one other state court case, the

22  Frey case, which we too will be working to dismiss pursuant to

23  the stipulation of settlement.

24        THE COURT:  Right.  Both of those were actually

25  mentioned in the order I looked at.

1        MR. ZARIAN:  They are.

2        THE COURT:  That's one thing I wanted to talk about.

3        MR. ZARIAN:  Thank you, Your Honor.

4        THE COURT:  All right.  Thanks you, folks.  Have a good

5   day.

6        MS. WHEELAHAN:  Thank you, Your Honor.

7        MR. BORDERUD:  Thank you, Judge.

8        MR. BROOKS:  Thank you, Judge.

9      (Proceedings concluded.)

10                    C E R T I F I C A T E

11        I, Jennifer S. Costales, do hereby certify that the

12   foregoing is a complete, true, and accurate transcript of the

13   proceedings had in the above-entitled case before the Honorable

14   ROBERT W. GETTLEMAN, one of the judges of said Court, at Chicago,

15   Illinois, on September 10, 2008.

16

17                    */s/ Jennifer Costales, CRR, RMR*

18                    Official Court Reporter

19                    United States District Court

20                    Northern District of Illinois

21                    Eastern Division

22

23

24

25