1

1    IN THE UNITED STATES DISTRICT COURT
     NORTHERN DISTRICT OF ILLINOIS
2              EASTERN DIVISION

3    In Re:  TRANS UNION          )
     CORPORATION, Privacy         )
4    litigation, et al.,          )
                                  )  No. 00 C 4729
5                                 )  MDL 1350
                                  )  Chicago, Illinois
6                                 )  March 4, 2008
                                  )  10:00 a.m.
7                                 )

8         TRANSCRIPT OF PROCEEDINGS - STATUS

9    BEFORE THE HONORABLE JUDGE ROBERT W. GETTLEMAN

10   APPEARANCES:
     For the Plaintiffs:          SAUNDERS & DOYLE
11                                20 South Clark Street
                                  Suite 1720
12                                Chicago, Illinois 60603
                                  BY:  MR. THOMAS A. DOYLE
13                                     MR. TERRY ROSE SAUNDERS

14                                THE BORDERUD LAW GROUP
                                  11620 Wilshire Boulevard
15                                Suite 400
                                  Los Angeles, California 90025
16                                BY:  MR. JON BORDERUD

17   For defendant Trans Union:   DLA PIPER RUDNICK GRAY CARY, US, LLP
                                  203 North LaSalle Street
18                                Suite 1900
                                  Chicago, Illinois 60601-1293
19                                BY:  MR. ROGER L. LONGTIN
                                       MR. PETER J. DONOGHUE
20
     For the Louisiana            MS. DAWN ADAMS WHEELAHAN
21   plaintiffs:                  650 Poydras Street
                                  Suite 1550
22                                New Orleans, Louisiana 70130

23
     Official Court Reporter:     JENNIFER S. COSTALES, CRR, RMR
24                                219 South Dearborn Street
                                  Room 1706
25                                Chicago, Illinois 60604
                                  (312) 427-5351

1  APPEARANCES:    (Continued)

2  For certain plaintiffs:        EDELMAN COMBS LATTURNER & GOODWIN
                                  120 South LaSalle Street
3                                 18th Floor
                                  Chicago, Illinois 60603
4                                 BY:   MR. DANIEL EDELMAN

5  For the Texas plaintiffs:      CADDELL & CHAPMAN
                                  1331 Lamar
6                                 Suite 1070
                                  Houston, Texas 77010
7                                 BY:   MR. CORY FEIN

8  For the Texas plaintiffs:      WELLER GREEN TOUPS & TERRELL
                                  2615 Calder
9                                 Suite 400
                                  Beaumont, Texas 77704
10                                BY:  MR. MITCHELL A. TOUPS

11 For Defendant Acxiom:          MC DERMOTT WILL & EMERY
                                  227 West Monroe Street
12                                Chicago, Illinois 60606
                                  BY:   MR. DAVID J. SCRIVEN-YOUNG
13

14

15

16

17

18

19

20

21

22

23

24

25

1      (Proceedings in open court.)

2          THE CLERK:   OO C 4729, in Re:   Trans Union Corporation,

3   privacy litigation.

4          MR. BORDERUD:   Good morning, Your Honor.

5          John Borderud appearing on behalf of plaintiffs.

6          MR. LONGTIN:   Good morning, Your Honor.

7          Roger Longtin on behalf of Trans Union with Peter

8   Donoghue.

9          MS. WHEELAHAN:   Good morning, Your Honor.

10          Dawn Wheelahan for the Louisiana plaintiffs.

11          MR. SCRIVEN-YOUNG:   Good morning, Your Honor.

12          David Scriven-Young from McDermott Will & Emery on

13   behalf of defendant Acxiom.

14          MS. SAUNDERS:   Good morning, Your Honor.

15          Terry Rose Saunders on behalf of the MDL plaintiffs.

16          MR. DOYLE:   Good morning, Your Honor.

17          Thomas Doyle, also MDL plaintiffs.

18          MR. FEIN:   Cory Fein on behalf of the Texas plaintiffs.

19          MR. TOUPS:   Mitchell Toups on behalf of the Texas

20   plaintiffs, Your Honor.

21          MR. EDELMAN:   And Daniel A. Edelman on behalf of certain

22   plaintiffs.

23          THE COURT:   And which are those, Mr. Edelman?

24          MR. EDELMAN:   I'm local counsel for Texas and Louisiana.

25          MS. WHEELAHAN:   And for me when I need a favor, Your

1 Honor.

2        THE COURT:  All right.  I have four matters on the

3 agenda today that I'd like to discuss, the most important being

4 perhaps the objections to Judge Mason's R&R on the settlement.  I

5 also the have Louisiana and Texas plaintiffs' motions to be

6 appointed counsel with the target marketing class.  I have a

7 Trans Union motion to enforce protective order.  I don't know if

8 that's still viable or not.  And then I have the Louisiana

9 plaintiffs' motion to lift the protective order.

10        Anything I missed?

11        MR. LONGTIN:  On the last two, Your Honor, our motion to

12 enforce the protective order is before Judge Mason.

13        THE COURT:  Is it?  Okay.  That's probably where it

14 belongs, if anywhere.

15        And the motion to lift the protective order, that was

16 filed with me.

17        MS. WHEELAHAN:  That's filed with you, Your Honor.  And

18 if you want to hear about it, as in most things, there is a

19 compromised position, but sometimes we need help to get there.

20        THE COURT:  Well, I think that's sort of the tail

21 wagging the dog here.

22        On the objections to Judge Mason's R&R, I don't think --

23 I think I've had so many briefs on that.  Of course, I've had

24 Judge Mason's opinion to review as well.  And I don't think,

25 unless you think I need more argument on that, I really don't

1  think I do.  Anybody want to --

2        MR. BORDERUD:  Depends on what your result is, Your

3  Honor.

4        THE COURT:  It doesn't go that way, sorry.  That's like

5  asking for a jury verdict and then saying, "Well, it depends on

6  how you guys come out, and then I'll do another closing

7  argument."

8        MR. LONGTIN:  Your Honor, obviously if you have any

9  questions, we'd be willing to come back and answer them, but I

10  don't think I really have any, certainly not any more to say on

11  behalf of Trans Union.

12        THE COURT:  I don't.

13        I guess I should start by saying that I know how hard

14  you worked on this, and I know how hard a problem this is,

15  because all of these things taken together demonstrate how

16  difficult this situation is.  Frankly, looking at a lot of these

17  other cases as I've been for a long time now and again recently

18  in preparing for today's proceedings, there is no doubt in my

19  mind this case is pretty unique.  I don't think any of these

20  other cases really, they help, but they don't definitively point

21  the way.

22        To make a long story short to keep you out of suspense,

23  I am overruling the objections to Judge Mason's report and

24  recommendation, and I'm adopting it.

25        I know there are some problems with it that you pointed

1  out.   There is no precedential value.   There is no law of the

2  case, except to the effect that he's rejected the settlement

3  proposal.

4        Apparently there were some misstatements or at least

5  purported misstatements of some facts and that sort of thing in

6  there, but I don't think that that's binding on me or the

7  parties.   What is binding I think is that we don't have a

8  settlement here at the moment.

9        I can go over my reasoning very briefly, but I really

10 don't think I have to.   I agree with Judge Mason on a number of

11 things.   The notice is inadequate.   We're missing too many

12 people.   The type of notice that you've suggested, it may be on a

13 practical level sensible to some degree.   But it just doesn't

14 reach enough people.   We have to find a better way to notify

15 everybody that they have certain rights.

16        The relief itself, I know there is a lot of disagreement

17 about how you measure the relief and how you measure the cost,

18 but I agree with Judge Mason that it's inadequate, because the

19 potential here is just so huge -- and you can argue about whether

20 or not we could have, whether or not the willfulness will be

21 easily proved or not.   After the Safco case, it's a lot easier.

22 And I think that the chances of proving willfulness here are

23 great enough that you're undervaluing the value of this recovery.

24        On those two grounds alone it seems to me sufficient to

25 reject the proposed settlement.   Judge Mason goes into a lot more

1  detail and thoughtfulness.  He certainly struggled with all of

2  you for many years, several years on this.

3         That doesn't mean, however, that the notion or the

4  structure of the settlement isn't sensible or that a settlement

5  couldn't be reached.  You know, I wish I had the time and

6  resources to write a tome on this myself like Judge Mason did,

7  and maybe I will one day, but today isn't that day.

8         I think that Ms. Wheelahan, I asked her to give me some

9  of her own ideas, I know she's been sort of involved with all of

10  this, and she did give me some ideas.  I don't remember seeing

11  responses to those.  But maybe they're in this pile somewhere.

12  I've got so many papers on all this that I missed it.

13         But there are other ways to do it.  And I think that

14  what this convinced me anew was that a nationwide settlement here

15  really is, if it's going to be settled, it's got to be

16  nationwide.  It can't be, you know, we can't be talking about $19

17  billion.  There is not $19 billion to go around.  But we have to

18  be talking about a lot more than the $10 million really that's on

19  the table, because that's really in my view all that's on the

20  table.

21         This in-kind relief is ephemeral.  You can hardly turn

22  on the TV today, and I'm not a great TV watcher, but when I do

23  watch what little TV I do watch, you can't help but be bombarded

24  by ads for free credit reporting and all the rest of it.  I don't

25  know what that means.  I know it doesn't include the insurance

1   aspect that Trans Union put on the table.   But giving people free

2   credit reports is giving them nothing that they can't get

3   already.   That's just one facet of this.

4          We have to find a way where people can be informed of

5   their rights and be able to apply for a certain amount of

6   monetary relief here.   Otherwise the alternative is to hold a

7   trial on willfulness and either reconsider a nationwide class

8   altogether on the target marketing or wait until we get 50 new or

9   maybe 36 new cases filed state by state for target marketing

10  classes, because I do believe that the statute has been tolled

11  all these years for target marketing class members nationwide.

12         There has been a nationwide, you know, it's an

13  interlocutory order that I entered, and it can be changed.   So I

14  think it's likely that it's tolled and that we'll be right back

15  to either a nationwide class or at least reconsideration of that

16  or 50 different state target marketing classes, and we'll have to

17  deal with this one way or the other.

18         The case should be settled.   And it should be settled in

19  a way that means a lot more money on the table from Trans Union.

20  That's how I feel about this.

21         I don't want another extended period of negotiating,

22  however, because it's just been too long.   This is a 2000 case

23  that's been going on since the mid '90s with the FTC, and it's

24  time to bring this to a head.

25         A lot of the class members, even if we were to send them

1    direct mail notice, which we're not going -- which I'm not

2    proposing, that would be, that itself, I did the numbers

3    somewhere here, and they're staggering.  I have some suggestions,

4    and maybe you all have them in your own heads as well, but I

5    think there are ways to give better notice than you've proposed

6    here.

7            There has to be a way for everybody to understand what

8    their rights are and be able to apply for some sort of relief.

9    It won't be, you know -- I think there are some really serious

10   issues here.  I don't know what the Court of Appeals would do

11   with this.  But I know what I would be willing to approve, and I

12   know what I think Judge Mason would be willing to approve or at

13   least a ballpark, and it would be less than the statutory

14   damages, whether that's even allowable.  I don't even know to be

15   honest with you.

16           I don't want to put Trans Union out of business.  But

17   anything close to even a minimal statutory award here, assuming

18   the most generous measure of damages would have that result it

19   would seem to me.

20           If we have 190 million people with only one violation

21   per person, it would be $19 billion.  And there ain't 19 -- there

22   isn't $19 billion.  So you have to figure something out.  But

23   that doesn't mean people get nothing.

24           And I know what the numbers are here since I've seen the

25   reports that were filed under seal, and I believe that Trans

1   Union can afford to pay a lot more than they have put on the

2   table.  If they're unwilling to do that, then we have -- then let

3   the chips fall where they may.  That's all I can say.  I mean, I

4   can't force a settlement.  I can just tell you what I think the

5   structure has to be.

6          So the result is that I'm sustaining Judge Mason's

7   rejection of the settlement.

8          Then we have the motion to lift the protective order.

9   And I think Ms. Wheelahan has a very strong point on this.  I

10  didn't see a response to that.  And if there was one filed I

11  just --

12         MR. LONGTIN:  No.

13         THE COURT:  There wasn't?  Good.  I tried to get

14  everything in order.  And now, of course, having gone through it

15  again this morning, everything is out of order, so I couldn't

16  find it if it was here.

17         But the notion of trying to, if there is going to be a

18  class settlement where there is going to be a fairness hearing no

19  matter what we do, and we're going to allow people to opt in or

20  opt out or take their chances filing their own individual

21  actions, which has to be a component of this, which I think all

22  of you recognize, the only way it seems to me to allow any

23  intelligent decision is to allow them to know what their options

24  are and what their chances are.

25         Now, it may be that we don't need exact numbers.  Maybe

1  we need, you know, at least type numbers or, you know, you could

2  phrase it in some way.  I don't think anybody is trying to pry

3  into all of the private finances of Trans Union.  It is a private

4  company.  And that cuts several ways.  One is there are private

5  interest at stake in keeping financial information closer than it

6  would be if it were a public company.  On the other hand, the

7  public interest isn't, you know, putting a private company in

8  jeopardy, it doesn't have the implications of putting a public

9  company in jeopardy, if that's what ultimately happens here.

10       So as I say, that cuts both ways.  But I think there

11  should be -- maybe you hinted at this earlier, Ms. Wheelahan,

12  that there are compromises that can be made if there is going to

13  be a proposed settlement.  If there is not going to be a proposed

14  settlement, then I don't think at this point you have to make

15  that information public.

16       As far as the 23(g) motion is concerned, I must tell you

17  that I am up in the air on that.  On one hand, you know, you're

18  all very good lawyers, and I appreciate getting materials from

19  very good lawyers, but it makes the decision making sometimes

20  that much harder.

21       But before I get to that, I guess I'm going to put the

22  question to both the plaintiffs' counsel and defense counsel

23  right now, and that is, having upheld Judge Mason's rejection of

24  this settlement proposal, what is next on your agenda?  I'm

25  assuming that you've thought about this possibility, if not

1   likelihood.

2        I think I should say, too, I'm not writing on this.  So

3   I think I want to make this oral record as clear as I can.  I do

4   believe that the standard of review is de novo.  It's a question

5   of law.  It's not a question of fact.  I don't think it's -- it's

6   really a recommendation to me having worked out a settlement with

7   you, something that I would have to approve both preliminarily

8   and finally, so, therefore, it's my decision ultimately, and I

9   did review his decision de novo.

10        All right.  Now, with that clarification, what do the

11   plaintiffs plan now?

12        MR. BORDERUD:  If I may, Your Honor?  I suppose in view

13   of the rejection we would ask the Court to put the case back on

14   the litigation track, and we would propose probably a timeline

15   for filing a nationwide motion for class certification, possibly

16   with also state-by-state classes of the plaintiffs we represent.

17   That would be another possibility.  We would probably ask for a

18   discovery cut-off --

19        THE COURT:  You're talking about target marketing then?

20        MR. BORDERUD:  Correct, correct.  We'd also ask for a

21   discovery cut-off, probably September 1st to complete discovery

22   on the willfulness issues and some other things.

23        THE COURT:  What more discovery do you need on that?

24        MR. BORDERUD:  Simultaneously we would probably explore

25   whether or not your comments today suggest anything to the

1  defendants with respect to any changes they might feel they might

2  be able to make.

3         THE COURT:  Well, I think there has been a lot written

4  by the higher courts since I made that initial decision, which I

5  would have to consider.  I haven't made a decision yet, but I

6  told you that I would be agreeable to rethinking that on the

7  class.

8         And it occurred to me that whether or not there would be

9  a trial or a summary judgment on the willfulness issue would be

10 up to the parties really.  If it were a trial, I assume it would

11 be a jury trial on that issue alone.  And that would be for all

12 cases, because it's the same issue for all cases.

13        MS. WHEELAHAN:  There might be a collateral estoppel

14 issue, Your Honor, that we would tee up.

15        THE COURT:  Collateral estoppel issue.

16        MS. WHEELAHAN:  Having to do with the decisions that

17 came from the FTC action.

18        MR. BORDERUD:  It's summary judgment.

19        THE COURT:  Well, that might be part of a summary

20 judgment motion.  I assume that you're going to want to try a

21 summary judgment motion anyway.  I'd like to, I'd like to get

22 this on as fast a track as possible.

23        What do the defendants --

24        MR. LONGTIN:  Well, obviously, Your Honor, our conduct

25 is somewhat contained by what the plaintiffs do.  We would be

1  prepared to defend against those issues.  We've thought about

2  summary judgment on the willfulness issue.  I'm not so sure that

3  the Court's comments about the trial binding everybody might

4  work.  Obviously we have to think about those things.

5        THE COURT:  Well, there is a distinction between states

6  classes of consumers.  I mean, we obviously have the firm offer.

7  But I think as we all know, the target marketing is where the big

8  numbers lie here.

9        MR. LONGTIN:  That's everybody.  You know, we'll take

10  your comments back to our clients about settlement.

11        But, you know, frankly, Your Honor, one of our problems

12  in the settlement process as a whole is, we've sat down and gone

13  through this process with Judge Mason twice, and at no time

14  during those conversations was he critical of the amounts being

15  offered to resolve the case.

16        You know, somebody would have said "no" in the middle of

17  the negotiations.  I mean, I know you're shaking your head, and I

18  appreciate that.  You know, I apologize --

19        THE COURT:  All I know is what --

20        MS. WHEELAHAN:  I said "no," Judge.  Nobody heard me.

21        THE COURT:  Well, wait a minute.  Wait a minute.  I just

22  want to stop you right now, because I want this record to be

23  clear.  Judge Mason and I have had a lot of talks about this

24  case.  We've met with you together on a number of occasions, and

25  we've coordinated.  I've never ever talked to him about the

1   details of your settlement.  So all I know is what I saw in his

2   R&R.

3            Now, if I was shaking my head, it's because I would just

4   have assumed that these numbers were put to him, and maybe he was

5   being very Solomonic and sitting back and listening politely to

6   what you had to say.  But I don't want to inject myself in the

7   mediation process that you engaged in with him.  All I know is

8   that it took an awful long time, and I know you all -- I'm not

9   doubting that you all worked hard.

10           He rejected the notion that the plaintiffs' lawyers

11  weren't doing their best.  And we'll get to that in a minute.

12           But anyway, go ahead.  I'm sorry.

13           MS. WHEELAHAN:  If I could say for the record, Your

14  Honor --

15           THE COURT:  No.  Wait.  He has the floor.

16           MS. WHEELAHAN:  All right.

17           MR. LONGTIN:  Thank you, Your Honor.

18           You know, the Court has indicated that you have some

19  ideas and what is fair in this case.

20           THE COURT:  Well, Ms. Wheelahan, you know, I invited her

21  to put some suggestions up.

22           MR. LONGTIN:  I understand.  And the numbers in that

23  settlement were a judgment of $900 million reduced and a

24  settlement value of 300 million for a complete release of all

25  claims.  That's the way I read it.

1          She also has a scheme that was laid out without numbers

2   associated with it that had a two-part level of resolving claims,

3   but it had no numbers associated with it.  So there is one that

4   says 900 million reduced to 300 million and one that has a

5   scheme.

6          The Court has indicated it has some ideas.  You know, I

7   will pass on to my client all of these ideas.  But you're right,

8   when you take the mathematics of the claim, $19 billion, or you

9   take the mathematics of Ms. Wheelahan's claim of $900 million,

10  either one results in, I mean, one results in an absurd number,

11  one results in, if you do the mathematics and apply it to the

12  class, like 4 and a half dollars a class member, assuming no cost

13  and no litigation fees.

14         So, I mean, between those numbers somewhere there has

15  got to be a rational resolution.  Now, obviously, we offered a

16  minimum value of $40 million.  And the Court says 10 million, but

17  it really comes to 40 million, I mean, in our view.

18              THE COURT:  Well, I value that in kind --

19              MR. LONGTIN:  As zero.

20              THE COURT:  -- very little.

21              MR. LONGTIN:  I appreciate that.

22              THE COURT:  It's probably worth more than zero.  But

23  it's not worth 22 million or whatever you put on it.  And the 20

24  million, if half of it goes to fees and costs, there is 10

25  million on the table.  Even if there is 20 million on the table,

1   with 190 million potential people --

2            MR. LONGTIN:  I understand.

3            THE COURT:  I think we need, what I would need -- well,

4   maybe we shouldn't even be talking about this on the record.  I

5   mean, I do have some ideas.  And maybe we should hold a meeting

6   with Judge Mason again.

7            MR. LONGTIN:  That's what we would, if I'm asking for

8   anything before I -- I mean, to sit down with my client, I have

9   to give them some ideas.  I mean, obviously you can see the

10  ranges here are so broad in terms of how you value the case.  I

11  mean, $19 billion is a gigantic number.  Trans Union's net worth,

12  the Court has that available to it.  I mean, $19 billion is

13  significantly in advance of that net worth.

14           THE COURT:  Well, I mean, nobody is, as I say, I don't

15  think anybody is trying to put Trans Union out of business.  I

16  know what their net worth is.  And I know what their yearly net

17  income is, too.  And I think that there is a lot more money that

18  they could afford to put on the table at least potentially and

19  give people an opportunity to actually respond to a notice.

20           We all know that the response rates for even direct

21  notice classes is small.  So I don't know if there has been any

22  scientific or expert opinion about how much -- if we were to

23  include a notice, let's say, in credit card bills, you know, you

24  open your credit card bill every month, and you get all kinds of

25  stuff in there, and some people like me throw it away without

1    looking at it, but that's at least notice.

2         Mr. Edelman will tell you a lot of people don't look at

3    anything in their contracts before they sign it, right?

4         And but at least that's notice.   A certain amount of

5    those people would respond.   To me, that's a way to do it.

6    That's a way to do it.

7         MS. WHEELAHAN:   We have an expert, Your Honor.   We have

8    talked to Todd Hillsby.

9         MR. LONGTIN:   Your Honor --

10        THE COURT:   Well, all right.   I'll get to you in a

11   minute.

12        But I'm just saying that there may be other ideas out

13   there that would be more acceptable to Judge Mason, ultimately to

14   me, and maybe everybody, and it's going to cost a lot more than

15   you've got on the table now.   That's the reality.   Before I

16   approve a settlement, it's going to cost a lot more than you've

17   got on the table.

18        And that's subject to a fairness hearing in which I

19   would take an objective look at any objections I got.   So it's

20   just got to be more than you're talking about now.

21        If you wanted to give it one more try, you know, I'm

22   always happy to do that.   But the length of time that you took to

23   get to this is discouraging, and the effort that you took is

24   discouraging.   But I don't know all of the, you know, the back

25   and forth and the history that you are all familiar with.

1        You know, I don't believe that Judge Mason is in the

2   business of wasting his time or yours.   So there must have been

3   an awful lot of talk.   That's all I can say.   But it just didn't,

4   it didn't produce anything that I could approve.

5            MR. LONGTIN:   Well, what are the chances of meeting with

6   you?

7            THE COURT:   Well, the chances of meeting with me are

8   darn good.

9            MR. LONGTIN:   I would suggest that that would be our --

10           MR. BORDERUD:   That would be helpful, Your Honor.

11           MS. WHEELAHAN:   I can say, Your Honor, I said "no" all

12   along.   And you know I was here in your court saying "no" to

13   their settlement.   Mr. Longtin says he never --

14           THE COURT:   If there is one thing I know is that you've

15   been saying "no."

16           MS. WHEELAHAN:   I've been saying "no," and nobody was

17   hearing me.

18           THE COURT:   Well, okay.   Let's talk about

19   Ms. Wheelahan's motion then, because, I mean, I don't think the

20   plaintiffs' lawyers are afraid to litigate this case.   To replace

21   them at this point I think would be foolish, and I don't think

22   23(g) requires that.

23           On the other hand, Ms. Wheelahan and her companions have

24   been I think an important part of this whole process all along.

25   And I'm toying with, I haven't made a decision yet, I'm toying

1  with the idea, or considering the idea maybe is a better way to

2  put it, of allowing them to come in as co-lead plaintiffs'

3  counsel with the rest of you.

4          I know that could complicate things and perhaps create

5  some problems, but I think that Ms. Wheelahan and her colleagues

6  have played an important part in this case.

7          MS. WHEELAHAN:   Thank you, Your Honor.

8          THE COURT:   You know, I don't know whether that's

9  workable or not.   But that's something we could certainly talk

10 about if we're going to have a meeting and try and see if we can

11 hash something out.

12         I mean, I think this case should be settled, because a

13 litigated solution could very well end up destroying this

14 company.   Would it be the end of the world?   Companies are coming

15 and going everyday, so it wouldn't be the end of the world to me.

16 And as I say it's not a public company, so we don't have public

17 shareholders.   But that's not a good result.   Nobody is seeking

18 that as a realistic resolution.   And I don't even think

19 Ms. Wheelahan's suggestions are either.

20         You know, I'm open to suggestions whether maybe you can

21 take some, you know, maybe you can take some of her suggestions

22 and respond to them informally and get me some alternative

23 solutions here.

24         I think notice is a really important part of my problem

25 with all this, too.

1        MR. LONGTIN:  It's a very difficult issue to deal with.

2        THE COURT:  I'm sure it is.  I'm sure it is.  What do

3   you think about my, I think you might have suggested that you

4   could put some sort of notice in credit card bills.

5        MR. LONGTIN:  Judge, you, of course, realize that people

6   who send out credit card bills are not us.  I mean, that would

7   be --

8        THE COURT:  No.  But, you know, I see the little fliers

9   that come in the credit card bills, and it's everything from name

10  stamps to --

11       MR. LONGTIN:  Right.

12       THE COURT:  -- credit insurance to, you know, windshield

13  wipers I guess.

14       MR. LONGTIN:  Obviously things that banks are promoting.

15  You know, we're not associated with them.  They don't have

16  contracts with us to promote stuff in their mailings.

17       THE COURT:  Well, you also don't have a contract with

18  Parade magazine, but you're willing to put it in Parade magazine.

19       MR. LONGTIN:  You buy time.

20       THE COURT:  Pardon me?

21       MR. LONGTIN:  You buy time.

22       THE COURT:  Yes.  You buy time, and you buy access to

23  those little envelopes.

24       MS. WHEELAHAN:  I could bring in Mr. Hillsby, Your

25  Honor.

1          THE COURT:  Pardon me?

2          MS. WHEELAHAN:  I could bring in Mr. Hillsby to talk

3    about notifications.

4          THE COURT:  Well, that's just an idea that came to my

5    mind, because we get these things in the mail all the time.  To

6    actually put a 41 cent, soon to be 42 cent stamp on an envelope

7    and send it to 190 million people --

8          MS. WHEELAHAN:  We don't advocate that, Your Honor.  But

9    Mr. Hillsby has got some -- he did all the notices for the

10   Federal Judicial Center.  If you click on that, you'll find his

11   things.  And he's done some really creative notices for Alaskan

12   Indians who didn't have televisions.  He'll bring you something.

13   I'm not the person to talk about it.  He is.

14         THE COURT:  Well, you know, there is a lot you can do

15   over the Internet obviously besides just putting something on a

16   website that nobody may visit.  I mean, most people don't have

17   reason to visit Trans Union websites.  You could advertise on

18   television, click on this website.  I don't know what that

19   coverage would be.

20         I know you have a class of beneficiaries that you

21   propose.  They're non-Internet people.  I assume a lot of people

22   are in that class.  I'm not sure whether you've ever quantified

23   that or not or even how to identify those people.  We all take

24   the Internet for granted.  We're all wearing suits and ties and

25   nice clothes.  We all have computers.  We have too many computers

1   actually.  But a lot of people out there don't have them.  We

2   have to find a way to get to them.  That's why I was suggesting a

3   way that just about anybody who has an open line of credit -- I

4   mean, some of the people in this class are no longer with us.

5   Some of those people probably don't have open lines anymore.

6   Some the people who have open lines now didn't have them then.

7          MR. LONGTIN:  Sure.

8          THE COURT:  And I'm sure there is all kinds of either

9   over or undercoverage that would be included in that.  I have no

10  idea what that would cost.  It's got to cost a lot less than a

11  first class letter.  I just don't, I don't know.  That's what I

12  mean, those are the kinds of things I would like to explore.  And

13  I would be happy to explore it with you and to see if we could

14  hash something out.

15          But you've got to remember something, too, and this is

16  one reason we used Judge Mason to begin with, I have to approve

17  preliminarily and finally a settlement.  If I'm involved in

18  negotiating it with you as a mediator, it's harder for me to be

19  as objective or to appear as objective as I would if I were

20  approving something that was hammered out with someone else, a

21  magistrate judge in this case or even a private mediator or the

22  parties themselves.

23          So, you know, I'm happy to talk to you about ideas, but

24  they're only going to be ideas.  I'm one of these judge who when

25  I hold settlement conferences I like to come up with solutions.

1 But in a class action setting, it's harder to do that and

2 maintain my role as the ultimate decision maker.

3          Yes.

4          MR. BORDERUD:  Even that would be helpful, Your Honor,

5 just getting some of your ideas, for example --

6          THE COURT:  Well, I would like to do it in conjunction

7 with Judge Mason, because --

8          MR. LONGTIN:  That's fine.

9          MR. BORDERUD:  That would be just fine.

10          THE COURT:  -- and I'm not even sure if he's around, but

11 I could go try to locate him and see when he's available.  I'd

12 like to do this sooner rather than later while --

13          MR. BORDERUD:  Absolutely.

14          THE COURT:  -- this is about as fresh in my mind as

15 possible.

16          MR. FEIN:  Your Honor, can I follow up on your comment

17 on the 23(g) motion?  Ms. Wheelahan and Texas counsel, we've

18 always been frozen out.  You said that you were inclined to add

19 us as co-lead counsel.

20          THE COURT:  I mean, that was a thought that came to

21 mind.  In a way, you are assuming a role in this case already,

22 you know, whether you have that title or not.  I don't want you

23 to be frozen out anymore.  You say you're frozen out.  They say

24 you weren't frozen out.

25          MR. BORDERUD:  Can I address that, Your Honor?

1      THE COURT:  You chose to remain out.  So I don't really

2  care who is --

3      MR. BORDERUD:  May I address that point, Your Honor?

4      THE COURT:  Sure.

5      MR. BORDERUD:  They haven't been frozen out.  They have

6  simply made a choice to make everything we do look bad, because

7  they want to come in and take the case.

8      MS. WHEELAHAN:  They didn't tell us what the settlement

9  was, Judge.

10      MR. BORDERUD:  Not true, not true.

11      THE COURT:  All right.  All right.

12      MR. BORDERUD:  Let me just make one point.  When we

13  initially set up the leadership structure, there were lots of

14  different proposals.  We arrived at a proposals that we thought

15  would be efficient.  It was a three-party structure so no one

16  firm would control the case.  It was a democratic arrangement

17  where the three leads had to agree before major decisions were

18  made.

19      We also tried to keep the costs of this down by not

20  including so many people that, I mean, the lodestar in this case

21  already is phenomenal, and if you add five more firms to it, it's

22  going to be in the stratosphere.  That's money.

23      The flip side of this is in arriving at a cash damage

24  figure, we didn't want to drive up the price just to have that

25  money come back to us in fees or go to a nonprofit.  We were very

1 mindful of the fact that it's difficult to get this cash that

2 you're talking about or relief to the class members.

3         So even if you push that number up to, you know, 80

4 million or 100 million, it's still going to have be made on a

5 claims-made basis of some kind.  And whoever doesn't claim, then

6 you're looking at attorneys coming in and claiming:  Well, we

7 created X value, therefore, we deserve this amount of fee.

8         We didn't want to be in that position.  We were trying

9 to set something up where it covered the claimants, but it didn't

10 necessarily put us in a position where we were claiming this

11 great value.  So I think we acted honorably there.  I think we've

12 tried to keep the costs down.

13         THE COURT:  Well, I know that Judge Aspen went through

14 that with you originally.

15         MR. BORDERUD:  Right.

16         THE COURT:  I want to honor that decision.  But I'm also

17 not unmindful of the fact that Ms. Wheelahan and her colleagues,

18 and maybe mostly her, have been responsible for an important

19 decision that I had to make in this case.  And I know it's hard

20 to foist, we're going through this in PSLRA cases now, to foist

21 lead counsel on parties, and it's hard to foist co-counsel on

22 other lawyers.

23         Maybe I just want you to think about how that might

24 work.  I'm not sure we need the entire team, but I think maybe

25 adding Ms. Wheelahan and perhaps one other group may be the best

1  thing to do here.  And I don't know how you could all deal with

2  that.  I haven't made a decision yet on that.  It's an odd

3  motion.  It's a very unique motion.  It's coming very, very late

4  in the case.  It's almost getting on to eight years old now.  And

5  I don't want it to go much longer.  It's far, far too long.

6      I'm not happy with the way it's been managed, and I take

7  some blame for that.  We let this go a long time, and we haven't

8  really moved the ball very far.

9      And these people, a lot of people who were entitled to

10  some even modest measure of relief here or the notice that would

11  allow them to seek individual relief are deceased or no longer

12  available or no longer reachable.  And that doesn't make me

13  particularly happy.

14      I know that some of this is going to happen in any case

15  of this size.  I'm not sure there has ever been a case of this

16  size before.

17      Let me adjourn for a few minutes and see if I can get a

18  hold of Judge Mason and see if he's around and when he could get

19  together with all of you having just given you these thoughts.

20      Maybe the next thing we should do is try to have a

21  meeting where we could throw some ideas around, and you could

22  take them back and then return with either, "Yeah, this is

23  doable" or "No, it's not," in which case we'll set it on to the

24  other track.

25      MR. BORDERUD:  All right.

1       THE COURT:  But it's got to go on.  We're at that point.

2       MR. BORDERUD:  I think that's a good idea, Your Honor.

3       THE COURT:  All right.  Let me just adjourn for a few

4  minutes.

5       (Recess.  Proceedings concluded.)

6                    C E R T I F I C A T E

7       I, Jennifer S. Costales, do hereby certify that the

8  foregoing is a complete, true, and accurate transcript of the

9  proceedings had in the above-entitled case before the Honorable

10  ROBERT W. GETTLEMAN, one of the judges of said Court, at Chicago,

11  Illinois, on March 4, 2008.

12

13                          _____

14                          Official Court Reporter

15                          United States District Court

16                          Northern District of Illinois

17                          Eastern Division

18

19

20

21

22

23

24

25