1

1 IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
2 EASTERN DIVISION

3 In Re: TRANS UNION )
CORPORATION, Privacy )
4 litigation, et al., )
) No. 00 C 4729
5 ) MDL 1350
) Chicago, Illinois
6 ) April 24, 2007
) 1:30 p.m.
7 )

8 TRANSCRIPT OF PROCEEDINGS - STATUS

9 BEFORE THE HONORABLE MICHAEL T. MASON

10 APPEARANCES:
For the Plaintiffs: SAUNDERS & DOYLE
11 20 South Clark Street
Suite 1720
12 Chicago, Illinois 60603
BY: MR. THOMAS A. DOYLE
13
(Via telephone) LERACH COUGHLIN STOIA GELLER RUDMAN
14 & ROBBINS LLP
655 West Broadway, Suite 1900
15 San Diego, California 90025
BY: MS. JOY BULL
16
(Via telephone) RIGHETTI LAW FIRM
17 220 Montgomery Street
16th Floor
18 San Francisco, California 94104
BY: MR. MATTHEW RIGHETTI
19
For Plaintiff Jowers: EDELMAN COMBS LATTURNER & GOODWIN
20 120 South LaSalle Street
18th Floor
21 Chicago, Illinois 60603

BY: MR. FRANCIS R. GREENE
22

23
Official Court Reporter: JENNIFER S. COSTALES, CRR, RMR
24 219 South Dearborn Street
Room 1706
25 Chicago, Illinois 60604
(312) 427-5351


2




1 Appearances: (Continued)

2 For Trans Union: DLA PIPER RUDNICK GRAY CARY, US, LLP
203 North LaSalle Street
3 Suite 1900
Chicago, Illinois 60601-1293
4 BY: MR. ROGER L. LONGTIN
MR. PETER J. DONOGHUE
5
O'MELVENY & MYERS
6 1625 Eye Street, N.W.
Washington, DC 20006-4001
7 BY: MR. BRIAN P. BROOKS

8 For Acxiom: ROSE LAW FIRM
(Via telephone) 120 East Fourth Street
9 Little Rock, Arkansas 72201
BY: MS. AMY L. STEWART
10
ALSO PRESENT: Mr. Daniel Halverson
11 Trans Union

12 Mr. Stephan Danelles
Lloyd's of London
13
For the Louisiana MS. DAWN ADAMS WHEELAHAN
14 plaintiffs: 650 Poydras Street
Suite 1550
15 New Orleans, Louisiana 70130

16

17

18

19

20

21

22

23

24

25

3

1 (Proceedings in open court.)

2 THE CLERK: 00 C 4729, In re: Trans Union Corporation.

3 THE COURT: Okay. The case has been called. If the

4 parties on the phone would please identify themselves for the

5 record. And we have a court reporter here so you're aware of

6 that.

7 MS. BULL: Good morning, Your Honor.

8 Joy Bull of Lerach Coughlin on behalf of the class.

9 MR. RIGHETTI: Matthew Righetti on behalf of the class,

10 Your Honor.

11 THE COURT: All right.

12 MS. STEWART: Amy Stewart on behalf of Acxiom.

13 THE COURT: And is that it, there are just the three

14 people on the phone?

15 MS. BULL: Correct, Your Honor.

16 THE COURT: One of the things I'd like to do, we've got

17 six attorneys that are involved in the case present in the

18 courtroom and then two other people, one attorney and one

19 representative, is that correct? Are you an attorney also, sir?

20 MR. DANDELLES: I'm an attorney, yes.

21 THE COURT: All right. And two other attorneys that are

22 sitting in the audience. And would you mind closing the door?

23 She already did.

24 One of the things that I would like to say to the

25 parties, I'm Mike Mason, I'm the Magistrate Judge here, I would

4

1 like to say that if when you are talking on the phone if you hear

2 a noise like that, I would like you to stop please, because there

3 is something that either I want to interject or one of the other

4 people want to interject.

5 Could you hear that noise?

6 MR. RIGHETTI: Yes, Your Honor.

7 THE COURT: All right. Now if we'll have everybody here

8 identify yourselves please and speak up. Keep in mind that we

9 have three individuals on the phone here.

10 MR. LONGTIN: Roger Longtin for Trans Union.

11 MR. DONOGHUE: Peter Donoghue for Trans Union.

12 MR. BROOKS: Your Honor, Brian Brooks for Trans Union.

13 MR. HALVERSON: Dan Halverson. I'm internal counsel

14 with --

15 THE COURT: I can't even hear that. What is it

16 again?

17 MR. HALVERSON: It's Dan Halverson.

18 THE COURT: All right.

19 MR. HALVERSON: In-house counsel, Trans Union.

20 MR. DOYLE: I'm Thomas Doyle, liaison counsel for the

21 MDL plaintiffs.

22 MS. WHEELAHAN: Dawn Wheelahan for the Louisiana

23 plaintiffs.

24 THE COURT: All right.

25 MR. DANDELLES: Stephan Dandelles on behalf of

5

1 Underwriters at Lloyd.

2 MR. GREENE: Frances Greene for Donald Jowers.

3 THE COURT: All right. I think everybody is here, and I

4 appreciate your all coming in. And as I pointed out to you

5 before, we're very fortunate to have a court reporter here today.

6 The court reporter happens to be Judge Gettleman's court

7 reporter. That wasn't done by design. It was done by however

8 they do it. But she had no idea that she was being called here

9 for this case today. But I thought it was important that we had

10 a court reporter so that each of you could order a transcript

11 right after this if you feel that you need to, and you may.

12 But what I want to do is go over a number of things with

13 you today, namely, the proposed settlement agreement itself. And

14 here is the reason why we're doing this. There are a number of

15 things that we need some answers to, and I think there are a

16 number of things that need to be changed if they can be in this

17 stipulated settlement agreement.

18 And I know that we're to submit an R&R to Judge

19 Gettleman on this matter as to whether or not it is our belief

20 that he should go ahead and have a fairness hearing on this

21 matter.

22 Because of the fact that we've come up with so many

23 issues here, we have decided at this time not to issue an R&R,

24 because we want to try to rectify this rather than go at this

25 twice. And the reason being if we issued an R&R right now, it

6

1 would be very lengthy. You would file objections. Judge

2 Gettleman would file an opinion on it and more than likely send

3 it right back to us to resume where we are. So that's why we're

4 doing this.

5 And the first thing that I want to start off with

6 regarding this, the parties need to withdraw their motion and

7 remove the injunctive relief provision from the settlement.

8 Judge Gettleman had previously ruled that injunctive

9 relief is not an available remedy under FCRA. Injunctions are

10 not an option. And to quote his language from his opinion, which

11 is In Re: Trans Union, 211 FRD 328, and the language is covered

12 on pages 339 to 340, he states, "The FTC again held that the

13 mailing list are consumer reports under the FCRA and cannot be

14 sold for target marketing purposes. Trans Union has been

15 permanently enjoined from further sale of target marketing

16 lists."

17 In addition, punitive damages cannot be part of a

18 non-opt-out class, because punitive damages are part of the FCRA.

19 Judge Gettleman has stated that disconnecting the availability of

20 punitive damages from the individual claims for actual or

21 statutory damages would cripple the statutory scheme designed by

22 Congress to achieve compliance with the FCRA. Therefore, class

23 members should be allowed to opt out of the settlement.

24 Now I have a list of things that I want to go through

25 please. I feel that the parties have failed to give me enough

7

1 information to analyze whether the $20 million settlement fund is

2 adequate. The parties failed to give me information on the costs

3 of notice and claims administration. They have given me no

4 information to even suggest how much will be in the fund to

5 settle the hypothetical punitive damages claims.

6 The parties have also allocated $10 million for the

7 settlement fund for plaintiffs' attorneys' fees and costs. And

8 that is noted in the sample notice in Exhibit D that was

9 submitted to me earlier.

10 The parties had failed to give me enough information to

11 determine if the 20 million in kind relief is adequate.

12 One, Trans Union failed to explain to me why the in kind

13 relief has a guaranteed minimum of $20 million.

14 Two, Trans Union has failed to reveal the actual cost of

15 credit monitoring and credit scores. Instead, they base their

16 valuation of the in kind on the retail cost of credit monitoring

17 and credit scores.

18 Based on the retail costs, Trans Union has demonstrated

19 that it is only prepared to provide in kind relief to 3 million

20 people out of the possible 190 million Americans affected by this

21 litigation.

22 THE CLERK: Actually it's 360,000.

23 THE COURT: It is back up to that now?

24 THE CLERK: If you take 20 million of the guaranteed and

25 divide that by 49.75 --

8

1 THE COURT: Which is, is it only 49.75?

2 THE CLERK: That's the value of the in kind relief, not

3 including the credit score.

4 THE COURT: Which is the 595?

5 THE CLERK: Correct.

6 THE COURT: Okay. I correct that number. So it's

7 someplace between 360 and 400,000 people out of a possible 190

8 million people.

9 Next, plaintiffs' counsel have failed to investigate and

10 discover the value of their claims and have failed to give us

11 reliable information about the risks they face going forward.

12 Since this case was transferred to the Northern District

13 of Illinois, the parties have been engaged in motions to dismiss.

14 To our knowledge, they have conducted no discovery whatsoever.

15 Plaintiffs have engaged -- haven't engaged in any

16 discovery pertaining to whether Trans Union willfully violated

17 the FCRA. We have no information available to us to evaluate the

18 risk that plaintiffs face if they go forward with litigating

19 their damages claims, because they haven't done any fact

20 discovery.

21 The lack of discovery calls into question whether this

22 settlement is fair, reasonable, and adequate. Moreover,

23 plaintiffs' counsel conducted confirmatory discovery after they

24 reached a settlement, which makes them appear that they

25 compromised the settlement class members' claims and that the

9

1 settlement terms are inadequate.

2 Next, and I explained to you earlier about issuing an

3 R&R, I think it at this time would be an unnecessary delay and

4 would cause a tremendous amount of expense in attorneys' fees and

5 costs. So that's why I have brought you in here, so that we can

6 go over these problems that I perceive to be problems and

7 hopefully have you come back to us with answers to these.

8 This settlement agreement may need to be redrafted in

9 light of Chapelle versus Engle, E-n-g-l-e.

10 Do we have a citation on that?

11 THE CLERK: I can get it, but that's a recent Seventh

12 Circuit decision. It pertains to a jurisdictional issue that we

13 can't retain, courts can't retain jurisdiction over settlement

14 agreements. But I'd have to get that.

15 THE COURT: All right. We can get it. But you should

16 be able to get it also.

17 MR. RIGHETTI: I'm sorry, I'm Matt Righetti. Who was

18 that speaking?

19 THE COURT: That was my law clerk, Stephanie.

20 MR. RIGHETTI: Okay. Sorry.

21 THE COURT: That's fine. Whenever you want to know

22 who's speaking, we'll tell you, okay.

23 Next, the parties failed to propose a settlement class

24 structure that meets the requirements of Rule 23 as well as Judge

25 Gettleman's prior rulings in the case.

10

1 THE CLERK: And we've already talked about that.

2 THE COURT: All right.

3 THE COURT: Which one do you want me to go down to, B,

4 or do you want me to cover A here? I'm on page 3, A on page 3.

5 THE CLERK: Which A?

6 THE COURT: Right above right at the top.

7 THE CLERK: No. I think we covered A.

8 THE COURT: Okay. The parties have failed to advise me

9 how their California state law claim for disgorgement of profits

10 has been affected by the Californians for Disability Rights case.

11 The parties have failed to provide enough information

12 about the proposed notice plan, and, namely, I want to go into

13 this, the notice plan is primarily based on print media form of

14 notice, nine consumer magazines and two newspaper inserts.

15 Trans Union is only covering up to $1.5 million of the

16 notice cost. The remainder comes out of the settlement fund. We

17 have no idea or even guesstimate at how much that might be, and

18 we need to have something from the parties telling us what that

19 amount is.

20 You've given us no indication of what the potential

21 costs of notice will be. And under the current plan, the notice

22 plan, the web-based notice my law clerk printed off the Google

23 site here for Trans Union, and according to the information that

24 we have been provided, if you take a look at the website here,

25 what you're proposing is that the notice would be through the

11

1 sponsored links.

2 And it says "The notice plan indicates that the

3 informational website will appear within the top six placements

4 to Google sponsored links section and within the top ten

5 placements in Yahoo sponsored link sections."

6 Well, looking at this document, and I'll just hold it up

7 for you all to see, that would be on the right-hand side, which

8 very few people ever refer to in the Google, and in the Yahoo

9 sponsored link section, it would be on the second page.

10 The settlement class members are going to see the link

11 to the website containing settlement information. They're not

12 going to see that, because the links won't appear in the results

13 of their website search. They're going to have to do a

14 tremendous amount of searching in order to find where the notice

15 plan is and how to get there.

16 It's going to be off on the right-hand side as I just

17 showed you for both Google and Yahoo, and for Yahoo, it's not

18 even going to be on the first page.

19 The Supreme Court has held that in actions for money

20 damages like this one, class members are entitled to personal

21 notice and an opportunity to opt out.

22 And we realize that that's impractical here because of

23 the number of people it involved, but we believe that Trans Union

24 can come up with a better web page notice than this. It almost

25 looks like you don't want everybody to find out about this

12

1 proposed settlement. And the whole idea is to make it as

2 available as we can to as many people as we can.

3 The notice plan does not indicate if there is a Spanish

4 language notice. And I know in your proposals you've stated

5 about the possibility of using Spanish as the other language,

6 which I think is great. But what about the website? There has

7 been no indication whatsoever whether or not that will be in both

8 English and Spanish. And if it is going to be in English and

9 Spanish, how are you going to do that?

10 And where is the money going to come from? And if it's

11 going to come from what you've proposed, anything over 1.5

12 million is going to come out of the fund. And we have no idea

13 how much this is going to cost. So we need to have at least some

14 idea from you of what you think or your experts can tell you this

15 will cost to have it done in both English and Spanish.

16 Also, what we want to know, this isn't the biggest thing

17 in the world, but are the U.S. Virgin Islands, American Samoa,

18 Puerto Rico and Guam and the military going to be included in

19 this notice, and if so, how, because as you know, these

20 publications are not available in a lot of these locations. And

21 how are the personnel in the military going to be notified about

22 this?

23 The dates of notice are not proper. Class members

24 claiming actual damages get 180 days from the date of the final

25 hearing -- I think that should be from the date of the final

13

1 approval, but please take a look at that -- whereas class members

2 claiming in kind relief get two years from the date of the

3 ultimate or final approval of the settlement.

4 So we'd like you to clear that up if you can for us.

5 And if there is a reason why you think it should be from the

6 final hearing as opposed to the final approval, we need to know

7 that.

8 THE CLERK: I think there is only a few things left.

9 THE COURT: Just give me a minute here if you will,

10 please.

11 We're looking at the next group?

12 THE CLERK: Yes, because we've covered almost

13 everything. Just the ones I've circled.

14 THE COURT: Is the $20 million in kind relief adequate?

15 That's what we had a question of. The process for obtaining in

16 kind relief, how do class members obtain the claim form? Is it

17 only Internet based?

18 Number two, current credit monitoring recipients, is the

19 in kind relief transferable for people who are already using

20 monitoring services? How many people use credit monitoring now?

21 And guaranteed minimum, what does a guaranteed minimum

22 mean? What happens if claims are under $20 million?

23 And then as to credit freeze law, what value does credit

24 monitoring have if class members can obtain better relief

25 somewhere else, which an example of that is a credit freeze law.


14


1 Yesterday Stephanie printed up, there is a new law that went into

2 effect January 1st here in Illinois that provides free access to

3 individuals 65 and older as well as prior victims of credit

4 fraud, and that is also included in six additional states.

5 THE CLERK: Actually I think it's 25.

6 THE COURT: Actually it comes to a total of 25. There

7 is 6 new states and then 19 other states that already have this

8 in effect.

9 So how will people who have this ability where they can

10 freeze their credit for free benefit from what you are proposing

11 to them that would you claim cost 49.75 or whatever the amount

12 is, $49.75 for six months I believe that is. And one of those

13 six months is free anyway. Everybody is entitled to the first

14 month free as I understand it. And then what you are proposing

15 is to add five months on top of that. And according to the

16 figures that the parties have given us, the retail value on that

17 is 49.75 or 49.95, whatever it is.

18 THE CLERK: And the credit freezes aren't free in every

19 state, but they're free to certain people.

20 THE COURT: Well, they're free here in Illinois for one.

21 And you're right, they're not free in every state. But several

22 states they are free in for people 65 and over and also for

23 victims of --

24 THE CLERK: Identity theft.

25 THE COURT: -- identification or credit fraud.

15

1 And the military, as you attached, Mr. Longtin, you

2 attached a document to one of your motions regarding the VA

3 regarding the notice that they sent out. Well, with all due

4 respect, I'm a veteran, I got that letter, and the only thing

5 that it tells you to do is keep an eye on your credit card bills,

6 and if there is anything suspicious there, notify the credit card

7 company, which is what any credit card, I mean, anybody it would

8 seem to me would do if they noticed something special, you know,

9 different on their credit cards, they would notify the credit

10 card company and contest that fact. So how is that a benefit? I

11 don't understand that.

12 MR. LONGTIN: Well, you mean as opposed to credit

13 monitoring?

14 THE COURT: Yes.

15 MR. LONGTIN: Which gives you daily access to your

16 credit report and your credit score.

17 THE COURT: For six months.

18 MR. LONGTIN: I understand it's for six months, as

19 opposed to for the rest of your life or for a year or anything.

20 THE COURT: And the way that we understand it, the new

21 law that went into effect in Illinois, for instance, if you are

22 65 or older, it's for the rest of your life, and if you have been

23 a victim. And you can clarify this. I'm not sure.

24 MR. LONGTIN: We're going to have to take a look,

25 because I thought that was a credit freeze that locked your

16

1 credit report.

2 THE COURT: Well, it is a credit freeze, but no one is

3 going to be able to look at your credit during the time period

4 that anybody has a credit freeze on.

5 MR. LONGTIN: Yes, but there is a problem with credit

6 freezes.

7 THE COURT: Okay. Tell us about that. And you can tell

8 us about that later on, not right now.

9 MR. LONGTIN: I mean, there are all kinds of mechanical

10 problems, and it may not be such a benefit.

11 THE COURT: These are things that we need to have

12 answered if we can.

13 MR. LONGTIN: I understand the question.

14 THE COURT: Okay. Just a couple more things here.

15 The class definition, assuming that the names on the

16 TMLs and the firm offer lists are included in the proposed class

17 definition, does the proposed class definition include people who

18 were never injured and should not deplete the relief available to

19 those who were injured? How do the plaintiffs know that the TML

20 lists cannot be reproposed? Shouldn't they have some discovery

21 on who was or wasn't on the list?

22 And Judge Gettleman has already expressed concerns about

23 manageability of a nationwide statutory damages litigation class

24 and punitive damages class. And do we have a concern about

25 manageability here?

17

1 Then a couple of other questions that I have in the

2 proposed settlement agreement. The administrator, and this could

3 be a misunderstanding on my part here, but as I understand it,

4 Trans Union is going to select the administrator here. So that

5 person is going to be in Trans Union's employ, is that correct?

6 MR. LONGTIN: You asked a question and --

7 THE COURT: Well, that's a question that I have, and if

8 you could answer that for us. And if that's the case, who pays

9 that person and where do the funds come from?

10 MR. LONGTIN: We're fronting the money.

11 MR. DONOGHUE: We're fronting the money. Eventually --

12 THE COURT: If you need to talk about that, that's fine.

13 MR. LONGTIN: Yeah, I'll look at it.

14 THE COURT: Okay.

15 MR. LONGTIN: My recollection, Judge, is that we have to

16 retain an administrator, because we have to start the process --

17 THE COURT: And I can understand.

18 MR. LONGTIN: -- before the settlement is funded.

19 THE COURT: And is the Court going to have any say in

20 who that administrator is? That's a question that I have for

21 you. And are the plaintiffs going to have any say in that?

22 MR. LONGTIN: The answer to the latter is yes.

23 THE COURT: Okay. All right. That's something that we

24 weren't sure about. And then how the administration goes. And

25 then who pays that and where do the funds come from? I assume

18

1 that you're going to say the funds now are going to come out of

2 the fund, the money.

3 MR. LONGTIN: Well, the problem is that this process

4 kicks off before there is a fund and before settlement is

5 approved.

6 THE COURT: Right.

7 MR. LONGTIN: So Trans Union has to write checks out of

8 its pocket to fund this in anticipation that a settlement would

9 be approved.

10 THE COURT: Right. But then they're going to be able to

11 go back in to the escrow fund as I understand it.

12 MR. LONGTIN: After a certain amount of money, after the

13 million five has been spent.

14 THE COURT: Right.

15 MR. LONGTIN: And depending on whether those are

16 chargeable expenses or not.

17 THE COURT: A million five is going to cover an awful

18 lot of things. And I just don't see -- it doesn't appear to me

19 that it's enough money. And that's what I want you to address.

20 MR. LONGTIN: The million five?

21 THE COURT: Not at this minute.

22 MR. LONGTIN: The million five?

23 THE COURT: Yes. And give us an estimate of what you

24 think the costs are going to be for the notice, the print notice.

25 Here is another one, the 800 number, is that going to be in

19

1 English? Is there going to be one in Spanish for that also? And

2 then the website, the funds, you know, anything beyond the

3 million five is going to come out of the fund as I understand it.

4 We need an estimate if you can give us that to the best of your

5 ability how much all this is going to cost.

6 MR. LONGTIN: Things like -- well, I mean, we've got to

7 be careful, because not all of these expenses come out of the

8 million five. As an example, you mentioned --

9 THE COURT: No. They come out beyond the million.

10 MR. LONGTIN: No, no. They come out of nothing.

11 THE COURT: Okay. Give me an idea.

12 MR. LONGTIN: Like the website, Trans Union covers that.

13 THE COURT: Okay. You're going to cover it all?

14 MR. LONGTIN: Yes.

15 THE COURT: No matter what the cost is?

16 MR. LONGTIN: That's exactly right.

17 THE COURT: If it's above a million five for everything,

18 you're covering that? Okay.

19 MR. LONGTIN: It's not even accounted for as part of the

20 expenses.

21 THE COURT: Well, what about the possibility, is it

22 going to be in Spanish also?

23 MR. LONGTIN: Well, I mean --

24 THE COURT: I think the breakdown that you gave me

25 initially when I took a look at this thing, I thought there was a

20

1 number of languages that were going to be needed here. However,

2 with the report that you submitted to me saying what the

3 breakdown is, English and Spanish seems to me that it's adequate,

4 more than adequate to cover all this. But that being said, it

5 seems to me that you have to have the websites in English and

6 Spanish also and the telephone in English and Spanish.

7 (Discussion off the record.)

8 MR. DONOHUE: It's not hard to do.

9 MR. LONGTIN: Well, I understand that. I mean, I think

10 the system was set up basically to mimic our consumer dispute

11 resolution process, which is mandated by the FCRA.

12 Modifying it to include Spanish, I don't know that that

13 creates a problem or not. To me it doesn't sound like a problem.

14 THE COURT: Well, if you're paying for it, it doesn't

15 create a problem as far as the fund goes, no pun intended. But

16 that's what we've got to know.

17 MR. LONGTIN: Exactly. Whatever is decided the

18 requirement is there does not come out of the fund.

19 THE COURT: Okay, all right. Anything else?

20 THE CLERK: They're clear that they have to withdraw the

21 motion to start off.

22 THE COURT: Yes. You need to withdraw your motion at

23 this time, and we need to have you resubmit that motion. But

24 what I'd like you to do, I want to give you two weeks, can you

25 get the answers to these questions within two weeks?

21

1 MR. LONGTIN: Sure.

2 THE COURT: Because one instruction that I have received

3 from Judge Gettleman -- and quite frankly, he doesn't want to

4 talk to me about this. He wants to keep me at arm's length on

5 this thing. But he has asked me to try to get the thing moving

6 along. That I can tell you.

7 MR. LONGTIN: I have at least one question, I'm sure

8 there are more.

9 THE COURT: I'm sure there are, too.

10 MR. LONGTIN: You did a calculation, and it was on the

11 minimum amount of in kind relief of $20 million and came to the

12 conclusion that that would be 360 to 400,000 people.

13 THE COURT: Stephanie is going to have to tell you about

14 that.

15 MR. LONGTIN: Well, why are you assuming the minimum?

16 THE CLERK: It was just because that's --

17 THE COURT: It's a starting point for us, because we

18 don't have anything.

19 THE CLERK: It was just a starting point.

20 MR. LONGTIN: But that's -- let's be careful.

21 THE COURT: You give us the maximum if you can.

22 THE CLERK: There is no limit.

23 MR. LONGTIN: Well, the maximum is no limit.

24 THE COURT: Or 190 million.

25 MR. LONGTIN: It could be, you know, 100 million with

22

1 those calculations.

2 But there are two numbers that are in clay here. One of

3 them is credit monitoring, which is one of the numbers that are

4 part of the equation, and that is the number that if somebody

5 wants that, they have to apply for and they become part of the

6 settlement.

7 THE COURT: Yes.

8 MR. LONGTIN: There is another number that's going on

9 here that's part of the injunctive relief, which you addressed

10 and we'll talk about that in a minute, but that is that those

11 people who touch Trans Union through the dispute process --

12 THE COURT: Yes.

13 MR. LONGTIN: -- who have been denied credit and who

14 normally would then get a credit report as part of that process.

15 In addition to getting a credit report, they get a free score

16 now. That score has -- we charge for that.

17 THE COURT: That's the 595?

18 MR. LONGTIN: Well, actually, we charge more for it now.

19 But the vantage score --

20 THE COURT: I remember that question came up, too.

21 MR. LONGTIN: -- is a specialized score, and the price

22 has actually gone up.

23 But that number is -- they get something else, too,

24 because they get notice of the lawsuit. But that's a free score.

25 That's part of this calculation.

23

1 The number of people that touch us in that period of

2 time, in a year, you know, it varies, but it's going to be a

3 number between north of 2 million people.

4 THE COURT: North of 2 million?

5 MR. LONGTIN: North of 2 million, yes, yes.

6 THE COURT: Yes, okay.

7 MR. LONGTIN: So if you were to ask me: Do I believe

8 the 20 million is going to be exceeded? The answer is I believe

9 by a significant margin when you count both pools. One pool is

10 just automatic. There is a few million people who are going to

11 get a free score that didn't get one before. And they're going

12 to get it for a period, I think the number is two years.

13 THE COURT: The question is how many are going to take

14 advantage of it.

15 MR. LONGTIN: They don't even have to participate in the

16 settlement. They get this, period.

17 THE COURT: And they'll know by the notice?

18 MR. LONGTIN: Excuse me?

19 THE COURT: How will they know this?

20 MR. LONGTIN: They don't have to -- the point is, Judge,

21 they get the notice and the reward at the same time. They

22 don't -- by getting this, they're not opting into the settlement.

23 THE COURT: Okay.

24 MR. LONGTIN: They're not affected by the settlement at

25 all. They still can come in and get credit monitoring. They can

24

1 still come in and get compensation for a claim of an injury, or

2 they can still opt out. They still get this incremental benefit.

3 Now, we're giving it to everybody who comes in to Trans

4 Union through the process. People come to Trans Union generally

5 through the credit dispute process.

6 THE COURT: Right.

7 MR. LONGTIN: So what we did was as part of this relief,

8 as part of what we call the injunctive relief, we provided this

9 benefit. That benefit is, well, when you start doing the

10 mathematics --

11 THE COURT: What does that have to do with injunctive

12 relief?

13 MR. LONGTIN: Well, because there is no -- everybody

14 gets it who comes into Trans Union. There is no discrimination

15 process. You don't have to give up anything to get it. I mean,

16 you're not giving up a right, a claim, or anything. And we're

17 not selecting you out. I mean, you're in effect selecting

18 yourself.

19 THE CLERK: Why can't it be a separate provision?

20 MR. LONGTIN: I want to talk about injunctive relief or

21 somebody else will probably talk about that.

22 THE COURT: Yes, whoever wants to talk about it can talk

23 about it.

24 MR. LONGTIN: Yes. And Judge Gettleman also decided you

25 couldn't serve by this as a class action. I don't think those

25

1 decisions --

2 MS. BULL: Your Honor, I apologize. Our conference call

3 keeps cutting out. I did not hear the last question. We're

4 missing like 30 or 40 seconds every couple of minutes.

5 THE COURT: Can you try to speak into that, because it

6 is supposed to amplify, raise your last question or issue.

7 MR. LONGTIN: I don't know what the last --

8 THE COURT: Neither do I.

9 Can you read it back? Here, we'll read it back.

10 (Record read.)

11 THE COURT: Could you hear that, Ms. Bull?

12 MS. BULL: I think I heard part of it. You were talking

13 about the injunctive relief and the fact that you don't want to

14 have to really do anything to get it. If that's the issue --

15 MR. LONGTIN: Not really. I mean, that's part of it.

16 What I was talking about was the score that is provided to those

17 people who come into Trans Union through the dispute process and

18 who get a score as a part of the injunctive relief, it's covered

19 in that section of the agreement, and that those people get a

20 benefit, a dollar, the number is actually larger now than it was

21 then, because the vantage score costs more.

22 But that number is a guaranteed number of people we know

23 are going to hit our system in a given year. We know that that

24 number is north of 2 million people. So if you take 2 million

25 and multiply it by whatever number we're talking about for two

26

1 years, that's north of $20 million right there. That's if nobody

2 actually took advantage of the settlement, we would already have

3 pumped out that much money in in kind relief.

4 In addition, that's also part of the notice plan. Those

5 same people and more will get direct notice of the settlement and

6 an opportunity to participate.

7 I think Brian, Mr. Brooks probably would be better to

8 address the issue of injunctive relief.

9 THE COURT: Sure.

10 MR. LONGTIN: I will say this about that before he, in

11 anticipation of him coming up here, I mean, this case has been

12 very long and complicated. Judge Gettleman has two rulings on

13 that issue, in effect, one is it can't be certified as a class

14 action. Obviously, that's what we're trying to do. The other is

15 that the Fair Credit Reporting Act does not establish an

16 individual right for injunctive relief. That doesn't mean that

17 we can't agree as part of a settlement to provide injunctive

18 relief.

19 I think your point is that part of the injunctive relief

20 is: Thou shalt not do target marketing in the manner it was

21 done. That's also included in this injunctive relief.

22 Effectively, that is --

23 THE COURT: But it's only cleared for five years, right?

24 MR. LONGTIN: Yeah, that's just duplicative.

25 THE COURT: Well, whereas this is Trans Union has been

27

1 permanently enjoined from further sale of target marketing lists.

2 That's a big difference.

3 MR. LONGTIN: Well, no. You know, I'm not sure --

4 THE COURT: I have the opinion here.

5 MR. LONGTIN: I know you're reading from Judge

6 Gettleman's opinion.

7 THE COURT: Right.

8 MR. LONGTIN: What the FTC did is: Thou shalt not sell

9 consumer reports without a permissible purpose. In effect, that

10 enjoined the target marketing business in the way it was

11 structured at the time.

12 You know, I'm not going to debate that distinction.

13 THE COURT: You can debate that with him.

14 MR. LONGTIN: Yeah. And you're right. But that does

15 not mean that injunctive relief cannot be provided in the context

16 of a settlement. We may quibble about whether it is the

17 appropriate relief. And on that, on that basis --

18 THE COURT: Okay.

19 MR. LONGTIN: -- when we talk about quibbling, I'll give

20 it to Mr. Brooks.

21 THE COURT: All right. Now, if you'd come up here.

22 If you're having problems on the phone hearing, I know

23 it's difficult, just interrupt, and we'll ask them to speak up.

24 I'm going to ask you to speak up as though we're all

25 having hearing problems if you will please.

28

1 MR. BROOKS: Well, Your Honor, I was going to say, "With

2 that warm introduction," maybe that would be misleading under the

3 circumstances. Your Honor, just two or three quick points in

4 reaction to --

5 THE COURT: Sure. And I don't want belabor this all

6 day.

7 MR. BROOKS: That's right. I'm here in part, because

8 I'm probably one of the poor saps who will be tasked with writing

9 this paper, so I want to make sure I know what to address.

10 Let me start with the injunction issue and just echo

11 what Mr. Longtin said, which is there are in the settlement

12 agreement a number of aspects of injunctive relief.

13 THE COURT: Yes, there are.

14 MR. BROOKS: Some of which are in the prohibitory, like

15 no dissemination of target marketing lists, which arguably might

16 have been covered by the FTC order, but also no dissemination of

17 the prescreened lists, an issue not addressed by the FTC at all,

18 except subject to certain limitations, which the law otherwise,

19 you know, we say wouldn't apply.

20 So when Your Honor says resubmit and strip out the

21 injunctive relief, we would just want to make sure that Your

22 Honor didn't mean there can't be a compulsory component to the

23 settlement, but that you're just talking about the part that

24 seems to overlap what Judge Gettleman interpreted.

25 THE COURT: I think that you need to convince me that

29

1 there can be.

2 MR. BROOKS: Right. Well, and that gets me to my second

3 point, which dovetails with two things Your Honor said, one was

4 take out the injunctive relief part, the other was address

5 manageability concerns that Judge Gettleman had talked about in

6 his order.

7 As Your Honor knows, in the Amchen Products versus

8 Windsor case, the U.S. Supreme Court took up the question of

9 whether there is a manageability requirement in class action

10 settlements. The Court said there is not.

11 The other elements of Rule 23 must be satisfied. But

12 the Supreme Court unanimously on that point did say there is not

13 a manageability requirement in a settlement class as distinct

14 from a litigation class.

15 THE COURT: I think he's looking at it from a practical

16 aspect.

17 MR. BROOKS: I understand that. But to give Your Honor

18 some history about what the class certification briefing looked

19 like there, what we talked about in the briefs that I think led

20 to that ruling were things like the concept of segregating out

21 people with actual injury from people without actual injury.

22 The Seventh Circuit's Ruffin-Thompkins case makes that

23 analysis important, and in the context of litigation, that could

24 be very difficult to address.

25 There was also the concept at that time of unjust

30

1 enrichment claims, other state law claims later dismissed, which

2 would be difficult given variations in state law that is

3 applicable. So there are lots of issues there having to do with

4 how would you charge a jury. How would you give a verdict form

5 or render a judgment in a class action trial that could address

6 those kinds of disparate legal issues and disparate factual

7 issues, all with them having to do with how would you run a

8 courtroom at the trial.

9 Here, and this is what the Supreme Court was getting at

10 I think in the Amchen case, we're not going to have a trial if we

11 can get the settlement done.

12 THE COURT: Hopefully.

13 MR. BROOKS: So what the Supreme Court said in Amchen is

14 you still have to satisfy the other elements of Rule 23. You do

15 have to show that there are common issues. In a 23(b)(3) class,

16 you do have to show that they predominate over individual issues.

17 But you don't have to show how you would actually stand up and

18 try the case in a manageable way, because that element is not

19 going to happen.

20 So I just urge Your Honor on that issue to take a look

21 at Amchen. And what I think we would want to say in our

22 resubmission is, at least on the manageability point, we should

23 be permitted to settle the case but for the others. And I will

24 say --

25 THE COURT: That's not my biggest concern at this point.

31

1 It may be Judge Gettleman's when it gets to him. But I'm more

2 concerned about the injunctive relief.

3 MR. BROOKS: Sure. And that brings me back to the

4 injunctive relief part, Your Honor, which is, to echo what

5 Mr. Longtin said, as with the manageability issue, there is an

6 injunctive relief issue in litigation, and then there is an

7 injunctive relief issue in the settlement.

8 And what our position is, I think, is that in the

9 litigation context where the plaintiff is seeking to compel Trans

10 Union and to invoke the statutory power conferred by Congress,

11 we're entitled to raise as a defense the proposition that Judge

12 Gettleman recognized, which is that only the FTC has the power to

13 compel adverse to us contrary to our consent.

14 In the settlement context, on the other hand, we don't

15 see anything in the FCRA that prohibits us from agreeing, subject

16 to the Court's supervision, not to do something.

17 THE COURT: Well, that's what you get to brief.

18 MR. BROOKS: Right. And that's what we're asking, as

19 long as we get to brief that, Your Honor, I think that would be

20 our intention.

21 THE COURT: Okay.

22 MR. BROOKS: Thank you, Judge. I appreciate that.

23 THE COURT: I'll get to you, Ms. Wheelahan. But let me

24 talk to the plaintiffs on the phone here.

25 Or if you want to speak on their behalf, it's up to you.

32

1 On the phone, any comments from any of the parties,

2 Ms. Bull, Mr. Reghetti, or Ms. Stewart?

3 MS. BULL: I guess my question is --

4 THE COURT: And who is this, please?

5 MS. BULL: This is Joy Bull for the plaintiffs, Your

6 Honor.

7 THE COURT: Okay, yes.

8 MS. BULL: I think my question is: Is the Court telling

9 us that we have to either remove all the injunctive relief or we

10 have to provide enough information to convince you to keep it in?

11 THE COURT: That's exactly what I'm telling you.

12 MS. BULL: And then you're telling us that punitive

13 damages cannot be part?

14 THE COURT: That's right.

15 MS. BULL: Okay. Under any circumstances?

16 THE COURT: Right.

17 MS. BULL: In view of just those two things not even

18 considering the rest of your list, I don't see how the parties

19 are going to be able to go back and negotiate, renegotiate the

20 stipulation in two weeks, because it took us like six months the

21 first time.

22 THE COURT: Well, what I am asking for is for you to

23 give me answers. I'm asking --

24 MS. BULL: Those are two major components. That's my

25 view of the -- I mean, I know we need to talk, but I don't see

33

1 how it's going to work if we have to go back and take out the

2 punitive damage and whether the defendants are even willing to go

3 forward on that basis.

4 THE COURT: Okay. Ms. Bull, thank you for your

5 comments.

6 And what I started to say -- did you hear me pushing

7 those buttons at all?

8 MS. BULL: No, Your Honor.

9 THE COURT: Okay. What I want from you in two weeks is

10 I want the answers to my questions and your proposal, your brief,

11 if you will, on this issue regarding injunctive relief. And then

12 after that I'll give you a chance to resubmit your stipulation of

13 settlement agreement.

14 MS. BULL: Thank you, Your Honor.

15 THE COURT: Sure.

16 MR. LONGTIN: You just said injunctive relief, but I

17 assume you mean that you would like us to withdraw what we have

18 now.

19 THE COURT: Absolutely.

20 MR. LONGTIN: Explain to you why we still believe

21 punitive damages can be included in the way they're included and

22 then address your other specific points?

23 THE COURT: Yes. What did I say? Did I say something

24 totally different from that?

25 MR. LONGTIN: No.

34

1 THE COURT: That's exactly what I want.

2 MR. LONGTIN: I want to make sure she, Ms. Bull and

3 everybody on the phone, seems to understand that.

4 THE COURT: And does everybody on the phone understand

5 that?

6 MS. BULL: I think so, Your Honor.

7 MR. RIGHETTI: Yes, Your Honor.

8 THE COURT: Well, now is the time to raise the question

9 if you have anything.

10 Stay up there, Mr. Longtin.

11 Evidently not.

12 Ms. Wheelahan?

13 MR. RIGHETTI: We have no questions, Your Honor.

14 THE COURT: Okay.

15 MS. WHEELAHAN: Should I come up?

16 THE COURT: Sure.

17 MS. WHEELAHAN: I just wanted to address what you said

18 about the injunctive relief and what Mr. Brooks and Mr. Longtin

19 said. You can't certify and settle a claim that can't be

20 brought. There is no claims for injunctive relief in the

21 settlement, because Judge Gettleman dismissed them.

22 You can offer injunctive relief as a provision in

23 settling damages claims. What they're wanting to do is settle

24 damages claims for injunctive relief. But you have to recognize

25 there is a difference between injunctive relief and some other

35

1 kind of relief, money or something else.

2 THE COURT: Which is the question that I raised to you.

3 MS. WHEELAHAN: But you can't settle an injunctive

4 claim, which means they can't (b)(2) the settlement based on

5 settling injunctive claims when there are no injunctive claims

6 extant in the complaint. And I think that's what you said,

7 Judge, that the (b)(2), the (b)(2) structure can't hold.

8 THE COURT: I'm going to let them brief it. And you can

9 file a brief yourself.

10 MS. WHEELAHAN: Sure.

11 THE COURT: I want it in two weeks, okay. Can you all

12 do that? I know it's a push, but I'm starting to get pushed now,

13 and that's why we're doing that.

14 And then I would like to have a status maybe sometime

15 after that. How much do you need as far as briefing goes on

16 that? As far as these other things, you should be able to clear

17 those up fairly easily I would think.

18 MR. BROOKS: Your Honor, one concern I guess I've got,

19 and I remember we had a robust debate about page limits when I

20 was last here anyway, I think one of the reasons why you may have

21 perceived the discussion to be somewhat thin is we did have very

22 tight page constraints before, which led us to --

23 THE COURT: How much do you want?

24 MR. LONGTIN: We won't know until we write. But we'll

25 promise you not to be excessive, because we don't have a lot of

36

1 time to write it.

2 THE COURT: Okay.

3 MR. BROOKS: I'm just concerned if we impose another 15

4 or 17-page limit --

5 THE COURT: I'm not going to do that.

6 MR. BROOKS: No? Okay.

7 THE COURT: But I don't want anything 75 pages long

8 here.

9 MR. BROOKS: You won't see anything like that.

10 THE COURT: And the same is true for you, Ms. Wheelahan,

11 and the plaintiffs if they want to file anything.

12 MR. LONGTIN: We'll get it done in two weeks.

13 THE COURT: All right.

14 MR. BROOKS: Your Honor, I did have two other questions

15 if I might just put them out there?

16 THE COURT: Sure. And speak up so they can hear you on

17 the phone.

18 MR. BROOKS: Will do. One question was, Your Honor had

19 said a couple of times that you had concerns about the nature of

20 the class definition. At one point I think you said that you

21 were concerned that the settlement class structure doesn't meet

22 Rule 23 or Judge Gettleman's prior rulings. And then elsewhere

23 you asked a question about whether the class definition included

24 people who were never injured, et cetera.

25 THE COURT: That was.

37

1 MR. BROOKS: Is there a specific definitional issue that

2 you wanted to address beyond simply clarifying what the

3 definition is?

4 THE COURT: Hang on a second. Give us a second, would

5 you please.

6 MR. BROOKS: Okay, sure.

7 (Brief recess.)

8 THE COURT: We have some questions we'd like to ask you.

9 What we'd like to get if you can is Trans Union and the

10 plaintiffs, since they're the ones who submitted this

11 stipulation, to join in a brief. Can you do that?

12 MR. LONGTIN: I mean, if you want us to, we'll try. I

13 mean, there are certain logistics, because they're out in

14 California.

15 MS. BULL: This is Joy Bull, Your Honor. We're

16 certainly willing to try to do that.

17 THE COURT: We'd like you to try. And we're not going

18 to limit your pages to 25 like we did the last time.

19 MR. LONGTIN: Okay.

20 THE COURT: And then we want a response from you,

21 Ms. Wheelahan, two weeks after this.

22 MS. WHEELAHAN: Okay.

23 THE COURT: And now your next question?

24 MR. LONGTIN: Well, Mr. Brooks had asked that question

25 about the class definition. And I had a feeling it was somehow

38

1 tied up with the firm offer class and the target marketing class

2 and your comment about determining who was not injured?

3 THE CLERK: Well, the concern is that if the class

4 definition from what I understand is basically everyone that had

5 an open line of credit from January 1st, 1987 to the present.

6 THE COURT: To the present.

7 MR. LONGTIN: Correct.

8 THE CLERK: The concern is of the possible 190 million

9 people that may or may not have been affected by the alleged

10 conduct, is the class larger than that 190 million people?

11 MR. LONGTIN: No.

12 THE COURT: And if so, why? So you're saying no?

13 MR. LONGTIN: I'm saying no --

14 THE CLERK: Okay, okay.

15 MR. LONGTIN: -- because the 190 million people are the

16 adult population of the United States.

17 THE COURT: Right now?

18 THE CLERK: Right.

19 MR. LONGTIN: You know, we used the 190 million number,

20 but the number is the target marketing database.

21 THE COURT: Okay.

22 MR. LONGTIN: And for practical purposes, anybody alive

23 today --

24 THE CLERK: Is on.

25 MR. LONGTIN: -- who submits a claim, who has a credit

39

1 line, and is in the database, I mean, in the current live

2 database or for that matter I suppose an estate that submits a

3 claim, we're going to count them as part of the class.

4 THE COURT: Okay. So it's not going to be a situation

5 where you had 100 million during this time period, and now there

6 is another 90 million that you're trying to add?

7 MR. LONGTIN: We're not floating it.

8 THE COURT: Okay.

9 MR. LONGTIN: Yeah, we're not floating it.

10 THE COURT: Okay.

11 MR. LONGTIN: The problem is for a period of time we

12 covered everybody with a credit trade line in the database. It

13 stopped at some point. But we're not going to say, you know --

14 we're looking at people the way they are now. I mean, we've had

15 some debate --

16 THE COURT: That's fine.

17 MR. LONGTIN: When we stopped, if you were 12, and now

18 you're 18 and in the credit database, technically we know that

19 you could not have been subject to this disclosure.

20 THE COURT: Okay.

21 MR. LONGTIN: We haven't got that fine yet. I mean, the

22 proposition is everybody.

23 Your other question I think had to do with the prescreen

24 or firm offer group.

25 THE COURT: I have the questions in front of me.

40

1 MR. LONGTIN: Let me talk about that.

2 THE COURT: Go ahead and talk about it for a second.

3 Ms. Wheelahan, I'll get to you in a second, okay.

4 Go ahead.

5 MR. LONGTIN: The issue here is -- and let me by way of

6 background so you understand what the FTC has done, what happened

7 here, I'll do it by way of example. And there are other examples

8 people can use. This is my favorite example --

9 THE COURT: Okay.

10 MR. LONGTIN: -- because it is the least noxious I

11 suspect. What happened here is Trans Union in its target

12 marketing business disclosed, for example, the fact that Roger

13 Longtin had a mortgage. Now, the reason the FTC ultimately

14 decided that that was a credit report was only, not because I

15 said Roger Longtin had a mortgage, but because I gathered that

16 information in connection with our credit reporting business.

17 If I had gone out and gathered that information from the

18 public records data or from banks just to publish it, that would

19 be fine. But it's the fact that I gathered it as part of credit

20 reporting that brought it within the Fair Credit Reporting Act.

21 So that's the target marketing type disclosure.

22 The firm offer disclosure is a little different, but

23 it's the same people. And when you analyze it, it's really the

24 same disclosure. In effect, in that disclosure, what we did or

25 alleged to have done is we do firm offers of credit, perfectly

41

1 permissible. The question is you're limited in firm offers of

2 credit once the law is modified to certain kinds of information

3 that you could give to a bank.

4 THE COURT: Right.

5 MR. LONGTIN: One of, you couldn't identify specific

6 credit information with a human being. So I couldn't say, "Here,

7 bank, Roger Longtin has a Citibank card." I could say "Roger

8 Longtin has bank cards" or I could say "Roger Longtin has a total

9 of X number of bank cards." But I couldn't say he had a Citibank

10 card. So I couldn't show them that part of my credit report.

11 Well, when banks do firm offers of credit, they have

12 criteria. They want to say, "Okay, I want you to pick everybody

13 who has two bank cards or less and good credit." So that's the

14 criteria they would give us.

15 In certain circumstances as a historical practice, I

16 don't think it's going on, I'm pretty sure it's not, these

17 criteria were audited by the banks at Trans Union. The

18 allegation here is that we disclosed in firm offer lists more

19 information than we should have. The only evidence is that that

20 possibility existed in audits.

21 Now, the audits, the problem with audits is it's not

22 really, you don't audit the whole list, you audit some random

23 selection. But the disclosure is very similar in nature in terms

24 of, quote, harm or potential harm or whatever you want to call it

25 to saying the same thing is in the target marketing list.

42

1 So there is not a significant distinction between the

2 acts, the two acts or the two groups. So you can't say one is a

3 person who is not injured.

4 Let me give you an example. The firm offer list, the

5 people who are on the firm offer list, all of those people who

6 were not audited, you know, they weren't subject to an audit, so

7 you say, "Oh, well, gee, they have never been subject to an

8 audit, so they're not, quote, injured."

9 Well, but they're also in the target marketing database.

10 So they're part of that, quote, injury. I mean, I don't like the

11 term, because it's a technical injury or a technical harm. But

12 it's still the same people. I mean, there is not a difference in

13 the group. You're not talking about one group has only been

14 subject to firm offer lists and one group has been the subject of

15 target marketing lists.

16 They're subsumed within, you know, the firm offer people

17 are subsumed within the target marketing people, and the

18 distinction in the disclosure is for our purposes meaningless.

19 THE COURT: For your purposes.

20 MR. LONGTIN: Well, I think legally is meaningless.

21 MS. WHEELAHAN: Judge, could I say something about that?

22 THE COURT: Are you finished?

23 MR. LONGTIN: Yes.

24 MS. WHEELAHAN: While we're on the subject.

25 THE COURT: Sure.

43

1 MS. WHEELAHAN: There was a problem with the release in

2 the settlement. And my page limits were so small that I didn't

3 get into it.

4 THE COURT: I'm not putting page limits on anybody.

5 MS. WHEELAHAN: Okay. I understand that. The problem

6 with the prescreening release is that the release is so broad

7 pertaining to prescreening that it would release claims that are

8 pending in many other lawsuits, including some that Mr. Greene's

9 firm is involved with, the Murray prescreening claims based on

10 that Seventh Circuit decision recently certified by Judge Cole.

11 The prescreen release is way too broad and would release

12 all kinds of other claims that are currently pending.

13 THE COURT: Address that.

14 MR. LONGTIN: It's not our intention. We don't think

15 so.

16 MR. BROOKS: Your Honor, just to address I think the

17 case that Ms. Wheelahan is talking about, there are a number of

18 auto lending and mortgage lending class actions out there to

19 which Trans Union is not a party.

20 MS. WHEELAHAN: But it would release Trans Union from

21 these claims.

22 MR. BROOKS: Well, I mean, we're not parties in those

23 lawsuits, so we're not sure what the issue is. But clearly some

24 sort of overreaching release is not an intention. If there is a

25 drafting issue that needs to be addressed, we're happy to do

44

1 that.

2 These are not, the bottom line, these are not cases in

3 which Trans Union participates or has an interest. And if in the

4 end Ms. Wheelahan can demonstrate some issue there, I'm sure we'd

5 be happy to draft around it. That's not our intention here.

6 MR. LONGTIN: As far as we know there is no claim

7 pending against us other than the one here in prescreening about

8 the overdisclosures of information.

9 THE COURT: Okay.

10 MR. LONGTIN: I'm not aware of any.

11 MS. WHEELAHAN: But if people have a right to bring the

12 claims, they should not be released as a part of this settlement

13 where those claims are not pending here.

14 THE COURT: Make your argument.

15 So you're clear on the brief that I want you to submit,

16 I want you to address in particular the injunctive relief, but I

17 want you to answer these other questions that we've given you.

18 MR. BROOKS: Yes.

19 THE COURT: So we don't have to two separate briefs.

20 MR. BROOKS: We understand that.

21 THE COURT: So you know that. And, again, I have told

22 you that I've been told to get this thing moving here. Is two

23 weeks going to be enough for you?

24 MR. LONGTIN: We're going to get it done.

25 MR. BROOKS: Well, Your Honor, if I could be the one to

45

1 overreach since I just said I wasn't overreaching on Murray

2 versus GMAC, could we do it two weeks from Friday, just to buy me

3 the extra two days?

4 THE COURT: Sure. We'll give you three weeks if you

5 want.

6 MR. BROOKS: Great. Three weeks from today. I'll

7 settle on that.

8 MS. WHEELAHAN: Three weeks.

9 THE COURT: Yes. Then we'll give Ms. Wheelahan.

10 In particular I want to give the plaintiff that three

11 weeks, because you have to coordinate with, not the plaintiffs,

12 Trans Union who is going to be drafting this with the plaintiffs

13 because of the fact that they're out in California. But, I mean,

14 everybody has e-mail now.

15 MR. BROOKS: Yes, we understand.

16 THE COURT: You should be able to do that.

17 MR. LONGTIN: It's easier to deal with the rascals if

18 you can see them, Judge.

19 THE COURT: If that's the case, order them to come in.

20 I'm not going to.

21 MR. BROOKS: We'll meet in the Omaha in one of the

22 constituent courts.

23 THE COURT: All right.

24 THE CLERK: So the joint brief is due May 15th.

25 THE COURT: Ms. Wheelahan, do you want three weeks after

46

1 that?

2 MS. WHEELAHAN: I might not need it, but yes, I'd like

3 to have the option, Judge.

4 THE COURT: Three weeks.

5 THE CLERK: June 5th.

6 THE COURT: When is your status before Judge Gettleman?

7 THE CLERK: May 14th.

8 THE COURT: And I think he's going to want to see you,

9 and you can tell him what I've done.

10 MR. LONGTIN: Yes, sir.

11 THE COURT: At least if he knows that we're moving on

12 this thing and we're trying to get it resolved. And I appreciate

13 all your efforts, but this has been very difficult. There is a

14 lot of stuff that you've given us, and there has been a lot of

15 dispute between the parties in this thing. And we're trying to

16 cover everything that we can to get this right so when we do

17 submit it to him it's going to be easy for him.

18 I don't know if we can do that or not. But you can help

19 us, both sides I'm talking about here. So do what you can to do

20 it right and make it so we can get this off to him, and he can

21 get it off his calendar if that's possible.

22 MR. LONGTIN: Yes.

23 THE COURT: How long has it been on his calendar, by the

24 way?

25 MR. BROOKS: Since 1999.

47

1 MR. DOYLE: 2000. It's a 2000 case.

2 THE COURT: Then how long on Judge Aspen's calendar

3 before that?

4 MR. DOYLE: I think when it came to the Northern

5 District it was in 2000. I think it has --

6 MR. LONGTIN: It's a 2000 case.

7 THE COURT: Well, he entered, Judge Aspen entered this

8 pretrial order on November 28th of 2000.

9 MR. LONGTIN: Yes.

10 THE COURT: So it had to come to him sometime before

11 that date.

12 MR. LONGTIN: Yes, a few months before that.

13 THE CLERK: No reply?

14 THE COURT: No reply unless we ask for one.

15 MR. LONGTIN: Yes, sir.

16 THE COURT: Okay. And then we'll set it for a status

17 shortly after that. I shouldn't say shortly. We'll set it for a

18 status after that.

19 MR. LONGTIN: I was going to say, you're going to read

20 fast.

21 THE COURT: Just because I assume you're all going to

22 give us, you know, your good arguments on this thing. And we're

23 going to do the best we can.

24 MR. LONGTIN: We'll take them in the order that you

25 raised them, I think.

48

1 THE COURT: Please do that.

2 THE CLERK: They're clear that the motion is withdrawn?

3 THE COURT: Yes. You're clear the motion is withdrawn?

4 MR. LONGTIN: Yes.

5 MR. DOYLE: Yes.

6 THE COURT: And we're going to enter that in an order

7 today saying that your motion is withdrawn pursuant to

8 discussions held in court today.

9 MR. LONGTIN: Yes, sir.

10 THE COURT: Okay. Thank you all very much. I'm sorry

11 for the heat. You notice they came right up and fixed it.

12 (Discussion off the record.)

13 MR. BROOKS: One minor bit of housekeeping? As Your

14 Honor knows, I'm sure, there is a proceeding in New Orleans

15 called Andrews versus Trans Union.

16 THE COURT: Yes.

17 MR. BROOKS: And Judge Ledet in that case has stayed

18 proceedings down there until a resolution of, one way or the

19 other, of this.

20 THE COURT: This?

21 MR. BROOKS: So I just want to make clear on the record

22 when Your Honor says the motion for approval is withdrawn, that's

23 just as part of a larger settlement approval process to be

24 concluded at the end of the briefing cycle we just discussed?

25 THE COURT: Yes. And I noticed a filing that

49

1 Ms. Wheelahan made with the Court down there where you were

2 implying that we were way too slow, we're doing the best we can

3 as fast as we can.

4 MS. WHEELAHAN: I know you are, Judge. My co-counsel in

5 New Orleans have taken the lead on that case. And I had

6 suggested that we can wait until we get a ruling from this Court.

7 THE COURT: Okay.

8 MS. WHEELAHAN: And I'll continue to suggest that. They

9 are taking the lead on that case.

10 THE COURT: Okay.

11 MS. WHEELAHAN: And they naturally want to push it

12 forward.

13 THE COURT: All right. No letters or anything. I want

14 the briefs.

15 Thank you very much.

16 MR. BROOKS: Thank you, Your Honor.

17 MR. LONGTIN: Thank you.

18 (Proceedings concluded.)

19 C E R T I F I C A T E

20
I, Jennifer S. Costales, do hereby certify that the
21 foregoing is a complete, true, and accurate transcript of the
proceedings had in the above-entitled case before the Honorable
22 MICHAEL T. MASON, one of the judges of said Court, at Chicago,
Illinois, on April 24, 2007.
23
_____
24 Official Court Reporter
United States District Court
25 Northern District of Illinois
Eastern Division