UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In Re: Trans Union Corp. | ) | Case No. 00 C 4729 |
| Privacy Litigation | ) | MDL Docket No. 1350 |
| | ) | Judge Robert W. Gettleman |
| | ) | Magistrate Judge Michael T. Mason |

**WATTS GUERRA CRAFT LLP'S OPPOSITION TO
MDL COUNSEL'S "MOTION FOR ORDER CLARIFYING THE COURT'S ORDER
GRANTING FINAL APPROVAL OF SETTLEMENT AND JUDGMENT"**

**I.    INTRODUCTION**

Watts Guerra Craft LLP ("WGC") opposes the motion of MDL Counsel and adopted by Dawn Wheelahan to "Clarify" this Court's Order Granting Final Approval of Settlement and Judgment. Docs. 821, 823, and 824. This Court should deny the motion for several reasons.

*First*, both the motion and Wheelahan's memorandum rest on violations of Local Rule 83.5 and 28 U.S.C. § 652(d), which expressly "prohibit disclosure of confidential dispute resolution communications" made in the course of court-ordered alternative dispute resolution (ADR) proceedings. In an effort to derail those proceedings—which unfortunately succeeded—MDL Counsel and Wheelahan disregard this rule and statute. Indeed, they share confidential mediation statements by representatives of Trans Union ("TU"), WGC, and Magistrate Judge Mason with a devil-may-care attitude. This Court should not permit such conduct.

*Second*, less than three months ago this Court rejected the very argument on which MDL counsel's "Motion To Clarify" is based—namely, that the claims of roughly 104,000 post-settlement claimants ("PSCs") are "aggregated actions." This argument was squarely presented in TU's Motion to Enjoin Post-Settlement Claimant Counsel (Doc. 786) and Wheelahan's Motion To Compel (Doc. 797). But on November 8, 2010, the Court denied these motions. Doc. 814.

*Third*, none of the actions asserted by the PSCs is an "aggregated action" as defined by the parties—*i.e.*, "any ***action*** in which ***two or more individual plaintiffs*** assert claims relating to the same or similar alleged conduct." Stipulation of Settlement, ¶ 1.3 (emphasis added) (Doc. 462-3); Final Approval Order (Doc. 515) (collectively, "Settlement"). MDL Counsel and Wheelahan urge this Court to reject this binding definition and to adopt dictionary definitions that purportedly support their position. But it is black-letter law that a court construing a contract must apply its terms. Resort to extrinsic evidence of the contract's meaning (such as dictionaries) is not only unnecessary, but improper, unless those terms are ambiguous. The term "aggregated action" is not ambiguous—indeed, it is expressly defined in the Settlement—and neither MDL counsel nor Wheelahan contend otherwise. In fact, MDL Counsel previously conceded that "100 percent of the class has effectively retained all of their individual rights"—their "individual rights to sue for actual damages," "their individual rights to sue for punitive damages," and "their individual rights to seek attorneys' fees and costs." 9/10/08 Tr. 53:5-11 (Doc. 708).

Nor is there anything unfair about the possibility that TU may seek reimbursement from the Settlement Fund for purposes of settling with the PSCs. The Settlement provides for disbursement to the "Remaindermen"[1] only of "funds remaining in the Settlement Fund, ***if any***," after payment of the PSCs (Doc. 462-3 at 15, ¶ 2.1 (b)(vi) (emphasis added)), and MDL Counsel has previously acknowledged that "[n]ot every claimant gets the same dollar value in every settlement case"—that "[i]f you have a better claim, those claims are usually allocated a higher percentage of the funds." 9/10/08 Tr. 72 (Doc. 708).

*Fourth*, if Movants' reading of the Settlement were adopted, it would violate due process, which "requires that class members generally must receive notice of the terms of the settlement"

---

[1] Because of the contingent nature of this distribution, the "persons who registered during the registration periods" have been referred to by the parties and the Court as "Remaindermen."

2

(*Burns v. Elrod*, 757 F.2d 151, 156 (7th Cir. 1985))—so they can object or opt out. As the Notice of Settlement here stated in myriad ways, "Class Members are keeping their right to sue the Defendants individually for damage claims relating to target marketing or pre-screening." Doc. 781-1 § 12. To read the Settlement as reneging on that representation would violate due process.

## II. ARGUMENT

### A. MDL Counsel's Motion To Clarify and Wheelahan's Memorandum In Support Violate This Court's Rules and A Federal Statute.

Local Rule 83.5 strictly prohibits use of confidential communications made in the course of court-ordered ADR proceedings—for any purpose.[2] This rule is rooted in Congress's directive that "each district court shall, by local rule . . . provide for the confidentiality of the alternative dispute resolution processes and . . . prohibit disclosure of confidential dispute resolution communications." 28 U.S.C. § 652(d).

In violation of Local Rule 83.5 and the judgment of Congress, attorneys Bull and Wheelahan filed in the public record self-serving summaries of confidential statements made by WGC representatives, TU representatives, and Magistrate Judge Mason in the course of confidential, court-ordered ADR proceedings. MDL Counsel's brief states that they "understand that at the conclusion of the mediation TU intends to seek this Court's approval for payment of the majority of the remaining Settlement Fund to PSCs in settlement of their claims against TU." Doc. 823 at 1 (Bull Memo.). Wheelahan too discloses confidential statements, asserting that "Trans Union

---

[2] Rule 83.5 states: "Pursuant to 28 U.S.C. §652(d), ***all non-binding alternative dispute resolution ('ADR') proceedings*** referred or approved by any judicial officer of this court in a case pending before such judicial officer, including any act or statement made by any party, attorney or other participant, ***shall, in all respects, be privileged and not reported, recorded, placed in evidence, made known to the trial court or jury (without consent of all parties), or construed for any purpose as an admission in the case referred or in any case or proceeding.*** No participant in the ADR proceedings shall be bound by anything done or said at the ADR conference unless a settlement is reached, in which event the settlement shall be reduced to writing or otherwise memorialized and shall be binding upon all parties to the settlement." (Emphasis added.)

3

has expressed its intent to offer to PSCs' counsel, representing approximately 104,000 claimants, virtually all the remaining settlement fund, in settlement of the claims they've aggregated against Trans Union." Doc. 824 at 1-2 (Wheelahan Memo.).

Evidently MDL Counsel and Wheelahan are unhappy with the progress of the confidential ADR proceedings ordered by this Court and underway (but not completed) before Magistrate Judge Mason. But rather than bargain in good faith—on behalf of parties to whom they owe fiduciary duties—they seek to disrupt the negotiations by publicly disclosing confidential communications in violation of this Court's rules and the federal statute governing ADR proceedings.

This Court has express and inherent authority to sanction rule violations, and WGC urges the Court to exercise that authority to protect the integrity of ADR proceedings that the Court ordered. L.R. 83.25; *Fred A. Smith Lumber Co. v. Edidin*, 845 F.2d 750, 752 (7th Cir. 1988).

### B. This Court Has Already Rejected The Argument That The PSC Claims Are "Aggregated Actions."

Setting aside that this latest round of argument over "aggregated" comes before the Court by virtue of Movants' violations of federal law, this Court has already rejected the argument that the claims asserted by the PSCs are "aggregated" actions. On October 5, 2010, defendant TU filed a Motion to Enjoin Post-Settlement Claimant Counsel ("Motion to Enjoin"). Doc. 786. TU asked this Court to enjoin prosecution of PSC actions filed in state court, arguing that such actions constituted "aggregated actions" barred by this Court's Final Approval Order. Doc. 812 at 21. Similarly, Wheelahan filed her own Motion To Compel, arguing that TU could not use settlement funds to settle PSC claims because "the settlement barred any aggregation of such claims." Doc. 797 at 2. On November 8, 2010, this Court denied those motions. Doc. 814.

Now, after two months of court-ordered ADR proceedings, Movants repackage the same arguments in the guise of a "Motion To Clarify." But styling the motion as such cannot disguise

4

its substance, which is a motion to reconsider this Court's ruling on TU's Motion to Enjoin. Indeed, Wheelahan openly asks the Court to enjoin all PSC actions. Doc. 824 at 5.

Yet neither MDL counsel nor Wheelahan attempts to meet the strict standard for reconsideration. That standard requires either a manifest error of law or fact or newly found evidence (*Publishers Res., Inc. v. Walker-Davis Publ'ns., Inc.*, 762 F.2d 557, 561 (7th Cir. 1985)), and "is not an appropriate forum for rehashing previously rejected arguments" (*Caisse Nationale de Credit Agricole v. CBI Indus., Inc.*, 90 F.3d 1264, 1270 (7th Cir. 1996)). Movants point to no error of law or fact in the Court's prior ruling (much less a "manifest" error), and they cite no newly discovered evidence. Their arguments about "aggregated actions" are the same as those previously rejected by this Court. And because "[m]otions to reconsider are not appropriate vehicles to advance . . . new legal theories not argued before the ruling" (*Zurich Capital Mkts., Inc. v. Conglianese*, 383 F. Supp. 2d 1041, 1045 (N.D. Ill. 2005)), that MDL counsel and Wheelahan now urge the Court to rely on definitions from dictionaries rather than the contract is irrelevant.

### C. Movants' Construction Of "Aggregated Action" Is Unsupportable.

Even if this Court were inclined to reconsider its previous ruling that the PSC actions do not constitute "aggregated" actions, there is no question that it arrived at the correct result.

#### 1. Resort To Extrinsic Evidence Of The Contracts' Meaning Would Plainly Be Erroneous.

It is black-letter law that a contract must be ambiguous before a court may use extrinsic evidence to construe it. *Temme v. Bemis Co., Inc.*, 622 F.3d 730, 734 (7th Cir. 2010). Movants do not acknowledge this standard, let alone satisfy it. To the contrary, Wheelahan previously told the Court that "[t]here is nothing unclear or ambiguous about the settlement's language." Doc. 765 at 6. Similarly, MDL counsel previously agreed "that the Stipulation of Settlement is clear[.]" Doc. 770 at 2. Movants' failure to show any ambiguity in the contract is fatal to their

5

motion. *Grun v. Pneumo Abex Corp.*, 163 F.3d 411, 420 (7th Cir. 1998).

This Court must therefore reject Movants' suggestion that this Court adopt a host of dictionary definitions in lieu of the contract definition of "aggregated." The parties' Settlement unambiguously states that "'Aggregated Action' shall mean *any action* in which *two or more individual plaintiffs* assert *claims* relating to the same or similar alleged conduct." Doc. 462-3 ¶ 1.3 (emphasis added). But under the undisputed evidence, WGC has been engaged by 69,608 *individual*, natural persons (each a "Client") to prosecute on each such Client's behalf his or her *individual* post-settlement claim, as defined in the Final Approval Order. Declaration of Mikal Watts, attached as Ex. C to Doc. 803 ("Watts Dec."). WGC prepared for each Client an individual petition entitled "Plaintiff's Original Justice Court Petition," containing the unique plaintiff's name and address (and none other) and a unique caption and cause number. *Id.* ¶¶ 5-7. There is not *one* "action" in which "two or more individual plaintiffs assert claims." Period.

After deciding to file all such actions in the Justice of the Peace Court (Precinct 5, Place 1) located in Nueces County, Texas (the "Justice Court"), WGC consulted the Justice Court regarding the logistics of filing so many individual civil actions. On August 26, 2010, WGC filed a petition in the Justice Court on behalf of Client Cynthia Ann Martinez ("Martinez"). *See id.* ¶ 7. WGC provided the Justice Court with the original, hard-copy Martinez petition and $31, which is the Justice Court's published filing fee for a petition such as the Martinez petition. *See id.*; *see also* http://www.co.nueces.tx.us/courts/jp/pdf/filing_fees.pdf; *see generally* Tex. Rev. Civ. Stat. Ann. § 118.121(1)(A). The Justice Court accepted for filing the Martinez petition, assigning the Martinez petition a unique cause number. *See* Watts Dec. ¶¶ 5, 7.

Then, on September 7, 2010, WGC filed 67,633 separate petitions, each unique to a particular Client, in the Justice Court. *Id.* ¶ 8. WGC provided the Justice Court with the original,

6

hard-copy petitions—67,633 unique documents—and paid a filing fee of $31 *for each one*. *Id.* On the same date, in accordance with Texas Rule of Civil Procedure 24, the Justice Court ruled that the 67,633 "cases" were properly filed, and that the fees of $2,096,623 tendered by WGC for these cases were appropriate and accepted. On September 14, 2010, WGC filed 1,974 separate petitions—again, each unique to a particular Client—in the same court and paid a $31 filing fee for each petition. *Id*. ¶ 10. Again, the Justice Court entered an Order that same date ruling that the 1,974 "cases" were properly filed, and that the fees tendered by WGC for these cases were appropriate. Each PSC filed by a Client of WGC has a unique case number. *Id*. ¶¶ 5, 7, 8, 10.

WGC's Clients have never sought to consolidate any of these individual actions (each an "Action," collectively, the "Actions"). *Id.* ¶ 17. In fact, each Client's petition disclaimed anything but individual relief: "Plaintiff asserts herein ***Plaintiff's*** Post-Settlement Claim ***and no other claims***. To the extent the allegations herein may support state or federal claims beyond ***Plaintiff's Post-Settlement Claim***, Plaintiff (a) ***expressly disavows such other claims***." O'Neil Dec., Ex. C. (Doc. 788-3) (emphasis added). Nor did WGC or TU seek to consolidate any of the Actions. In fact, TU's counsel has stated that seeking to consolidate the Actions would be "fruitless." 10/12/10 Tr. 6:19-20. Nor has the Justice Court indicated any intent to consolidate them.

As these undisputed facts confirm, the Actions filed by WGC are not aggregated actions under the Final Approved Order. Each PSC Action here is being prosecuted by a single individual identified by a unique name and address. No petition lists more than one plaintiff. Each petition states that the petitioner seeks redress for his or her own claim only and expressly disavows assertion of any other claim. Each petition further states that the plaintiff is commencing a post-settlement claim, which is expressly permitted by the Settlement. The Actions commenced by WGC, therefore, are not "aggregated actions" within the meaning of the Settlement.

7

### 2. Movants' Strained Contract Reading Leads To Absurd Results.

Few rules are better established than the rule that a contract should be "read as a whole with all its parts given effect." *Temme*, 622 F.3d at 734. No contract language may be "render[ed] . . . superfluous" by the Court's interpretation, and "the meaning of separate [contractual] provisions should be considered in light of one another and the context of the entire agreement." *Young v. Verizon's Bell Atl. Cash Balance Plan*, 615 F.3d 808, 823 (7th Cir. 2010).

These fundamental rules of construction foreclose the reading of "aggregated" urged by Movants. If they were correct, much of the Settlement would become superfluous. But those documents draw a sharp distinction between "aggregated actions" (which are barred), and individual "post-settlement claims" (which are not). Doc. 462-3 ¶ 1.31. Similarly, the Notice of Proposed Settlement states that "[a]s part of the settlement, Class Members ***are keeping their right to sue the Defendants individually for damage claims*** relating to target marketing or pre-screening." Doc. 781-1 § 12 (emphasis added).

In light of the contract terms, it should come as no surprise to learn of class counsel's statement at the fairness hearing that:

> 100 percent of the class has effectively retained ***all of their individual rights***. They have retained their ***individual rights to sue for actual damages***. They have retained their individual rights to sue for statutory damages. They have retained their ***individual rights to sue for punitive damages***. And they have retained their ***individual rights to seek attorneys' fees and costs*** in doing so.

9/10/08 Tr. 53:5-11 (Doc. 708) (emphasis added). This Court agreed, stating: "[W]e are preserving the class members' right to seek individual damages in their own lawsuits." *Id*. at 84:5-6.

But if "aggregated action" is read to cover actions brought by one individual using counsel that have separately been retained by others bringing PSC claims, that would effectively bar a host of class members from exercising their "individual rights to sue" TU—thus stripping much of the Settlement's language of meaning. For example, no lawyer could file two separate actions

for two separate people because, in so doing, the lawyer would have "gathered together into a mass . . . two or more individual plaintiffs." Doc. 823 at 4. Likewise, two PSCs who were husband and wife would have to hire separate counsel. There are roughly 190 million class members. But the last time we checked, there are not 190 million lawyers to represent them.

The transcript of the fairness hearing confirms that this Court contemplated situations in which a "bunch of people" would hire the same lawyer and file "a bunch of lawsuits" to pursue post-settlement claims, recovering not only damages but costs and attorneys' fees:

> MR. BACHARACH: But a group of working class people probably are not going to be able to go together and say: We're the Carpenters Union Local 207, and we'd love to bring a claim and get some money for our members. So I really—
>
> THE COURT: Why couldn't they do the same thing you just described?
>
> MR. BACHARACH: I'm sorry, what?
>
> THE COURT: Why couldn't they do the same thing you just described? If you had a bunch of people with a common interest like a union, for instance, they could hire a lawyer and just file a bunch of lawsuits?
>
> MR. BACHARACH: Sure, but—
>
> THE COURT: And knowing that if they recover, they're going to get their filing fee back and all their costs and attorneys' fees.

9/10/08 Tr. 18:4-18 (Doc. 708). No one suggested this would be a barred "aggregated action." Thus, Movants can claim no surprise at the developments that led to their motion to "clarify."

In short, Movants' proposed definition of "aggregated" leads to an absurd result that, as a practical matter, would eviscerate that portion of this Court's Final Approval Order granting individual class members a right to file post-settlement claims. That definition should be rejected.[3]

---

[3] Movants' remaining contract construction points are frivolous. For example, MDL Counsel says the PSC actions are "aggregated" because many were filed in the same court. Doc. 823 at 4-5. But the contract's definition of "aggregated action" places no restrictions on where post-settlement claims may be filed. Moreover, nothing in the definition of "aggregated action" states that filing in an impermissible venue would somehow render an action "aggregated." *See id*. at 3. Further, no evidence exists that venue is improper in any of the PSC actions.

Wheelahan's reliance on WGC's March 15, 2010, confidential settlement demand (Doc. 824 at 2-3) is both barred by L.R. 83.5 and misplaced. The term "aggregated action," as defined in the settlement, does

9

### 3. The Settlement Contemplated That PSCs Would Recover More than Remaindermen, And That Remaindermen Might Recover Nothing.

Nor is there any basis to Movants' suggestion that there is something unseemly, unfair, or inconsistent with the "spirit" of the Settlement for the PSCs, rather than the Remaindermen to "take reimbursement from the settlement fund." Doc. 824 at 1, 2. Indeed, the Settlement provides for disbursement to the Remaindermen only of "funds remaining in the Settlement Fund, *if any*," after payment of the PSCs. Doc. 462-3 at 15, ¶ 2.1 (b)(vi) (emphasis added).

Movants acknowledge that "the settlement reserved to class members their right to litigate an individual claim against Trans Union." Doc. 824 at 2. What is more, class counsel has expressly acknowledged that "[n]ot every claimant gets the same dollar value in every settlement case"—that "[i]f you have a better claim, those claims are usually allocated a higher percentage of the funds." 9/10/08 Tr. 72 (Doc. 708). As Ms. Bull elaborated at the fairness hearing:

> MS. BULL: "This is not really a conflict issue. This is a set amount of money to be allocated among class members. And it depends on the value of their claims. ***So obviously someone who thinks they have a better claim comes forward and files a lawsuit or makes a demand on the company should have more funds than someone who just files for whatever is left over at the end***. And that's basic, basic case law on allocation of settlement funds that courts deal with in every case, because you always have a set amount of money, and ***those better claims should be allocated a higher percentage of the cash fund.*** You know, it's the basic premise upon which all settlement funds are distributed. ***Not every claimant gets the same dollar value in every settlement case. If you have a better claim, those claims are usually allocated a higher percentage of the funds.***"

*Id*. (emphasis added). Similarly, the Court stated: "it may be somebody who feels they want to at least file a lawsuit and serve some discovery to see how many times their information was dis-

---

not convert individual actions into an "aggregated" one simply because a lawyer representing a number of PSCs makes a demand upon TU on behalf of its PSC Clients.

Similarly misplaced is Wheelahan's reliance on the fact that "lawyers representing post-settlement claimants are not licensed to practice in the jurisdictions where the claimants reside." Doc. 824 at 3. WGC has filed some 69,000 individual Actions in Texas state court. Neither the Stipulation of Settlement, nor the Final Approval Order, nor any rule of law bars a Texas lawyer from representing out-of-state PSCs. To the contrary, such representations are specifically authorized under Texas law. TEX. R. CIV. P. 7 ("Any party to a suit may appear and prosecute or defend his rights therein, either in person or by an attorney of the court.").

closed improperly would have a stronger case than someone who didn't." *Id*. at 75.[4]

Nor is there anything unfair about the possibility that TU may require most of the Settlement Fund to secure reimbursement of PSCs. TU faces roughly 104,000 such PSCs, and is potentially exposed to more than $1 billion in statutory damages.[5] Yet Movants would deny TU its contract right to make such reimbursements. They say it would be more "fair" to give priority to the Remaindermen. That proposal would turn the parties' agreement on its head, as the Settlement makes plain that the Remaindermen are not in line to collect any money from the Settlement Fund unless and until TU resolves all PSCs—*and* there is money left over.

This only makes sense. In 2008, when this Court entered its Final Order, class members who wanted to prosecute their Post-Settlement Claims faced a hard climb. They had to (1) be consumer debtors found in TU's database when TU was engaged in the offending practice (if not, they faced certain motions to dismiss), (2) persuade counsel with the expertise and resources that it made sense to attempt to prosecute a complex federal privacy action for mere statutory damages, and then succeed in doing so, and (3) steel up for litigation during which their meddle and claims would be tested. By contrast, the Remaindermen merely filled out a one-page, online registration form, and all that is known about them is what they chose to assert in their form. The information in these forms is unverified, and per this Court's Final Order it always will be. For all we know, the Remaindermen could be foreign teenagers with Internet access. But in any

---

[4] Trans Union has likewise stated: "The Settlement does not impose any sort of parity on the value of PSCs and the value of contingent claims of online registrants. In fact, as the Committee acknowledges, the Final Approval Order specifically contemplates that claimants on the Fund could get nothing. Committee Br. 3 (quoting Final Approval Order ¶ 17(f)). Obviously, all parties understand that it was entirely possible that the entire fund would be distributed to PSC claimants, ***making the Committee's parity argument absurd***." Doc. 783 at 3 (emphasis added).

[5] This Court has found and TU has confirmed that Settlement Class Members prosecuting Post-Settlement Claims are entitled to $100 to $1,000 per violation, and it is easy to imagine that TU may have wrongfully sold each of the approximate 104,000 Post-Settlement Claimants' data 10 or more times, over the approximate 14 years that TU was engaged in the offending practice. Therefore, TU faces potential exposure of $1.4 billion (104,000 x $10,000 (a typical Justice Court jurisdictional limit)).

event, Remaindermen who missed the "commencement" date for a Post-Settlement Claim and who have done no more than complete a one-page online form, present no exposure to TU.

Finally, Wheelahan asserts that denying her motion would not be "fair" because WGC's Clients have done little more than the Remaindermen, and because she knows little about the Post-Settlement Claims. But Wheelahan is uninformed. WGC's Clients have fully qualified to file PSC Actions and, but for a settlement in connection with this Court's now-pending ADR process, will litigate legitimate Post-Settlement Claims against TU to final judgment. Further, TU has no interest in settling unmeritorious Post-Settlement Claims. Consequently, TU has compelled all Post-Settlement Claim counsel to provide detailed contact and identifying data in connection with each of their clients, so that settlement funds are used only to dispose of valid and qualified Post-Settlement Claims. Therefore, Settlement Funds will be paid only to qualified PSCs. There is nothing unfair about this funding scheme, which was plainly set forth in this Court's Final Approval Order and Notice to class members.

### D. Movants' Reading Of The Settlement Agreement Would Create Serious Due Process Violations.

Movants' reading of the Settlement must also be rejected on constitutional grounds: If adopted, that reading would violate the due process rights of class members who relied on the Notice of Settlement's confirmation that the right to bring individual claims would be preserved.

"Notice and an opportunity to be heard are the touchstones of procedural due process," *Simer v. Rios*, 661 F.2d 655, 667 (7th Cir. 1981), and "[d]ue process requires that class members generally must receive notice of the terms of the settlement." *Burns v. Elrod*, 757 F.2d 151, 156 (7th Cir. 1985). Rule 23(e)(1) requires courts to "direct notice in a reasonable manner to all class members who would be bound by" proposed settlements, and Rule 23(e)(5) allows "[a]ny class member [to] object to the proposal if it requires court approval." Rule 23 notice "must contain

12

information that a reasonable person would consider to be material in making an informed, intelligent decision of whether to opt out or remain a member of the class and be bound by the final judgment." *In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1105 (5th Cir. 1977). Indeed, "serious due process questions would be raised if the court did not try to make sure that the members knew about the action and about their right to opt out of it so as not to be bound by the final judgment." *Woods v. New York Life Ins. Co.*, 686 F.2d 578, 579 (7th Cir. 1982).

As we have shown, the settlement agreement can *only* be read to preserve the right of all PSCs to bring their own individual actions against TU with the choice of their own counsel. But if the Court were somehow to conclude that the agreement is ambiguous, due process would require reading it to preserve the right to bring individual actions. *Cf. Clark v. Martinez*, 543 U.S. 371, 385 (2005) ("when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction, the canon [of constitutional avoidance] functions as a means of choosing between them."). Why? Because the settlement notice declared that, "[a]s part of the settlement, Class Members are keeping their right to sue the Defendants individually for damage claims relating to target marketing or pre-screening." Doc. 781-1 § 12. Indeed, this notice was packed with guarantees to class members that they would keep their right to bring individual actions. *See generally* Doc. 781 (Notice of Proposed Settlement).[6]

It follows that, to read the settlement agreement as Movants urge would deprive the PSCs

---

[6] For example, the front page of the notice contained a section entitled "Your Legal Rights and Options in this Settlement" that stated: "File an Individual Lawsuit: You can file your own lawsuit against the Defendants." Doc. 781-1 at 1. Similarly, the section entitled "The Settlement Benefits—What You Get if You Qualify" asks, "What does the settlement provide?" and answers that "[t]he settlement will: establish a $75 million Settlement Fund" and, among other things, "pay for settlements or judgments for damage claims related to lawsuits brought individually by Class members against the Defendants," and "give any money remaining (after deducting the costs for everything listed here) in the Settlement Fund to eligible Class members or to non-profit organizations." *Id*. at 4; *see also id*. at 6 ("Your options for benefits provided by the settlement are as follows: 1. File an individual lawsuit against Defendant(s) for claims related to target marketing or prescreening . . . .").

of their right to bring individual actions without advance notice—in violation of due process. *E.g.*, *Woods*, 686 F.2d at 579; *Burns*, 757 F.2d at 156. Undoubtedly, many class members relied on the guarantee of the right to bring an individual action in declining to object to the proposed settlement. Others undoubtedly relied on the notice in declining to opt out of the class, which was another means of securing the right to pursue individual claims. Even accepting, *arguendo*, Movants' untenable reading of the settlement *itself*, there is no way to read the *Notice of Proposed Settlement* as indicating that a class member's right to bring an individual action against TU could be lost if her counsel also represented others bringing individual claims—"information that a reasonable person would consider to be material in making an informed, intelligent decision of whether to opt out or remain a member of the class and be bound by the final judgment." *Nissan*, 552 F.2d at 1105. One does not notify class members that they are losing their right to sue a defendant individually by telling them that "Class Members are keeping their right to sue the Defendants individually." Doc. 781 § 12. Accordingly, interpreting the settlement agreement to mean that the PSCs at issue have lost their individual right to sue would violate the due process rights of those class members who relied on the settlement notice.

    **E.**    **Wheelahan's Separate Misconduct Merits Sanctions**.

Finally, Wheelahan's Memorandum is packed with factually unsupported attacks on opposing counsel. For example, Wheelahan says WGC violated the FTC Act (Doc. 824) and engaged in an unlawful conspiracy to kick back fees to TU (Doc. 829). The only "evidence" that she cites in support of her baseless allegation is a confidential settlement communication (plainly marked Confidential per Fed. R. Evid. 408) submitted by WGC to TU on behalf of WGC's clients. But Rule 408 prohibits this very use of statements made during settlement discussions.

Wheelahan's propensity to engage in baseless *ad hominem* attacks on opposing counsel is likewise troubling. An attorney's "decision to continue . . . his practice of making *ad hominem*

14

attacks and unsupported accusations" is "most unfortunate" and the lowest form of advocacy. *Matter of Andy Frain Servs. Inc.*, 798 F.2d 1113, 1128 (7th Cir. 1986). Such attacks demean the legal profession and the integrity of the judicial process. *See id.* at 1128.

Sanctions are all the more justified for repeat offenders, and Wheelahan is no stranger to unprofessional conduct. Indeed, this very Court previously censured her for "unseemly attacks on her co-counsel and the integrity of both the Special Master and the Magistrate Judge, as well as her grossly excessive time sheets." Doc. 689 at 9 (12/09/09 Mem. Op. & Order). Adopting the findings of the Special Master, this Court found that Wheelahan's conduct was "reprehensible, unprofessional and stray[ed] far beyond conduct becoming of any attorney." *Id.* at 8. Only "reluctantly" did this Court decline to impose sanctions beyond a censure. *Id.* at 9.

Wheelahan's most recent attacks on opposing counsel confirm that she failed to learn her lesson from this Court's previous censure of her conduct. Her allegations are altogether baseless. And her pleadings reflect that she thinks herself free to thumb her nose at the Court's Local Rules, such as L.R. 83.5. Under these circumstances, which involve violation of those Rules and obligations of confidentiality, WGC urges this Court to exercise its authority to revoke her *pro hac vice* admission to practice before this Court.[7]

## III. CONCLUSION

For the foregoing reasons, WGC respectfully urges this Court to enter an Order (1) denying MDL Counsel's Motion To Clarify, (2) revoking Wheelahan's *pro hac vice* admission to practice before this Court, and (3) referring her conduct to the Executive Committee of the U.S. District Court for the Northern District of Illinois for disciplinary proceedings.

---

[7] A district court may revoke an attorney's admission to practice *pro hac vice* for violating local rules. *E.g., Lasar v. Ford Motor Co.*, 399 F.3d 1101, 1116-17 (9th Cir. 2005); *Butler v. Biocare Med. Technologies, Inc.*, 348 F.3d 1163, 1175 (10th Cir. 2003); *MacDraw, Inc. v. CIT Group Equip. Fin., Inc.*, 138 F.3d 33, 38 (2d Cir. 1998); *In re Rimsat, Ltd.*, 212 F.3d 1039 (7th Cir. 2000); *Baldwin Hardware Corp. v. FrankSu Enter. Corp.*, 78 F.3d 550 (Fed. Cir. 1996).

                                  Respectfully submitted,

                                  /s/ Kimball R. Anderson
                                  Counsel for Watts Guerra Craft LLP

Kimball R. Anderson
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, Illinois 60601
312 558 5858
kanderson@winston.com

Dated: February 2, 2011