IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IN RE: TRANS UNION CORP. PRIVACY LITIGATION, ) ) ) _____ ) THIS DOCUMENT RELATES TO: ) ) ALL ACTIONS ) | No. 00 C 4729 MDL Docket No. 1350 Judge Robert W. Gettleman |

## MEMORANDUM OPINION AND ORDER

"In every big transaction . . . there is a magic moment during which a man has surrendered a treasure, and during which the man who is due to receive it has not yet done so. An alert lawyer will make that moment his own, possessing the treasure for a magic microsecond, taking a little of it, passing it on." Kurt Vonnegut, Jr., God Bless You, Mr. Rosewater: or, Pearls Before Swine (1965).

Some of the lawyers in the instant MDL action make Vonnegut, and his protagonist, look altruistic. After negotiating a generous settlement for a class of more than 190 million people (everyone who had a credit rating with Trans Union from 1987 to 2008), these lawyers have directed their efforts to grabbing for themselves as much of the settlement fund as possible.[1] One of these lawyers, Dawn Wheelahan, was exceptionally fortunate to press an appeal of this court's award to her of $2.7 million, which resulted in an additional $1.425 million award by the court of appeals. See In re Trans Union Corp. Privacy Litigation, Appeal of Dawn Adams

---

[1] As Judge Posner noted in the first line of Dawn Wheelahan's appeal, "It is a curiosity of class action litigation that often there is greater ferocity in combat among class lawyers over the allocation of attorneys' fees than there is between the class lawyers and the defendants." 629 F.3d at 742-43.

Wheelahan, 629 F.3d 741 (7th Cir. 2011). In the most recent act of chutzpah, "Texas Counsel,"[2] who had litigated the case with Wheelahan, sought (unsuccessfully) an additional award of $835,577, despite the court of appeals' explicit holding that class lawyers other than Wheelahan "are not entitled to additional fees." Id. at 748.

The subject of this opinion involves a clever maneuver by several groups of lawyers who were not involved in negotiating the original settlement to grab even more fees for themselves and, indirectly, reduce the amount of the cash fund available to class members. The settlement mechanism was explained in the Order Granting Final Approval of the Settlement and Final Judgment, and the Stipulation of Settlement.[3] To summarize, the settlement included the creation by Trans Union of a $75 million cash fund and more than $30 million of in-kind relief made available to a settlement class defined as "[a]ll consumers who had an open credit account or an open line of credit from a credit grantor located in the United States at any time during the period January 1, 1987, to May 28, 2008."

The cash fund was to be used to pay class plaintiffs' attorneys' fees, payments to named plaintiffs, and costs of administering the settlement, and to reimburse Trans Union for payment of individual claims (referred to in the settlement as post-settlement claims or claimants, or "PSCs")[4] made by class members whose credit information Trans Union allegedly improperly

---

[2]Texas Counsel consists of attorneys from Caddell & Chapman of Houston, Texas and Weller, Green, Toups & Terrell, LLP, of Beaumont, Texas.

[3]In re: Trans Union Privacy Litig., 00 C 4729 (Doc Nos. 515, 462-3).

[4]The term "Post Settlement Claims" is defined in the Settlement Agreement as "any claim by a Settlement Class Member (other than a Plaintiff) against a Defendant that is currently pending or that is asserted after the date of the Stipulation, which is May 20, 2008, arising out of, or relating to, the facts or claims alleged in the Actions concerning Defendants' alleged distribution of Target Marketing lists or related information or concerning Firm Offer claims

disclosed. Any money remaining in the settlement fund after fees, costs, payments to named plaintiffs, and reimbursement to Trans Union for resolving PSCs was to be divided among those class members who had registered for a possible cash disbursement under the terms of the settlement agreement (the "Registered Claimants").

The settlement notice thus described the various options for benefits available to class members:

- **File an individual lawsuit against Defendant(s) for claims related to target marketing and prescreening:** You can also sign up for six months of credit monitoring.

- **Sign up for six months of credit monitoring services:** You can also register to receive a possible cash payment in the event of a cash distribution or file an individual lawsuit against the Defendants.

- **Sign up for nine months of enhanced credit monitoring services:** You will not receive any further benefits, including a cash payment, and you will not be able to file an individual lawsuit against the Defendants.

- **Register to receive a possible cash payment:** You can also sign up for six months of credit monitoring; however if you receive a cash payment, you cannot file an individual lawsuit against the Defendants.

- **Do Nothing:** You won't get any benefits. You will keep your right to sue the Defendants individually (see the detailed notice and Settlement Agreement for more information).

The time to sign up for benefits through the claims administrator ("Administrative Claims") expired on September 24, 2008. The settlement agreement extended the statute of limitations for any PSCs (including individual lawsuits or claims) to September 16, 2010, two years after the date of final approval of the settlement (September 17, 2008).

---

alleged in any of the MDL Actions, the Andrews Action, or the Frey Action. The term "Post-Settlement Claims" shall include, without limitation, claims under any legal or equitable theory, whether asserted in the form of a complaint filed in state or federal court, a demand for arbitration, an informal demand letter, or otherwise.

The final judgment approving the settlement provided that all settlement class members (except the named plaintiffs) were enjoined from bringing any claims against Trans Union arising from the conduct alleged in this case as "either (a) named plaintiffs or class members in any class action, (b) plaintiffs in any Joined Actions, or (c) plaintiffs in any Aggregated Action."

The judgment order approving the settlement defined "Aggregated Action" as "any action in which two or more individual plaintiffs assert claims relating to the same or similar alleged conduct." The order defined "Joined Action" as "any action in which any plaintiff asserts both (a) Post-Settlement Claims, and (b) claims relating to any other subject matter whatsoever, regardless of whether the causes of action asserted in the action are created by the same statute, common law principle, or equitable principle." The order defined "Class Action" as "an action brought by one or more individual plaintiff on behalf of a class of similarly situated persons under any applicable state or federal statute or rule, whether certified or uncertified."

The purpose of these provisions in the settlement agreement, as approved by the court, was to allow members of the certified settlement class to file claims on a form provided to them in connection with the administration of the settlement. The claim form was easy to complete and transmit to the claims administrator for processing. The settlement was widely advertised through direct notices to consumers as well as multiple publications, broadcast media, and the internet. The court has been informed that, as a result of the notice to the class, approximately 450,000 Registered Claims were timely filed with the Claims Administrator to receive cash distributions.

The provision allowing individuals to assert claims outside the administrative process recognized that individual claimants might seek statutory or actual damages under the Fair

4

Credit Reporting Act[5] that would exceed the likely recovery to Registered Claimants under the administrative process. During the hearings concerning the settlement, the court inquired as to whether this provision would allow groups of plaintiffs who were gathered by organizations such as unions to file multiple individual cases or claims with Trans Union. The parties to the settlement agreed that such claims were contemplated by the settlement agreement, and neither those parties nor the court expected reimbursement to Trans Union for resolving those claims to consume the entire cash fund of $75 million.

Much to the surprise of those parties and the court, several groups of lawyers advertised heavily on the internet that there was free money to be had as a result of this settlement. Included among the lawyers' solicitations are the following excerpts from a law firm in Texas:

> The **Trans Union Class Action Settlement Lawyers** at the renowned litigation firm of Watts Guerra Craft LLP are currently handling thousands of claims against United States credit reporting giant **TransUnion**. The claims and related lawsuits against **TransUnion** focus on issues arising from a 2008 **class action settlement** with the credit reporting Agency.
>
> While the initial phase of the **settlement** described above has since expired, there is still a right to make a direct claim against the $75 million **settlement** fund as a result of a unique provision placed in the **TransUnion class action settlement** agreement. That provision allowed for persons to make "post-settlement" claims. Fill out our form today to see if you qualify to make a post **settlement** claim. If you had at least one form of credit, or a loan of any type between 1987 and 2000, you will likely qualify. Sign up today to make your claim against **TransUnion** for a portion of the $75 million **settlement** fund![6] [Emphasis in original.]

---

[5]15 U.S.C. § 1681n.

[6]Formerly available at www.trans-union-class-action.com. These statements are inaccurate in a number of ways. Most egregiously, the law firm of Watts Guerra Craft LLP ("Watts Guerra") is most definitely not "The Trans Union Class Action Settlement Lawyers." That honor goes to the lawyers appointed by the court to represent the class. Even the website's URL is misleading; it suggests an official site. Moreover, the claims being solicited are not made "against the $75 million settlement fund," a term also (improperly) employed by the Heenan Law Firm in Montana. They were to be made against Trans Union, which then would

5

Principally as a result of solicitations by these lawyers, more than 73,000 lawsuits have been filed by post-settlement claimants and more than 30,000 informal demands have been made to Trans Union. Virtually all of these approximately 104,000 PSCs have adopted or incorporated the second amended consolidated complaint filed in this MDL action by reference. The Watts Guerra firm filed 69,608 of those lawsuits in the Justice Court in Nueces County, Texas, which charges only $31 for each such action filed. Another 2,000 lawsuits were filed in Montana, another group of 17,668 claims were made by lawyers in Ohio, and 131 lawsuits were filed in Georgia. For all practical purposes, all of these lawsuits and claims are substantially identical, and the lawyers apparently filed them in the judicial venues that charged the lowest filing fees that those lawyers could find. With few exceptions, the lawyers filing these cases signed fee agreements with their clients providing for contingency fees of between 40 and 50 percent of the amounts recovered. Under the Fair Credit Reporting Act, if the plaintiffs in each of these cases were awarded statutory damages, the total sum would range from $10,400,000 to $104,000,000. 15 U.S.C. § 1681n.

In January 2011, MDL Counsel, joined by Wheelahan and Texas Counsel, filed "motions to clarify" the meaning of the term "Aggregated Action," contending that the groups of lawsuits and informal claims against Trans Union constituting the PSCs were "Aggregated Actions" as defined by dictionaries: "to gather into a mass, sum or whole."[7] MDL Counsel and Wheelahan contend that because the lawyers filing the PSCs treated them as aggregated, identical claims,

---

receive reimbursement from the fund, subject to objections by class counsel.

[7]American Heritage Dictionary 87 (2d ed. 1985). Webster's Third New International Dictionary 41 (2002) defines "aggregate" as "formed by the collection of units or particles into a body, mass, or amount."

6

filed in local courts regardless of the plaintiffs' residences (the claimants reside all over the country, having responded to the lawyers' mass solicitations, and generally executed identical fee agreements paying the lawyers nearly half the amounts to be recovered), the PSCs should be regarded as Aggregated Actions under the settlement agreement and related judgment.

The court agrees that, in the absence of a contractual or judicially imposed definition, the PSCs, or at least those "aggregated" by the soliciting lawyers, would fit the commonly understood meaning of the term. These claims were certainly bundled together (in Webster's term, "collected") and filed en masse in local courts having little or nothing to do with their plaintiffs. To be sure, this court never contemplated such mass actions when it approved the settlement.

The problem, however, is that the settlement agreement and related judgment did define the term "Aggregated Action" to mean "<u>any</u> <u>action</u> in which two or more individual plaintiffs assert claims relating to the same or similar alleged conduct." (Emphasis added.) Both "any" and "action" are singular, and clearly require that an "Aggregated Action" be a single lawsuit (or claim) that includes two or more individual claimants or plaintiffs. With this definition in mind, the PSC lawyers were careful to file each of the PSCs in the individual name of each claimant, thus avoiding the definition of "Aggregated Action" in the settlement agreement and judgment.[8] Equally mindful of that definition, each of the PSCs specifically disclaimed anything other than

---

[8]Curiously, the Heenan Law Firm's solicitation (formerly available at http://www.heenanlawfirm.com/trans-union-settlement.php) stated "**Joint Representation** Because of the commonality of legal and factual issues and relatively small amount of statutory damages available to each individual claimant, Law Firm intends to join together other people and file the lawsuit jointly. Law Firm will attempt to negotiate a global settlement whereby each client represented by Law Firm receives the same amount of statutory damages between $100 and $1000." Apparently, Heenan had second thoughts about this representation.

individual relief for each plaintiff or claimant. For example, the Watts Guerra complaint in the Texas Justice Court contained the following language: "Plaintiff asserts herein plaintiff's Post-Settlement Claim and no other claims. To the extent the allegations herein may support state or federal claims beyond plaintiff's Post-Settlement Claim, plaintiff . . . expressly disavows such other claims."

As the PSC counsel point out, settlement agreements and judgments approving them, like contracts generally, must be read as a whole and the terms thereof given their plain meaning without resort to extrinsic evidence or unwritten intent. See Tamme v. Bemis Co., Inc., 622 F.3d 730, 734 (7th Cir. 2010). Certainly, had a single lawyer filed, say, four or five PSCs for existing clients, neither this court, nor likely even the MDL Counsel or Wheelahan, would have argued that such claims were "Aggregated Actions." The fact that the PSCs at issue involve staggering numbers of claims filed in remote jurisdictions to save filing fees and convenience the lawyers (rather than the actual claimants, most of whom would have to travel far from their homes to pursue modest awards) should make no difference. In short, because the settlement agreement and judgment define the term "Aggregated Actions" to exclude the types of claims represented by the PSCs, the "motions to clarify" must be denied.

In connection with the extensive briefing of these motions, several other matters deserve mention. First, the Watts Guerra papers accuse MDL Counsel, and particularly Wheelahan, of violating this court's Local Rule 83.5 by disclosing certain statements made by various attorneys in connection with the mediation being conducted by Magistrate Judge Mason in this matter. Although, in hindsight, the moving counsel might have couched their language a bit more carefully, the court cannot fault those lawyers for making the arguments they did in the manner they did. Part of their argument in favor of their position that PSC counsel were treating the

8

claims as "aggregated" included their bundling of the claims for settlement purposes. Although this court has rejected that argument, putting the actions of those lawyers in those terms appears to have been a legitimate attempt to make the point. Given the unusual nature of these proceedings, the court finds no L.R. 83.5 violation.

There have been other accusations and cross-accusations by the lawyers against each other's conduct. Ms. Wheelahan has attacked the nature of the solicitations by certain PSC counsel, solicitations that the court finds distasteful and at least partially misleading, but is unable to address as unethical. That would be a matter for the appropriate authorities in the states governing those lawyers' professional conduct. After all, those cases are not pending in this court, and there has been no successful attempt to remove them to federal court or consolidate them with the underlying MDL action.

As mentioned above, PSC counsel have attacked the moving counsel as having violated a local rule, and have generally disparaged the entire effort by moving counsel to define the term "aggregated" to include the PSCs.[9] Again, this court cannot conclude that the moving counsels' conduct was unethical or otherwise objectionable. The number of PSCs filed and the amount of money involved, which might consume the entire cash fund remaining after the payment of attorneys' fees and costs, came as a surprise to this court and were not contemplated at the time the settlement was approved. Had this type of maneuver been contemplated, the court and the parties could easily have defined the terms "Aggregated Action" to include the types of claims represented by the subject PSCs. The fact that they didn't should not reflect poorly on MDL

---

[9]As an example, a late submission by Watts Guerra is titled "Response to the New, But Equally Flawed, Arguments by MDL Counsel and Wheelahan in Support 'of Clarifying' the Court's Final Approval Order."

Counsel or Wheelahan. Indeed, although these lawyers have received substantial fees in connection with this case, they surely contributed to the litigation over the many years it lasted and were instrumental in fashioning what the court had considered to be an exceptionally fair and reasonable settlement. The same cannot be said of the lawyers for the PSCs, who joined the feeding frenzy late in the game.

Finally, MDL Counsel and Wheelahan have put Trans Union on notice that, should it settle some or all of the PSCs, they will challenge the portion of those settlements that constitute the attorneys' fees under the contingent fee agreements executed by the PSC claimants and their lawyers. Trans Union, for its part, has asked the court to assure it that any ruling on the current motions would not prevent it from seeking reimbursement from the settlement fund for payments to the PSCs as provided by the settlement agreement and judgment. The court assures all the parties that the denial of the motions to clarify does not constitute a decision either in favor of or against Trans Union's ability to seek reimbursement from the settlement fund for any payments that it makes to the PSCs. That issue will be decided, if necessary, in the absence of a settlement, at a later date.

The motions to clarify (Doc. Nos. 821 and 827) are denied.

**ENTER:** March 14, 2011

_____
**Robert W. Gettleman**
**United States District Judge**