**EXHIBIT A**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re TRANS UNION CORP. | ) | |
| PRIVACY LITIGATION | ) | |
| | ) | Lead Case No. 00 cv 4729 |
| | ) | |
| THIS DOCUMENT RELATES TO: | ) | MDL Docket No. 1350 |
| | ) | |
| ALL ACTIONS. | ) | Judge Robert W. Gettleman |
| | ) | |

**TRANS UNION LLC'S MEMORANDUM IN OPPOSITION TO
MDL COUNSEL'S MOTION FOR REIMBURSEMENT TO THE SETTLEMENT FUND**

Roger L. Longtin (ARDC No. 01689185)
Michael O'Neil (ARDC No. 06201736)
Peter J. Donoghue (ARDC No. 06206849)
**DLA PIPER LLP (US)**
203 N. LaSalle Street, Suite 1900
Chicago, IL 60601
Tel: (312) 368-4000
Fax: (312) 236-7516

Richard J. Prendergast
**RICHARD J. PRENDERGAST LTD.**
111 W. Washington Street, Suite 1100
Chicago, IL 60602
Tel.: (312) 641-0881
Fax: (312) 641-3562

# TABLE OF CONTENTS

**Page(s)**

I.    PREFATORY STATEMENT ................................................................... 1

II.    BACKGROUND .................................................................................. 2

    A.    The Class Settlement................................................................ 2

    B.    The Settled PSC's. .................................................................. 5

    C.    The PSC Settlement Agreements............................................. 6

    D.    The Motion for Reimbursement................................................ 7

III.    ARGUMENT ....................................................................................... 8

    A.    Reimbursing Trans Union for $260 Settlement Payments is Not "Improper." ........................................................................... 8

    B.    Trans Union Has No Duty to Force the Voiding of the Contingent Fee Agreements and Then Negotiate Fees with PSC Counsel. ............................ 9

        1.    The Settlement creates no such duties. ...................................... 9

        2.    The Settlement does not authorize this Court to determine the fees of PSC counsel.......................................................... 10

        3.    The implied good-faith doctrine does not create such an obligation. .................................................................. 12

        4.    Trans Union has no fiduciary duty to remaindermen. .............................. 15

        5.    The demanded tortious interference by Trans Union with the attorney-client contract is improper. .................................................. 15

    C.    "Common Fund" Principles for Determining Attorneys' Fees are Inapplicable Here. ................................................................... 17

    D.    FCRA Statutory Fee-Shifting Principles Do Not Apply........................................ 19

    E.    Class Members Properly Incentivized PSC Counsel to Prosecute PSC's........................................................................... 20

    F.    Complaints Regarding PSC Counsel's Fees Cannot be Basis for Denying Trans Union Right to Reimbursement. .................................................. 21

# TABLE OF AUTHORITIES

**Page(s)**

CASES

Alexander v. Chicago Park Dist.,
927 F.2d 1014 (7th Cir. 1991) ...........................................................................18

Allstate Fin. Corp. v. Util. Trailer of Ill., Inc.,
936 F. Supp. 525 (N.D. Ill. 1996) (Gettleman, J.) ...................................13

Baxter Healthcare Corp. v. O.R. Concepts, Inc.,
69 F.3d 785 (7th Cir. 1995) .......................................................................13, 14

Beraha v. Baxter Health Care Corp.,
956 F.2d 1436 (7th Cir. 1992) ........................................................12, 13, 14

Buckhannon Bd. and Care Home, Inc. v. West. Va. Dept. of Health & Human Res.,
532 U.S. 598 (2001)...........................................................................................19

Crabill v. Trans Union LLC,
259 F.3d 662 (7th Cir. 2001) ...........................................................................19

Cross v. Am. Country Ins. Co.,
875 F.2d 625 (7th Cir. 1989) ......................................................................1, 16

Florin v. Nationsbank of Ga., N.A.,
34 F.3d 560 (7th Cir. 1994) ..............................................................................18

Mafitt v. Gammon & Matthews,
No. 01-95-00568-CV, 1996 WL 404045 (Tex. Ct. of App., July 18, 1996) ..........................16

Marks v. Struble,
347 F. Supp. 2d 136 (D.N.J. 2004) .................................................................16

Martindell v. Lake Short Nat'l Bank,
15 Ill.2d 272 (1958) ............................................................................................12

Richette v. Solomon,
187 A.2d 910 (Pa. 1963) .....................................................................................16

Skelton v. Gen. Motors Corp.,
860 F.2d 250 (7th Cir. 1988) ...........................................................................18

Stuessy v. Byrd, Davis & Eisenberg,
381 S.W. 2d 126 (Tex. Civ. App. 1964) ........................................................16

United States v. Env. Waste Control, Inc.,
737 F. Supp. 1485 (N.D. Ind. 1990) ..............................................................21

<u>Venegas v. Mitchell</u>,
    495 U.S. 82 (1990)........................................................................................................20, 21

**STATUTES**

42 U.S.C. § 1983...........................................................................................................20

Civil Rights Act, 42 U.S.C. § 1988...........................................................................................20

**OTHER AUTHORITIES**

2 M.F. Derfner & A Wolf, <u>Court Awarded Attorney Fees</u> ¶ 21.01 ..............................................19

# I. **PREFATORY STATEMENT**

Almost three years after Trans Union first paid $75 million into the Settlement Fund, certain class members of the certified Plaintiff Settlement Class have finally received, indirectly, the monetary benefits of the Settlement. Approximately 3,400 class members who filed individual lawsuits against Trans Union in the state courts of Montana and Texas each recently agreed to resolve their lawsuits in exchange for Trans Union's payment of $259-$261 (depending upon the particular filing fee paid with the lawsuits). Following reimbursement of such payments to Trans Union by the Settlement Fund, moving class counsel now object. Based not upon Trans Union's payment to class members, but upon those class members' presumed payments to their lawyers pursuant to contingent fee agreements, class counsel seeks to deprive Trans Union of its contractual right to reimbursement.

The purpose of the Fund, following the payment of fees to class counsel, was to facilitate Trans Union's settlement of claims that had not been released in the Settlement. MDL Counsel (later joined by Texas Counsel), by the relief they seek here, turn that purpose on its head by forcing Trans Union to litigate claims (and subsequent fee petitions) to judgment in order to get reimbursement. It appears that every PSC claimant has entered into a contingency fee agreement with his or her counsel.[1] MDL Counsel suggest that Trans Union is obligated to condition any settlement of a class member's PSC on the (1) class member voiding the fee agreement with PSC counsel and (2) the PSC counsel agreeing to allow this Court to set the appropriate attorneys' fee. Nothing in the Settlement, or any legal authority cited by class counsel requires (or

---

[1] The use of contingency fee agreement is not remarkable. Indeed, the Seventh Circuit has noted that they are the basic means by which tort litigation is brought. Cross v. Am. Country Ins. Co., 875 F.2d 625, 630 n.2 (7th Cir. 1989). Indeed, class counsel in these proceedings entered into contingency fee agreements with their clients, for payments of up to 45% of any recovery. (Report and Recommendation of Special Master (Doc. No. 689) at 9.)

1

empowers) Trans Union to police contingency fee agreements freely entered into by class members. More to the point, given the relief requested by the Motion, nothing in the Settlement deprives Trans Union of its right to reimbursement for its failure to void such fee agreements.

## II.    BACKGROUND

### A.    The Class Settlement.

Under the Settlement, unless a class member agreed to accept the enhanced credit monitoring benefit, no class member gave up any substantive claims against Trans Union. (Order Granting Final Approval of Settlement and Final Judgment (Doc. No. 515) at ¶¶ 11, 13 ("Final Approval Order"); Stipulation of Settlement (Doc. No. 462) at § 2.8(b)(i), (iii) ("Settlement").)  In addition, the Settlement did not provide for any guaranteed payments to the class members.

Despite obtaining no releases in exchange, Trans Union deposited $75 million into a Settlement Fund pursuant to the Settlement.  (Settlement § 2.1(a).)  The sole express purpose of the Settlement Fund, after payment of notice costs and class counsel fees, is to help Trans Union obtain releases of claims asserted by individual class members.  In particular, class members, retained their rights to bring individual damages claims against Trans Union.  (Settlement § 2.8(b)(iii).)  Indeed, as the Court concluded at the Final Approval hearing, "there is every incentive for class members who have educated themselves about the nature of this claim to go ahead and do just that."  (Sept. 10, 2008, Trans. (Doc. No. 708) at 84  ("Final Approval Trans.").)  The Settlement further established a mechanism by which Trans Union could resolve claims by either paying a judgment in a lawsuit asserting a "Post-Settlement Claim" ("PSC"), or settling the claim, and then obtaining reimbursement from the Settlement Fund.  (Settlement § 2.1(b)(iv).)  Trans Union is automatically "entitled" to such reimbursement, "without prior

approval of the Court or Settlement Counsel," and this Court can order the return of such

reimbursement only if the Court determines such reimbursement is "improper." (Id.)

Allowing Trans Union to obtain reimbursement from the Settlement Fund for resolution

of claims is the primary — and, potentially, the only — method for distributing the monetary

benefits of the Settlement to Settlement Class Members. Trans Union's potential liability for

PSC's is not limited by the Settlement, and it was contemplated that all of the money in the

Settlement Fund could be used to reimburse Trans Union for resolving PSC's. Class Notice

(Doc. No. 462-16) at ¶¶ 12, 13 ("Class Notice"); Final Approval Trans. at 84.) The Settlement

further provides:

> The amount set forth in this Stipulation as the Settlement Fund
> represents full disgorgement of Trans Union's relevant profits and
> is intended for restitution to affected Settlement Class Members
> and for payment or reimbursement of legal and administrative
> expenses incurred by them. The Settlement Fund shall be used in
> the manner and for the purposes provided for herein.

(Settlement § 2(c) (emphasis added).)

A secondary, and contingent, vehicle for delivering a cash recovery to class members was

to allow them to register for a possible pay-out from the Fund. However, such pay-out, if any,

would occur only if monies remained in the Settlement Fund after resolution of the PSC's.

Those who registered for a possible pay-out were fully advised of its contingent nature. (See

Class Notice at ¶ 13.)[2] Upon the two-year anniversary of Ultimate Approval of the Settlement

(in or about August 2011), and only after provision is made for funding the resolution of any

---

[2] As stated in the Class Notice:

    13.    Can I get a cash payment from the settlement?

        Maybe. If you do not select the enhanced credit monitoring you may register to
get a cash payment. Payments will be made to Class members that register if the
Court determines, at least two years after final approval of the settlement, that
there is sufficient money left over in the Settlement Fund after paying the costs
and expenses listed in Question 9 above and the cost of distribution is reasonable

remaining PSC's, the money remaining in the Fund may be paid to such Settlement Class Members. (Settlement § 2(b)(vi).) Upon receipt of any payment from the Settlement Fund, these registrants would release their claims against Trans Union. (Final Approval Order ¶ 12.)

The Settlement contemplates that class members seeking a non-contingent pay-out from the Fund would hire lawyers to prosecute their PSC's against Trans Union. The Settlement defines class members' "PSC's" against Trans Union as "claims under any legal or equitable theory, whether asserted in the form of a complaint filed in state or federal court, a demand for arbitration, an informal demand letter, or otherwise." (Final Approval Order ¶ 1(u); Settlement § 1.31.) Moreover, the Settlement expressly contemplates that legal fees incurred by class members would be paid from the payments coming indirectly from the Settlement Fund. (Settlement § 2(c).) The Class Notice repeatedly informed class members that they could choose to retain their own counsel to advise them with respect to their rights, and that they could choose to file lawsuits against Trans Union. However, nothing in that Class Notice, the Settlement, or the Final Approval Order indicated that class members could not hire lawyers on a contingency fee basis, or that Trans Union, in effect, would be precluded from settling their claims if the class members did so.

Trans Union agreed not to raise a limitations defense to PSC's "asserting the type of FCRA claims pending in these proceedings at the time the Settlement was entered into," if the PSC's were commenced within two years of the date of Final Approval, i.e., September 17, 2010. (Settlement § 2.4.) As counsel for the plaintiffs and the Court noted at the Final Approval Hearing, the purpose of this provision was to incentivize class members to bring claims against

---

compared to the amount that could be distributed. If there is not enough money left over to pay each registered Class member then the remaining money will be donated to a non-profit organization(s) (*see* Question 11).

(Class Notice at ¶ 13.)

4

Trans Union by allowing claims that otherwise would be time-barred. (Final Approval Trans. at 42, 87.)

## B. The Settled PSC's.

As previously noted, Bingham & Lea, P.C., and the Law Offices of David Schafer, PLLC (collectively "Bingham"), filed 1,388 lawsuits asserting PSC's against Trans Union in Texas state Justice of the Peace Courts, and The Heenan Law Firm ("Heenan") filed 1,996 individual lawsuits asserting PSCs in state courts in Montana. (See Decl. of Michael O'Neil (Doc. No.788) at ¶¶ 9-11.) The complaints Bingham and Heenan filed adopted by reference the factual allegations and legal causes of action set out in the Second Amended Complaint filed in this action. Class counsel accuse PSC counsel in this regard as having "done nothing more than free-ride on Plaintiffs' Counsel's work." (Memorandum at 7.) However, these precise allegations presumably were intended to clearly identify the lawsuits as Post-Settlement Claims that would get the benefit of the limited waiver of the statute of limitations that Trans Union provided in the Settlement.

In October 2011, Trans Union removed twenty-one (21) cases that Bingham and Heenan filed to three district courts in Texas and Montana. After Bingham and Heenan voluntarily dismissed certain of these cases upon removal, Trans Union identified the remaining eleven (11) cases to the Judicial Panel on Multidistrict Litigation as potential tag-along actions to this proceeding. (In re Trans Union Privacy Litig, MDL 1350, Doc No. 60 (J.P.M.L).) Bingham and Heenan each filed memoranda with the MDL Panel opposing the tag-along actions. (In re Trans Union Privacy Litig, MDL 1350, Doc Nos. 61, 62 (J.P.M.L).) The MDL Panel has taken no action with respect to transferring these actions.

In November 2010, Bingham and Heenan agreed on behalf of their clients to participate in the global mediation before Judge Mason established by this Court's order of referral of

5

November 8, 2010 (Doc. No. 814).  PSC counsel each travelled to Chicago to participate in the

mediation before Judge Mason.  They further had numerous telephone conversations with

counsel for Trans Union aimed at exploring whether a settlement could be reached.  In order to

facilitate settlement negotiations, Bingham and Heenan agreed to stay all of their clients' cases

— whether in state court or federal court — pending the outcome of the mediation process.  To

effectuate that stay, the parties filed motions to stay and status reports in the pending federal

actions.

**C.    The PSC Settlement Agreements.**

Under the PSC settlement agreements placed at issue by the Motion, Trans Union agreed

to settle with only "qualified" PSC claimants.  A "qualified" PSC claimants is: a member of the

Plaintiff Settlement Class (as defined in the Settlement); who filed a PSC lawsuit on or before

September 17, 2010; who did not receive Enhanced In-Kind Relief; and, who had not assigned

their claims and was not deceased when their lawsuit was filed against Trans Union.  (Bingham

Sett. Agr. ¶ 2 (Ex. 1 to Doc. No. 892); Heenan Sett. Agr. ¶ 2 (Ex. 4 to Doc. No. 892).)

To enable Trans Union to determine which PSC claimants were "qualified," the PSC

counsel provided Trans Union with identifying information about their clients.  Trans Union

compared this information to its current and historical consumer credit databases to locate

information corresponding to each PSC claimant.  (Bingham Sett. Agr. ¶ 2(a); Heenan Sett. Agr.

¶ 2(a).)  Based on this data, Trans Union determined whether each claimant was a member of the

Plaintiff Settlement Class, i.e., whether the class member had "an open credit account or an open

line of credit" during the January 1987 to May 2008 class period, (Final Approval Order ¶ 1(t)),

as well as whether each claimant met the other criteria to be "qualified" under the settlement

agreements with Bingham and Heenan.  (See Bingham Sett. Agr. ¶¶ 2(a)-(e), 3; Heenan Sett.

Agr. ¶¶ 2(a)-(d), 3.)  Trans Union also obtained from the administrator of the Settlement

information identifying class members who accepted Enhanced In-Kind Relief under the

Settlement, to identify any PSC claimants that had already released their claims. (See Bingham

Sett. Agr. ¶ 2(c); Heenan Sett. Agr. ¶ 2(c).) Trans Union cooperated with PSC counsel to agree

which of the identified PSC claimants were qualified for settlement. (Bingham Sett. Agr. ¶ 3;

Heenan Sett. Agr. ¶ 3.)

1,349 of Bingham's PSC claimants (or 98.9%), and 1,916 of Heenan's PSC claimants (or

97.8%), were deemed eligible for settlement. (Bingham Sett. Agr. ¶ 3; Heenan Sett. Agr. ¶ 3.)

These "qualified" claimants are identified in Exhibit B of each of the Bingham and Heenan

settlement agreements.

**D.      The Motion for Reimbursement.**

The Motion does not challenge as "improper" the payment to class members of $259-

$261 to settle lawsuits seeking statutory damages, punitive damages and attorneys' fees under

the FCRA. Moreover, class counsel expressly disavow any objection to the payment of the

amounts that counsel believes will go to each claimant, or payments to reimburse court filing

fees. (Memorandum at 8 n. 2.) Instead, class counsel object to the reimbursement of amounts

paid by Trans Union that, they believe, will be used by the PSC claimants to pay their lawyers.

Estimating that $100 per settled case is due to PSC counsel, based on a template contingency fee

agreement, the Motion describes (without citation to any fact) that amount as "exorbitant" and

"grossly excessive and way out of proportion to the minimal amount of work performed by

counsel for these PSC's." (Memorandum at 1.)

Despite this complaint, the Motion does not question the validity or enforceability of the

contingent fees agreements entered into by the class members and their PSC counsel. Instead,

the Motion seeks to deny Trans Union reimbursement for that portion of the settlement amounts

that, counsel believes, will flow to PSC counsel. Nowhere do class counsel argue that such

reimbursement is "improper," which is the standard under the Settlement for ordering Trans Union to return money to the Fund. (Settlement § 2.1(b)(iv).) Instead, class counsel argues for the return of the money by contending that Trans Union breached its purported duties (a) to void the agreements between the PSC claimants and their individual lawyers, (b) to separately negotiate fees with the PSC counsel, and (c) to "preserve" the Fund for those class members who registered for a possible distribution from the Fund after resolution of the PSC's. (Memorandum at 4, 6, 17.)

## III.   ARGUMENT

### A.   Reimbursing Trans Union for $260 Settlement Payments is Not "Improper."

The Settlement establishes Trans Union's presumptive entitlement to reimbursement from the Fund of amounts paid to settle PSC's, and severely limits the challenges that the Committee may make to Trans Union's reimbursement. As an initial matter, the settlement makes clear that "Trans Union <u>shall be entitled, without prior approval of the Court or Settlement Class Counsel</u>, to receive reimbursement from the Settlement Fund equal to any amounts paid to satisfy settlements on judgments arising from Post-Settlement Claims." (Settlement § 2.1(b)(iv).) Moreover, Trans Union can only be ordered to return the reimbursement of monies to the Fund that this Court determines are "improper."

Moving class counsel do not and cannot suggest that reimbursement from the Fund for payment to the PSC plaintiffs of $259-$261 to resolve their PSC lawsuits is "improper." Such lawsuits asserted claims for the statutory damages of $100 - $1,000, punitive damages, and attorneys' fees available under the FCRA. Moreover, this Court (and Magistrate Judge Mason) have commented on the likelihood that the requisite willfulness would be established. (<u>See</u>, <u>e.g.</u>, Report and Recommendation, January 3, 2008 (Doc. No. 406) at 38; Transcript of Proceedings, March 4, 2008 (Doc. No. 710) at 6; Memorandum Opinion and Order, December 9, 2009 (Doc.

No. 689) at 4.)  This Court also commented (during the hearing on final approval of the Settlement) that the potential statutory damages liability could be well in excess of the $1,000 statutory maximum, in the event that a class member's information was disclosed more than once during the 20-year class period and if a court determined that statutory damages were awardable on a per-violation rather than a per-consumer basis.  (Final Approval Trans. at 75, 80.)  With this background, payment of $260 to resolve such a lawsuit is nowhere near "improper."

Implicitly acknowledging their inability to challenge the reimbursement for the $260 payment, class counsel instead challenge the portion of the amounts paid by Trans Union which, they believe, will be paid by class members to PSC counsel.  There is no basis in the Settlement for parsing the settlement amounts paid by Trans Union into suspected payments — by class members, not Trans Union — under presumed contingent fee agreements.  The PSC settlements at issue here provide only for the payment of monies directly to the PSC plaintiffs qualified for the settlement.  (See supra. Part II.C.)  The PSC settlements do not contemplate separate payments for the fees of PSC counsel.  If, as is clear, the payment of $260 to resolve the lawsuit is not in any way "improper," then such payment cannot be made "improper" by the separate and private decision of the PSC plaintiff to share with counsel a portion of the settlement recovery pursuant to a contingent fee agreement.

**B.** **Trans Union Has No Duty to Force the Voiding of the Contingent Fee Agreements and Then Negotiate Fees with PSC Counsel.**

1.    The Settlement creates no such duties.

The precise issue before this Court is whether the reimbursement of Trans Union for amounts paid is "improper," which is the only basis for ordering Trans Union to return the money.  (Settlement § 2.1(b)(iv); Final Approval Order ¶ 17(d).) Filings by class counsel fail to squarely address this standard, and instead complain generally that Trans Union failed to take

certain steps. More specifically, the Motion complains that Trans Union did not take specific steps to force a termination of the fee agreement between the PSC plaintiff and his counsel, and did not negotiate separately the attorneys' fees to be paid to PSC counsel. (Memorandum at 4.) Class counsel also complain that Trans Union did not seek to reduce the fees paid to PSC counsel in order to ensure the existence of funds for class members who registered for a possible distribution. (Id. at 1, 4.) Class counsel suggest that such inaction by Trans Union was a breach of its duties under the Settlement. However, nothing in the Settlement expressly or even impliedly creates such duties for Trans Union. Indeed, none of the class counsel cite to any provision of the Settlement which might support the claimed duties.

2.  The Settlement does not authorize this Court to determine the fees of PSC counsel.

Class counsel also contend that the Settlement permits the use of the monies in the Settlement Fund to pay only the fees of PSC counsel that are approved by this Court. (See, e.g., Memorandum at 5 ("Trans Union should be ordered to reimburse the Settlement Fund for all amounts that are above and beyond what the Court deems to be a reasonable fee for PSC's counsel under the circumstances.") (emphasis added).) Although the Settlement contemplates the payment of fees to PSC counsel (Settlement § 2(c)), it does not contemplate that such fees will be set by this Court. In contrast, when the parties did intend to subject an award of attorneys' fees to this court's review, it did so expressly. The Settlement sets forth the process by which class counsel must seek Court approval for reimbursement of fees from the Fund. (See Settlement §§ 4.1-4.4.) Class counsel's attempt to expand the scope of these provisions to PSC counsel, therefore, is not consistent with the terms of the Settlement.

The suggestion by class counsel that this Court has jurisdiction over the attorneys' fees paid to PSC counsel is further contradicted by the rights of class members to assert PSC's in

other forums.  The Settlement contemplates that PSC's can be asserted in any "state or federal court," arbitration tribunal, "or otherwise."  (Settlement § 1.31 (definition of "Post-Settlement Claim").)  Consistent with this provision, none of the 104,000 asserts PSC's were filed in this Court.  Instead, they were filed in the state courts of Texas, Montana, Alabama and Georgia, as well as the federal courts of Georgia.  (See Decl. of Michael O'Neil (Doc. No. 788) at ¶¶ 3-13.)

Notably, this Court has already issued orders suggesting its lack of jurisdiction over the PSC's filed in other forum and the PSC counsel prosecuting such claims.  On October 5, 2010, Trans Union filed its Motion to Enjoin Post-Settlement Claimant Counsel, seeking an order, directed at PSC counsel, barring their prosecution of certain PSC's and ordering them to participate in a mediation of those claims as directed by this Court.  (Doc. No. 786.) None of the Settlement Class Counsel filed a brief supporting or opposing this Court's jurisdiction over the PSC's or the counsel prosecuting them.  Counsel for the Watts Guerra law firm, which had filed approximately 69,000 lawsuits in Texas state court, opposed the motion in part on the argument that the court did not have the requisite jurisdiction.  (Doc. No. 803 at 15.) This Court denied the motion to enjoin in its entirety.  (Minute Entry, November 8, 2010 (Doc. No. 814).)

Trans Union then reached agreement with counsel for virtually all of the PSC's to participate in mediation with Magistrate Judge Mason.  This Court's order referring the PSC's to Magistrate Judge Mason for settlement expressly stated that "PSC counsel and their clients shall not be deemed to have subjected themselves to the jurisdiction of this Court." (Doc. No. 814.) More recently, this Court commented on the attacks on the nature of the solicitations by certain PSC counsel.  Although finding the solicitations "distasteful," this Court determined that it was "unable to address" such attacks.  (Memorandum Opinion and Order (Doc. No. 873) at 9.) "That would be a matter for the appropriate authorities in the states governing those lawyers'

professional conduct. After all, those cases are not pending in this court and there has been no

successful attempt to remove them to federal court or consolidate them with the underlying MDL

Action." (Id.) Therefore, Trans Union could not reasonably have expected that this Court would

adjudicate the reasonableness of fees paid (indirectly) to PSC counsel.

      3.     The implied good-faith doctrine does not create such an obligation.

Implicitly recognizing that the Settlement itself offers no support for the duties that class

counsel now seeks to impose, MDL Counsel alternatively relies on the "implied duty of good

faith and fair dealing" to justify imposing duties on Trans Union not set forth, or even

contemplated, by the Settlement. However, resort to such extra-contractual authority is equally

unavailing. Guidance on the relevance of the Illinois doctrine is gleaned from the key portions

of the Illinois doctrine that class counsel fail to include in their quote:

> Every contract implies good faith and fair dealing between the parties to it, **and where an instrument is susceptible of two conflicting constructions, one which imputes bad faith to one of the parties and the other does not, the latter construction should be adopted**.

Martindell v. Lake Short Nat'l Bank, 15 Ill.2d 272, 286 (1958) (portion of quotation omitted by

MDL Counsel emphasized). (See Memorandum at 6.) MDL Counsel presumably omit this key

component of the doctrine because they cannot identify a provision of the Settlement imposing a

duty on Trans Union which is ambiguous and susceptible to multiple interpretations.

Rather than serving as the basis for an independent and enforceable duty, as urged by

MDL Counsel, the Illinois doctrine of an implied duty of good faith and fair dealing is a contract

interpretation tool. See Beraha v. Baxter Health Care Corp., 956 F.2d 1436, 1443 (7th Cir.

1992) ("[U]nder Illinois law, the covenant of good faith and fair dealing has never been an

independent source of duties for the parties to a contract. … Instead, the covenant guides the

construction of explicit terms in an agreement."), citing Martendell, 15 Ill.2d at 286. Accord

Allstate Fin. Corp. v. Util. Trailer of Ill., Inc., 936 F. Supp. 525, 529 (N.D. Ill. 1996) (Gettleman, J.) ("The obligation of good faith, however, is not an 'independent source of duties for parties to a contract.' Rather, it guides the construction of explicit terms of an agreement.").

Despite this basic principle, moving counsel assert that the implied good-faith duty imposes upon Trans Union the contractual duties of investigating "the amount of work that was actually performed by these counsel [and] ... whether their lodestars or hourly rates were reasonable," and to "negotiate or otherwise reduce the fee payments" to counsel in order to maximize the contingent recovery of class members who registered for a possible distribution from the Fund. (Memorandum at 4, 6.) As noted above, nothing in the Settlement suggests such duties. As the Seventh Circuit makes clear, the doctrine of good faith and fair dealing should not be used to "imply additional obligations that were not bargained for." Baxter Healthcare Corp. v. O.R. Concepts, Inc., 69 F.3d 785, 792 (7th Cir. 1995); see also James v. Heartland Health Servs., 04 C 2744, 2005 WL 678732, at *3 (N.D. Ill. Jan. 28, 2005) (Gettleman, J.) (the "implied covenant [of good faith and fair dealing], however, is generally not considered an independent source of duties").

Reliance on the implied good-faith doctrine also fails because the purported duties conflict with both the structure of the Settlement and the corresponding reasonable expectations of the parties. See e.g., Beraha, 956 F.2d at 1444 (doctrine "requires a party vested with discretion to exercise that discretion reasonably, with proper motive and in a manner *consistent with the reasonable expectations of the parties*"). The Settlement provides a specific mechanism for this Court's approval of attorneys' fees for work performed on behalf of class members by class counsel. (See Settlement §§ 4.1-4.4 (establishing mechanism for award of fees to class counsel).) Conspicuously absent from the Settlement, however, is any language suggesting that

the fees earned by PSC counsel will similarly be subject to this Court's scrutiny. The Seventh Circuit has rejected a similar attempt to use the implied good-faith doctrine to impose contract duties. In <u>Baxter</u>, the plaintiff relied upon the doctrine to impose an exclusive distribution requirement for a particular product subject to the contract. The Seventh Circuit noted that when the parties "wanted an exclusive distribution relationship to exist [for other products], they included language in the Agreement to provide for it." <u>Baxter</u>, 69 F.3d at 792. In this circumstance, the Seventh Circuit held that the doctrine of good faith and fair dealing could not "imply additional obligations that were not bargained for." <u>Id</u>. This Court should similarly reject MDL Counsel's invocation of the doctrine of good faith and fair dealing to impose additional contractual duties on Trans Union.

MDL Counsel also assert that Trans Union has a duty to preserve the Fund to ensure and maximize the recovery by class members who registered for the contingent distribution. It is clear, however, that any such distribution could be considered only after provision for the resolution of PSC's was made. (<u>See</u> Settlement § 2.1(b)(vi); Final Approval Order ¶ 17(f).) Indeed, the Settlement expressly contemplates that there may be no "funds remaining in the Settlement Fund" at the time the Court considers a possible distribution. (<u>Id</u>.) Moreover, agreeing with counsel for the objectors, this Court recognized that, given the potential liability that Trans Union retained, the entire Fund may be consumed by Trans Union's settlements. (Final Approval Trans. at 84.) Thus, the duty sought to be imposed by MDL Counsel conflicts with the Settlement.[3]

---

[3] To the extent Trans Union has some duty to preserve the Fund, one can easily imagine the later complaint of class counsel if Trans Union did not settle these claims for relatively small amounts, allowed thousands of cases to go to trial and, potentially, judgment, and then seek reimbursement for the resulting monetary award and much larger fee award. Therefore, in one very real sense, the PSC settlements here serve to preserve monies in the Fund.

4.     Trans Union has no fiduciary duty to remaindermen.

Moving counsel complain that "Trans Union obviously elevated its own interests and those of PSC counsel over the interests of Settlement Class Members who made timely claims for cash payments and now their pro-rata share of the Settlement Fund will be depleted" by the payments at issue here.  (Memorandum at 1.)  Similarly, the Motion complains that Trans Union did not "preserve the Settlement Fund for Settlement Class Members who made timely claims for cash payments, and whose payments will be reduced as a result" of Trans Union's payments to settle lawsuits.  (Id. at 4.)

These arguments, which are the backbone of the pending Motion, wholly ignore the relative rights of Trans Union (and the class members asserting PSC's) and the remaindermen class members who have effectively waived their claims against Trans Union (by not timely asserting a PSC).  As was made clear in the Settlement (§ 2.1(b)(iv)), the Final Approval Order (¶ 17(d)), as well as the remarks of many during the final approval hearing (Final Approval Trans. at 34-35, 60-63, 84-86, 89), the Fund remains first and foremost available to Trans Union to satisfy settlements and judgment of PSC's.  There is nothing "improper," therefore, for Trans Union to settle PSC's on what class counsel concedes is a fair basis, even if such settlements reduce the amounts available in the Fund for the remaindermen class members.

5.     The demanded tortious interference by Trans Union with the attorney-client contract is improper.

Although careful not to acknowledge the point, class counsel's argument that Trans Union should have conditioned settlement upon payment of fees on a "reasonable" lodestar basis, in fact, urges that Trans Union should have forced a termination of the fee agreements existing between PSC counsel and their clients.  Such conduct by a defendant, in an effort to settle litigation, however, may easily constitute tortious interference with contract.  This Court

15

cannot order Trans Union to return monies to the Settlement Fund due to its failure to interfere with the fee agreements.

It is well-settled that tort claim liability may arise where, as MDL Counsel proposes here, a third party interferes with the attorney-client relationship.  For example, "Illinois courts have long recognized that third party inducement of breaches of contract between attorneys and clients are actionable."  Cross, 875 F.2d at 630.  In Cross, an attorney sued an insurance company for tortious interference with his contingency fee arrangement with a client.  Specifically, the lawyer plaintiff alleged that the defendant settled the case directly with the client, thereby denying the lawyer the agreed-upon contingency fee.  Id. at 626–27, 631.  The Seventh Circuit affirmed judgment for plaintiff, including an award of damages.  Id. at 631–32.

Courts from other jurisdictions have similarly ruled that a defendant's attempt to interfere with the fee agreement between plaintiff and his counsel may subject it to liability.  "The relationship between a lawyer and his client is a serious, vital and solemn one.  No third person may interfere with the relationship any more than he may with propriety intervene between a doctor and his patient."  Richette v. Solomon, 187 A.2d 910, 912 (Pa. 1963) (awarding compensatory and punitive damages where the defendants, facing personal injury liability in connection with a matter for which plaintiff was retained, convinced the client to terminate the engagement), see also Marks v. Struble, 347 F. Supp. 2d 136, 144 (D.N.J. 2004) (recognizing "an attorney's cause of action against a third party who interferes with the attorney's contingency fee agreement by inducing the client to enter into an independent settlement agreement"); Mafitt v. Gammon & Matthews, No. 01-95-00568-CV, 1996 WL 404045, at *4 (Tex. Ct. of App., July 18, 1996) (not designated for publication) (recognizing claim for interference with contingency fee contract arising from opposing counsel's direct settlement with plaintiff's client; Stuessy v.

Byrd, Davis & Eisenberg, 381 S.W. 2d 126, 128–29 (Tex. Civ. App. 1964) (affirming lower court's issuance of injunction against defendants who demanded that plaintiff's client fire plaintiff or lose his job).

Therefore, Trans Union cannot be denied its right to reimbursement under the Settlement based on a failure to interfere with the PSC plaintiffs' fee agreements with PSC counsel.

**C.      "Common Fund" Principles for Determining Attorneys' Fees are Inapplicable Here.**

Class counsel suggests that this Court has the same authority regarding the award of fees to class counsel with respect to those fees received by PSC Counsel. Once again, this argument ignores the express provisions of the Settlement. The settlement signed by all moving counsel expressly contemplated that class members would need to hire lawyers to file lawsuits, arbitrations or, as a threshold step, informal demands, in order to assert PSC's. (See Settlement § 1.31 (definition of "Post-Settlement Claim"), ¶ 2.4 (waiver of statute of limitations defense).) Moreover, contrary to the statement of class counsel that the Settlement did not contemplate the payment to PSC counsel of fees (Memorandum at 6 n. 1), the Settlement expressly states that monies in the Fund are "intended for restitution to affected Settlement Class Members and for payment or reimbursement of legal and administrative expenses incurred by them." (Settlement § 2(c) (emphasis added).) However, the Settlement contains no restrictions on, or mechanism for determining, such fees.

Moving counsel's citation to Seventh Circuit case law for this Court's authority over the attorneys' fees paid to PSC counsel fails. As an initial matter, in the cases cited by class counsel all parties agreed that the Court would determine the fees to be paid to counsel. Here, however, there is no agreement in the Settlement as to how PSC counsel would be paid. Certainly, the notice to the class did not advise that class members could not enter into contingency fee agreements with counsel hired to prosecute PSC's. (See Class Notice at ¶¶ 9, 12, 15, 24.)

However, more fundamentally, counsel's cases are distinguishable because of the "unusual" nature of the Settlement Fund and the express provision in the Settlement as to how the monies in the Settlement Fund can be used.

In Skelton v. Gen. Motors Corp., 860 F.2d 250 (7th Cir. 1988), the court did hold that "equitable fund principles" apply to an award of attorneys' fees from a settlement fund. However, that decision, and the other decision cited by counsel, make clear that such principles apply only "when a settlement fund is created in exchange for release of the defendant's liability both for damages and for statutory attorney's fees." 860 F.2d at 256; see also Florin v. Nationsbank of Ga., N.A., 34 F.3d 560, 563 (7th Cir. 1994) (quoting Skelton and noting that the agreement in Florin "provides that the defendants are released from potential liability"); Alexander v. Chicago Park Dist., 927 F.2d 1014, 1025 (7th Cir. 1991) (same).

Here, however, Trans Union obtained no releases from the class members in exchange for its payment of $75 million. During the final approval hearing on the Settlement, the Court noted this "unusual" aspect of the Settlement, thereby making it "a strange looking animal." (Final Approval Trans. at 83.) Therefore, consistent with this "unusual" settlement, and unlike the typical common fund created by a class settlement, the Settlement Fund is expressly earmarked for Trans Union's use in resolving claims expressly preserved under the Settlement. (Settlement § 2.1(b)(iv); Final Approval Order ¶ 17(d).) As one of class counsel previously noted, "Trans Union continues to have an enormous interest in preserving the Fund from which it is entitled to satisfy its potential liabilities to millions of class members who retain their claims against it." (Rule 59(e) Motion to Amend Judgment (Doc. No. 597) at 12.) Trans Union's

contractual right to use the monies it disgorged into the Settlement Fund to resolve claims not released by the Settlement cannot be trumped by inapplicable "common fund" principles.[4]

**D.     FCRA Statutory Fee-Shifting Principles Do Not Apply.**

Ms. Wheelahan separately argues that Trans Union cannot obtain reimbursement for money that the PSC plaintiffs paid to their lawyers pursuant to contingency fee agreements because "post-settlement claims are individual cases; and under the FCRA, such cases recover fees under the FCRA's statutory fee-shifting principles, set forth in § 1681n and § 1681o." (Doc. No. 897 at 5.)  This argument fails for two separate reasons.

First, contrary to Ms. Wheelahan's assertion, the PSC claimants could not pursuant to the settlements "recover fees under the FCRA's statutory fee-shifting principles." The settlements resolved individual lawsuits prior to judgment.  The fee-shifting provisions of federal statutes, including the FCRA, and the principles guiding fee awards under them, only apply to an award of fees when a plaintiff has "prevailed" by receiving formal relief from the court – for example, an enforceable judgment.  Buckhannon Bd. and Care Home, Inc. v. West. Va. Dept. of Health & Human Res., 532 U.S. 598, 604-605 (2001); see also Crabill v. Trans Union LLC, 259 F.3d 662, 667 (7th Cir. 2001) (applying Buckhannon to fee shifting provisions of the FCRA and noting that to recover fees plaintiff must receive "formal judicial relief").  Fee-shifting provisions do not apply to private settlements.  2 M.F. Derfner & A Wolf, Court Awarded Attorney Fees ¶ 21.01 ("if a case is settled in a fashion that provides the plaintiff relief, the plaintiff is nevertheless not the prevailing party under a federal fee shifting statute unless the settlement has received imprimatur from the federal court."); see also Buckhannon, 532 U.S. at 604 n.7

---

[4]  In any event, the "common fund" case law cited by class counsel offers no support for disregarding the contingency fee agreement between a class member and PSC counsel in connection with an individual lawsuit filed in other courts.

(rejecting contention that fees can be awarded for a private settlement).  Here, the PSC claimants never obtained relief from the Texas or Montana courts, and they accordingly could not recover fees under the FCRA.

Second, even if the fee shifting provisions of the FCRA were somehow relevant to the settled PSC's, that fact is irrelevant.  Fee shifting provisions do not interfere with the enforceability of a contingent-fee agreement between a PSC claimant and his or her lawyer. Venegas v. Mitchell, 495 U.S. 82, 90 (1990).  Therefore, as in Venegas, the PSC counsel would be entitled to seek the contingency fee that the client agreed to pay.  Id.

**E.      Class Members Properly Incentivized PSC Counsel to Prosecute PSC's.**

If the Court grants the Motion, it will in effect void the contingency fee agreements between the class members who have asserted PSC's and their counsel, particularly with respect to the 100,000 remaining claims.

The U.S. Supreme Court has recognized the value of contingent fee agreements in enabling plaintiffs to secure counsel to vindicate federal statutory rights, particularly where, as here, the ultimate recovery may be small.  At issue in Venegas, 495 U.S. 82, was the right of an attorney representing a 42 U.S.C. § 1983 plaintiff to the fee owed to him under the fee agreement with the plaintiff.  Following a $2 million trial verdict in favor of the plaintiff, his counsel was awarded approximately $75,000 in attorney's fees pursuant to the fee provision of the Civil Rights Act, 42 U.S.C. § 1988.  During an appeal of that ruling, plaintiff's counsel sought to intervene in the district court to confirm a lien on the judgment, in order for counsel to collect an additional $400,000 from the plaintiff.  The Supreme Court agreed with both lower courts that the lawyer could collect under the contingent fee agreement an amount in addition to what the district court awarded under § 1988.  495 U.S. at 88-90.

Addressing an argument similar to that raised by class counsel here, the <u>Venegas</u> court expressly rejected the notion that the contingent fee agreement must be measured by the "reasonable attorney's fee" standard that might apply to an award of fees by the court. 495 U.S. at 90. <u>Accord</u> <u>United States v. Env. Waste Control, Inc.</u>, 737 F. Supp. 1485, 1494 (N.D. Ind. 1990), citing <u>Venegas</u> ("[a]n attorney's fee may be perfectly reasonable in the context of the agreement with the client, but not 'reasonable' for other purposes"). Such after-the-fact interference with contingent fee agreements, the Court noted, would disserve plaintiffs prosecuting federal statutory claims who seek to "assign part of their recovery to an attorney if they believe that the contingency arrangement will increase their likelihood of recovery." <u>Venegas</u>, 495 U.S. at 88. Moreover, the Court noted that depriving plaintiffs of the right to enter into contingency fee agreements is at odds with the purpose of statutory fee provisions intended to enable plaintiffs to secure competent counsel. <u>Id</u>. at 89-90.

Not surprisingly, therefore, class counsel themselves have entered into contingent fee agreements with their individual clients in these actions which provide for up to 45% of any recoveries going to counsel. (<u>See</u> Report and Recommendation of Special Master, attached to Memorandum Opinion and Order (Doc. No. 689) at 9.) Equally unsurprising is that PSC counsel who are prosecuting the identical claims entered into similar fee agreements with their clients. Indeed, this Court acknowledged that class members might need to incentivize counsel to assert Post-Settlement Claims with contingency fee agreements that would ultimately be paid out of the Settlement Fund. (Final Approval Trans. at 23.)

**F.      Complaints Regarding PSC Counsel's Fees Cannot be Basis for Denying Trans Union Right to Reimbursement.**

Class counsel complain throughout their Memorandum that PSC counsel "did nothing to create the Settlement Fund from which they and their clients are being paid." (Memorandum at

4.)  This, of course, is true.  However, the division of labor between class counsel and PSC counsel, and the resulting separate awards of fees, is the unavoidable consequence of the Settlement.  The arguments that all class counsel have made to this Court (as well as those made by some counsel to the Seventh Circuit Court of Appeals) for an allocation of fees among class counsel were premised upon the idea that class counsel are the only lawyers who might bring the benefits of the Settlement to the class.  This, of course, is <u>not</u> true.  In fact, prior to the challenged settlements none of the efforts of class counsel have resulted in any class member receiving any monetary benefit of the Settlement.

Three years after Trans Union first deposited $75 million into the Settlement Fund, and after pay-outs in excess of $20 million to class counsel and the class settlement administrator, the first monies, in effect, from the Settlement Fund have been delivered to approximately 3,400 class members.  But for the efforts of PSC counsel to file lawsuits in order to stake a claim to the Settlement Fund, they would have received no money.  Regardless of the value that class counsel created in forming the Settlement Fund, they must now respect the decision of certain class members to hire their own lawyers to obtain the monetary benefits of the Settlement, and to incentivize those lawyers to bring such claims.

In any event, class counsel's disapproval of payments made by class members to their PSC counsel cannot be basis for depriving Trans Union of its right to reimbursement.

WHEREFORE, for the foregoing reasons, Trans Union LLC respectfully requests that the Court deny MDL Counsel's Motion for Reimbursement to the Settlement Fund.

22

Dated: May 11, 2011

Respectfully submitted,

**TRANS UNION LLC**

By: /s/Michael O'Neil
       One of its Attorneys

Roger L. Longtin (ARDC No. 01689185)
Michael O'Neil (ARDC No. 06201736)
Peter J. Donoghue (ARDC No. 06206849)
**DLA PIPER LLP (US)**
203 N. LaSalle Street, Suite 1900
Chicago, IL 60601
Tel: (312) 368-4000
Fax: (312) 236-7516

Richard J. Prendergast
**RICHARD J. PRENDERGAST LTD.**
111 W. Washington Street, Suite 1100
Chicago, IL 60602
Tel.: (312) 641-0881
Fax: (312) 641-3562

EAST\44711973.1